IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

| | | |
|---|---|---|
| DAVID CROSS, SHAWN DAVIS, | ) | |
| DONALD GOULD, PAUL LONARDO, | ) | |
| JOSEPH VASTA, and GEORGE ZELLNER, | ) | |
| individually and on behalf of all others | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO.: |
| | ) | |
| CITY OF SARASOTA; SARASOTA POLICE | ) | |
| DEPARTMENT; and BERNADETTE DIPINO, | ) | |
| in her official capacity as Chief of Police, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, DAVID CROSS, SHAWN DAVIS, DONALD GOULD, PAUL LONARDO,

JOSEPH VASTA, and GEORGE ZELLNER, (hereinafter "Plaintiffs"), sue the City of Sarasota,

the Sarasota Police Department, and Bernadette DiPino, (hereinafter "Defendants"), and allege

as follows:

**INTRODUCTION**

1.      This case seeks declaratory and injunctive as a result of the City's persistent

efforts to criminalize the status of those who are homeless despite the lack of an available shelter

and a deepening housing crisis. The Plaintiffs contend that the City's use of ordinances that

criminalize sleeping violates the Eighth Amendment prohibition on cruel and unusual

punishment. Separately, the City's ordinance criminalizing panhandling is facially

unconstitutional because it contains geographical restrictions that are content-based in violation

of the First Amendment. Plaintiffs seek relief on behalf of themselves and all others similarly

situated.

**Exhibit A-1**

## PARTIES

2.      DAVID CROSS is a homeless man in Sarasota who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2013, Mr. Cross was criminally prosecuted by the City for lodging out of doors, but a judge dismissed the case. In 2015, Mr. Cross was given a trespass warning based on the predicate of lodging out of doors. After Mr. Cross appealed the trespass warning, the City vacated the warning. Mr. Cross is in need of shelter and lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

3.      SHAWN DAVIS is a homeless man in Sarasota who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2013, Mr. Davis was criminally prosecuted by the City for lodging out of doors. In 2015, Mr. Davis was given a trespass warning based on the predicate of lodging out of doors. After Mr. Davis appealed the trespass warning, the City vacated the warning. Mr. Davis is in need of shelter and lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

4.      DONALD GOULD, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Gould meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Gould will be in need of shelter. Absent an available shelter, Mr. Gould reasonably fears that he will be subject to

arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

5.    PAUL LONARDO, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Lonardo meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Lonardo will be in need of shelter. Absent an available shelter, Mr. Lonardo reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

6.    JOSEPH VASTA, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Vasta meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Vasta will be in need of shelter. Absent an available shelter, Mr. Vasta reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

7.    GEORGE ZELLNER is a homeless man in Sarasota who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2015, Mr. Zellner was given a trespass warning based on the predicate of lodging out of doors. After Mr. Zellner appealed the trespass warning, the City vacated the warning. Mr. Zellner is in need of shelter and

lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

8.      Defendant, City of Sarasota, Florida, (City) is a municipal corporation, organized under the laws of the State of Florida, with the capacity to sue and be sued. The City is the legal and political governmental entity responsible for the actions of the Sarasota Police Department, its officials, agents, and employees. The City is sued in its own right and on the basis of the acts or omissions of its officials, agents, and employees who were following the City's Ordinances and policies.

9.      Defendant, Bernadette DiPino, is the Chief of Police of the Sarasota Police Department (Chief DiPino) and has the responsibility for enforcement of municipal ordinances. She is sued in her official capacity.

## JURISDICTION AND VENUE

10.      This Court has concurrent jurisdiction over claims brought under 42 U.S.C. §§ 1983 and 1988. See *Page v. Valentine,* 552 So.2d 212, 213 (Fla. 4th DCA 1989) *approved sub nom. Town of Lake Clarke Shores v. Page,* 569 So.2d 1256 (Fla. 1990).

11.      Venue is appropriate in Sarasota County, Florida. Plaintiffs reside here and the acts and omissions complained of occurred in Sarasota County, Florida.

## GENERAL ALLEGATIONS

**The HUD framework**

12.      Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act), on May 29, 2009. The HEARTH Act consolidated homeless assistance programs administered by the U.S. Department of Housing and Urban Development (HUD) into a single program and codified into law the Continuum of Care (*CoC*)

planning process. The HEARTH Act directed HUD to promulgate regulations for these new programs and processes.

13.     HUD subsequently promulgated rules which imposed regulatory requirements towards its ongoing efforts to bring technological advancements to homeless service providers' approach to record-keeping. A unified system of data collection ensured a collaborative effort among communities and offered a better understanding of these efforts to HUD. These improvements were aimed at exploring issues faced by communities and their homeless. Additionally, more precise data about this vulnerable population served to streamline missions as well as aid HUD and other agencies in targeted funding.

14.     HUD had previously introduced a program that would transition agencies that serve the homeless from paper to electronic data-collecting program called Homeless Management Information Systems (*HMIS*). Congress directed HUD to work with communities, bringing services agencies together for the purpose of evaluating the dispersion of state and federal grants.

15.     HUD and other planners and policymakers use aggregate *HMIS* data to better inform homeless policy and decision making at the federal, state, and local levels. *HMIS* enables HUD to collect national-level data on the extent and nature of homelessness over time. Specifically, *HMIS* can be used to produce an unduplicated count of homeless persons, understand patterns of service use, and measure the effectiveness of programs. Data on homeless persons is collected and maintained at the local level.

16.     Through *HMIS*, the government hoped to implement technology that provided more exact strategies to their funding. Using the information from communities' homeless populations' needs, HUD believed it could make more educated decisions about how to allocate

governmental funding. Such funding is contingent on the use of *HMIS* by supportive agencies. Those agencies are required to determine how they combine their efforts to meet the requirements of the *CoC* for those agencies seeking governmental funding.

17.     The Suncoast Partnership to End Homelessness (*Suncoast Partnership*) is the lead agency in Sarasota County designated by HUD to further the *CoC* agenda and administer the *HMIS*. On an annual basis, and pursuant to HUD requirements, the *Suncoast Partnership*, in collaboration with 28 local agencies, conducts a comprehensive survey for homeless adults referred to as the *Point-In-Time Count Report*. ("the *PIT Survey*"). The *PIT Survey* counts individuals in Sarasota County who are living on the streets, in encampments, the jail, temporary shelters and transitional shelters.

18.     HUD has also established regulations that require state and local grantee governments to support their applications for funding under the Community Planning and Development (*CPD*) formula grant programs under a variety of federal housing programs. These regulations, codified at 24 CFR Part 91, require grantee governmental units to submit what is known as a consolidated plan that serves as the comprehensive housing affordability strategy to receive funding under the *CPD* grant programs. A consolidated plan must describe a jurisdictions' homeless strategy and conduct a homeless needs' assessment. The jurisdiction must set out a three to five-year strategy that establishes priorities, identifies resources available to meet goals and objectives, and establishes a one-year action plan. HUD requires submission of a consolidated plan every five years.

19.     Federal law defines a "homeless individual" to include one who lacks a fixed, regular and adequate night-time residence, or one who resides in a shelter, transitional housing or a place not ordinarily used for sleeping accommodations, such as streets, automobiles,

6

abandoned buildings, parks or other public spaces. Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2000). A homeless individual is also an "individual[] who lack[s] a fixed, regular, and adequate nighttime residence." 24 C.F.R. § 576.2.

20.    Federal regulations define "chronically homeless" as:

(1) An individual who:

(i) Is homeless and lives in a place not meant for human habitation, a safe haven, or in an emergency shelter; and

(ii) Has been homeless and living or residing in a place not meant for human habitation, a safe haven, or in an emergency shelter continuously for at least one year or on at least four separate occasions in the last 3 years, where each homeless occasion was at least 15 days; and

(iii) Can be diagnosed with one or more of the following conditions: substance use disorder, serious mental illness, developmental disability (as defined in section 102 of the Developmental Disabilities Assistance Bill of Rights Act of 2000 (42 U.S.C. 15002)), posttraumatic stress disorder, cognitive impairments resulting from brain injury, or chronic physical illness or disability;

(2) An individual who has been residing in an institutional care facility, including a jail, substance abuse or mental health treatment facility, hospital, or other similar facility, for fewer than 90 days and met all of the criteria in paragraph (1) of this definition, before entering that facility; or

(3) A family with an adult head of household (or if there is no adult in the family, a minor head of household) who meets all of the criteria in paragraph (1) of this definition, including a family whose composition has fluctuated while the head of household has been homeless.

24 C.F.R. § 578.3.

**Sarasota's Consolidated Plan**

21.    In 2011, the City and Sarasota County submitted a joint consolidated plan to HUD covering the five-year period of 2011-2016 (*Consolidated Plan*). See Exhibit 1.[1] The City

---

[1] Many of the findings, goals and strategies documented in the Consolidated Plan were a repeat of the prior joint consolidated plan submitted to HUD for the period covering 2005-2010.

is the lead agency in Sarasota County responsible for administering jointly funded programs covered by the Consolidated Plan.

22.    The *Consolidated Plan* noted that a homeless census conducted in 2009 identified 803 homeless in Sarasota County on any given day. Ex. 1 at 58.

23.    The *Consolidated Plan* stated that in 2010 the *CoC* identified an emergency homeless shelter as a high priority. Ex. 1 at 60.

24.    The *Consolidated Plan* identified a goal of developing a "viable alternative to arrest and incarceration" within the city of Sarasota and Sarasota County "to encourage chronic homeless to choose treatment over incarceration."  Ex. 1 at 64.

25.    The *Consolidated Plan* documented a gap of 884 units of emergency shelter needed within Sarasota County. Ex. 1 at 110.  The *Consolidated Plan* further noted a need for services for 75 chronically homeless individuals, 31 of whom are severely mentally ill.  Ex. 1 at 111. A strategy for addressing these unmet needs was to build and complete a homeless facility shelter in North County by 2015. Ex. 1 at 112.

26.    The *Consolidated Plan* highlighted that there were large pockets of "extreme poverty" in Sarasota County due to 17.2% of the population having between 0-50% of the Area Median Income (AMI). The City in particular, "has a disproportionately high percentage of very-low and low-income households. Within [the City], these populations are proportionately near double the other municipalities and unincorporated areas." Ex. 1 at 33.

27.    In December 2011, the S*uncoast Partnership* also presented a detailed plan called "StepUp Sarasota: A Ten Year Plan to End Homelessness."[2] The StepUp Sarasota Plan called for 5 objectives:

---

[2] The report is available at http://suncoastpartnership.org/wp-content/uploads/2013/08/STEP-UP-

- Streamline countywide systems to develop, fund, implement and monitor programs that address homelessness, poverty, and economic stability

- Meet immediate needs of the homeless

- Develop communitywide intervention programs to identify and stabilize housing for people and families at risk of homelessness

- Use cost-effective ways to provide levels and steps of housing to support people toward permanent housing

- Cultivate economic stability by creating steps toward self-sufficiency, permanent housing and financial stability

**The Marbut Report**

28.    After a series of incidents in 2013 about which the City received national media attention over its treatment of the homeless, the City and Sarasota County hired Dr. Robert G. Marbut, a nationally-recognized expert on homelessness, to assess the situation, provide recommendations and submit a written Strategic Action Plan ("the *Marbut Report*").

29.    In November 2013, the *Marbut Report* was delivered to a joint city-county meeting. See Exhibit 2. The *Marbut Report* made the following key findings:

a.    There are at least 1,460 single homeless adults in Sarasota County;

b.    There is a shortage of at least 1,187 beds/mats for adults, not including families;

c.    21% of the jail population is homeless.

Ex. 2 at 8.

30.    The *Marbut Report* noted that Sarasota County does not have a true emergency shelter for adult men and women. Ex. 2 at 9. The *Marbut Report* made twelve recommendations, including the establishment of a 24/7 *Public Safety Triage and Stabilization Unit* emergency shelter to serve as the main intake portal for adult homeless men and women. Ex. 2 at 3.

Volume-One-12-21-11.pdf (last accessed September 30, 2015).

31.     Significantly, the *Marbut Report* noted that area law enforcement agencies would not be able to enforce several ordinances until such time as an emergency shelter was operational. The *Marbut Report* discouraged criminalizing homelessness through ordinance enforcement. Ex. 2 at 22-23.

32.     On November 25, 2013, both the City and Sarasota County, acting through their respective legislative commissions, unanimously approved the *Marbut Report*.

33.     In a series of meetings in 2014, the legislative body for the City rejected several site selections for a homeless shelter.

34.     In a written report dated June 19, 2015, attached as Exhibit 3, a report card was given assessing each of the twelve recommendations contained in the *Marbut Report*. The report card assessed an "F" for addressing the critical recommendation numbered 4 in the *Marbut Report*, and noted that all empirical and anecdotal evidence indicated that street homelessness within the City was increasing. See Ex. 3 at 10-11.

**Housing crisis**

35.     A housing crisis exists in Sarasota County, particularly for low-income individuals.

36.     As part of the planning process for the 2016 submission to HUD of the *Consolidated Plan*, the City performed a Housing Market Analysis (*HMA*) in Sarasota County in 2015. See Exhibit 4. The *HMA* revealed that there are nearly 18,000 residents who earn less than 30% of the AMI, but only 1,415 housing units affordable to that income group. The *HMA* identified an additional 20,000 residents who earn between 30 and 50% of the AMI, but only 14,149 housing units affordable to that income group. This gap resulted in 20% of all Sarasota residents having to pay more than 50% of their income for housing. The *HMA* stated:

> One stark example of the need is that in January 2015, the Sarasota Housing
> Authority opened their Housing Choice Voucher list for the first time in more
> than 5 years. More than 7,900 residents applied for housing in one week.

*HMA* at 6.

37.    The *HMA* further noted that many individuals within the community that are disabled due to mental illness receive supplemental security income (SSI) in the amount of $733 a month and that a person living on SSI will find it very difficult, if not impossible, to find affordable housing in Sarasota …. [and] that the lack of affordable housing leads to people cycling in and out of homelessness, jails, shelters and hospitals." *HMA* at 18-19.

38.    Another recent study from the Florida Housing Coalition documented a housing crisis in Sarasota County and reported that 25% of households pay more than 30% of their income for housing. 50% of those households pay more than 50% of their income towards housing.

**The *PIT Survey* numbers**

39.    According to the 2015 *PIT Survey*, there are at least 1,365 unsheltered homeless persons in Sarasota County, Florida. The *PIT Survey* documented that 1,106 (more than 75 percent) of these homeless individuals are located within the City of Sarasota, Florida. *PIT Survey* at 17.

40.    903 of these individuals are single adults. *Id* at 18. Nearly 12 percent are veterans and 53 percent suffer from one or more disabilities. *Id*. at 19-20. More than 50 percent of the homeless population in Sarasota County reported that they became homeless as a result of loss of employment or financial reasons while nearly 30 percent were forced into homelessness as a result of housing issues. 372 of the 1,365 unsheltered homeless persons had stayed in an emergency shelter or used motel vouchers the night before the survey while 325 reported they

were in a place not meant for habitation. Another 223 stayed in transitional housing for the homeless. *Id*. at 22.

41.    359 homeless individuals last had a regular place to stay for at least 3 months to 1 year and 364 reported that they last had a regular place to stay for more than 1 year. *Id.* at 23.

42.    Of the shelters located in Sarasota County, there are a total of 436 beds available for unsheltered homeless individuals, leaving a gap of 929. *Id.* at 27.

43.    The 2015 *PIT Survey* established that there is a shortage of at least 1,187 beds for adults, not including homeless families.

44.    According to the 2015 *PIT Survey* the overall homeless rate in Sarasota County went up 17.4% and unsheltered adult street-level homelessness rose from 320 in 2014 to 324 in 2015.

45.    Sarasota County Fire Department's monthly "Response to Homeless Population" report shows that calls for service to individuals experiencing homelessness in the City went up 28.3% between June 2014 and April 2015 compared to the period from July 2013 to May 2014.

**LODGING ORDINANCE**

46.    The City criminalizes lodging out of doors via Section 34-41 of the City Code (Lodging Ordinance). See Exhibit 5, attached hereto. In relevant part, the Lodging Ordinance makes it unlawful to use any public or private property for lodging out of doors without the permission and consent of the property owner. Subsection (c) provides that the following conduct may constitute lodging out of doors:

> Being in a tent, hut, lean-to, shack or in a temporary shelter or being asleep atop or covered by materials in a public place or private place out-of-doors without the permission and consent of the property owner may be evidence of a violation but is not alone sufficient to constitute a violation of this section. One or more of the following must also exist before a law enforcement officer can find probable cause to issue a summons or to make an arrest:

(1) Numerous items of personal belongings are present;
(2) The person is engaged in cooking activities;
(3) The person has built or is maintaining a fire;
(4) The person has engaged in digging or earth breaking activities;
(5) The person is asleep and when awakened states that he or she has no
     other place to live.

47.    Subsection (d) states that when an officer has probable cause to believe a violation has occurred, the individual must be afforded an opportunity to be transported to an available shelter, that any personal property which is not taken to a shelter will be inventoried and stored for 60 days, and that if a person elects to be transported to an available shelter they will not be charged with a violation.

**The Salvation Army**

48.    As noted in the *Marbut Report*, there is no 24/7 publicly available shelter within Sarasota County for the chronically homeless.

49.    The one facility that purports to have an emergency shelter program is at the Salvation Army, located near downtown Sarasota.

50.    Under the terms of a Conditional Use Permit issued by the City, the Salvation Army is not permitted by zoning to have more than 262 beds.

51.    Under current zoning regulations governing mass shelters, the Salvation Army is required to have a minimum of 35 square feet of space for each of the 262 beds at the facility.

52.    The Salvation Army is not legally required to accept any individuals transported to its facility and numerous individuals have been trespassed from the facility.

53.    The Salvation Army has a policy that charges an individual in need of shelter a daily fee.

54.     Since approximately 2007, the Salvation Army has designated 98 mats to be placed on the floor in the facility's kitchen and in hallways each evening for the purpose of taking individuals off the street and, for a fee, providing them with a temporary shelter ("the overflow mats").

55.     The Salvation Army receives grants from HUD under the Emergency Solutions Grant program set forth in 24 C.F.R. § 576. The minimum standards for emergency shelters operating under the ESG program require that "the shelter must provide each program participant in the shelter with an acceptable place to sleep and adequate space and security for themselves and their belongings." 24 C.F.R. § 576.403(b)(3).

56.     The Salvation Army does not provide those individuals on the overflow mats with an acceptable place to sleep and adequate space and security for themselves and their belongings.

57.     The overcrowded conditions of the kitchen floor area where the overflow mats are located do not provide individuals with an acceptable place to sleep and adequate space and security for themselves and their belongings.

58.     The number of individuals placed on overflow mats exceeds the Conditional Use Permit imposed by the City.

59.     The kitchen floor and hallway areas where the overflow mats are located do not provide for adequate emergency ingress and egress.

60.     Individuals placed on the overflow mats do not have the minimum 35 square feet of space required by the City's current zoning regulations for mass shelters.

61.     Individuals placed on the overflow mats are not provided space to store their belongings.

62.     Individuals placed on the overflow mats are not provided with any sheets for bedding.

63.     Individuals placed on the overflow mats are required to exit the facility no later than 4:30 a.m. each day and may not return until 5:00 p.m.

64.     The Salvation Army does not have sufficient beds to meet the needs of the 1,365 homeless individuals documented in the *PIT Survey*.

65.     Those individuals who are unable to obtain a bed or floor mat in the shelter have no choice but to sleep in the public places of Sarasota.

66.     The capacity of the overflow mats at the Salvation Army is routinely exceeded on any given night. Attached hereto as Exhibit 6 is the daily census data for the period beginning January 1, 2014, through September 23, 2015, of homeless individuals who seek shelter at the Salvation Army.

67.     For the period between January 1, 2015, and September 23, 2015, the Salvation Army was at or above capacity 235 out of 266 nights (88%) for the overflow mats.

68.     For the period between January 1, 2015, and September 23, 2015, the Salvation Army operated on average at 116.7% above the capacity for the overflow mats.

69.     For the period between July 1, 2015, and September 23, 2015, the Salvation Army operated on average at 128% above the capacity for the overflow mats.

70.     Based on information and belief, the Sarasota County Fire Marshal recently conducted an inspection of the Salvation Army and found the facility to be in noncompliance with the maximum occupancy load.

71.     Without accounting for those individuals who are excluded from accessing the Salvation Army based on policies, such as limitations on the length of stay, fees charged for

emergency shelter, religious participation requirements, and those trespassed from the facility, the Salvation Army is not an available shelter.

**Criminal Prosecutions**

72.     The City has arrested and criminally prosecuted 882 individuals for sleeping via the use of the lodging ordinance or being in a park after hours.

73.     In 2013, the City criminally prosecuted 354 individuals for lodging out of doors and 127 individuals for being in a park after hours.

74.     In 2014, the City criminally prosecuted 192 individuals for lodging out of doors and 107 individuals for being in a park after hours. 139 of those criminal prosecutions were for conduct that occurred when the Salvation Army was at or above the 98 designated overflow mats.

75.     As of September 23, 2015, the City had criminally prosecuted 62 individuals for lodging out of doors and 40 for being in a park after hours. 59 of those criminal prosecutions were for conduct that occurred when the Salvation Army was at or above the 98 designated overflow mats.

76.     The individuals prosecuted for lodging out of doors are homeless with no shelter available to them.

77.     The overwhelming majority of individuals prosecuted for being in a park after hours are homeless with no shelter available to them.

78.     On November 7, 2014, Christopher Nelson, a homeless man who had been arrested and criminally prosecuted by the City six times for lodging out of doors or sleeping in a public park, was found incapacitated by emergency first responders as a result of thousands of yellow jacket wasps covering every inch of his skin. Mr. Nelson had fallen into a yellow jacket

colony while seeking shelter. Mr. Nelson died from anaphylactic shock as a result of multiple stings.

**Other Police Conduct**

79.     The City, through its exercise of police power, routinely engages in conduct that harasses homeless individuals and prevents them from sleeping.

80.     Despite knowing that there is no available shelter within Sarasota County, the City regularly gives homeless individuals sleeping in public spaces a warning that if they are discovered or seen sleeping in public places again that they will be cited for trespass, lodging out of doors, being in a public park after hours, or other criminal offenses.

81.     The City routinely awakens homeless individuals sleeping and demands identification from them for the purpose of running warrant checks.

82.     The City conducts what it describes as "field interviews" of homeless individuals at all times of the day, but mostly during the late evening or early morning hours, which includes the detention of the individual and their identification for the purpose of running a check for active warrants.

83.     Even when an individual is found not to have any active warrants, the City instructs homeless individuals that they cannot sleep in public spaces, telling them that they must roll their bedding up and move on to another location out of sight.

84.     The City criminally prosecutes homeless individuals even though the Salvation Army is closed and the officer is unable to offer or transport an individual to an available shelter.

85.     Despite knowing that there is not available shelter, the City routinely issues trespass warnings to homeless individuals on the basis that they are lodging out of doors or sleeping in a public park after hours.

17

86.     Because of the lack of shelter space and the inability to obtain permanent housing, a large number of individuals who are homeless in Sarasota will remain so for the foreseeable future.

**David Cross**

87.     Mr. Cross is homeless and his passion is reading.  He lacks a fixed, regular, and adequate nighttime residence and his primary nighttime residence is a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

88.     Mr. Cross can be found inside the Selby Library in downtown Sarasota for much of the time it is open.

89.     At approximately 4 a.m. on August 18, 2015, Mr. Cross was sleeping in the bushes outside of the Selby Library. Mr. Cross had previously been instructed by officers that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

90.     The Selby Library is designated by the County as a "safe place" with signs indicating such. Mr. Cross chose this location to rest because it is well-lit and has multiple video cameras on the premises.

91.     After being awakened, Mr. Cross was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass warning operated as an injunction against Mr. Cross from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

92.     Mr. Cross appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Cross was unable to visit the Selby Library in the interim for fear that he would be arrested.

93.     Mr. Cross does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

94.     Mr. Cross cannot afford to pay the fee that the Salvation Army charges for shelter each night.

**SHAWN DAVIS**

95.     Mr. Davis is homeless. He lacks a fixed, regular, and adequate nighttime residence and his primary nighttime residence is a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

96.     At approximately 4 a.m. on August 18, 2015, Mr. Davis was sleeping in the bushes outside of the Selby Library. Mr. Davis had previously been instructed that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

97.     After being awakened, Mr. Davis was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass warning operated as an injunction against Mr. Davis from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

98.    Mr. Davis appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Davis was unable to visit the Selby Library in the interim for fear that he would be arrested.

99.    Mr. Davis does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

100.    Mr. Davis cannot afford to pay the fee that the Salvation Army charges for shelter each night.

**DONALD GOULD**

101.    Mr. Gould has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

102.    At the time of those criminal prosecutions Mr. Gould had no access to an available shelter.

103.    Mr. Gould has made substantial progress and does not currently reside on the streets. Mr. Gould, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Gould still meets the definition of being homeless under 24 C.F.R. § 91.5.

104.    Mr. Gould reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance

**PAUL LONARDO**

105.    Mr. Lonardo has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

106.    At the time of those criminal prosecutions Mr. Lonardo had no access to an available shelter.

107.    Mr. Lonardo has made substantial progress and does not currently reside on the streets. Mr. Lonardo, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Lonardo still meets the definition of being homeless under 24 C.F.R. § 91.5.

108.    Mr. Lonardo reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance

**JOSEPH VASTA**

109.    Mr. Vasta has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

110.    At the time of those criminal prosecutions Mr. Vasta had no access to an available shelter.

111.    Mr. Vasta has made substantial progress and does not currently reside on the streets. Mr. Vasta, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living

accommodations. As such, Mr. Vasta still meets the definition of being homeless under 24 C.F.R. § 91.5.

112.     Mr. Vasta reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance

**GEORGE ZELLNER**

113.     At approximately 4 a.m. on August 18, 2015, Mr. Zellner was sleeping in the bushes outside of the Selby Library. Mr. Zellner had previously been instructed that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

114.     After being awakened, Mr. Zellner was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass warning operated as an injunction against Mr. Zellner from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

115.     Mr. Zellner appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Davis was unable to visit the Selby Library in the interim for fear that he would be arrested.

116.     Mr. Zellner does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

117.     Mr. Zellner cannot afford to pay the fee that the Salvation Army charges for shelter each night.

## COUNT I

### Violation of Prohibition Against Cruel and Unusual
### Punishment (Eighth Amendment; Declaratory Judgment)

118.     Plaintiffs DAVID CROSS, SHAWN DAVIS and GEORGE ZELLNER hereby incorporate paragraphs 1-3, 7-100, and 113-117 as if fully set forth herein.

119.     This Count is filed pursuant to 42 U.S.C. § 1983 against the City and Chief DiPino in her official capacity seeking declaratory relief and damages.

120.     Poverty, unemployment, untreated mental and physical illness, drug and alcohol dependence, and the absence of an available shelter often forces Plaintiffs and other homeless individuals to sleep in public places in Sarasota.

121.     Criminalizing the sleeping in a public space when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

122.     Plaintiffs are homeless and have no way to comply with the Lodging Ordinance because they must sleep outdoors and do not have access to an available shelter.

123.     Defendants have cited, arrested, or threatened Plaintiffs for sitting, lying, or sleeping in public places in Sarasota.

124.     Defendants are punishing Plaintiffs and other homeless individuals based on their status as homeless persons.

125.     Defendants' actions penalize Plaintiffs for sleeping, a basic and necessary life-sustaining function.

131.     Defendants have a policy and custom of enforcing the statute broadly; the statute's prohibition on camping amounts to a ban on sleeping, lying down, or sitting—basic necessities in life. The statute particularly targets persons who are homeless because they have to

carry and possess their personal belongings at all times in violation of the statute and do not have the ability to store them due to their homeless status.

132.    The Sarasota Police Department does not monitor whether the shelters actually report their status or encourage them to do so. Police officers do not monitor the Salvation Army to confirm whether or not the shelters are actually full on a given night. There have been times that the shelter has been full but that information was not provided to or obtained by the Sarasota Police Department.

133.    The Sarasota Police Department does not determine whether a particular person with specific disabilities can be accommodated at the Salvation Army or whether any particular person is permitted to stay at any shelter because of a prior trespass warning.

134.    On information and belief, the City, through the Sarasota Police Department, Chief of Police, and police officers, aggressively enforces the Lodging Ordinance against homeless individuals in Sarasota in order to force these individuals to make the untenable choice between criminal convictions and leaving the City.

126.    On information and belief, the enforcement of these ordinances is part of a policy promoted by the City and the Sarasota Police Department to "solve" the homelessness problem in Sarasota through the criminalization of being homeless.

127.    Defendants' actions in criminalizing Plaintiffs for sleeping in public when there is no available shelter constitutes cruel and unusual punishment in violation of Plaintiff's' rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

128.    Because the challenged ordinance violates the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution

when there is no available shelter, Plaintiffs are entitled to a declaratory judgment that the Lodging Ordinance is unconstitutional as applied.

129.    Plaintiffs have suffered damages as a result of the City's actions in enforcing the lodging out of doors ordinance as a predicate for the issuance of trespass warnings, including, but not limited to, restricting their freedom, right of association, right to travel, and right to access public facilities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A. A declaration that enforcement of the Lodging Ordinance violates the Eighth Amendment when there is no available shelter;

B. Compensatory damages;

C. Attorneys' fees and costs;

D. Such other relief the Court deems appropriate.

## COUNT II

### (Injunctive Relief)

135.    Plaintiffs, DAVID CROSS, SHAWN DAVIS, DONALD GOULD, PAUL LONARDO, JOSEPH VASTA, and GEORGE ZELLNER, restate paragraphs 1 through 117 as if fully set forth herein.

136.    This Count is brought pursuant to 42 U.S.C. § 1983 against the City and Chief DiPino in her official capacity.

137.    Plaintiffs reasonably fear and are at substantial risk of being criminally prosecuted by the Defendants for violation of the Lodging Ordinance despite the absence of an available shelter.

138.    Enforcement of the Lodging Ordinance when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

139.    Criminalizing the sleeping in a public space when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

140.    The Salvation Army is not an "available shelter" within the meaning of the ordinance. Homeless individuals not involved in programmatic activity at the Salvation Army are given a mat to sleep on the floor of the kitchen and, most of the time, must pay a fee of approximately $10 to do so. Such individuals are required to leave the facility at 4:30 a.m.

141.    Defendants have a policy and custom of enforcing the statute broadly; the statute's prohibition on camping amounts to a ban on sleeping, lying down, or sitting—basic necessities in life. The statute particularly targets persons who are homeless because they have to carry and possess their personal belongings at all times in violation of the statute and do not have the ability to store them due to their homeless status.

142.    The Sarasota Police Department does not monitor whether the shelters actually report their status or encourage them to do so. Police officers do not monitor the Salvation Army to confirm whether or not the shelters are actually full on a given night. There have been times that the shelter has been full but that information was not provided to or obtained by the Sarasota Police Department.

143.    The Sarasota Police Department does not determine whether a particular person with specific disabilities can be accommodated at the Salvation Army or whether any particular person is permitted to stay at any shelter because of a prior trespass warning.

144.    On information and belief, the City, through the Sarasota Police Department, Chief of Police, and police officers, aggressively enforces the Lodging Ordinance against

26

homeless individuals in Sarasota in order to force these individuals to make the untenable choice between criminal convictions and leaving the City.

145.    On information and belief, the enforcement of these ordinances is part of a policy promoted by the City and the Sarasota Police Department to "solve" the homelessness problem in Sarasota through the criminalization of being homeless.

146.    Repeat citations or convictions under the Lodging Ordinance or sleeping in public can have a detrimental effect on an individual's health and his or her ability to find and continue employment, procure and maintain housing, and receive government assistance or benefits.

147.    Defendants' actions pose a health risk to the homeless population of Sarasota because the constant need to keep moving to avoid citations under these ordinances prevents these individuals from sleeping. Sleep is a physical and mental necessity for people to properly function. Lack of sleep causes disruptions in cognitive function and exacerbates a myriad of physical and mental health problems.

148.    Homeless individuals like Plaintiffs typically cannot afford to pay the fines associated with violations of the Lodging Ordinance. These individuals often do not have a permanent address or telephone, which makes it difficult for them to receive communications from the court. They also often lack reliable transportation. If they fail to appear in court, the court will issue a warrant for their arrest, which will result in additional time in jail and fines for failing to appear. If these fines are not paid, the homeless individual may be subject to a civil contempt order, which only worsens the situation. Incarceration is also disruptive and expensive. Periods of incarceration interrupt employment and social security disability benefits.  Moreover, a homeless individual can be charged the costs for his or her incarceration.

149.    Homeless individuals must disclose criminal convictions, even for minor infractions, on applications for public and private housing. These convictions become a matter of public record. As a result, the convictions may cause them to lose the opportunity to obtain permanent public and private housing. Additionally, an individual may lose a housing placement if he or she is incarcerated. Conviction and incarceration for camping or sleeping can also interfere with the ability to obtain and maintain Social Security disability benefits. Recipients may not receive benefits for any period in which they are incarcerated. In addition, those applying for benefits may miss crucial hearings or deadlines while incarcerated, delaying their receipt of much needed income and the ability to access medical care with Medicaid eligibility.

150.    Likewise, individuals must disclose criminal convictions when they apply for employment, and even minor infractions may make a potential employer less likely to hire an applicant. Missing work due to required court appearances or because of periods of incarceration may lead to the loss of employment and income.

151.    Defendants' policy, custom and practice of issuing citations to, arresting, and harassing homeless individuals like Plaintiffs under the Lodging Ordinance and other ordinances, under the circumstances alleged herein, and when there is no publicly available shelter, has the effect of "criminalizing" homelessness. These measures do not accomplish any significant or legitimate public policy goal. Instead, they perpetuate the cycle of homelessness by decreasing opportunities for homeless individuals to find housing and gainful employment and take care of their health needs.

152.    "[T]he criminalization of homelessness does nothing to address the underlying causes of homelessness and often serves to exacerbate them. . . . It serves only to move people away from services and causes them to acquire a criminal record, thus making it even more

difficult for them to obtain employment and housing." *Ombudsman's Report* at 5 (summarizing problems described in The National Coalition for the Homeless and The National Law Center on Homelessness & Poverty, *A Dream Denied: The Criminalization of Homelessness in U.S. Cities* (2006)).

153.    The U.S. Interagency Council on Homelessness states, "[c]riminalization undermines real solutions."  Moreover, "[i]n addition to violating domestic law, criminalization measures may also violate international human rights law, specifically the Convention Against Torture and International Covenant on Civil and Political Rights." U.S. Interagency Council on Homelessness, *Searching Out Solutions: Constructive Alternatives to the Criminalization of Homelessness* 7, 8 (2012).

154.    At all relevant times, Defendants and their agents acted under color of state law and within the scope of their employment.

155.    The City, through its Police Department, and the Chief of Police maintain a policy, custom and practice of unlawfully enforcing § Sec. 34-41, against homeless individuals despite their knowledge that there is no publicly available shelter.

156.    Plaintiffs have each received citations and/or convictions, or threats of citations, for violations of the Lodging Ordinance or for sleeping or lying down in public.

157.    On information and belief, with knowledge that Plaintiffs were homeless and had no lawful place to sleep or rest within the City of Sarasota because of a chronic shortage of shelter beds, Sarasota police officers have issued citations, arrested, and/or threatened Plaintiffs in an effort to drive them and other homeless individuals out of the City of Sarasota. As a result, Plaintiffs often had to move constantly all night long, or sleep outside of the city limits to avoid further harassment from police officers.

158.    In addition, the City, its Police Department, and Chief DiPino, failed to exercise the proper supervision over Sarasota police officers' interactions with homeless individuals and failed to train these officers in how to appropriately and lawfully enforce the Lodging Ordinance. This policy of inadequate training and supervision constitutes deliberate indifference on the part of Defendants towards the rights of homeless individuals with whom the police come into contact.

159.    Defendants' policies and practices of enforcing the Lodging Ordinance in the absence of an available shelter have caused and will continue to cause Plaintiffs to suffer irreparable injury. Unless enjoined Plaintiffs will continue to suffer sleep deprivation, humiliation and psychological and physical harm from the threat of criminal prosecution for engaging in the life-sustaining activity of sleeping.

160.    Plaintiffs seek a temporary restraining order and/or preliminary and permanent injunction, enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing the Lodging Ordinance with respect to persons sleeping or lying down in public when there is no publicly available shelter.

161.    Plaintiffs have demonstrated a substantial likelihood of success because the data shows that the City has enforced and continues to enforce the Lodging Ordinance despite the absence of an available shelter in violation of the express language of the Lodging Ordinance.

162.    The granting of the requested injunction serves a public interest because it is contrary to the public's interest to impose cruel and unusual punishment upon homeless persons who engage in the life-sustaining activity of sleeping when there is no available shelter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A. A declaration that enforcement of the Lodging Ordinance violates the Eighth Amendment when there is no available shelter;

B.  Compensatory damages;

C. Attorneys' fees and costs;

D. Such other relief the Court deems appropriate.

## COUNT III

### (Facial challenge to Panhandling Ordinance)

158.    Plaintiff, DAVID CROSS, repeats paragraphs 8 through 11 as if fully set forth herein.

159.    This count seeks declaratory relief and compensatory damages under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendment of the United States Constitution.

160.    Section 23-6 of the City Code defines "panhandling" as "any solicitation made in person upon any street, public place, park or beach in the city, in which a person requests an immediate donation or money or other gratuity from another person, and includes but is not limited to seeking donations: (1) [b]y vocal appeal or for music, singing, or other street performance; and, (2) [w]here the person solicited receives an item of little or no monetary value in exchange for a donation, under circumstances where a reasonable person would understand that the transaction is in substance a donation." See § 23-6(a), City Code (Panhandling Ordinance), attached hereto as Exhibit 7.

161.    Section 23-7 of the Panhandling Ordinance makes it unlawful to engage in the act of panhandling at specified locations within the City. Specifically subsection (a) makes it unlawful:

to engage in an act of panhandling when either the panhandler or the person being solicited is located at any of the following locations: at a bus stop; in any public

31

transportation vehicle or public transportation facility; in a sidewalk cafe; on private property, unless the panhandler has permission from the owner or occupant; in a parking lot or garage owned or operated by the city, including entryways or exits and pay stations connected therewith; in a public park, beach, fairground, or sporting facility, including entryways or exits thereto; or within twenty (20) feet in any direction from an automatic teller machine, parking meter, parking pay station or entrance to a bank.

§ 23-7(a), Panhandling Ordinance.

162.     The solicitation of charitable contributions in a public forum constitutes speech protected under the First Amendment.

163.     The Panhandling Ordinance broadly covers solicitation by any means, including holding a sign or standing with hands outstretched. At the same time, it is tailored to limit soliciting an ***immediate*** donation or transaction, and therefore does not cover soliciting a future payment or a signature on a petition.

164.     The restrictions contained within § 23-7(a) of the Panhandling Ordinance are not content neutral because they restrict speech that solicits an immediate donation or transaction, but not one that solicits a future donation or transaction.

165.     The restrictions contained within § 23-7(a) of the Panhandling Ordinance are also not content neutral because they restrict a category of speech by geographical limitations, but do not restrict other speech, including commercial speech entitled to less constitutional protection, within those same geographical limitations.

166.     Even if the restrictions contained within § 23-7(a) of the Panhandling Ordinance are content neutral, they are content-based regulations because they draw distinctions based on the message a particular speaker conveys within the geographical limitations set forth therein.

167.     Even if the restrictions contained within § 23-7(a) of the Panhandling Ordinance are content neutral, they are content-based regulations because they restrict speech based on the

City's disagreement with the message panhandling conveys within the geographical limitations set forth therein.

168.     Since 2013, the City has regularly prosecuted and arrested individuals for violation of § 23-7.

169.     Just recently, the City prosecuted an individual for violation of § 23-7 and extradited them from another jurisdiction when they failed to appear for a court date. The failure to appear and contempt was dismissed, but the defendant was sentenced to ten (10) days in jail.

170.     Mr. Cross desires to exercise his right to engage in speech within the City, including in certain geographical areas such as (1) at a bus stop; (2) in any public transportation vehicle or public transportation facility; (3) in a sidewalk cafe; (3) on private property; (4) in a parking lot or garage owned or operated by the City, including entryways or exits and pay stations connected therewith; (5) in a public park, beach, fairground, or sporting facility, including entryways or exits thereto; and (6) within twenty (20) feet in any direction from an automatic teller machine, parking meter, parking pay station or entrance to a bank.

171.     But for the reasonable fear by Mr. Cross that he would be criminally prosecuted for violation of § 23-7, he would exercise his First Amendment right to engage in soliciting charitable contributions within the geographical areas prohibited under the Panhandling Ordinance.

172.     Other individuals are regularly allowed to engage in free speech within the geographical areas prohibited under the Panhandling Ordinance, including individuals seeking future contributions, entities and individuals soliciting commercial business, individuals soliciting political support, voter registration, and petition-signature gathering.

173.    The restrictions contained in § 23-7 of the Panhandling Ordinance are facially unconstitutional and are not narrowly tailored to serve any compelling governmental interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A.  A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is not content neutral;

B.  A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is a content-based regulation that draws distinctions based on the message a particular speaker conveys within the geographical limitations set forth therein;

C.  A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is a content-based regulation that restricts speech based on the City's disagreement with the message panhandling conveys within the geographical limitations set forth therein;

D.  A declaration that the Panhandling Ordinance violates the First Amendment as applied to Mr. Cross because it restricts speech based on Mr. Cross' status as a homeless person.

E.  Compensatory damages;

F.  Attorneys' fees and costs; and

G.  Such other relief the Court deems appropriate.

Respectfully submitted,

/s/ Andrea Flynn Mogensen
ANDREA FLYNN MOGENSEN
Florida Bar No. 0549681
Cooperating Attorney for the American Civil
  Liberties Union Foundation of Florida, Inc.
  Sarasota Chapter
The Law Office of Andrea Flynn Mogensen, P.A.
200 South Washington Boulevard, Suite 7
Sarasota FL 34236
Tel: 941.955.1066
Fax: 941.866.7323
amogensen@sunshinelitigation.com


/s/ Tracy Pratt
Tracy Pratt, Florida Bar No. 113074
Cooperating Attorney for the American Civil
  Liberties Union Foundation of Florida, Inc.
  Sarasota Chapter
5726 Cortez Rd. W. #221
Bradenton, FL 34210-2701
(941) 920-8815
tracy@tracyprattlaw.com


/s/ Nancy Abudu
Nancy Abudu, Florida Bar No. 111881
Legal Director
ACLU Foundation of Florida, Inc.
4500 Biscayne Boulevard – Suite 340
Miami, FL 33137-3227
Telephone:  786-363-2700
Facsimile:  786-363-1108
nabudu@aclufl.org


/s/ Adam Tebrugge
Adam Tebrugge, Florida Bar No. 473650
Staff Attorney
ACLU Foundation of Florida, Inc.
P.O. Box 21142
Tampa, FL 33622-1142
(813) 288-8390
atebrugge@aclufl.org

# Sarasota Consortium

## 2011 - 2016

## CONSOLIDATED PLAN

**SARASOTA OFFICE OF HOUSING AND COMMUNITY DEVELOPMENT**

**111 South Orange Avenue**
**P.O. Box 1058**
**Sarasota, FL 34230**

**Donald D. Hadsell, Director**

**PHONE (941) 951-3640**
**FAX (941) 951-3649**
**TDD (941) 954-4133**

**WORLD WIDE WEB:**
**ohcd.sarasotagov.com**

*<u>Sarasota Consolidated Plan for the Period of October 1, 2011 - September 30, 2016</u>*



**EQUAL HOUSING
OPPORTUNITY**

# SARASOTA 2011 – 2016 CONSOLIDATED PLAN

*Sarasota County Commissioners*
**Nora Patterson, Chair**
**Carolyn Mason, Vice Chair**
**Joe Barbetta, District 2**
**Christine Robinson, District 3**
**Jon Thaxton, District 5**

*City of Sarasota Commissioners*
**Suzanne Atwell, Mayor**
**Terry Turner, Vice Mayor**
**Paul  Caragiulo, District Two**
**Willie Shaw, District One**
**Shannon Snyder, District Three**

*Interim County Administrator*
**Terry Lewis**

*City Manager*
**Robert J. Bartolotta**

| APPLICATION FOR FEDERAL ASSISTANCE | OMB Approved No. 3076-0006 | | Version 7/03 |
|---|---|---|---|

| **2. DATE SUBMITTED**<br>8/16/2011 | | **Applicant Identifier**<br>FL 122766 |
|---|---|---|
| **3. DATE RECEIVED BY STATE** | | State Application Identifier |
| **4. DATE RECEIVED BY FEDERAL AGENCY** | | Federal Identifier |

**1. TYPE OF SUBMISSION:**

| Application | Pre-application |
|---|---|
| ☐ Construction | ☐ Construction |
| ☒ Non-Construction | ☐ Non-Construction |

**5. APPLICANT INFORMATION**

| Legal Name:<br>City of Sarasota | **Organizational Unit:** |
|---|---|
| | Department:<br>Neighborhood and Development Services |
| Organizational DUNS:<br>07-322-5724 | Division:<br>Office of Housing and Community Development |
| **Address:**<br>Street:<br>1565 First Street | **Name and telephone number of person to be contacted on matters involving this application (give area code)** |
| City:<br>Sarasota | Prefix:<br>Mr. |First Name:<br>Donald |
| County:<br>Sarasota | Middle Name |
| State:<br>FL | Zip Code<br>34236 | Last Name<br>Hadsell |
| Country:<br>USA | Suffix: |
| | Email:<br>Donald.Hadsell@sarasotagov.gov |

| **6. EMPLOYER IDENTIFICATION NUMBER** *(EIN):*<br>5 9 - 6 0 0 0 4 2 6 | Phone Number (give area code)<br>(941) 951-3640 | Fax Number (give area code)<br>(941) 951-3647 |
|---|---|---|

**8. TYPE OF APPLICATION:**

☒ New   ☐ Continuation   ☐ Revision

If Revision, enter appropriate letter(s) in box(es)
(See back of form for description of letters.)   ☐   ☐

Other (specify)

**7. TYPE OF APPLICANT:** (See back of form for Application Types)

N

Other (specify)
Consortia

**9. NAME OF FEDERAL AGENCY:**
HUD

**10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER:**   1 4 - 2 1 8

TITLE (Name of Program):
Community Development Block Grant

**11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:**

2011-2012 Action Plan

**12. AREAS AFFECTED BY PROJECT** *(Cities, Counties, States, etc.):*

City of Sarasota

**13. PROPOSED PROJECT**

| Start Date:<br>10/1/2011 | Ending Date:<br>9/30/2012 |
|---|---|

**14. CONGRESSIONAL DISTRICTS OF:**

| a. Applicant<br>13 | b. Project<br>13 |
|---|---|

**15. ESTIMATED FUNDING:**

| a. Federal | $ | 505,867 | 00 |
|---|---|---|---|
| b. Applicant | $ | | 00 |
| c. State | $ | | 00 |
| d. Local | $ | | 00 |
| e. Other | $ | | 00 |
| f. Program Income | $ | 20,000 | 00 |
| g. TOTAL | $ | 525,867 | 00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**

a. Yes. ☐ THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON

DATE:

b. No. ☐ PROGRAM IS NOT COVERED BY E. O. 12372

☒ OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**

☐ Yes If "Yes" attach an explanation.   ☒ No

**18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT. THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED.**

a. Authorized Representative

| Prefix | First Name<br>Susan | Middle Name |
|---|---|---|
| Last Name<br>Atwell | | Suffix |
| b. Title<br>Mayor | | c. Telephone Number (give area code)<br>(941) 954-4115 |
| d. Signature of Authorized Representative | | e. Date Signed<br>8-15-11 |

Standard Form 424 (Rev.9-2003)
Prescribed by OMB Circular A-102

| APPLICATION FOR FEDERAL ASSISTANCE | OMB Approved No. 3076-0006 | | Version 7/03 |
|---|---|---|---|

| 1. TYPE OF SUBMISSION: | | 2. DATE SUBMITTED 8/16/2011 | Applicant Identifier FL 122766 |
|---|---|---|---|

| Application | Pre-application | 3. DATE RECEIVED BY STATE | State Application Identifier |
|---|---|---|---|
| ☐ Construction | ☐ Construction | 4. DATE RECEIVED BY FEDERAL AGENCY | Federal Identifier |
| ☑ Non-Construction | ☐ Non-Construction | | |

**5. APPLICANT INFORMATION**

| | |
|---|---|
| Legal Name: City of Sarasota | Organizational Unit: |
| | Department: Neighborhood and Development Services |
| Organizational DUNS: 07-322-5724 | Division: Office of Housing and Community Development |
| **Address:** | **Name and telephone number of person to be contacted on matters involving this application (give area code)** |
| Street: 1565 First Street | Prefix: Mr. / First Name: Donald |
| City: Sarasota | Middle Name |
| County: Sarasota | Last Name Hadsell |
| State: FL / Zip Code 34236 | Suffix: |
| Country: USA | Email: Donald.Hadsell@sarasotagov.com |

| 6. EMPLOYER IDENTIFICATION NUMBER (EIN): | Phone Number (give area code) | Fax Number (give area code) |
|---|---|---|
| 5 9 – 6 0 0 0 4 2 6 | (941) 951-3640 | (941) 951-3647 |

| 8. TYPE OF APPLICATION: | 7. TYPE OF APPLICANT: (See back of form for Application Types) |
|---|---|
| ☑ New   ☐ Continuation   ☐ Revision | N |
| If Revision, enter appropriate letter(s) in box(es) (See back of form for description of letters.) ☐ ☐ | Other (specify) Consortia |
| Other (specify) | 9. NAME OF FEDERAL AGENCY: HUD |

| 10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER: | 11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT: |
|---|---|
| 1 4 – 2 1 8 | 2011-2012 Action Plan |
| TITLE (Name of Program): HOME Investment Partnership Program | |

| 12. AREAS AFFECTED BY PROJECT (Cities, Counties, States, etc.): |
|---|
| Sarasota County, City of Sarasota, City of North Port, City of Venice |

| 13. PROPOSED PROJECT | | 14. CONGRESSIONAL DISTRICTS OF: | |
|---|---|---|---|
| Start Date: 10/1/2011 | Ending Date: 9/30/2012 | a. Applicant 13 | b. Project 13 |

| 15. ESTIMATED FUNDING: | | 16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS? |
|---|---|---|
| a. Federal | $ 885,775 .00 | a. Yes. ☐ THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON |
| b. Applicant | $ .00 | |
| c. State | $ .00 | DATE: |
| d. Local | $ .00 | b. No. ☐ PROGRAM IS NOT COVERED BY E. O. 12372 |
| e. Other | $ .00 | ☑ OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW |
| f. Program Income | $ 150,000 .00 | 17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT? |
| g. TOTAL | $ 1,035,775 .00 | ☐ Yes If "Yes" attach an explanation.   ☑ No |

**18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT. THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED.**

| a. Authorized Representative | | |
|---|---|---|
| Prefix | First Name Susan | Middle Name |
| Last Name Atwell | | Suffix |
| b. Title Mayor | | c. Telephone Number (give area code) (941) 954-4115 |
| d. Signature of Authorized Representative | | e. Date Signed 8-15-11 |

Previous Edition Usable
Authorized for Local Reproduction

Standard Form 424 (Rev.9-2003)
Prescribed by OMB Circular A-102

| APPLICATION FOR FEDERAL ASSISTANCE | OMB Approved No. 3076-0006 | | Version 7/03 |
|---|---|---|---|

**APPLICATION FOR FEDERAL ASSISTANCE**

OMB Approved No. 3076-0006            Version 7/03

| 2. DATE SUBMITTED 8/16/2011 | Applicant Identifier FL 129115 Sarasota |
|---|---|
| **3. DATE RECEIVED BY STATE** | State Application Identifier |
| **4. DATE RECEIVED BY FEDERAL AGENCY** | Federal Identifier |

**1. TYPE OF SUBMISSION:**

| Application | Pre-application |
|---|---|
| ☑ Construction | ☐ Construction |
| ☐ Non-Construction | ☐ Non-Construction |

**5. APPLICANT INFORMATION**

| Legal Name: Sarasota County | **Organizational Unit:** |
|---|---|
| | Department: Planning and Development Services |
| Organizational DUNS: 07-319-2924 | Division: Office of Housing and Community Development |
| **Address:** Street: 1660 Ringling Blvd | **Name and telephone number of person to be contacted on matters involving this application (give area code)** |
| City: Sarasota | Prefix: Mr.  First Name: Donald  Middle Name |
| County: Sarasota | Last Name Hadsell |
| State: Florida   Zip Code 34236 | Suffix: |
| Country: USA | Email: Donald.Hadsell@sarasotagov.com |

**6. EMPLOYER IDENTIFICATION NUMBER** *(EIN):*

5 9 - 6 0 0 0 8 4 8

| Phone Number (give area code) (941) 951-3640 | Fax Number (give area code) (941) 951-3647 |
|---|---|

**8. TYPE OF APPLICATION:**

☑ New    ☐ Continuation    ☐ Revision

If Revision, enter appropriate letter(s) in box(es)
(See back of form for description of letters.)

☐    ☐

Other (specify)

**7. TYPE OF APPLICANT:** (See back of form for Application Types)

Other (specify) Consortia

**9. NAME OF FEDERAL AGENCY:**
HUD

**10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER:**

1 4 - 2 1 8

TITLE (Name of Program): Community Development Block Grant Program

**11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:**

2011-2012 Action Plan

**12. AREAS AFFECTED BY PROJECT** *(Cities, Counties, States, etc.):*

Sarasota County, City of North Port, City of Venice

**13. PROPOSED PROJECT**

| Start Date: 10/01/2011 | Ending Date: 9/30/2012 |
|---|---|

**14. CONGRESSIONAL DISTRICTS OF:**

| a. Applicant 13 | b. Project 13 |
|---|---|

**15. ESTIMATED FUNDING:**

| | | |
|---|---|---|
| a. Federal | $ | 1,347,628 .00 |
| b. Applicant | $ | .00 |
| c. State | $ | .00 |
| d. Local | $ | .00 |
| e. Other | $ | .00 |
| f. Program Income | $ | 500 .00 |
| g. TOTAL | $ | 1,348,128 .00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**

a. Yes. ☐ THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON

DATE:

b. No. ☑ PROGRAM IS NOT COVERED BY E. O. 12372

☑ OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**

☐ Yes If "Yes" attach an explanation.    ☑ No

**18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT. THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED.**

| a. Authorized Representative | | |
|---|---|---|
| Prefix | First Name Nora | Middle Name |
| Last Name Patterson | | Suffix |
| b. Title Sarasota County Commission Chair | | c. Telephone Number (give area code) 941-861-5000 |
| Signature of Authorized Representative | | e. Date Signed 7/28/11 |

Standard Form 424 (Rev.9-2003)
Prescribed by OMB Circular A-102

# TABLE OF CONTENTS

INTRODUCTION …………………………………………………...………...…………...…….. Page 1

EXECUTIVE SUMMARY ……………………………………………………………...….....… Page 3

HOUSING ASSESSMENT …………...……………..……..... ………………………………….. Page 9

HOUSING NEEDS MARKET ANALYSIS………………………………………………………... Page 29

COMMUNITY AND ECONOMIC DEVELOPMENT NEEDS ASSESSMENT……………..……… Page 47

HOMELESS NEEDS ASSESSMENT AND MARKET ANALYSIS…………………..…….……... Page 57

SPECIAL NEEDS ASSESSMENT AND MARKET ANALYSIS..……………...……….……….… Page 71

PUBLIC AND ASSISTED HOUSING NEEDS ASSESSMENT AND MARKET ANALYSIS.......... Page 88

LEAD-BASED PAINT HAZARDS…………………………………………...……………………… Page 97

STRATEGIC PLAN…………………………………………………………………………….…….. Page 99

ACTION PLAN NARRATIVE……...……………………………………………...………………… Page 125

FIVE YEAR FUNDING TABLES…………………………………………………………………..… Page 158

SUMMARY OF SPECIFIC PROJECTS …………………………………………………………… Page 163

SUMMARY OF SPECIFIC ANNUAL OBJECTIVES ……………………………………………… Page 185

CERTIFICATIONS……………………………………………………………...……………...……… Page 192

CITIZEN PARTICIPATION PLAN…………...……………………………………………………..... Page 206

GLOSSARY OF TERMS……………………………………………..…………...…………………….Page 213

ANTI-DISPLACEMENT PLANS …………………………………………………………..…...…...Page 221

HUD-REQUIRED AND OPTIONAL TABLES……………………………………..…….………… Page 225

SUMMARY OF PUBLIC PARTICIPATION…………………………………………...…………… Page 233

PUBLIC COMMENTS ………………………………………………………………………………... Page 238

RESPONSES TO PUBLIC COMMENT ………………………………………………………….….. Page 247

# <u>INTRODUCTION</u>

## Background and Purpose

Title I of the National Affordable Housing Act established the requirement that states and local governments applying for direct assistance under certain U.S. Department of Housing and Urban Development (HUD) programs have a Consolidated Plan approved by HUD.

Federal law requires each local jurisdiction to describe its plan for providing decent housing, a suitable living environment, and expanding economic opportunities principally for low- and moderate-income persons. The jurisdiction must set out a three to five-year strategy that establishes priorities, identifies resources available to meet goals and objectives, and establishes a one-year Action Plan.

## Consolidated Plan Period

The Sarasota Consortium is required to submit a Consolidated Plan to HUD at least once every five years. The Consortium submitted its last Consolidated Plan in August of 2005**.** The Consortium – acting through the Sarasota County Board of County Commissioners and Sarasota City Commission – will submit its five-year plan in August 2011 and will cover fiscal years 2011 through 2016. The one-year Action Plan, certifications, and Performance Reports shall be submitted on an annual basis.

## Function of the Consolidated Plan

The Consolidated Plan is the document submitted to the U.S. Department of Housing and Urban Development (HUD) that serves as the comprehensive assessment of the jurisdictions' needs and identifies resources available to meet those needs. The Consolidated Plan is:

1. A planning document for the Sarasota Consortium which builds on a participatory process at the lowest levels;
2. An application for federal funds under the HUD formula grant programs;
3. A data driven document that details community needs and offers measurable solutions; and
4. An action plan that identifies activities undertaken by the jurisdiction annually to meet its needs and determines their effectiveness.

The Consolidated Plan includes the application requirements for the following programs:

- Community Development Block Grant (CDBG) program (received by the City and County); and
- The HOME Investment Partnerships (HOME) program (received by the Consortium).

It also includes other federal, state, local and private resources that will be used for housing and community development needs.

## Consolidated Plan Strategies

The Housing, Homeless, and the Housing Market Analysis describe the housing needs of extremely low-, low-, and moderate-income families, the homeless, and individuals with special needs, as well as characteristics of Sarasota County's housing market. The Strategic Plan outlines priorities for the five-year planning period. The Action Plan allocates entitlement resources for each individual year. The Sarasota Office of Housing and Community Development prepared this submission in accordance with 24 CFR Section 91 *Consolidated Submission for Community Planning and Development Programs.*

## Lead Agency

The City of Sarasota is the lead agency responsible for overseeing the development of the Consolidated Plan. The Office of Housing and Community Development (OHCD) was created to administer the programs covered by the Consolidated Plan as a result of the consolidation of the City of Sarasota and Sarasota County's housing and community development programs.

## Citizen Participation

The Consolidated Plan also includes a summary of the citizen participation process, including citizen comments, and responses from the Sarasota Office of Housing and Community Development. The Citizen Participation Plan is included in this document.

# EXECUTIVE SUMMARY

## Introduction

The Consolidated Plan is a five-year road map for local jurisdictions that receive Federal funds for housing and community development activities.  The plan is used to identify housing, homeless, community and economic development needs, and to develop a strategic plan for meeting these needs.

The Consolidated Plan identifies the overall vision for Sarasota County and the City of Sarasota and outlines a strategy to address that vision. The Staff Steering Committee (SSC) that led the public outreach efforts and made initial funding recommendations was drawn from staff from all the municipalities that make up the Consortium in order to align the strategies of the Consolidated Plan with public needs and individual municipal goals.

Federal law requires each local jurisdiction receiving Community Development Block Grant and/or HOME Investment Partnership funds to describe its plan for providing decent housing, a suitable living environment, and expanding economic opportunities principally for low- to moderate-income persons.  The jurisdiction must set out a five-year strategy that establishes priorities, identifies resources available to meet goals and objectives and establishes a one-year Action Plan.

The Sarasota Consortium, consisting of Sarasota County and the City of Sarasota, is required to submit a new Consolidated Plan every five years.  This five-year Consolidated Plan will cover fiscal years 2011-12 through 2015-16. The Action Plan, certifications, and performance reports will be submitted annually.

The City of Sarasota is the lead agency responsible for overseeing the development and implementation of the Consolidated Plan.

Sarasota County and the City of Sarasota have formally merged the administration of housing and community development programs through an interlocal agreement that allows for the seamless delivery of services to all Sarasota County residents.

The interlocal agreement between Sarasota County and the City of Sarasota has been successful in delivering housing and community development services for citizens throughout the entire county. Through this agreement, Sarasota County and all its incorporated jurisdictions (the City of Sarasota, City of North Port, City of Venice) work together on housing and community development programs, and allocate resources based on the needs of the entire county and not just based on jurisdiction.  The Town of Longboat Key decided to be counted with Manatee County instead of Sarasota.

The agreement serves the citizens by creating one set of rules for housing and community development programs, rather than several differing and potentially conflicting rules for each jurisdiction. The agreement also ultimately saves money for

the citizens of Sarasota County by reducing administrative costs by administrating all housing and community development programs through one central office.

The Consolidated Plan contains a Citizen Participation Plan, housing data, a homeless and special needs assessment, a public and assisted housing needs assessment, a discussion of strategies, priority needs and objectives for housing and community development activities, a one-year Action Plan, and certifications required by HUD. The Consolidated Plan was developed utilizing demographic data, consultation with public and private agencies, and extensive citizen participation.

## Background and Demographic Profile

Sarasota County is located on Florida's West Coast on the Gulf of Mexico, south of Tampa Bay, and north of Charlotte Harbor. Bordering to the north is Manatee County, to the south is Charlotte County, to the east is DeSoto County, and to the west is the Gulf of Mexico.

The county's incorporated municipalities include the cities of Sarasota, Venice, North Port, and the southern portion of the Town of Longboat Key.

Like much of Southwest Florida, Sarasota County is a popular tourist and retirement destination. It has also become a center for the arts, culture, and business. The area's warm climate and Gulf of Mexico beaches draw visitors as well as part-time and full-time residents from around the country and around the world.

In 1930 Sarasota County's population was just over 12,000. By 1950 it had more than doubled to over 28,000. By 1970 it had grown to over 120,000. During the 1970s and 80s there was tremendous growth, with the population growing to 277,776 residents in 1990. In 2009, there were an estimated 371,320 residents within the entire county.

The City of Sarasota's population was 8,398 in 1930.  By 1950 it had grown to 18,896 and by 1980 to 48,868. With the city essentially built out and developed, the population growth slowed considerably and reached 50,961 by 1990. In 2009, the city had an estimated population of 53,160 and is planning for future population increases as redevelopment continues throughout the downtown area.

## Public Participation Process

From January of 2011 until March of 2011, the Staff Steering Committee (see Citizen Participation Plan and Summary of Public Participation) met on a regular basis to provide a forum for public input on the Consolidated Plan and to provide guidance throughout the whole process of writing the plan.  The SCC took time to understand the needs of the community, the resources available, and weigh the priorities in an effort to maximize results.

The SCC then chose high, medium, and low priorities for the 2011-2016 Consolidated Plan, which are listed below.

| High | Medium | Low |
|---|---|---|
| Public Infrastructure | Increasing Homeownership | Neighborhood Beautification |
| Maintaining the Affordable Single-Family Housing Stock | Special Needs Housing | Increasing the Supply of new Affordable Single-Family Homes |
| Homeless Facilities | Maintaining Existing Rental Units | |
| Public Services | Increasing the Supply of Affordable Rental Units | |
| Economic Development | | |
| Public Housing Revitalization | | |
| Increasing Supply of Rental Subsidies | | |
| Public Facilities | | |

Through this process - along with an analysis of data contained in the Homeless Needs, Special Needs, and Housing Needs and Market Analysis - the following points were highlighted:

- There is a great need for economic development programs and activities;
- Job training is essential to create an improve the economic future of the county;
- There is a large unmet demand for all youth services;
- South Sarasota County requires Homeless Shelters, Prevention, Outreach, and Services to address their growing homeless issues;
- The redevelopment of the Venice Housing Authority is an important community priority;
- There is a continual need for general infrastructure improvements countywide;
- Residents throughout the county need assistance to prevent foreclosures;  and
- Rehabilitation of both homeowner and rental units is essential to improve countywide housing stock.

Staff consulted with assisted housing, health, and social service agencies during focus groups to determine the resources available to address needs of chronically homeless persons.  In addition, the Sarasota County Health Department was consulted regarding lead paint issues and data.  Finally, a copy of the plan was submitted to the State and all municipalities in the Sarasota Consortium.

There were seven official public comments on the draft Consolidated Plan.  Two of the public comments requested additional public service funding for youth/social programs, four letters of support for homeless funding, and one comment from a City of North Port

Commissioner requesting a change in the name of the project for North Port.  A summary of the letters/comments are included in the summary of citizen participation. All public comments requesting funds were addressed.  The County Commission determined that since the project in North Port would be funded in 2012-2013 Action Plan, the final project for North Port could be determined in the submitted Action Plan for 2012-2013.

## Strategies

Sarasota County and the City of Sarasota agreed upon the following strategies to meet the needs of the community and to accomplish the overall goals of providing and sustaining decent housing for low- and moderate-income residents, creating and maintaining a suitable living environment for citizens, and expanding economic opportunities principally for low- and moderate-income persons.  A combination of Federal (CDBG, HOME and HOPWA), state (SHIP), local and private sector resources will be used to implement this five-year plan.

The vast majority of the Consortium's housing and special needs activities will be conducted on a countywide basis. Community development activities will target neighborhood revitalization efforts in the City of Sarasota as identified in the Newtown Redevelopment Plan and in the County by the Neighborhood Initiative Program. Homeless activities will be countywide but also two new homeless facilities are targeted to be built.  One in South County and one in North County outside of the City of Sarasota's jurisdiction. Social services delivery will be enhanced in the City of North Port in South County.

Using the limited resources anticipated to be received, the Consortium agreed to the following strategies for affordable housing, the homeless, special needs, and community development needs. Additional funds either generated or received will go to meet unmet needs appropriate to the source of funding and based on the priorities and strategies outlined in the plan.

The Affordable Housing Strategies are as follows:

## Homeownership

- Rehabilitate 250 owner-occupied units.  This strategy will include general rehabilitation, emergency rehabilitation and barrier removal for both the elderly and the disabled.
- Rehabilitate five homes and resell to low-income homeowners in partnership with a CHDO organization.
- Assist 50 owner-occupied units with purchasing a backflow preventer.  This will ensure that more homeowners meet the health and safety standards mandated by the state of Florida.

## Rental Activities

- Create 300 new affordable rental units for low-income and moderate-income residents.  Elderly/frail elderly units will be encouraged under this strategy;

## The Special Needs Strategies are as follow:

- All existing affordable housing strategies are targeted to help the elderly.  Outreach efforts will encourage the elderly/frail elderly who are low-income to apply for the programs including homeowner rehabilitation and barrier removal;
- The Consortium will support applications for Section 202 funding and/or tax credit programs to create an affordable rental development for the elderly;
- The removal of architectural barriers will continue to be an eligible use of funds in the housing rehabilitation program.  OHCD will target both the elderly and the physically disabled under this program;

## The Homelessness Strategies are as follow:

- Prevent or rehouse 100 families at risk of becoming homeless.  To increase accessibility of homeless individuals to services, the Consortium will give $442,790 dollars to SPEH to be used to assist homeless individuals throughout the community.  By giving these funds to SPEH, it is possible to ensure the best use for them under the COC planning process.
- To build a homeless facility in South Sarasota County to provide emergency shelter and transitional housing.

- To build a North County homeless facility following the completion of the 10 year plan to end homelessness that will provide a one-stop location for many homeless services.  The facility would be partially funded by the City of Sarasota, but not necessarily located in the City of Sarasota."

- To assist the SPEH with hiring staff to implement the 10-Year Plan to End Homelessness.  The community is in the planning process of creating a new 10-Year Plan to end Homelessness.  If the plan is going to be successful, a project manager needs to oversee the long and short term goals of the plan.  The funding provided is meant to help the position initially while matching funds are sought.

## Non-Housing Community Development Strategies are as follows:

## Infrastructure

- Construct infrastructure improvements in 7 low- to moderate-income neighborhoods and/or communities.  The long-term goal of these projects will be

to cut crime rates and code violations while creating a suitable living environment for inhabitants of the neighborhoods.

## Economic Development

- Build a business incubator in the City of North Port to support new business and expanded business opportunity in South County.
- Provide business/job training in the City of Sarasota sponsored business incubator.
- Fund economic development projects that will increase employment opportunities for low-income residents.
- Provide job skills and employment to low-income teenagers in the City of Sarasota.  This eight week program gives children an opportunity to learn employment skills that will help them improve their long-term economic future.

## Social Services
- Continue to employ 3 social service attendants at the North Port Social Service Building.

The strategies will be coordinated and monitored by the Sarasota Office of Housing and Community Development on behalf of the Consortium in cooperation with local governments, non-profits, local lenders, neighborhood organizations, and others involved in housing and community development activities described in the plan.

The Consortium will also pursue the following activities and plans during the next five years:

1. During the Consolidated Plan period, the City of Sarasota and Sarasota County will work with the Sarasota Housing Authority to continue to redevelop the existing public housing developments;
2. The Consortium will work with the Venice Housing Authority to rebuild public housing in South County;
3. The Consortium will implement action strategies identified in the new IA;
4. Throughout 2005-2010, OHCD will work with the Suncoast Partnership to implement their new plan 10 Year Plan to End Homelessness.
5. Lastly, OHCD will organize and sponsor an annual Housing and Community Development Summit in which local governments, public housing authorities, providers of affordable housing, homeless services, special needs housing, private sector homebuilders and developers, and other interested parties can meet, exchange information, and openly discuss housing and community development issues.

# HOUSING ASSESSMENT

## Introduction

In accordance with 24 CFR Section 91, the Sarasota Office of Housing and Community Development has prepared a housing assessment for Sarasota County including the unincorporated County and the cities of Sarasota, Venice, and North Port.

This chapter of the Consolidated Plan describes the significant demographics of the current and projected housing stock in Sarasota County, including the supply, condition, demand, and the cost of housing.  In addition, it includes an estimated number of vacant or abandoned buildings and whether they are suitable for rehabilitation.   Finally the chapter will identify areas of low-income and minority concentrations.

Housing Needs are discussed in the Market Analysis Chapter.  Existing housing to serve individuals with disabilities and HIV/AIDS victims and their families is examined in the Special Needs Market Analysis Chapter.

The demographic data included in the Housing Assessment comes from a variety of sources including:

- The 2000 Census;
- 2005-2009 American Community Survey Data
- The 2010 Census;
- Shimberg Center for Affordable Housing;
- HUD's Low to Moderate Income Data;
- MLS Area Data;
- Florida Housing Data Clearinghouse; and
- Sarasota Planning and Development Services

**TOTAL POPULATION PROJECTIONS BY JURISDICTION**



*Source:* Shimberg Center for Affordable Housing

Based on projections from the Shimberg Center for Affordable Housing, the total population for Sarasota County is anticipated to grow from an estimated 389,303 people in 2010 to 414,600 in 2015. Most of the growth is expected to occur within North Port and Unincorporated Sarasota County. The remaining municipalities are essentially built-out, with additional growth coming from infill and redevelopment activities. It is important to note that the 2010 and 2015 population numbers are projections. The population estimate from the 2010 Census was 379,448.

| Place | 2010 | 2015 | 2020 |
|---|---|---|---|
| ***Sarasota County*** | 389,303 | 414,600 | 446,901 |
| Longboat Key (Sarasota part) | 5,011 | 5,254 | 5,594 |
| North Port | 57,214 | 70,758 | 86,303 |
| Sarasota | 52,706 | 52,532 | 52,848 |
| Venice | 21,774 | 22,919 | 24,453 |
| Sarasota-Unincorporated | 252,598 | 263,137 | 277,703 |

*Source:* Shimberg Center for Affordable Housing

## Population by Age

Persons 65 years and older comprised 26.4% of the population in 2010, compared to 17.4% for the state. In terms of age cohorts, the most growth is expected to occur in the 55-74 age demographic, reflective of the aging baby-boomer generation. This population can have a significant impact on housing demand and supportive needs. This can include an increased demand for smaller housing sizes, condominiums, apartments and similar units with reduced maintenance needs, and demands for supportive housing units, including assisted living and continuing care facilities.

## Population by Race

Sarasota County is predominately white based on the 2010 Census.   White persons not of Hispanic or Latino origin were reported as 84.9% of the population. Black persons comprised only 5.3% of total population, and 1.3% of Asian descent. 7.9% of the population was of Hispanic or Latino origin.

## Supply of Housing Units

**Type of Housing Units**



Florida Housing Data Clearinghouse

Sarasota County, as a whole, is dominated by single-family detached housing structures, accounting for 57% of all units. Sarasota County also has a number of units in manufactured housing, largely located within Venice and the unincorporated areas. The cities of Sarasota and Venice have a relatively balanced housing stock, with various sized multifamily structures balancing the single-family housing stock. Unlike any of the other municipalities, Longboat Key has more than half of the housing stock (62%) located within large (20 unit or more) multifamily structures, with only 19% of housing in single-family residential. This can be attributed to its limited area and location on a barrier island, as well as high land values and allowed densities.

In 2010, there were an estimated 228,413 housing units within Sarasota County. The majority of households within Sarasota County were located within the unincorporated areas of the County, at 66%. The next largest concentrations were located within the City of Sarasota and the City of North Port, with 14% and 12% respectively. Approximately 7% of residents live within the City of Venice and another 1% live within the Sarasota County portion of Longboat Key.

## Vacancy Rates

Overall vacancy rates are not an appropriate measure of housing availability within Sarasota County or its municipalities due to the seasonal nature of our population. Using the 2005-2009 ACS data, there is a calculated vacancy rate of 23.1%.

A closer look at the data attributes 63% of these vacancies to be seasonal, recreational or occasional use with 17% vacant for-rent housing and empty for sale.  The vacancy rate due to sale or rental has increased significantly since 2005 due to the foreclosure epidemic in Florida.

| | For Rent | For Sale Only | Rented or Sold, Not Occupied | Seasonal, Recreational or Occasional Use | Total Vacant |
|---|---|---|---|---|---|
| *Sarasota County* | 3955 | 4947 | 2741 | 32940 | 52437 |
| Longboat Key (part) | 463 | 175 | 10 | 4703 | 5449 |
| North Port | 384 | 946 | 267 | 1925 | 4953 |
| Sarasota | 1011 | 563 | 499 | 2946 | 6439 |
| Venice | 444 | 399 | 134 | 4482 | 5969 |
| Unincorporated | 1653 | 2864 | 1831 | 18884 | 29627 |

## Housing Demand

Based on the estimated 2015 population of 414,600 and the average persons per household for Sarasota County (Census 2000) of 2.13, this equates to an estimated 194,647 households. 2010 Census updates put total housing units within Sarasota County at an estimated 228,413 units.

Based on this, there would appear to be a surplus of housing units overall. However, vacancy data indicates that approximately 14.4% of housing units are vacant because of seasonal, recreational, or occasional use. Applying this to the housing stock, it reduces the functional housing stock to 195,473 units. This indicates no additional housing stock needed for 2015.

However, there is a projected population of 446,901 by 2020.  If the average household remains at 2.13, this equates to an estimated 209,812 households.  By the year 2020, Sarasota County could need an additional 14,339 housing units primarily in Unincorporated Sarasota County and the City of North Port.

The Florida Housing Data Clearinghouse provides estimates of affordable housing needs summary, based on the number of severely cost burdened (50%+) households with income less than 80% AMI. These are further broken down by tenure. By 2015, it is estimated that there will be 12,504 owner and 6,713 renter households in need of affordable housing. This is a projected increase of approximately 1,548 households in need of additional affordable housing.

However, there is a small decrease when examining projected need in 2020.  In total, it is projected that there will be 19,041 rent/owner cost burdened households in Sarasota County, down 176 households from 2015.  The continued decrease in housing prices may be responsible for this slight decrease.

| Household Income as % of AMI | 2015 Owner | 2015 Renter | 2015 Total | Projected Increase 2010-2015 |
|---|---|---|---|---|
| 0-30% AM | 5,215 | 3,757 | 8,972 | 699 |
| 30.1-50% AMI | 4,137 | 1,891 | 6,028 | 473 |
| 50.1-80% AMI | 3,152 | 1,065 | 4,217 | 376 |
| *Total* | *12,504* | *6,713* | *19,217* | *1,548* |

| Household Income as % of AMI | 2020 Owner | 2020 Renter | 2020 Total | Projected Increase 2015-2020 |
|---|---|---|---|---|
| 0-30% AM | 5,364 | 3,659 | 9,023 | 51 |
| 30.1-50% AMI | 4,199 | 1,853 | 6,052 | 24 |
| 50.1-80% AMI | 2,844 | 1,122 | 3,966 | -251 |
| *Total* | *12,407* | *6,634* | *19,041* | *-176* |

## Condition of Housing Units

## Age of Housing Stock

The age of housing stock varies greatly within the County. Overall approximately 54.3%, or just over half, of the housing units were built prior to the 1980s. Within the City of Sarasota, however, that number jumps to more than three-quarters of all units, at 75.7%.

A large percentage of older housing stock can put a burden on homeowners and residents in terms of major repairs and a higher potential for substandard conditions. Older structures within Florida can carry greater risk, particularly if they were built prior to the initiation of the FEMA Flood Insurance Rate Map and modern building codes providing for greater hurricane protection and energy efficiency. In many cases these older homes are forced to carry the state-backed property insurance, at a substantial additional cost to home owners. The issues of an older house and the required maintenance can be further exacerbated when a property owner falls into financial stress (leading to foreclosure) and are unable or unwilling to perform such tasks. Emphasis should be on both maintenance and renovation, and redevelopment.

In contrast, North Port has seen substantial growth within the 1990s and accelerated even more in the early 2000's, contributing to their high percentage of new housing stock. The remaining areas are generally balanced, with a large percentage of their housing stock constructed in the 1970s and 1980s. While not at risk for some of the problems associated with significantly older housing stock, there is still a need for normal maintenance and repair to ensure these homes do not fall into substandard condition.



## Substandard Housing

Substandard housing includes housing conditions where there is overcrowding (more than 1 person per room), no fuel used for home heating, lacking complete kitchen facilities, and lacking complete plumbing facilities. The most common condition was overcrowding, including 3,135 units overall. The highest proportion of overcrowded units was in Sarasota, accounting for 5.5% of the overall housing stock, or 1,286. In raw numbers, the unincorporated area contained slightly more overcrowded units (1,532), however is represents only 1.8% of the overall housing stock within that area. The second most common substandard condition was lack of fuel for heating, totaling approximately 1,135 units.

While this can cause hardship, it should be noted that the average low temperature for Sarasota County is 61.9 degrees, and an average high temperature of 82.8 degrees, making heating less critical than in other climates. It is also interesting to note the distribution of substandard conditions is not limited to those considered very-low to moderate income. This range accounts for just over half (54% or 2,903 units) of the substandard units, with the remaining occurring in households earning greater than 80% of the AMI.



## Home Sales and Prices

Like many other parts of the Country, Sarasota County saw rapid escalation in home values through the early 2000s peaking at a median sale price of $269,900 in 2006, and then saw the "bubble burst" starting in 2007 and rapidly declining as the recession set in.  As of May 2011, the estimated median sales price was $144,500, a price not seen

since 2002. Home sales continue to pick up, but sales price continue to fall.   In large part, this rapid price decline has been driven by high foreclosure rates, as well as market corrections to the speculative buying and lending practices that precipitated the problem.



Source: Shimberg Data, Except 2010 MLS, Projected

## Racial Concentrations (91.205 b2)

There are racial concentrations within Sarasota County, according to 2005-2009 American Community Survey (ACS) data.

A racial or minority concentration is 10% more than the county average. See the supporting maps for racial and minority concentrations below.

The predominant racial/cultural minority concentrations are the black and Hispanic populations with most black and Hispanic residents living in the City of Sarasota.

| Racial Group | Sarasota County | Unincorporated County | City of Sarasota | City of Venice | City of North Port |
|---|---|---|---|---|---|
| White | 334,983 | 229,978 | 40,252 | 19,992 | 44,761 |
| % of Total | 91.16% | 94.35% | 77% | 96.19% | 88.37% |
| Black | 16,642 | 4,843 | 8,332 | 297 | 3,170 |
| % of Total | 4.53% | 1.99% | 15.94% | 1.43% | 6.26% |
| American Indian/Alaskan Native | 736 | 481 | 86 | 7 | 162 |
| % of Total | .2% | .2% | .16% | .003% | .32% |
| Asian | 4634 | 3353 | 743 | 272 | 266 |
| % of Total | 1.26% | 1.38% | 1.42% | 1.31% | .53% |
| Native Hawaiian/Pacific Islander | 67 | 37 | 0 | 0 | 30 |
| % of Total | .02% | .02% | 0% | 0% | .06% |
| Other | 6,592 | 3,298 | 1999 | 68 | 1,227 |
| % of Total | 1.79% | 1.35% | 3.82% | .33% | 2.42% |
| Two or More | 3,792 | 1,754 | 861 | 146 | 1,031 |
| % of Total | .72% | .72% | 1.65% | .70% | 2.04% |

## Racial Concentrations-Black Population

| RACIAL CONCENTRATION – BLACK POPULATION | | | |
|---|---|---|---|
| Area | 2005-2009 Population | Number | Percent |
| Census Tract 1.02 | 4,251 | 655 | 15.41% |
| Census Tract 2 | 4,773 | 2,073 | 43.43% |
| Census Tract 3 | 3,600 | 3,046 | 84.61% |
| Census Tract 10 | 3,076 | 872 | 28.35% |
| Census Tract 11.01 | 3,838 | 757 | 19.72% |
| Census Tract 11.02 | 4,366 | 1,121 | 25.68% |

*Source:* 2000 Census

According to the US Department of Housing and Urban Development (HUD), a racial concentration occurs if an area has a minority population that is greater than 10% of its countywide average population.  The Countywide black population is 4.53%.  The Census tracts displayed above all have racial concentrations greater than 14.53% and

are displayed on the map below.   2005-2009 ACS data was used because at the time
the plan was written, 2010 Census data was not available at the census block level.
**(91.210 a)**

## RACIAL CONCENTRATION – BLACK POPULATION



# Racial Concentrations-Hispanic Population

The Hispanic countywide population is 6.8%.  The Census tracts displayed below all have racial concentrations greater than 16.8% and are displayed on the map below.

| RACIAL CONCENTRATION – HISPANIC POPULATION | | | |
|---|---|---|---|
| Area | 2005-2009 Population | Number | Percent |
| Census Tract 1.02 (City of Sarasota) | 4,251 | 1,534 | 36.08% |
| Census Tract  4.01 | 3,890 | 887 | 22.80% |
| Census Tract  4.03 | 7,518 | 4,983 | 33.71% |
| Census Tract  4.05 | 3,341 | 731 | 21.87% |
| Census Tract  5.03 | 4,738 | 847 | 17.87% |
| Census Tract  11.02 | 4366 | 860 | 19.69% |
| Census Tract  16.02 | 3,409 | 594 | 17.42% |

## RACIAL CONCENTRATION – HISPANIC POPULATION



## Low-Income Concentrations in Sarasota County

| HIGHEST POVERTY RATES | | | |
|---|---|---|---|
| **Area** | **2000 Population** | **Number in Poverty** | **Percent in Poverty** |
| Census Tract 3 (City of Sarasota) | 3,409 | 1,248 | 36.61% |
| Census Tract 2 (City of Sarasota) | 4,167 | 1,287 | 30.89% |
| Census Tract 1.02 (City of Sarasota) | 3,213 | 648 | 20.17% |
| Census Tract 18.03 | 2,736 | 607 | 22.19% |

*Source:* 2005-2009 American Community Survey Data

Highlighted areas are low-to moderate-income concentrations. Such concentrations are defined as areas where more than 45% of household have low to moderate-incomes.

## A Closer Look at Low-Income Concentrations in Sarasota County

The maps below show six areas of low-income concentrations in Sarasota County. The maps are listed as follows:

1. North County
2. Nokomis/Venice
3. Central Sarasota County
4. Southern Venice/North Port
5. North Port
6. Englewood

## Low- Income Concentrations North County



Low to Moderate Income
Census Block Groups
North County

## Low- Income Concentrations Nokomis/Venice



## Low- Income Concentrations Central Sarasota County



# Low- Income Concentrations Southern Venice/North Port



# Low- Income Concentrations North Port



## Low- Income Concentrations Englewood



The City and County of Sarasota have intentionally used federal and local funding in these areas to improve the quality of life for all residents and have very active neighborhood divisions that continue to address low-income needs.   A more in-depth analysis of these areas can be found in the Neighborhood and Economic Development Chapter.

## BARRIERS TO AFFORDABLE HOUSING

Sarasota County and the City of Sarasota established a citizens committee to identify barriers to affordable housing.  The committees examined established policies and procedures, ordinances, land development regulations and the adopted comprehensive plan and in December 2008 recommended specific actions or initiatives to encourage or facilitate affordable housing.

The Committee found the following barriers:

1.   Even though both the City and County had expedited permitting for affordable housing projects, many developers and builders were not aware of this policy.  In

addition, there was no tracking system set up to determine if affordable housing projects were indeed being expedited.

2. County Impact fees were excessive and impeded affordable housing

3. The County's current density requirements hindered the development of affordable tax credit developments under the Florida Housing Finance Corporation's Tax Credit and HUD's Section 202 programs.

4. The lack of an affordable housing overlay district.

5. The City of Sarasota does not allow affordable housing to be built on already platted, non conforming residentially zoned lots.

# HOUSING NEEDS MARKET ANALYSIS

In accordance with 24 CFR Section 91, the Sarasota Office of Housing and Community Development has prepared a Housing Needs Market Analysis for Sarasota County including unincorporated County and the cities of Sarasota, Venice, and North Port.  The Town of Longboat Key is now included in Manatee County's Consolidated Plan, yet it remains in this analysis since it is still part of Sarasota County.

In order to truly understand housing needs throughout Sarasota County, an in-depth review of all categories of households must take place. This chapter explores housing needs through estimates of the number and type of families in need of housing assistance by income, by tenure, by age, and by family size.  It will also include a discussion of cost burden and severe cost burden, overcrowding, and substandard housing conditions as they are experienced by all income categories of homeowners and renters.  Special needs populations will have separate chapters detailing their needs as will public and assisted housing.

The housing needs data included in the Consolidated Plan comes from a variety of sources including:

- The 2005 Sarasota Consolidated Plan;
- The 2000 Census;
- The 2006-2008 American Community Survey;
- The 2005-2009 American Community Survey
- Comprehensive Housing Affordability Strategy (CHAS) Databook;
- The Sarasota County Comprehensive Plan;
- Sarasota Planning and Development Services;
- The City of Sarasota Comprehensive Plan;
- Input from local nonprofit and service organizations;
- The Shimberg Center for Affordable Housing, University of Florida;
- The Florida Agency for Workforce Innovation.

## Distribution of Households by Location

In 2010, there were an estimated 228,413 housing units within Sarasota County. The majority of households within Sarasota County were located within the unincorporated areas of the County, at 66%. The next largest concentrations were located within the City of Sarasota and the City of North Port, with 14% and 12% respectively.  Approximately 7% of residents live within the City of Venice and another 1% live within the Sarasota County portion of Longboat Key.



## Distribution of Household by Types

Of the 166,993 households estimated by the 2005-2009 American Community Survey, approximately 60.8% of households were family households, with the large majority of those under married-couple families.

Approximately 11% of households were male or female householder only, with females two and a half times more likely to be a single householder. This is only a slight increase from 2000 (10.1% of households), however there were more significant increases between 1990 and 2000, as detailed in the previous Community Housing Plan. Single-family households continue to be a concern, as single households tend to have higher rates of poverty than joint households.  For instance, in 2000 the percentage of poverty for single-mother households in Sarasota County was 20% as opposed to all families, which is 5.1%.  Therefore, single-mother households are 4 times as likely to be impoverished as other families in Sarasota County.

Within nonfamily households, more than 80% are householders living alone.

| Households by Type | Total | Percent Total |
|---|---|---|
| Total: | 165,707 | |
| Family households: | 101,051 | 61.4% |
| Married-couple family | 83,162 | 50% |
| Other family: | 18,049 | 11.0% |
| Male householder, no wife present | 4,889 | 2.9% |
| Female householder, no husband present | 13,160 | 7.9% |
| Nonfamily households: | 64,656 | 39% |
| Householder living alone | 53,382 | 32.2% |
| Householder not living alone | 11,274 | 6.8% |

## Income and Poverty

The U.S. Census estimated 35,441persons below the poverty level in 2009 or 9.8% of the County's total population. This represents a percentage increase from the 2000 census when 7.7% of the population was below poverty or 24,817 persons.  By comparison, the national percentage of poverty is 13.47% and Florida's is 13.1%. Therefore, Sarasota's poverty rate is below that of both the state and national government.  Poverty disproportionately affects those under age 18, with an estimated 9,109 individuals, or 25.7% of the subject population.

Another fairly accurate measure of poverty is the number of students receiving reduced or free meals due to poverty. Children from a family of four qualify for free meals if the household income is less than $28,665 or for reduced prices if the income is less than $41,000.

In Sarasota County schools, almost 45% of students were eligible for free or reduced meals in 2009, a six-point jump from 2008 and an increase from 34% in 2004. Schools with high numbers of free and reduced-price meals are located and/or serve residents in the City of Sarasota (Alta Vista Elementary, Booker Elementary, Booker Middle, Booker High, Tuttle Elementary, Gocio Elementary) and the City of North Port (North Port Glenallen Elementary and North Port Toledo Blade Elementary.) This corresponds with higher levels of poverty found in the cities of Sarasota and North Port. The biggest jump in children needing assistance came in North Port, which endured a high number of job losses and home foreclosures.

Source: US Census Bureau American Community Survey; School Board of Sarasota County, 2009

## Social Security Income

Based on the 2005-2009 American Community Survey estimates, approximately 46% of households received Social Security income within Sarasota County. This is not overly surprising given the fact that 30.4% of Sarasota County residents were 65 or older in 2008.

## Public Assistance

Based on the 2005-2009 American Community Survey estimates, approximately 1,290 households (approximately 0.7%) received public assistance income within Sarasota County. Slightly more households, 5,348 or 3.2%, received food stamp benefits.  Among those households, approximately half contained children under 18 years of age. This is generally consistent with data compiled by BEBR in 2002 (based on individuals rather than households) which found 7,665 individuals were recipients of Food Stamp benefits, of which 1,649 also received public assistance.

## Unemployment

The unemployment rate in Sarasota County was 10.6% for April 2011, up from 6.3% in May of 2008. This ranked Sarasota County as #19 in the state, of 67 Counties. The County's unemployment rate was slightly lower than the State unemployment rate of 10.8% and the Federal Rate of 9%.[1] In terms of non-agricultural employment, the largest job losses have occurred in the goods producing and construction sectors, which collectively represent 40.5% of total employment. There has been a slight reduction in the unemployment rate which peaked in November of 2010 at 12.4%.



Increasing unemployment has both immediate effects to the economy as well as a delayed effect on real estate, as it takes a number of months for a property owner to fall behind in payments, have foreclosure proceedings initiated, and reach final disposition. Given this, the increasing unemployment that we face now may result in a greater foreclosure spike within the next year or more. Combined efforts of foreclosure counseling and prevention programs, Homeless Prevention Fund programs (under the 2009 Recovery & Reinvestment Act), home repair programs, job training, and other economic development programs can help address some of the social and underlying aspects of the program. However, it is unclear what impacts this will have long-term on housing.

---

[1] SOURCE: Florida Agency for Workforce Innovation, Labor Market Statistics Center, Local Area Unemployment Statistics Program, in cooperation with the U.S. Department of Labor, Bureau of Labor Statistics. (Released June 19, 2009)

## Income Distribution

Sarasota County is often regarded as an affluent community.  There is substantial truth to this, with almost 43% of the population having an annual income that is at least 120% of the area median income (AMI).  However, there are also large pockets of extreme poverty as illustrated below by 17.2% of the population having between 0-50% of the AMI.



According to the 2006-2008 American Community Survey, the median household income in Sarasota County for 2008 was $50,220. The median household income for Florida and the United States was $48,637 and $52,175 respectively.  The median household income in the City of Sarasota ($41,797) is lower than the rest of the county.

## Distribution of Income by Location

The City of Sarasota has a disproportionately high percentage of very-low and low-income households. Within Sarasota, these populations are proportionately near double the other municipalities and unincorporated areas.  It is interesting to note that Longboat Key and the City of Venice also have relatively high numbers of residents indentified as low-income. However, both of these communities have a much higher median age, and thus retirees, that may show a lower actual income that is disproportionate to their actual fiscal solvency and need.

| SARASOTA COUNTY MEDIAN FAMILY INCOME - $62,300 | | | |
|---|---|---|---|
| 2009 Income Limit Summary | | | |
| Household Size | Extremely Low 30% of Median | Low income 50% of Median | Moderate Income 80% of Median |
| 1 | $ 13,100 | $ 21,800 | $ 34,900 |
| 2 | 14,950 | 24,900 | 39,900 |
| 3 | 16,850 | 28,050 | 44,850 |
| 4 | 18,700 | 31,150 | 49,850 |
| 5 | 20,200 | 33,650 | 53,850 |
| 6 | 21,700 | 36,150 | 57,850 |
| 7 | 23,200 | 38,650 | 61,800 |
| 8 | 24,700 | 41,100 | 65,800 |

*Source:* HUD Web Site www.hud.gov

| Place | 0-30% AM | 30.1-50% AMI | 50.1-80% AMI | 80.01-120% AMI | 120+% AMI | Total |
|---|---|---|---|---|---|---|
| *Sarasota County* | *13,887* | *18,024* | *32,200* | *41,320* | *79,350* | *184,781* |
| Longboat Key (Sarasota part) | 183 | 319 | 524 | 636 | 1,294 | 2,956 |
| North Port | 1,463 | 1,927 | 3,960 | 5,721 | 11,242 | 24,313 |
| Sarasota | 3,348 | 3,271 | 4,839 | 4,873 | 8,498 | 24,829 |
| Venice | 951 | 1,324 | 2,285 | 2,729 | 5,130 | 12,419 |
| Sarasota-Unincorporated | 7,942 | 11,183 | 20,592 | 27,361 | 53,186 | 120,264 |



| Place | 0-30% AMI | 30.1-50% AMI | 50.1-80% AMI | 80.01-120% AMI | 120+% AMI |
|---|---|---|---|---|---|
| *Sarasota County* | *7.5%* | *9.7%* | *17.4%* | *22.4%* | *42.9%* |
| Longboat Key (Sarasota part) | 6.2% | 10.8% | 17.7% | 21.5% | 43.8% |
| North Port | 6.0% | 7.9% | 16.3% | 23.5% | 46.2% |
| Sarasota | 13.5% | 13.2% | 19.5% | 19.6% | 34.2% |
| Venice | 7.7% | 10.7% | 18.4% | 22.0% | 41.3% |
| Sarasota-Unincorporated | 6.6% | 9.3% | 17.1% | 22.8% | 44.2% |

## Home Ownership Rates

Homeownership rates for Sarasota County average 77.43% in 2009. The City of Sarasota had the lowest homeownership rate, at 59.99%. Homeownership was highest in Longboat Key, at 95.96%, which can be attributed to a relative lack of rental properties. It is also worth noting that, based on 2005-2009 ACS data; Longboat Key had substantially higher median rents of $1,471, compared to an average of $860 for the County. At the time, the City of Sarasota had the lowest median rents, at $783.

| Place | Owner Households | Percent Owners | Renter Households | Percent Renters | Total Households |
|---|---|---|---|---|---|
| *Sarasota County* | *128309* | *77.43%* | *37398* | *22.57%* | *165,707* |
| Longboat Key (Sarasota part) | 2470 | 95.96% | 104 | 4.04% | 2,574 |
| North Port | 19,484 | 80.46% | 3808 | 19.54% | 19,484 |
| Sarasota | 13,919 | 59.99% | 9283 | 40.01% | 23,202 |
| Venice | 8,175 | 73.53% | 2943 | 21.47% | 11,118 |
| Sarasota-Unincorporated | 88,069 | 80.55% | 21,260 | 19.45% | 109,329 |

## Recent Challenges

Many of the older subdivisions, as well as new housing developments, saw rapid increase in housing values and signs of renewal as the real estate market escalated in 2005. However, since then they have taken drastic hits in terms of rapidly declining property values, foreclosures, and other challenges that have compounded the problems of an aging housing stock.

## Substandard Housing

Substandard housing includes housing conditions where there is overcrowding (more than 1 person per room), no fuel used for home heating, lacking complete

kitchen facilities, and lacking complete plumbing facilities. The most common condition was lacking a complete kitchen at 2,278 households.  The second most common substandard condition was lack of fuel for heating, totaling approximately 1,355 units.

While this can cause hardship, it should be noted that the average low temperature for Sarasota County is 61.9 degrees, and an average high temperature of 82.8 degrees, making heating less critical than in other climates. It is also interesting to note the distribution of substandard conditions is not limited to those considered very-low to moderate income. This range accounts for just over half (54% or 2,903 units) of the substandard units, with the remaining occurring in households earning greater than 80% of the AMI.

| | 1.01 or more Persons per Room | No Fuel Used | Lacking Complete Kitchen Facilities | Lacking Complete Plumbing Facilities |
|---|---|---|---|---|
| Sarasota County | 1165 | 1,355 | 2278 | 1,156 |
| Longboat Key (part) | 0 | 0 | 0 | 0 |
| North Port | 277 | 154 | 249 | 76 |
| Sarasota | 433 | 296 | 528 | 354 |
| Venice | 88 | 45 | 278 | 25 |
| Sarasota-Unincorporated | 367 | 860 | 1223 | 701 |

*Source:* 2005-2009 ACS Data

## Housing Problems (91.205 b1)

The definition of housing problems is as follows: "Households with housing problems include those that: 1. Meet the definition of physical defects; 2. Meet the definition of overcrowded and/or 3. Meet the definition of cost burden greater than 30%."

As used in the Comprehensive Housing Affordability Strategy (CHAS) and the 2005 Consolidated Plan, the definition of a physical defect is a housing unit lacking a complete kitchen or bathroom. The definition of overcrowded is a housing unit containing more than one person per room. The definition of a cost burden is the extent to which gross housing costs, including utilities, exceed 30% of gross income. Severe cost burden is defined as the extent to which gross housing costs, including utilities exceed 50% of the households' gross income.  All severely cost burdened households are also included in the figures for cost-burdened households.   It is

widely accepted that these numbers are actually higher due to the long-term effects of the Great Recession.

## Total County Housing Problems

According to CHAS data, 37.99% of all 168,015 occupied households have a housing problem, or approximately 63,825 households.



***Source:*** CHAS 2005-2007*

|  | All Households | Black | Hispanic | Elderly | Small Family | Large Family | Only Overcrowded | Cost Burdened | Severe Cost Burden |
|---|---|---|---|---|---|---|---|---|---|
| Renters | 53.02% | 66.86% | 84.53% | 17.21% | 40.4% | 59.6% | 2.79% | 25.65% | 24.03% |
| Owners | 33.61% | 51.03% | 59.57% | 15.48% | 22.9% | 36.1% | 0.46% | 17.86% | 15.28% |

* The data for small and large families is from the 2000 CHAS data since it was not available in the 2005-2007 dataset.

## Extremely Low Income

According to the 2010 Housing & Cost Data by Age by Shimberg Center for Affordable Housing, the 0-30% AMI income bracket represents an estimated 8,042 households (6.7% of total households). This group includes 13.5% of renter-occupied households, and 5.3% of owner-occupied households. Within this income bracket, a majority of households (59.4%) are severely cost burdened. An additional 14.1% are cost burdened, with only about a quarter (26.5%) paying an amount

deemed affordable based on income. It is interesting to note that, within this group, renters aged 65+ were much more likely to have affordably priced housing, at a rate of 44%. The most severely cost burdened households were renters in the 15-34 age group, with 72.7% paying more than 50% of their AMI towards housing.



### Extremely Low-Income Housing Problems

*Source:* CHAS 2005-2007*

| | **All Households** | **Black** | **Hispanic** | **Elderly** | **Small Family** | **Large Family** | **Only Overcrowded** |
|---|---|---|---|---|---|---|---|
| Renters | 91.27% | 79.53% | 76.92% | 77.06% | 79.60% | 88.80% | 3.21% |
| Owners | 90.69% | 91.30% | 97.37% | 70.26% | 77.40% | 87.40% | 0.38% |

As the chart above depicts, the extremely low-income all have a high rate of housing problems. With the exception of overcrowding, the vast majority of households in this category are vulnerable to housing issues.

## Low Income

According to the 2010 Housing & Cost Data by Age by Shimberg Center for Affordable Housing, the 30.01-50% AMI income bracket represents an estimated 11,183 households (9.3% of total households). This group includes 12.2% of renter-occupied households and 8.7% of owner-occupied households. Within this income bracket, 30% of households are severely cost-burdened, with an additional 31.7%

cost burdened. In contrast with some of the other income brackets, nearly all renters within this group were cost burdened (55.3%) or severely cost burdened (35.9%), versus less than half of those in owner-occupied units



**Low Income Housing Problems**

*Source:* CHAS 2005-2007

|  | **All Households** | **Black** | **Hispanic** | **Elderly** | **Small Family** | **Large Family** | **Only Overcrowded** |
|---|---|---|---|---|---|---|---|
| Renters | 94.74% | 57.72% | 95.30% | 81.43% | 88.70% | 85.00% | 4.74% |
| Owners | 84.33% | 88.06% | 76.34% | 56.49% | 84.60% | 90.20% | 0.56% |

Households that make in-between 31-50% of the Area Median income are also vulnerable to housing problems. Overcrowding remains an exception to this issue. This is probably due to the fact that many households do not like to report overcrowded conditions.

## Moderate Income

According to the 2010 Housing & Cost Data by Age by Shimberg Center for Affordable Housing, the 50.1-80% AMI income bracket represents an estimated 20,592 households (17% of total households). This group includes 21.4% of renter-occupied households and 16.1% of owner-occupied households. Within this income bracket 12.0% of households are severely cost burdened, with an additional 31.1%

cost burdened. Within this bracket, those 65+ were much more likely to be severely-cost burdened as renters at 37.9% versus less than ten percent of renters aged 15 to 64. Within this income group, it is interesting to note that 55.7% of homeowners aged 15-34 were cost burdened. As these individuals are likely to have entered the home ownership market relatively recently, it indicates that this group may have taken on mortgage payments out of proportion with their current income. This may put them at greater risk of foreclosure, especially since they are less likely to have the savings necessary to make it though unemployment and other financial strains.





*Source:* CHAS 2005-2007

|  | All Households | Black | Hispanic | Elderly | Small Family | Large Family | Only Overcrowded |
|---|---|---|---|---|---|---|---|
| Renters | 77.11% | 57.72% | 63.35% | 64.96% | 55.90% | 70.00% | 2.93% |
| Owners | 48.94% | 51.52% | 69.08% | 34.72% | 41.30% | 64.30% | 0.34% |

Housing problems begin to decrease for this income group, but still remain high. Owners have fewer problems than renters. Hispanics have the highest rate of housing problems in this income group.

## Middle Income

Middle income is a family whose income is from 80.01% MFI to 120% MFI, as determined by HUD. According to the 2010 Housing & Cost Data by Age by Shimberg Center for Affordable Housing, there are 41,320 middle income households with 17.16% or 7,091 with a cost burden and 3.7% or 1,540 with a

severe cost burden. Among renters in this income category 22.5% have a cost burden.



### Middle Income Housing Problems

*Source:* CHAS 2005-2007

|  | **All Households** | **Black** | **Hispanic** | **Elderly** | **Small Family** | **Large Family** | **Only Overcrowded** |
|---|---|---|---|---|---|---|---|
| Renters | 41.74% | 0.00% | 12.38% | 54.20% | 12.10% | 35.00% | 2.04% |
| Owners | 39.36% | 58.33% | 31.08% | 16.39% | 12.90% | 20.70% | 0.64% |

The above graph and chart depicts that 0% of Black renters in the middle income have a housing problem. This is highly unlikely and can be explained through the margin of error in the data. However, there is no doubt that as income increases, housing problems decrease. Black homeowners in this income group have the highest rate of housing problems at 58.33%. The above graph only includes income up to 85% of the Area Median Income since CHAS data does not make a distinction between income above 85%.

## Owners and Renters

Rental households experience housing problems at a much higher percentage than owner occupants, except for the extremely low-income category in which homeowners experience slightly more problems. Fifty three percent of Sarasota County renters have housing problems.

CHAS data also shows the following regarding renters in Sarasota County:

- There are 37,875 households who rent, of those 5,765 are extremely low-income and 5,805 are low-income;
- Of the 31,394 households who rent, 53.02% have a housing problem;
- Of the extremely low-income renters, 91.27% have a housing problem, 14.1% have a cost burden, and 56.5% have a severe cost burden;
- Of the low-income renters, 82.4% have a housing problem, 79.9% have a cost burden, and 39.2% have a severe cost burden.

Homeowners tend to have fewer housing problems than renters, with 24.8% (29,580) of the 119,275 owner households showing housing problems. Homeowners also tend to be less cost-burdened than renters, with 41% of renters being cost-burdened as compared to 23% of homeowners.

## Overcrowding

Although data generally indicates that renter households are more prone to face overcrowding, Sarasota County in general does not appear to have significant issues. Based on the 2006-2008 American Community Survey data, both owner and renter occupied units had occupancy at 0.5 or less occupants per room, at 84% and 70% respectively. Only 0.6% of owners and 3.2% of renters had occupancy of more than 1 person per room. Only 60 households were estimated to have occupancy greater than 2 persons per room Countywide for both groups.



## Large Families/Overcrowding

Large families in particular face the greatest challenges in terms of overcrowding (more than one person per room), particularly among renters. Of the 1,879 large-related rental households, 59.7% have a housing problem. With large families whose

income is below 30% MFI, 88.8% of the 259 rental families have a housing problem as compared to 79.6% of small rental families. This data suggests that it is more difficult to find adequate housing when a family is low income and has five or more persons and points to a need for more affordable units that are larger in size to accommodate the needs of large families.

## Elderly Households

The majority of elderly households are homeowners. Of 62,211 elderly homeowners, 21.8% have a housing problem, according to CHAS data.

Among the 7,923 elderly households who rent, 49.6% have a housing problem.

Additional analysis of elderly and frail elderly needs can be found in the "Special Needs Assessment and Market Analysis" Section.

## Affordable Housing: Rentals (91.210 a)

According to a National Low-Income Housing Coalition 2011 study of the rental market, 60% of renters in Sarasota County are unable to afford Fair Market Rent (FMR) for a two-bedroom unit.  According to HUD, a unit is considered affordable if its total cost (including utilities) is no more than 30% of the renter's gross income. The National Low-Income Housing Coalition reported Sarasota County Fair Market Rent (FMR) for a one-bedroom unit in 2011 was $923 per month. Fair market rent in Sarasota County for a two-bedroom unit was $1,111. (See Glossary for an explanation of Fair Market Rent)

| SARASOTA COUNTY FAIR MARKET RENT 2011 | |
|---|---|
| Number of Bedrooms | Fair Market Rent (FMR) |
| 0 | $843 |
| 1 | $ 923 |
| 2 | $ 1,111 |
| 3 | $ 1,419 |
| 4 | $ 1,559 |

*Source:* HUD Web Site www.hud.gov

According to the National Low-Income Housing Coalition, a worker earning the Federal Minimum Wage ($7.25 per hour) in Sarasota County has to work 118 hours per week in order to afford a two-bedroom unit at the area's Fair Market rent in 2011.

The National Low-Income Housing Coalition's, "Housing Wage" in Sarasota County is $19.78. This "Housing Wage" is the amount a worker would have to earn per hour in order to be able to work 40 hours per week and afford a two-bedroom unit at the area's Fair Market rent in 2011.

An extremely low-income household (earning 30% of the Area Median Income) can afford monthly rent of no more than $443.   A minimum wage earner can afford monthly rent of no more than $377. A household on Supplemental Security Income (SSI) can afford monthly rent of no more than $202.



The Shimberg Center for Affordable Housing also projects the number of rent-burdened families. In 2010, there are a projected total of 13,973 rent-burdened families making less than 120% of the AMI out of 36,573 renters in Sarasota County, or about 38%.  By the year 2015 there are a projected 14,853 rent-burdened families out of a rental population of 38,777, an increase of 330 families.  By 2020, there will be 14,623 rent-burdened families out of a rental population of 38,017.

Of the projected rent-burdened families in 2020, 6,956 of them will be severely cost-burdened or paying more than 50% of their gross income on rent and utilities.  This data includes only households making less than 120% of the Area Median Income. If taking into account Shimberg's projection that Sarasota County will have 14,623

families that are rent-burdened in 2020, the creations of affordable rental units remain priority for Sarasota County.

## Owner-Occupied Households (91.210 a)

According to the 2005-2009 American Community Survey, there were an estimated 165,707 occupied housing units within Sarasota County.   Of these units, 128,309 or 77.43% were owner-occupied. The City of Sarasota has the owner occupied rate at 59.99%, the City of North Port at 80.46% and the City of Venice at 73.53%.

According to the American Community Survey data, the median value of owner-occupied homes in Sarasota County is $ 243,000. However, like many other parts of the County, Sarasota County saw rapid escalation in home values through the early 2000s peaking at a median sale price of $269,900 in 2006, and then saw the "bubble burst" starting in 2007 and rapidly declining as the recession set in. Estimated sales prices as of June 2011, at $162,000, have dropped to those last seen in 2002.

In large part, this rapid price decline has been driven by high foreclosure rates, as well as market corrections to the speculative buying and lending practices that precipitated the problem.  While there are signs that the housing market in Sarasota may be stabilizing, it is unknown when housing prices will end their downward curve.

## Affordable Housing: Owner-Occupied

While homeownership was often a popular alternative to decrease the number of rent-burdened families, many homeowners in Sarasota County also pay more than 30% of their income on their mortgage and utilities.  In fact, according to Shimberg Center for Affordable Housing estimates, at least 40.43% of homeowners in Sarasota County making less than 120% of the AMI suffered from cost-burdened conditions.

The Shimberg Center for Affordable Housing goes further and predicts the number of owner-occupied households that are cost burdened in 2010, 2015 and 2020 for homeowners making less than 120% of the AMI.

## Cost Burdened Home Owners in Sarasota County



In the year 2015, there will be a projected 33,399 cost-burdened homeowners in Sarasota County making less than 120% of the Area Median Income.  In the year 2020, there will be 33,589.  Of those, 13,895 and 13,903 families respectively are projected to be severely cost-burdened.  By 2020, there is a projected increase of 3,282 cost-burdened families from the year 2010.

# COMMUNITY AND ECONOMIC DEVELOPMENT ANALYSIS

## Background

A healthy community must have a good supply and range of quality housing, a sustainable economy, and a high quality of life.  These three objectives are not possible if a community lacks strong, vibrant neighborhoods and a robust local economy.  If neighborhoods lack a strong sense of identity, it is more difficult to protect the housing stock and entice desirable businesses and highly skilled workers to the area.

Sarasota acknowledges the role that neighborhoods play in protecting the quality of life in our community.  Both the City of Sarasota and the County of Sarasota have highly active neighborhood departments that determine at-risk neighborhoods and devise neighborhood strategy plans to promote neighborhood conservation and revitalization.

Due to the recession and widespread unemployment, Sarasota has decided to more closely examine the possibility of using Federal community development and affordable housing funding to strategically spur sustainable economic development throughout the county.  A focus group of neighborhood and economic development experts was held to gain additional insight on how to best use limited funding for the maximum benefit of the entire community.

## Eligibility Areas

If the Federal Community Development Block Grant (CDBG) is going to be used to promote neighborhood revitalization, it must be done in low-income areas.  However, some flexibility does exist because communities are analyzed by block group, instead of census tract.  Normally, a block group must consist of over 50% low to moderate-income (LMI) individuals to be eligible for CDBG funds.

However, when a locality has less than 10% of its block groups with 50% or greater LMI populations, then CDBG funds can be used in block groups that have greater than 45% LMI populations.  Sarasota County has fewer than 10% LMI block groups so it follows the 45% rule.  Since the City of Sarasota has more than 10% of its block groups with LMI populations, it follows the 50% rule.

The maps below show six areas of low-income concentrations in Sarasota County where CDBG funds can be used.  The maps are listed as follows:

1. North County
2. Nokomis/Venice
3. Central Sarasota County
4. Southern Venice/North Port
5. North Port
6. Englewood

## Low- Income Concentrations North County



The majority of low-income block groups in North County lie in what is traditionally called the Newtown Community.  There are three block groups in this area that have a LMI population of more than 75 percent.  A low-income pocket also exists in the Pinecraft area.

## Low- Income Concentrations Nokomis/Venice



The Nokomis/Venice area of Sarasota County continues to have lower poverty rates than that of North Sarasota County.  The majority of low-income populations remain around the core of downtown Venice.

## Low- Income Concentrations Central Sarasota County



Central Sarasota has the least amount of low-to moderate income census blocks in Sarasota County.  The highest rate of poverty is 55.6% and lies in census block 001801.1.

## Low- Income Concentrations Southern Venice/North Port



South Venice has one census block with 100% poverty that OHCD has questioned. It can be seen in the above map. It has large areas that are above income so if a project is created in this area staff will conduct field surveys to ensure that it is actually low-income. Staff contacted HUD about this census block, but was assured that the data was correct.

## Low- Income Concentrations North Port



## North Port

North Port is a relatively young city. Built since 1970, it did not have the high concentration of poverty that the City of Sarasota and North Sarasota County did until the Great Recession. However, its poverty rates have increased since the 2005-2010 Consolidated Plan. The LMI populations occur throughout the city with the highest rate of poverty occurring in block group 2710.1 in the southern center of the city. Due to the relatively low density in North Port, these block groups cover a larger geographic area.

## Low- Income Concentrations Englewood



Poverty rates in Englewood have also increased since the 2005-2010 Consolidated Plan. The majority of Englewood now has a low-to moderate income population with the highest rate of poverty in census block 002603.2. Sarasota County has large project planned in Englewood in the next few years that should help to address the need for revitalization in this area.


## Neighborhood Action Strategies

In the past, the majority of CDBG dollars in both the City of Sarasota and Sarasota County have been used to support neighborhood redevelopment. The last Consolidated Plan focused much of the County CDBG funds into a water/sewer project in North Sarasota County and water lines in the Laurel neighborhood along with other smaller infrastructure projects such as sidewalks. With the water/sewer project now completed, there is now a chance to use CDBG funds for neighborhood revitalization.

Currently there are three ways for redevelopment funds to be channeled into neighborhoods.  The City of Sarasota has two divisions responsible for neighborhood planning and implementation, the Neighborhoods, Special Projects and Downtown Redevelopment Division and the North Sarasota/Newtown Redevelopment Division. The County of Sarasota has a Neighborhood planning division within their Development Services Business Center.  All three of these offices either write or implement existing neighborhood plans to promote quality of life and community stabilization in low to moderate-income areas.

## City of Sarasota Neighborhoods, Special Projects and Downtown Redevelopment Division

The City of Sarasota began planning for neighborhood revitalization with the Neighborhood Action Strategy (NAS) Program in 1999 within the Neighborhood Division. Through this program, neighborhood residents, landowners and businesses, with assistance of City staff, identified ways to improve conditions in their neighborhoods. City staff then recommended specific projects and funding strategies to the City Commission for approval.  Eight neighborhoods benefited from this program. These neighborhoods were chosen based upon a variety of demographic data including median household income, educational attainment, code violations and crime index.

Staff actively manages the implementation of action items from these NAS´s and tracks their progress while providing results to service users and providers. There are a total of 646 individual action items for the eight NAS neighborhoods.  Funds from the 2011-2016 Consolidated Plan will be used to further implement these plans to improve the quality of life for the residents of Sarasota.

## Newtown Redevelopment

The North Sarasota/Newtown Redevelopment Division within the City of Sarasota focuses a significant portion of its neighborhood efforts in the Newtown area.  The City's Newtown Redevelopment Office is located within the Newtown community and offers a variety of services to the neighborhood's residents and business owners.  The Newtown neighborhood has the majority of poverty and racial/ethnic concentrations in the City of Sarasota.

Newtown is just over one mile long and has the majority of the public housing in Sarasota County.  It is currently designated as an Enterprise Zone, a HUB Zone, and a Florida Front Porch Community.  The Newtown Redevelopment plan is a neighborhood redevelopment plan with a heavy emphasis on economic development.  Both the City and County of Sarasota have made significant commitments to implement the Newtown Redevelopment Plan.   Listed below are just seven activities that have occurred to implement the plan:

1. The City and County have awarded $16,951,200 to the Housing Authority of the City of Sarasota to redevelop 388 units of public housing that are located in

Newtown.  The funding is $1,500,000 in Tax Increment Financing, $5,000,000 in County Housing Trust Funds, $219,500 in City Housing Trust Funds, $4,420,000 in Penny Sales Tax, $3,825,999 in State Housing Initiatives Partnership Funding and $685,701 in City and County CDBG funds.  This local funding will leverage an additional $110,700,000 in private funding.

2.  The City has committed $786,535 in CDBG and CDBG-R funding to 17 commercial businesses serving the Newtown neighborhood to renovate the exteriors of the businesses and remove code violations.  A total of 15 businesses, most located within the traditional Newtown commercial district along Dr. Martin Luther King Jr. Way have been approved for funding in the program.  This program should be complete by the end of 2011.

3.  The construction of the Robert Taylor Community Complex.  The City of Sarasota has committed over $11 million dollars in local funding and has received 4 separate EDI grants totaling $931,250 for the construction of a new community center serving the Newtown area.  The construction of the Robert Taylor Center began in October 2009 and will be completed by July 2011.

4.  The Sarasota School District has recently constructed new elementary and middle schools in the Newtown Neighborhood and will now construct a new high school.  The new school will enhance educational opportunities as it is being designed to enhance small learning communities.

5.  The City of Sarasota has committed $3,630,000 in local funding for Capital Improvements in Newtown and $917,000 for landscaping improvements for the Newtown Neighborhood in conjunction with the widening of U.S. 301.

6.  Sarasota County has constructed Public Water and Sewer lines, sidewalks, and a pedestrian bridge to serve the North Sarasota Neighborhood.  The past infrastructure improvements in the North Sarasota area totaled $6,615,124.  The City of Sarasota has also spent $1,791,000 on park improvements and a new parking lot for the Newtown commercial district.

7.  OHCD was awarded an NSP2 grant that will provide $23 million dollars to help stabilize and redevelop the Newtown area.   This funding has allowed OHCD to purchase several multi-family units that will greatly increase quality of life in the North Sarasota neighborhood.

## Sarasota County's Neighborhood Initiative Program

The Neighborhood Initiative Program selects neighborhoods to partner with county staff to create neighborhood improvement plans based on income, education, health, safety and code violations.  County staff first listens to the neighborhood's top concerns and then creates a strategy to address them by identifying and evaluating the

neighborhood's strength and weaknesses. To develop the plan residents, business owners and staff members from various agencies discuss each issue in detail during a series of meetings.

To date, neighborhood plans have been created for the Laurel, North Sarasota, Pinecraft, Venice Gardens, and Old Miakka neighborhoods.  There are also additional areas eligible for CDBG funds that have already established community and revitalization plans in Sarasota County.  Those neighborhoods include Nokomis, South Venice, and Englewood.  County CDBG funds will be used to implement these plans.

Neighborhood conservation and revitalization is necessary to keep both growing and built out communities strong.  Both the City and County of Sarasota are dedicated to conserving the high quality of life that strong neighborhoods provide the Sarasota community.

## Economic Development

The Community and Economic Development Focus Group brought to life the importance of business incubators, additional training and educational opportunities for residents, and the ability to use business loans to entice employers to the Sarasota area. As the Consolidated Plan priorities are selected, the creation of jobs will be a top priority.  A business incubator is currently being planned in the Newtown area and the City of North Port has set aside funding in this Consolidated Planning period for another one.

## Neighborhood Obstacles

- Competitive process for limited resources.
- Neighborhood plans need on-going commitment, support, and updating.
- Disagreements over needs, priorities, and goals for neighborhoods.

## Economic Development Obstacles

- Lack of businesses willing to locate in low and moderate-income neighborhoods and communities;
- Lack of existing businesses in low- and moderate income communities;
- Competition for limited funds;
- Commitment needed from business community and lending institutions to encourage economic development in low and moderate-income areas;
- The development of a new organization to oversee the loan program;
- Risk of businesses losing money and/or going bankrupt waiting for area to revitalize.

# HOMELESS NEEDS ASSESSMENT AND MARKET ANALYSIS

## Introduction

Homelessness has untold causes and each case requires unique solutions.  However, as a way to prioritize programs and funding, homeless solutions are being created that focus on either 1st time homeless cases or the chronic homeless.  Generally, the causes of homelessness include poverty, unemployment, low wages, a lack of affordable housing, alcoholism, drug abuse, mental illness, family disintegration, lack of education and training, migration and immigration without means of self-sufficiency and free will. The Great Recession has increased homelessness throughout the state of Florida as families who once had stable homes now have lost their homes through either foreclosure or unemployment.

According to HUD a person is homeless if the individual:

1. Lacks a fixed, regular, and adequate nighttime residence; and

2. Has a primary nighttime residence that is -

    A. a supervised publicly or privately operated shelter designed to provide temporary living accommodations (including welfare hotels, congregate shelters, and transitional housing for the mentally ill);

    B. an institution that provides a temporary residence for individuals intended to be institutionalized; or

    C. a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

To be considered chronically homeless, persons must have been sleeping in a place not meant for human habitation (e.g., living on the streets) and/or in an emergency shelter during that time.  For the purposes of chronic homelessness, a disabling condition is a diagnosable substance use disorder, serious mental illness, developmental disability, or chronic physical illness or disability, including the co-occurrence of two or more of these conditions.  A disabling condition limits an individual's ability to work or perform one or more activities of daily living.

In 2010, the state of Florida released its Annual Report on Homeless Conditions.  This report analyzed both the changes in the homeless population due to the current economic crisis.  According to the report, in 2010 there were a total of 57,643 persons homeless on a daily basis.  This number increased by 1% from 2009 due to:

- The downturn in the national economy;
- Florida's growing number of filings for foreclosure;
- Increasing numbers of applicants for cash assistance, food stamps, and other benefits;
- Rise in demand for local food and feeding programs; and
- Declining revenues for local and state government human services and housing programs.

It is important to note that the State of Florida's definition of homeless includes individuals and families sharing housing due to lack of employment or income.

The rate of first time homelessness remains high due to the difficult economic times. In 2010, over forty-three percent of the persons reported being homeless for the very first time. This is up from 37% in 2007, but down by 6.8% from 2009.   Florida's high rate of foreclosure is in part responsible for the high rate of first time homelessness as individuals lose their homes or are forced to move from rental homes that have been foreclosed upon.

## Local Homeless Data

The Suncoast Partnership to End Homeless (SPEH) which is both the Continuum of Care (CoC) and Homeless Coalition for Sarasota County estimated that there were 803 homeless in Sarasota County on any given day, according to its 2009 Homeless Census Results.  This is substantially higher than 2008, in which the coalition estimated there were 655 homeless in Sarasota County.  However, this is a very large decrease than the homeless population in 2004 when it was estimated that 1,294 homeless individuals in Sarasota County.

When homeless service providers were asked to expound upon the change in the homeless population they concluded that the deep recession that has existed in Florida since 2007 has radically changed the homeless population.  Many homeless have migrated to areas where day labor jobs are easier to obtain.  In addition, the Federal emphasis on ending chronic homeless during the last decade did meet with success with the chronic homeless subpopulation.

Service providers were quick to point out that due to the recession, the homeless population has dramatically transformed.  It is estimated that up to 70% of homeless families and individuals who have lost their jobs are currently living with family members and are therefore not counted in their numbers.  In addition, homeless families are worried that they may lose their children to the foster care system if it is known that they are unable to provide them with a stable home.  While Sarasota County was awarded Homeless Prevention and Rapid Rehousing funds that help to address the increase in homeless families, the need is greater than funding provided and will end by June of 2012.

Focus groups and public visioning sessions throughout Sarasota County pointed out the

need for improved services for families, homeless facilities and feeding programs in South Sarasota County, and a one-stop community center to provide all homeless services in North Sarasota County.  The City of North Port has been deeply impacted by the foreclosure crises and as a result, has a large population of homeless families and families living in foreclosed homes at risk of becoming homeless.  Homeless camps have emerged throughout the county, especially in South County as individuals have outstayed their welcome at friends and families homes and have nowhere to go. Homeless service providers are particularly worried about South County since social services for the homeless exist primarily in the City of Sarasota.

The data provided below is from the HMIS system which is considered a superior data source by the local Coalition as compared to the Point in Time Study.

| Sarasota County Homeless by Year | |
|---|---|
| **2008** | **3295** |
| **2009** | **3900** |
| **2010** | **3773** |

| 2010 Homeless by Gender | |
|---|---|
| **Male** | **1,172** |
| **Female** | **2,652** |

| 2010 Homeless by Age | |
|---|---|
| **Children under 18** | **252** |
| **Adults 18 to 59** | **3,291** |
| **Elderly 60 and up** | **228** |

| 2010 Homeless by Race | |
|---|---|
| **White** | **2,742** |
| **Black** | **723** |
| **Asian** | **23** |
| **American Indian/Alaskan Native** | **13** |
| **Other** | **247** |

| 2010 Homeless by Hispanic Ethnicity | |
|---|---|
| **Yes** | **264** |
| **No** | **3426** |

| 2010 Disabling Condition | |
|---|---|
| **Yes** | **1,158** |
| **No** | **2,447** |

| 2010 Homeless by Need or Disability * | |
|---|---|
| **Addiction** | **39** |
| **Mental Illness** | **66** |
| **AIDS/HIV** | **4** |

The HMIS system experienced a 14.5% increase in overall homelessness between 2008 and 2010 with the primary cause being the economic downturn and commensurate rise in unemployment, while the chronic homeless population remained relatively stable.

According to the SPEH there continues to be insufficient housing to meet the consistent needs of the chronically homeless population.  In addition, due to the recession families with children continue to be one of the fastest growing homeless populations and both emergency and permanent housing remains inadequate to properly assist them.

In general, low- and very-low income families are at-risk of homelessness due to factors ranging from a lack of employable skills, employment opportunities and affordable housing options.  Ongoing case management and supportive services are also required in order to stabilize families for the long-term.  Homeless prevention has been a key focus of Sarasota County over the past five years and resources have been allocated to address the growing demand for emergency financial assistance in the new Consolidated Plan, however staff and financial resources are currently insufficient to properly assist individuals and families at-risk of homelessness.

 In 2010, the CoC listed the following issues as high priority:

1.  Additional emergency shelters for families, woman with HIV/AIDS, youths aging out of foster care, homeless unaccompanied youth who are not being served by foster care, and single men who are chronically homeless and where homelessness has been caused by unemployment;

2.  Additional transitional shelters for families, woman with HIV/AIDS, youths aging out of foster care, and single men who are chronically homeless and where homelessness has been caused by unemployment;

3.  Additional permanent housing for families, woman with HIV/AIDS, youths aging out of foster care, homeless youths, and single men who are chronically homeless and where homelessness has been caused by unemployment.

These priorities were chosen based upon several factors**.**

1.   Monthly meetings with area homeless service providers;

2.  The 2009 Homeless Census Results;

3.  An annual meeting with homeless service providers to determine unmet needs and gaps in services;

4.  Surveys submitted by service providers that detail services provided, populations and geographic areas served, and the unmet needs specific to area agencies;

5.  The CoC also attends a caseworker roundtable that determines unmet needs; and

6.   An analysis of the regional 2-1-1 phone calls for services and needs both met and unmet.

A focus group discussion with homeless service providers including the CoC in Sarasota County showed that a wide array of services for the homeless exist in Sarasota County.  Their priority needs were:

1.  Programs to assist the homeless;
2.  Financial support of programs that feed the homeless;
3.  Facilities and programs for the homeless in South Sarasota County; and
4.  Transitional living facilities for homeless youths and youths aging out of foster care.

## Continuum of Care and Homeless Coalition

The Suncoast Partnership to End Homelessness, Inc. (SPEH) was designed to be the provider of the Continuum of Care System for Sarasota and Manatee Counties. The Continuum of Care (COC) is a community plan to organize and deliver housing and services to meet the specific needs of people who are homeless as they move to stable housing and maximum self-sufficiency.  The SPEH was created by community and governmental leaders to provide collaborative-based services to homeless people.  The Sarasota-Manatee Continuum of Care program is a partnership of over 100 agencies, partners and individuals from throughout Manatee and Sarasota Counties with the widest possible representation from the business, criminal justice, government, homeless and social service communities. The SPEH assesses community homeless needs, identifies gaps in service, monitors agency programs and researches best practices to improve the efficiency and effectiveness of programs to prevent and end homelessness in the community.

The Suncoast Partnership writes federal and state grant applications on behalf of homeless service providers and was awarded over $1.2 million in grants in FY2009 to

build and operate housing for homeless individuals and families with special needs. The agency conducts the annual homeless census (mandated by HUD) and publishes the findings in an annual *Community Report on Homelessness.*

The Suncoast Partnership gathers, analyzes, and reports aggregate homeless client and service data using HMIS (Homeless Management Information System) and provides HMIS training, licensing and technical support at no cost to participating agencies.  Through HMIS, the Suncoast Partnership captures an estimated 80% of all homeless services provided in Sarasota and Manatee counties.

The Suncoast Partnership will also continue to develop and manage special programs such as the Art & Homelessness program at Resurrection House and the "Tour de Ranch" at Lakewood Ranch which provides bicycle transportation to homeless people.

## Plan to End Homelessness and Chronic Homelessness

Currently, the SPEH is participating in a countywide outreach effort to create a Ten Year Plan to Prevent and End Homelessness in Sarasota County.  The Consolidated Plan and Ten Year Plan are integrated and will work together over the next five years to accomplish homeless goals.  The Consolidated Plan includes funding for homeless shelters in North and South County as well as funding to hire staff to help implement the Ten Year Plan.

While still under development, the plan has the following eight strategic goals:

- Increase access to appropriate homeless housing options, including emergency shelter, transitional, permanent and permanent supportive housing and accessible, affordable housing.  Focus on long-term safe, stable housing.

- Improve outreach to people experiencing homelessness.

- Increase awareness of homelessness among all sectors of the community.

- Improve discharge planning from foster care, health, substance abuse and mental health and detention facilities.

- Increase access to supportive health and human services for people experiencing homelessness.

- Increase economic opportunity for homeless people and people at risk of becoming homeless.  Focus on job readiness, job training, job placement and mentor support.

- Focus on preventing homelessness by providing early supportive services to keep people in safe, stable living environments.

- Create innovate community partnerships to prevent and end homelessness.

## Plan to End Chronic Homelessness

While the Ten Year Plan is written, the CoC will still continue to seek funding for additional housing to reduce chronic homelessness. Additional housing was developed in 2009, the Housing First initiative has been presented and discussed locally and a Shelter+Care model has been implemented with 25 housing vouchers. Community education about homelessness is ongoing through a Speaker's Bureau in an effort to obtain wider community support for ending chronic homelessness, however, limited funding and other challenges, such as zoning prohibitions, and a lack of strong community understanding and support are impediments to creating additional housing and services for chronically homeless individuals.

The main strategy for ending chronic homelessness in Sarasota remains in attracting this population into the service delivery system. This involves two thrusts—service development and outreach.

The first is the area of service development. The community needs to increase the capacity of existing services available to the chronic homeless. Emergency shelters, provision of food and basic medical care are high priorities. Renaissance Manor and the Volunteers of America are both expanding the number of permanent supportive housing beds available.

A key element for the continued growth of services to fill identified gaps is the need for a stable, renewable funding source to support these new/expanded services on an ongoing basis. To relieve the financial burden of increased services, the community needs to explore the large resource of retired individuals in the area. A local provider of elderly services has done an excellent job of recruiting retired doctors, dentists and nurses for a very successful health clinic for the elderly. A similar approach needs to be explored to expand this concept to the homeless populations in general and the chronic homeless in particular. The provision of adequate facilities from which to more effectively deliver these services is also a need.

The second thrust is to expand active outreach to the chronic homeless populations. It is estimated that there are 360 chronic homeless individuals at any given point in time in Sarasota and Manatee Counties. Of this number 173 are sheltered and 187 unsheltered. The area is fortunate to have resources such as our two-day resource centers (Resurrection House in Sarasota and Open Door in Bradenton). Largely volunteer staffed, these centers are one of the primary points of contact with the chronic homeless. The dedication of their staff enables the building of relationships that can (over time) lead to personal decisions to seek help and change behaviors.

The need for a "safe haven" type of facility needs to be explored as another possibility. Also, there is a growing street ministry by the downtown churches and continued outreach into the homeless camps by the Salvation Army.  All of these efforts need to be encouraged, supported, and expanded.

Efforts to develop a viable alternative to arrest and incarceration continue in the city of Sarasota and Sarasota County.  This collaborative effort with city police and county law enforcement, mental health providers, emergency shelter providers and mental health court will provide a protocol for law enforcement to encourage chronic homeless to choose treatment over incarceration.  The final step in this area will be to develop a coordinated plan for regular outreach to geographic areas not currently being covered by existing service provider efforts.  Development of such a plan will follow the development of the intervention protocols for law enforcement and the identification of needed service expansions to handle increased referrals resulting from such outreach.

## Discharge Planning Policy

After an extensive community analysis, the CoC has implemented the following discharge planning policies:

## Foster Care:

SPEH has worked with Florida Coalition to develop formalized protocol for a foster care discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices.

Currently, when a child ages out of foster care, he/she receives an Independent Living Services Transitional Services Plan which includes assistance and information on applying for life skills classes; transportation; school enrollment assistance; assistance with registering for employment at Workforce Development; identifying local employment opportunities; applying for job training and/or apprenticeship programs; continued care in the areas of physical health, mental health and education; obtaining safe and stable housing; identifying community activities; and maintaining an ongoing relationship with the local system of care.

SPEC has also researched and produced a foster care report and developed partnerships with Children's Guardian Fund and Next Step programs. SPEH assists with grant writing to provide youth aging out of foster care with transition and educational expenses and support.

## Health Care:

Suncoast Partnership has worked with Florida Coalition for the Homeless to develop formalized protocol for health care discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices.

Currently, patients may be discharged from the hospital or transferred to another level of care, treatment, and services, to different health professionals, or to settings for continued services. The hospital's processes are based on the patients assessed needs. The hospital assesses the patients needs, plans for discharge or transfer, facilitates the process, and helps to ensure that continuity of care, which may include mental health or substance abuse treatment, other treatment, and services. Planning consists of a clear understanding of how to access services in the future. Information related to the care, treatment, and services provided is exchanged with other service providers.

Outreach mobile healthcare to homeless persons is provided daily at agencies and sites though out Sarasota County. Sarasota Memorial Hospital will continue to contact the Salvation Army Sarasota and arrange for homeless patients to enter the Salvation Army program for temporary housing, drug abuse counseling, job placement and case management.

## Mental Health:

Suncoast Partnership has worked with Florida Coalition for the Homeless to develop formalized protocol for mental health discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices. Currently, discharge planning for all indivduals receiving treatment includes transportation, access to stable living arrangements, assistance in obtaining aftercare follow up for medications and case management, assessment of medication availability, community program contact and referral information, referral to substance abuse treatment programs, and trauma or abuse recovery focused programs or other self-help groups.

First Step also has a discharge plan that involves housing, vocational assistance, supportive care and individualized support based upon individual client needs. Manatee Glens provides ongoing supportive services to discharged clients including referral to housing agencies and the Salvation Army. They also provide rental assistance to qualified individuals.

## Corrections:

The Manatee and Sarasota County Sheriff's Office are implementing discharge planning policies and procedures that include continued care and follow-up after release. The plan begins upon recognition of a serious physical or behavioral health issue. Planning includes linkages and discussion on importance of follow-up.

Sarasota County Jail's multi-step discharge plan provides a bi-lingual book of referrals; an interview with Suncoast Workforce Board, applications to housing, and linkage to Salvation Army for housing and substance abuse support services.

Manatee County Jail established a Discharge Planner position and the caseworker who

filled this position has met with over 1,300 inmates and successfully placed 40% of them upon discharge in the Manatee and Sarasota community. Currently the caseworker is meeting with 60-100 inmates per month with the majority being veterans and/or those in need of mental health services. There is support for a similar position in Sarasota County.

The Sarasota County Sheriff's Department has established jail pods for men and women who wish to recover from drug and alcohol addictions with the intention that this initiative will lead to long-term sobriety and a decrease in recidivism.

The CART Program is a collaboration among 6 agencies in Sarasota County which focuses on diverting homeless individuals from the criminal justice system through a secure receiving center.  CART includes a 10-week residential services program, a150 hours of substance abuse treatment, mental health services, vocational assistance, health care, and counseling.

## Reception/Day Center

**Access One –** Provides assistance for the homeless who also suffer from mental illness.

**All Faiths Food Bank –** Feeds the hungry through a food pantry service for other agencies and individuals in need.

**Bethesda House –** Ministry providing supportive services to people with HIV/AIDS, their families, friends and caregivers.  Provides food pantry, support groups, programs for women, laundry facilities, pastoral counseling, case management, information and referral, assistance with obtaining housing and public benefits, home and hospital visitation and transportation.

**Caritas of St. Martha's –** Provides emergency help, food, and utilities for the poor.  It is a program run by the Church of the Redeemer, First Baptist Church, First Presbyterian Church USA, First United Methodist Church and St. Martha Catholic Church.  These churches serve about 25-30 clients a day.

**Catholic Charities –** Assists with utilities, rent, and medical needs for the poor. About 242 homeless clients per year including 64 families, 149 children and 93 adults are assisted.

**Central Church of Christ** – Food pantry providing canned/packaged goods for temporary food assistance.

**Child Development Center –** Parenting education for homeless families.

**Children First, Inc**. **–** Early Head Start placement for children of homeless families.

**Church of Palms -** Food pantry providing canned/packaged goods for temporary food assistance.  Referral required.

**Community Care and Share –** Venice-based assistance program with food, utilities, medical care and other services anticipated as funding becomes available.

**Consumer Credit Counseling Services –** Provides money management education for homeless families and individuals.

**Englewood Bible Church –** Assists about 40-80 families every week with food and other services in the Englewood Community.

**Englewood Helping Hand** – Englewood residents may receive immediate emergency help with food, rent, utility bills, referral services, clothing, prescription medicines, disabled children's medical equipment and job placement.  Those with an emergency homeless situation may be placed for one night so other arrangements can be made.

**Epiphany Cathedral –** Venice-based emergency assistance for homeless individuals. Provides referrals for emergency shelter.

**First Step of Sarasota, Inc. –** Intake for alcohol/drug abuse, detoxification, drug treatment, pregnant substance abuse women's program and residential alcohol treatment. Serves homeless and non-homeless individuals.

**Florida Department of Children and Family Services –** Cash assistance for families with absent or disabled parents, food stamps, Medicaid and other services for needy children and adults.

**Gifts from God Ministries –** Provides free food pantry for the needy.

**Good Samaritan Ministries –** Provides free clothing and meals for the needy.

**Goodwill Industries** – Provides job training, employment and related services for the homeless with a focus on persons with disabilities. Assists approximately 135 homeless clients annually.

**Gulfcoast Legal Services –** Provides free legal assistance to low-income persons.

**Harvest Tabernacle –** Provides a food pantry and other services.

**Jim Russo Development Center –** Program for ex-offenders coming directly from prison. Services include housing assistance, employment services, meals, and transportation. The program averages 60 clients per year from both Sarasota and Manatee counties. Currently they can house up to 20 clients at one time.

**Mary House Ministries –** Bradenton-based halfway house for substance abusers.

Clients are typically homeless or in danger of homelessness. Serves more than 25 women and their children each year.

**Mothers Helping Mothers** – Provides necessities to families in need in Sarasota. Works with other agencies with battered women, substance abusers, Hispanic women and farm workers, the disabled, and women in homeless shelters.

**North Port Social Services –** Food, gas vouchers, and referral services for the poor.

**Resurrection House** – Service provider for the homeless including medical assistance, counseling, restrooms, showers, laundry, food, clothing, telephone, bus tickets, job search, temporary housing for families, and referrals to other agencies.

**Safe Place and Rape Crisis Center** – Information and referrals for victims of domestic violence and abuse.

**Saint Vincent De Paul –** Provides assistance with housing, food, medical bills or transportation.

**Salvation Army of Sarasota** – Social Services Department provides assistance with rent, utilities, food boxes, clothing, auto fuel vouchers, and emergency prescriptions. Also has a feeding program that assists between 300-400 people daily.  Serves breakfast, lunch and dinner.

**Sarasota County Health and Human Services Business Center –** Clinics at shelters, provides health care and referrals. Provides burial services, utility assistance, medical assistance, medically indigent adult program, rent assistance, veterans assistance, and referrals.

**Sarasota Veterans Center –** (part of the Sarasota Health and Human Services Business Center) Provides counseling and referral services for homeless veterans.

**Second Chance/Last Opportunity -** Walk-in facility for the homeless, life management skills, clothing, washing facilities, food vouchers and baskets and referrals to services such as the Salvation Army and Resurrection House. Serves over a 1,000 a homeless per year.

**SHARE –** Food program with sites at Grace United Methodist Church in Venice, North Church United Methodist, Peace Lutheran, St. Andrew Church of Christ, Trinity United Methodist and Vamo United Methodist.

**United Way 2-1-1 of Manasota Inc.** – Telephone resource for anyone in Sarasota or Manatee County seeking any kind of social service program. This service refers the homeless, or those threatened with homelessness, to sources of financial assistance, food, shelter, and other assistance.   The call center has been handling over 4,000 calls each month from residents of both Sarasota and Manatee County.

**YMCA** – The YMCA provides educational services for homeless youth.  They impact approximately 1900 homeless children and their family members each year.

## Emergency Shelter

**Coastal Behavioral Healthcare –** Health care facility providing services and housing to those affected by drug abuse, alcohol abuse, mental illness, and mental health problems.  Provides services to over 650 homeless individuals annually.

**First Step of Sarasota, Inc**. **–** Provides services and shelter for adults with drug and alcohol problems, mental health problems, or both. Their Detoxification program has 15 beds, with eight available for homeless clients.

**Good Samaritan Ministries –** Six beds available for emergency housing.

**Mercy House –** Temporary shelter serving families and individuals of the Venice area. There are 10 beds available for homeless families.

**Safe Place and Rape Crisis Center –** 16 emergency shelter beds for domestic violence victims.

**Salvation Army of Sarasota** – provides 96 men and 16 females with emergency shelter.  In addition, has an emergency family dorm that can serve up to 5 families.

## Transitional Housing

**Harvest House –** offers food, shelter, clothing, immediate full-time employment upon entry, job training, transportation, addictions counseling, financial management and a loving, nurturing environment.  Serves up to 80 men.

**Our Mother's House** – Our Mother's House provides low-cost apartment living in a safe, nurturing, yet stimulating, community environment. Our Mother's House goal is to promote the healthy development of single homeless mothers and their at-risk children through support services that provide the opportunity to develop healthy parenting skills; and, gain economic self-sufficiency.  Mothers are required to enroll in an educational or vocational program while their children have an educational experience in the day care provided on site. The house has 10 one-bedroom apartments where a mother and child can stay while the mother pursues an education, degree, and/or job training. Serves about 30 homeless clients a year.

**Safe Place and Rape Crisis Center -** 24 transitional housing beds available for domestic violence victims.

**Salvation Army VIP Program-** The Salvation Army offers their VIP Program, which is a 12-week drug and alcohol rehabilitation program for homeless individuals.  It serves

both men and women and follows an AA model.

**Salvation Army F.A.I.TH Program-** provides long-term living for 12 families. Families may stay for one year and must pay off their debt and save a minimum of $3,000 before graduated from the program.

**Salvation Army Transitional Living Center** – clients can stay for up to 6 months in a safe, drug free environment for $70 a week.  Must be single and employed.

**YMCA** – Provides a transitional living program for homeless youth and homeless single mothers ages 16-21. Has shelter for up to 16 at a time.

# SPECIAL NEEDS ASSESSMENT AND MARKET ANALYSIS

## Introduction

The populations identified that have special needs are persons who are not homeless
but require supportive housing. These include:

- The elderly;
- Frail elderly;
- Persons with disabilities (mental, physical, developmental);
- Persons with alcohol and/or drug addictions;
- Victims of domestic violence;
- Persons with HIV/AIDS and their families; and
- Persons living in public and assisted housing.

## The Elderly

Elderly is defined by HUD as a person who is at least 62 years of age. Most Census
data for the elderly, however, is for persons 65 and older.

Due in part to a large number of retirees, the elderly constitutes the largest category of
special needs in Southwest Florida.  According to the Florida Department of Elder
Affairs in 2008, 41.6% of Sarasota County's housing stock is occupied by someone 65
years of age or older.  There are 121,958 elderly individuals in Sarasota County or just
over 30% of the total population.

| 2008 SARASOTA COUNTY ELDER POPULATION BY AGE GROUP | | |
|---|---|---|
|  | Number | Percent |
| 65+ | 121,958 | 31.0% |
| 70+ | 93,848 | 23.8% |
| 75+ | 67,448 | 17.1% |
| 80+ | 42,056 | 10.7% |
| 85+ | 20,875 | 5.3% |

*Source:* Florida County Profiles, Florida Department of Elder Affairs

According to the Department of Health and Human Services, by the year 2030 the
elderly population in the United States will double from 35.6 million to an estimated 70
million as the baby booming population ages.  This will have a dramatic effect in
Sarasota County where the elderly already account for over 31% of the population.  The
Bureau of Economic and Business Research predicts that the number of elderly (65+) in
Sarasota County will be 89,696 by 2030.

Data provided by HUD for the 2007 Sarasota County Comprehensive Housing Affordability Strategy (CHAS), shows 49.2% of elderly renters and 21.2% of elderly homeowners in Sarasota County have a housing problem.

Households with housing problems include those that:

- Occupy units meeting the definition of physical defects;
- Meet the definition of overcrowded;
- Meet the definition of cost burden greater than 30%.

According to the CHAS data:

- 6,520 elderly renter households in Sarasota County have a housing problem;
- 20,140 elderly homeowners in Sarasota County have a housing problem;
- A total of 26,660 elderly households in Sarasota County have a housing problem.

The data makes no distinction between frail elderly and elderly, and is inclusive of both populations.

According to 2007 CHAS data, there are 7,796 elderly one- and two-member households who rent.  In addition, according to 2007 CHAS data there are 6,260 elderly households who are very low income (earning less than 30% of MFI). It is likely nearly all of these households are in need of some level of support, with need increasing inversely with income.

According to the Florida Department of Elderly Affairs 2008 population profile for Sarasota County, 41.6% of Sarasota's housing stock is occupied by elders and of those 23% are paying more than 30% of their income towards housing expenses.

These numbers may be far worse due to the foreclosure crisis throughout the nation. As a result of the deflating housing bubble and economic recession, many elderly homeowners were pushed into foreclosure along with millions of other Americans. Housing that had once been secure became insecure and more elderly renters faced the tight rental market with their fixed incomes.  At this time, there is no data that captures the full effects of the recession on the elderly in Sarasota County.

Another major concern is that as many as 50% of the elderly may suffer from depressive disorders resulting from increased dependency and isolation from family support systems following retirement and migration, according to the Florida Department of Elder Affairs. For many this has led to alcoholism, misuse of prescription drugs, and suicide.  Few elderly persons with mental illness receive needed services since depressive disorders are often masked by physical symptoms.  Mental health outreach is a need in the elderly community.  As the county's population ages, both mental and physical disorders become more important to address.

According to Sarasota Senior Friendship Center, there is an increase in unplanned forced retirement due to the economic recession.  They are an entirely new class of elderly individuals who will never economically recover from early forced retirement.  This will drive up housing and social services needs in the coming years.

**Frail Elderly**

Frail elderly is defined in HUD regulations as "an elderly person who is unable to perform at least three activities of daily living (i.e. eating, dressing, bathing, grooming, and household management activities)" - 24 CFR 889.109.

According to the Florida Department of Elder Affairs there are 16,370 elderly with two or more disabilities, while there are 6,534 more who have two or more disabilities including a self-care limitation.  Therefore, there are at least 6,534 frail elderly in Sarasota County.

The CHAS data for elderly housing needs is inclusive of all elderly housing, including the frail elderly.

The frail elderly are particularly in need of decent, safe and sanitary independent living environments.  For this reason, assistance is needed with cleaning, maintenance, housing rehabilitation and other services such as emergency alert/response.  In order to maintain the elderly and frail elderly in decent, safe and sanitary independent living environments, about half of the homes rehabilitated by the Sarasota Office of Housing and Community Development each year are elderly occupied.  Without such assistance, homes can fall into disrepair, resulting in health and safety hazards, code violations, property liens, foreclosures and ultimately premature institutionalization.

According to Sarasota's Senior Friendship Center, their waiting list for Aging in Place services is exploding.  Aging in Place services are those that allow the elderly to continue to live independently in their own homes, i.e. cleaning and meal delivery services.  These programs are much less expensive to carry out than the cost of assisted living, but currently they are not able to meet the growing demand.

In addition, there are many elderly individuals and couples who require assisted living, but are unable to sell their homes to pay for the additional level of care.  They are trapped in their homes not receiving the care that they require until the housing market improves.

**Services and Facilities for the Elderly and Frail Elderly**

According to the Florida Department of Elder Affairs, the following services for seniors, retirement facilities, assisted living facilities (ALFs), adult family care homes (AFCHs), and nursing homes are available for the elderly and frail elderly populations who are not homeless but require social services:

**Services**

- 211: One-stop information and referral service for all community, social and government services.

- The Assisted Living for the Elderly (ALE) is a home and community-based services program for recipients who reside in qualified assisted living facilities.  Seniors in danger of being placed in a nursing home may apply for this waiver to help cover the cost of an ALF.  According to Sarasota's Senior Friendship Center, there is currently a 3-year waiting list for this state funded program.

- Senior Friendship Centers: Non-profit organization providing services to help individuals 60 and older. Provides numerous services including social, recreational, health and other activities.

- Community Mobile Meals of Sarasota: Provides home-delivered, well-prepared and nutritionally balanced meals six days a week to homebound elderly as well as disabled or ill residents of all ages.

- Venice Area Mobile Meals: Provides same service as Community Mobile Meals of Sarasota.

- Meals on Wheels of North Port: Delivers meals to North Port residents.

- Home Health Care: Provides skilled care and supportive services for persons living at home.

- Tidewell Hospice: Provides support system for patients and families with life-limiting illness.

- Area Agency on Aging of Southwest Florida: Provides seniors with a call center to determine solutions to their individual problems, particularly with access to long-term support options.

**Retirement Facilities
(Individually Owned)**

- Bay Village: 400 residents
- Fountains at Lake Pointe Woods: 184 apartments
- Glenridge on Palmer Ranch: 301 units
- Plymouth Harbor: 227 apartments, 10 assisted living apartments, 60-bed health center

- Sarasota Bay Club: 343 units
- Sunnyside Village: 38 duplexes, 66 villas, 122 garden apartments
- Waterside Retirement Estates: 164 units, 25 assisted living units
- Jacaranda Trace: 188 units, 201 units

## Retirement Facilities (Rentals)

- Alderman Oaks: 48 apartments
- Beneva Oak Apartments: 40 units
- The Bayou: 120 apartments
- Casa Santa Marta: 78 units
- Casa Santa Marta II: 52 units
- Colonial Park Club: 90 apartments
- Elmar Guest Home: 12 residents
- J.H. Floyd Sunshine Village: 59 units
- Jefferson Center: 210 units
- Kobernick House: 191 apartments
- McCown Towers I and II: 176 units
- Palmer Club At Prestancia (The): 100 apartments
- Lakehouse West Retirement Estates: 25 units
- Willow Creek Phase I and II: 224 units
- Village on the Isle: 220 apartments, 100 assisted living apartments, and 60-bed nursing center
- Villa San Marco: 80 units
- Villas Of North Port: 37 units

## Assisted Living Facilities
## (15 or more residents)

- Alterra Clare Bridge Of Sarasota: 40 beds
- Alterra Sterling House Of Venice: 60 beds
- Amberwood: 31 beds
- Anchin Pavilion: 109 beds
- Arden Courts: 56 beds
- Ashton Place: 40 beds
- Aspen Bella Vita: 115 beds
- Bahia Oaks Lodge: 100 beds
- Balmoral Court On Fruitville, Inc.: 16 beds
- Bay Village Of Sarasota, Inc.: 30 beds
- Beneva Park Club: 120 beds

- Bons Secours Place at Healthpark: 103 beds
- Cabot Reserve on the Green: 60 beds
- Claire Bridge of Sarasota: 36 beds
- Claire Bridge of Venice: 42 beds
- Colonial Park Club: 110 beds
- Crestwood Manor: 20 beds
- Cypress Gardens At Palmer Ranch: 130 beds
- Cypress Gardens At Sarasota: 100 beds
- Emeritus at Beneva Park: 120 beds
- Emeritus at Sarasota: 102 beds
- Englewood Meadows: 19 beds
- The Gardens of North Port: 75 beds
- The Gardens of Sarasota: 107 beds
- The Grand on Beneva: 44 beds
- Gulf Winds: 35 beds
- Harbor Inn of Venice: 10 beds
- Harbor Inn of Venice South: 6 beds
- Harborchase Of Venice: 108 beds
- Harmony Pavilion:  20 beds
- Heron East: 112 beds
- Heron House: 95 beds
- Highlands (The) At The Glenridge On Palmer Ranch: 80 beds
- Horizon Bay of Sarasota: 150 beds
- Inglenook: 16 beds
- Inn Aston Gardens at Pelican Pointe Venice: 50 beds
- Inn at Lake Pointe Woods: 110 beds
- Live Oak Manor: 67 beds
- McIntosh Manor: 16 beds
- Merrill Gardens at Sarasota: 173 beds
- North Port Retirement Center: 100 beds
- Lakehouse West: 32 beds
- Osprey Pointe on Palmer Ranch: 118 beds
- Palmer Ranch Healthcare & Rehabilitation ALF: 60 beds
- Park Place of Venice: 90 beds

- Pines of Sarasota: 72 beds
- Pinewood Gardens: 34 beds
- Renaissance Manor: 41 beds
- River Oaks: 216 apartments
- Riverpark Senior Residence: 92 beds
- Savannah Grand: 44 beds
- Siesta Assisted Living: 34 beds
- Springrove ALF: 15 beds
- Summerville of Venice: 89 beds
- Sunnyside Manor: 45 beds
- Sunset Lake Village: 110 beds
- Sunshine Meadows: 75 beds
- Village On The Isle: 100 apartments
- Waterside Retirement Estates: 185 beds

### Assisted Living Facilities (Fewer Than 15 Residents)

- Arlington Manor: Six beds
- Aurora Manor, Inc: 10 beds
- Bayshore Guest Home: 10 beds
- Briggs III, Inc.: Six beds
- Carefree Living Of Sarasota, Inc.: Six beds
- Casona: Eight beds
- Coash Gardens: Six beds
- Croton Manor: Six beds
- Desoto Acres:  Six beds
- Duyn's Place: Nine beds
- Excelsior Omega:  13 beds
- Family Traditions III: Six beds
- French Blossoms: Six beds
- French Blossoms II: Six beds
- Hacienda La Grande: Five beds
- Harbor Inn of Venice: 10 beds
- Harbor Inn of Venice South: Six beds
- Jacaranda Trace: 13 beds
- Joy of Living: Six beds
- La Paloma:  Six beds
- Mary's On Bayshore: Six beds
- Marella House: 11 beds
- Oppidan, Inc.: 12 beds

- Palmetto Court Park: 12 beds
- Plymouth Harbor, Inc.: 10 beds
- SLC of Sorrento: Six beds
- Sea View Inn: Six beds
- Sunniland Retirement: Six beds

**Adult Family Care Homes**

These are set up for up to five residents and offer a personalized and home-like setting. They are regulated by the Adult Services Division of the Florida Department of Children and Families. According to the Florida Department of Elderly Affairs, there are 12 Adult Family Care Homes in Sarasota County serving up to 59 individuals.

### Nursing Homes

- Bay Village Of Sarasota: 107 beds
- Beneva Lakes Healthcare: 120 beds
- Venice Regional Medical Center: 312 beds
- Consulate Healthcare:80 beds
- Cypress Gardens At Palmer Ranch: 60 beds
- Englewood Healthcare and Rehabiliation Center: 120 beds
- Glenridge On Palmer Ranch: 37 beds
- Harborchase Of Venice: 45 beds
- Healthsouth Ridgelake Hospital:  40 beds
- Heartland Healthcare: 140 beds
- Heritage Health Care: 120 beds
- Inn At Sarasota Bay Club: 60 beds
- Kensington Manor: 87 beds
- Lakeside Terrace: 120 beds
- Life Care Center Of Sarasota: 120 beds
- Magnolia Health And Rehabilitation Center: 120 beds
- Manorcare Health Services: 178 beds

- Manorcare Health Services of Venice: 129 beds
- Palmer Ranch Healthcare and Rehabilitation:  60 beds
- Pines of Sarasota Nursing Home: 204 beds
- Pinebrook Rehabilitation and Nursing Center: 120 beds
- Plymouth Harbor Incorporated: 60 beds
- Quality Health Care Center: 120 beds
- Sarasota Health and Rehabilitation Center: 169 beds
- Sarasota Memorial Nursing and Rehabilitation Center:  120 beds
- Springs At Lake Pointe Woods: 119 beds
- Springwood Rehabilitation And Nursing Center: 120 beds
- Sunnyside Nursing Home: 60 beds
- Sunset Lake Health and Rehabilitation Center:  120 beds
- Tandem Health Care Of Sarasota: 81 beds
- Tarpon Point Nursing and Rehabilitation Center:  120 beds
- Village On The Isle: 60 beds

**Persons with Disabilities**

People with disabilities are in the midst of an increasingly acute affordable housing crisis.   According to 2007 CHAS data, there are 17,535 disabled households in Sarasota County.

Data from the Social Security Administration reveals that there were a total of 3,559 persons receiving SSI benefits in Sarasota County in 2008.

Without affordable housing, people with disabilities live at home with aging parents, are homeless or in danger of being homeless, or must choose between substandard housing conditions or paying most of their income for rent.  Advocates for disabled persons desire additional affordable homes in their community.

| MAXIMUM SSI BENEFITS FOR INDIVIDUALS LIVING INDEPENDENTLY, 2010 | | | |
|---|---|---|---|
| Location | Maximum Annual SSI Benefit | Maximum Monthly SSI Benefit | Maximum Affordable Housing Cost Per Month |
| Florida | $8,088 | $674 | $202 |
| Sarasota County | $8,088 | $674 | $202 |

*Source:* National Low-Income Housing Coalition

According to the National Low Income Housing Coalition, monthly Supplemental Security Income (SSI) payments for an individual are $674 in Sarasota County.  If SSI represents an individual's sole source of income, $202 in monthly rent is affordable while the Fair Market Rent for a one-bedroom is $923.

**Physical Disabilities**

Under the Americans with Disabilities Act, persons are viewed as disabled if they have a physical or mental impairment that substantially limits one or more major life activities such as walking, talking, hearing, seeing, breathing, learning, performing manual tasks, or caring for or managing oneself.

According to the 2005-2009 ACS, there are 68,356 disabled individuals in Sarasota County or roughly 20% of the total population.  As the population continues to age, it is assumed that this part of the population will grow significantly.

According to the Social Security Office, there were 110,625 individuals receiving Social Security Benefits in Sarasota County in 2008.  Of these individuals, 8,085 were disabled workers while 130 were spouses of disabled workers and 1,440 were children of disabled workers.

The Shimberg Center for Affordable Housing estimates that there are 52,492 households with a disabled individual who is at least 15 years of age.  Of these households, 12,117 are below 80% AMI and are paying at more than 30% of their income towards housing costs and are cost-burdened.  Due to the high cost of housing, as many as 12,117 affordable units may be required to meet the needs of this population.

It has been pointed out by Suncoast Center for Independent Living that most existing facilities for the disabled are in North County.  There is a definite need for more affordable housing choices for the disabled in the South County area.

Also, to assist the physically disabled, rehabilitation therapies are available at in-patient rehab-hospitals as well as private therapy offices.  Most programs participate in Medicare, health insurance plans and accept private payment.  The goal of rehabilitation for patients of all ages is to restore and maintain capabilities to allow independence and pleasure to the fullest extent possible in the activities of daily living.

**Mental Illness**

According to an estimate from the National Institute of Health (NIMH), 26.2 percent of Americans ages 18 and older suffer from a diagnosable mental disorder in a given year. Even though mental disorders are widespread in the population, 6 percent of our population suffers from a serious mental illness. While no widespread data exists on the number of individuals suffering from a serious mental illness in Sarasota County, there are widespread services available to help individuals suffering from mental illness.

Renaissance Manor is a leader in mental health services in Sarasota.  Currently Renaissance Manner provides 160 beds for supportive housing, assisted living, and targeted case management.  Their philosophy is to "… provide safe, affordable housing in very nice residential neighborhoods, which allow people to live as independently as possible."

Renaissance Manor believes that the decrease in rental prices in Sarasota County has allowed more mentally ill individuals to live independently.  In 2005, they estimated that there were 500 individuals still in need of supported housing.  Renaissance Manor now estimates that number has dropped to 250 low-income individuals.  The remaining individuals require supportive housing, where the mentally disabled can live an independent life.

Another instrumental organization is Mental Health Community Center (MHCC), which provides support services to adults with mental illness and disabling emotional problems. MHCC offers daily programs and activities that bring individuals with mental illness into the mainstream.

MHCC has two main concerns for the mentally ill in Sarasota.  The first is that they are living with elderly parents or are considerably rent burdened.  This causes a high level

of concern because mentally ill adults will be left with no place to live upon the death of
their parents or be forced to spend most of their income on housing at the expense of
being able to afford many activities which allow them to fully integrate into society.

MHCC is also troubled with the low amount of SSI income upon which many of the
mentally ill were forced to live.  As discussed previously, it is almost impossible for an
individual to support himself/herself on SSI.

The following facilities are available to serve the mentally ill with housing issues in
Sarasota County:

- Audubon program of Coastal Behavioral Healthcare: 10 beds for children; 20
  beds for adults
- Alternative Family Program at Gulf Coast Community Care: 12 beds
- Renaissance Manor: 160 beds

**Developmentally Disabled**

According to the US Administration on Developmental Disabilities, there are nearly four
million Americans with developmental disabilities.  Developmental disabilities are
severe, chronic disabilities attributable to mental and/or physical impairment, which
manifest before age 22 and are likely to continue indefinitely.  They result in substantial
limitations in three or more areas: self-care, receptive and expressive language,
learning, mobility, self-direction, capacity for independent living, and economic self-
sufficiency, as well as the continuous need for individually planned and coordinated
services.

The State of Florida currently serves 450 developmentally disabled individuals in
Sarasota County and has 324 individuals on a waiting list for Sarasota County.
However, since the State estimates that 1% of the population has developmental
disabilities, more than 3,000 individuals in Sarasota County may have developmental
disabilities.  Fortunately, a very strong partnership exists in Sarasota County to care and
promote the independence of these men and women.

The largest provider of housing for this population is the Community Affordable
Supported Living (CASL).   In June 2009, CASL merged with Renaissance Manor and
currently serves 80 individuals.  While CASL cannot determine the full need for
supportive housing, they believe there are not enough housing vouchers to serve
people in community based settings.

They are concerned that individuals with developmental disabilities are inappropriately
placed with aging parents, institutions such as skilled nursing homes or in a
substandard living situation.  The organization is a strong advocate for expanding
funding to serve persons with developmental disabilities and is willing to expand to
serve more clients should additional funding become available.

A strong partner of CASL is Children's Haven and Adult Community Services (CHAC). Presently CHAC serves over 400 disabled adults in a variety of programs. They provide housing and living support for fewer than fifty. CHAC also provides job training services to clients who are supported in their living situation by other agencies. All others live in family homes and may need support in the future.

Currently, 85 people CHAC serves receive Medicaid Waiver funding and therefore are eligible for housing assistance. However, there is a state waiting list of over 20,000 individuals so it is unclear what the state's ability or willingness will be to provide the varied level of assistance needed by their clients when their parents can no longer be the caregivers.

CHAC expressed the ability to expand housing programs if funding is available.

An additional service provider is Easter Seals of Southwest Florida. One of the many programs that Easter Seals runs is an Adult Day Training (ADT) program for the developmentally disabled. The program offers relevant personal, social, therapeutic, and work skill training to adults with disabilities through community and center-based resources. The activities are designed to advance individual independence and expand participants' life choices at work, home, school, and in the community. Currently, Easter Seals is serving 15 Sarasota residents with this program.

Of their current Sarasota county clients, two are living independently, one is in assisted living, and a fourth lives in a group home. The other 11 clients are being cared for by their families. Easter Seals has expressed concerns over the aging of current caretakers and the future of their clients once they are no longer able to care for them.

OHCD held a special needs focus group with service providers. Two main concerns were brought to light as a result. The first is that due to lax licensing requirements many developmentally disabled individuals living in assisted care are becoming victims of abuse or improper care.

The second issue is that the developmentally disabled would benefit from a family village living scenario. When asked by providers, many clients would choose to live in apartments or houses with their fellow developmentally disabled friends. Providers point out that this kind of arrangement would cut service and transportation costs while maximizing benefits. Currently, the state of Florida will not allow this type of living arrangement since it is viewed as an institutional setting.

**Persons with Alcohol or Drug Addictions**

There is no Sarasota County data regarding the number of persons addicted to drugs and alcohol or the number of beds needed to address substance abuse addiction.

According to the Substance Abuse and Mental Health Services Administration (SAMHSA), in 2008, an estimated 22.2 million persons aged 12 or older or 8.9% of the

US population were classified with substance dependence or abuse. Of these, 3.1 million were classified with dependence on or abuse of both alcohol and illicit drugs, 3.9 million were dependent on or abused illicit drugs but not alcohol, and 15.2 million were dependent on or abused alcohol but not illicit drugs. Florida had the same rate of estimated abuse. Since Sarasota County had a population of 371,320 in 2009, there are an estimated 33,047 individuals in Sarasota County that may have a substance abuse problem.

There is a clear need for Sarasota County to determine both the need and the resources for individuals suffering from alcohol and drug addiction. A newly formed organization, the Sarasota Coalition on Substance Abuse (coalition) hopes to fill this gap. Created in 2000, the coalition is just beginning to make its presence felt in Sarasota County. The coalition also estimates that there are between 8-10% of the population with an addiction problem or 26,000 to 32,000 individuals in Sarasota County.

According to the coalition, there is a definite need for safe, decent, and affordable housing for individuals who have completed treatment for substance abuse in Sarasota County. The coalition believes such housing should be substance free, near both work opportunities and public transportation and offer a sense of dignity for clients. In addition, since services do not yet exist, this housing should be developed gradually, but consistently.

First Step of Sarasota says its facility has about 128 treatment beds for alcohol and drug addicts. They have a detoxification program with 15 beds, residential treatment, programs for pregnant mothers with 20 beds, and fairly extensive programs for adults with substance abuse problems in the judicial system. In addition, they also offer individual therapy, open group therapy, outpatient psychiatric services, adolescent/teen programs, and recovery maintenance programs for individuals who have successfully stopped abusing alcohol or drugs.

The Salvation Army offers their VIP-ER Program, which is a 10-week drug and alcohol rehabilitation program for individuals with limited means. It serves both men and women and follows an AA model.

Many of the beds available for the mentally ill and homeless in Sarasota also treat substance abuse addictions since these vulnerable populations overlap.

**Victims of Domestic Violence**

According to Florida Law "Domestic violence" means any assault, aggravated assault, battery, aggravated battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, false imprisonment, or any criminal offense resulting in physical injury or death of one family or household member by another family or household member.

The initial six month data for 2009 released by FDLE reflected an alarming 8.9 percent increase in domestic violence homicides, a 100 percent increase in domestic violence manslaughters, and a 38 percent increase in stalking (a typical precursor to homicide). Many  these homicides and manslaughters were some of the most brutal in Florida's history.[1]

According to the Florida Coalition Against Domestic Violence (FCADV) in 2008, 113,123 incidents of domestic violence were reported to the Florida Department of Law Enforcement, and 67,615 arrests were made for domestic violence. In that same year, domestic violence offenses accounted for approximately 89 percent of violent crimes.[2] Many victims of domestic violence face the daunting task of finding affordable housing as they seek to rebuild their lives. If housing is not found, they may have little choice but to return to the abusive partners and homes. Many victims of domestic violence and their children can be found sleeping in their cars, doubled up with family and friends or even living on the streets. There are some short term remedies, such as emergency shelter; however, there remain few long term solutions to ease the housing crisis. Battered women are among the hardest hit in Florida's affordable housing crisis. A recent needs assessment by the Department of Children and families found that lack of housing was the number one problem facing women escaping violence.

Victims of domestic violence face unique barriers in seeking affordable housing. Often, leaving an abusive relationship means leaving stable housing and income provided by the abuser. Many victims of domestic violence have been unable to work due to injuries from the violence, or have been prevented from doing so by the batterer. They often require case management and resources to develop or strengthen the independent living skills necessary to rebuild their lives. These resources include childcare, job readiness training and placement, budget counseling and credit repair. Victims of domestic violence often face these overwhelming barriers with little or no support from immediate or extended family. They are often chastised for their choice in a partner, or their decisions to leave the batterer. These barriers be can significantly exacerbated without stable and affordable housing.

One study from Georgia State University in 2003 examined housing problems and homelessness after separation in a sample of 110 women who had experienced domestic violence. Of the sample, 38% reported homelessness. Similar percentages reported related problems (e.g., late paying rent, skipping meals, threatened with eviction). Predictors of more housing problems included experiencing a greater severity of violence, contacting fewer formal systems, having less informational support, and receiving a negative response from welfare agencies. Women's odds of reporting homelessness were reduced by 30% if police officers responded negatively. These findings highlight the importance of changing system responses in an effort to reduce women's housing problems and risks for homelessness after separation. [3]
The extent of the need for social services and housing assistance for victims of domestic violence in Florida and Sarasota County is unknown.  However, in response to the affordable housing crisis, the Florida Coalition Against Domestic Violence (FCADV) formed a planning group to take a statewide look at what could be done to address the

housing needs of domestic violence survivors. The group made recommendations for significant expansion of efforts at the local and state level to address the housing needs.

Safe Place and Rape Crisis Center (SPARCC) is the only state-certified center for domestic violence and sexual assault services for Sarasota. In 2008, SPARCC provided the following services:

- 5,284 shelter days to a total of 183 women and 149 children;
- Counseled 1,637 victims totaling 8,093 hours of individual and group counseling;
- 6,440 hotline callers were provided with crisis counseling and needs assessments and volunteers and staff responded to 29 emergency calls from area hospitals to meet with sexual and domestic violence victims in order to provide support and information regarding SPARCC services; and
- 618 presentations were provided in the community to more than 17,000 people.

SPARCC's priority goals in addressing community need include:

- Identifying gaps in service delivery to domestic violence victims and potential systemic breakdowns;
- Promoting training and cross-training to professionals; and
- Coordinating the activities of agencies involved to share and exchange information.

At a Special Needs Focus group held by OHCD, it was pointed out that the greatest need SPARCC would like to address is a lack of affordable housing for victims of domestic abuse through a dedicated affordable housing voucher program.   In addition, SPARCC would like to offer domestic abuse rights education to public housing employees who have in the past threatened to deny housing rights to victims of domestic abuse.

While the exact number of victims of domestic abuse is never known due to under reporting, in 2010 there were 1,754 arrests made for domestic violence including four murder victims.

[1] Tiffany Carr (FCADV President/CEO), Presidents Report, Florida Voice-Winter 2010, page 1.

[2] Florida Voice-Winter 2010, page 1.

[3] Violence Against Women, Vol. 9, No. 7, 754-783 (2003) DOI: 10.1177/1077801203009007002

## HIV/AIDs

In Sarasota, like many communities, persons living with HIV or AIDS risk losing their housing due to compounding factors, such as increased medical costs and limited incomes or reduced ability to keep working due to AIDS and related illnesses.  Stable housing is the cornerstone of HIV/AIDS treatment, allowing persons with HIV/AIDS to access comprehensive healthcare and adhere to complex HIV/AIDS drug therapies.

According to HUD, one-third to one-half of the persons with AIDS in the nation are either homeless or in imminent danger of losing their homes.

According to the CDC, there were approximately 1,056,400-1,156,400 persons living with HIV infection in the United States at the end of 2006. Florida has consistently reported 10–12% of the national AIDS morbidity and currently accounts for 11% of all persons living with AIDS in the U.S. In 2007, the Department of Health estimated that approximately 125,000 persons, or roughly 11.7% of the national total, were living with HIV infection in Florida.

According to the 2007 Florida Annual Report from the Florida Department of Health, Florida ranked second among states in the number of reported acquired immune deficiency syndrome (AIDS) cases.  Florida also ranked fifth among the 38 states that reported human immunodeficiency virus (HIV) cases in 2006.

The 2009-2011 Sarasota County HIV Prevention plan was released in late 2008 and closely examines HIV and AIDS in Sarasota County.  The plan states that Sarasota County has had over 1382 people diagnosed with HIV/AIDS since reporting started by DOH in 1988.  The plan also points out that as of June 2008, there were 304 persons living with HIV and 481 persons living with AIDS for a cumulative total of 769 persons living with HIV/AIDS (PLWHA) in Sarasota County.

HIV/AIDS cases by Sex, Sarasota County, June 2008

| Diagnosis | Males | Females | Total |
|-----------|-------|---------|-------|
| AIDS | 891 | 180 | 1071 |
| HIV | 229 | 82 | 311 |
| Total | 1120 | 262 | 1382 |
| PLWHA | 596 | 173 | 769 |

PLWHA by Race and Sex, Sarasota County, June 2008.

| Race | Male | Female | Total (%) |
|------|------|--------|-----------|
| Black | 105 (17.6) | 82 (47.4) | 187 (24.3) |
| White | 429 (72) | 85 (49.1) | 514 (66.8) |
| Hispanic | 62 (10.4) | 6 (3.5) | 68 (8.8) |
| Totals | 596 | 173 | 769 |

As the figures above illustrate, white males suffer from a higher rate of both HIV and Aids than other racial groups, but according to the report, there is a growing increase in both black and Hispanic reported cases.

Sarasota County currently has a strong support system in place for HIV/AIDS patients. The HIV/AIDS Network of Sarasota (HANS) is the group that guides HIV/AIDS prevention in Sarasota County, along with the Sarasota County Health Department. Members of HANS are from local community based organizations and governments throughout Sarasota County.

Bethesda House and the Comprehensive Care Clinic are two such organizations in Sarasota County. Bethesda House is a day center providing services such as counseling, support groups, a food pantry, laundry and housing and benefit assistance. Bethesda House has 300 active clients and an additional 50 that are registered.  They provide a housing safety net for HIV/AIDS patients who are in danger of becoming homeless once HOPWA funds are no longer available.  When asked to estimate HIV/AIDS clients in imminent danger of becoming homeless, they responded more than 50% of all AIDS/HIV patients.

CCC provides medical services for 550 individuals in Sarasota County. They work in conjunction with Bethesda House to provide holistic care to individuals suffering from HIV/AIDS.  Their focus is on therapy, case management and dental care for their patients.

The National Commission on AIDS reports that at any point in time, up to 50% of those living with HIV/AIDS are at imminent risk of homelessness. Persons with HIV/AIDS often are unable to work and must rely on SSI for their sole source of income. Housing assistance – including HOPWA funding – is time limited and often less than fair market value. Using the National Commission on AIDS reports and the estimated number of individuals living with the disease, it is estimated there are 385 individuals at risk of homelessness due to HIV/AIDS in Sarasota County.

According to local service providers, access to affordable housing is a critical need of people living with HIV/AIDS. Bethesda House claims that many persons with HIV/AIDS find themselves in need of housing assistance at some stage of the illness. A significant percentage of persons living with HIV have histories of previous homelessness or inadequate housing due to socioeconomic conditions preceding their diagnosis. Others living with the virus that had adequate housing are in danger of losing their homes in the latter stages of illness due to lack of income, lack of transportation, or being forced to leave home by partners or family due to their medical status.

The lack of affordable housing is problematic for individuals with HIV/AIDS receiving medical treatment and on complex medical dosing schedules. Studies demonstrate homeless and those marginally housed fail to be compliant with the complex HIV treatment regimens. The stress of homelessness and poverty exacerbates symptoms, accelerates disease progression and decreases compliance to medical schedules. Stable housing helps individuals meet these requirements and provides the best chance for success for individuals following complex combination therapies.

According to the Special Needs Focus Group held by OHCD, persons with HIV/AIDs and their families are having trouble finding safe, affordable housing in the community. Clients are facing fair housing discrimination and HOPWA funds are not sufficient to meet their needs.

**Foster Care Graduates**

A new special need emerged as a result of the Special Needs Focus Group held by OHCD.  It was pointed out by special needs advocates that as children leave the foster care system they are having severe trouble finding jobs and housing due to the current economic crisis.  Little data is available concerning this issue, but it will be further explored in the coming months.

# Public Housing Market Analysis

## Introduction

Sarasota County has a total of 1,889 units of public housing and Section 8 assisted housing and 1,598 units of subsidized housing. Sixty eight units in Janie's Gardens should be complete by the end of the year for a total of 1957. (See Tables in this Section for details on Public and Assisted Housing units).

It is expected that 36 units of public housing will be lost during the next five years due to a homeownership conversion project. These units of public housing are being turned into condominiums for low-income homebuyers.

The Sarasota Housing Authority (SHA) is a public housing authority separate from the City of Sarasota which runs the Section 8 program for both the City of Sarasota and Sarasota County and six public housing complexes. The SHA is governed by a board appointed by the mayor and approved by the Sarasota City Commission.

The Venice Housing Authority (VHA) is also a separate housing authority from the City of Venice, and is governed by a board appointed by the mayor, with the approval of the Venice City Council.

In Sarasota County there are six public housing complexes managed by the SHA. The VHA did have one complex, but it was demolished in 2010. The VHA is currently seeking funds to build new public housing. Funds to help rebuild the VHA will be set aside in this plan.

SHA reported a waiting list of 422 individuals for public housing and a current occupancy rate of 98.5%. SHA also reports 662 on the waiting list for Section 8 housing for the City of Sarasota and Sarasota County, while the VHA currently has no applicants on their waiting list due to the demolition of the existing facility and planned rebuilding.

## Section 8

The Section 8 rental voucher program increases affordable housing choices for very low-income households by allowing families to choose privately owned rental housing in which the rent is subsidized by the public housing authority (PHA).

The Sarasota Consortium supports the deconcentration of Section 8 units from low-income areas to more mixed-income areas.

## Public Housing Authorities

HUD awarded grants to local Public Housing Authorities (PHAs) to help finance the development of housing to be used as Public Housing.

The local PHA becomes the owner and manager of that housing, once it is developed. As a manager, the PHA is responsible for all aspects of day-to-day management of the housing.  As discussed above, there are two PHAs in Sarasota County, SHA and the VHA.

A PHA must charge its residents a dwelling rent based on a percentage of the resident's income or a flat rent amount. This dwelling rental income is usually insufficient to cover the PHA's operating expenses. So, to cover this "shortfall" between income and expenses, HUD pays operating subsidy to PHAs.

HUD also makes periodic modernization grants to PHAs, to help cover the cost of modernizing and upgrading public housing. In exchange for the financial assistance in developing and operating public housing, PHAs agree to manage the housing according to certain basic, minimum rules and regulations established by HUD.

However, the operating subsidies are shrinking due to budget cuts and PHA's are being forced to either create mixed income housing that will support their operating expenses or prioritize and/or defer capital improvement projects based on available funding.

The SHA has successfully partnered with OHCD to purchase and renovate low-income housing under the Neighborhood Stabilization Program.  Currently, the SHA is running income restricted units that were once in danger of being abandoned.   In addition, the SHA has successfully converted one section of Janie Poe into Janie's Gardens a mixed income development.  The second phase of this redevelopment is underway.

## Capital Fund Program (CFP)

PHAs receive CFP funding on a formula basis. Because it is formula-based, CFP represents a reliable and predictable funding source for PHAs to enable them to modernize their units. PHAs under the CFP program have flexibility and discretion to determine what improvements are needed, how those improvements will be accomplished and the timing of the expenditures.

SHA's and VHA's HUD-approved five-year Action Plans for the Capital Fund Program are incorporated (as may be amended) in the Consolidated Plan by reference.

## Family Self-Sufficiency Program

The purpose of a Family Self-Sufficiency (FSS) program is to promote the coordination of public housing and/or Section 8 program assistance with other public and private resources, to enable eligible families to achieve self-sufficiency.

PHAs are encouraged to establish an FSS program. Neither public housing nor Section 8 resident families are required to participate. Those that choose to participate enter into contracts with PHAs. These contracts outline the resources and services to be made available to help the family achieve self-sufficiency. Among the supportive services that may be provided are childcare, transportation, remedial education, and job training.

When a family experiences an increase in earned income due to participation in the FSS program, the difference between what the family would be paying in rent versus what they actually paid prior to the contract is used to fund an escrow savings account. This account is available to the family upon successful completion of the FSS program and successful performance of its obligations under the FSS contract of participation.

SHA received a FY 2008 grant to operate a Family Self-Sufficiency Program. The grant provides for the salary of an FSS Coordinator to develop 5-year self-sufficiency plans with residents. The FSS Coordinator will also link the resident with resources either in the community or within the ROSS Program which will help them achieve the goals in their plans.

## Resident Opportunities and Self-Sufficiency (ROSS) Program

The 1937 Housing Act authorizes funds for technical assistance and training to resident councils and resident management corporations to promote increased resident self-sufficiency.

Under the ROSS Program, communities are able to select from a wide range of activities, including job training, business development, youth programs, family and social services, education, leadership development projects, and programs designed to promote self-sufficiency.

SHA received a FY 2006 grant of $150,000 to operate a Family Self-Sufficiency Program for three years.  In 2009, SHA received an additional $116,000 from the Gulf Coast Community Foundation of Venice and $5,000 from BB&T Bank in Atlanta.

In 2010, through a partnership with the Manatee Sarasota Workforce Funders Collaborative and Gulf Coast Community Foundation of Venice, the Resident Services Department started offering several training programs that will lead to living wage career opportunities. Some of these courses include:

Licensed Practical Nurse · Pharmacy Technician · Construction Helper

Patient Care Technician ·Dental Assistant/Hygienist

## Economic Development and Supportive Services

Through the Economic Development and Supportive Services (EDSS) program, HUD awards grants to PHAs that form partnerships with nonprofit agencies, or incorporated for-profit agencies. The grants are used to:

- Provide economic development opportunities and supportive services to assist residents of public housing to become economically self-sufficient. Residents who benefit from these services are generally families with children where the head of household is working, seeking work, or are preparing for work by participating in job training or educational programs.
- Provide supportive services to assist the elderly and persons with disabilities to live independently or to prevent premature or unnecessary institutionalization.

## Service Coordinators for Public Housing Agencies

The Service Coordinators for Public Housing Agencies (SCPH) program is a comprehensive effort to ensure that elderly and nonelderly disabled residents have access to the services they need to enhance the quality of life, to live independently, and to avoid premature or unnecessary institutionalization. SCPH funds both supportive services and the hiring of Service Coordinators.

## Homeownership

The 1937 Housing Act authorizes a public housing homeownership program. HUD has also approved individual homeownership programs designed locally. Homeownership programs offer local Public Housing Agencies a flexible approach to design and implement a homeownership program for the sale of public housing units to its residents. The PHA is able to retain and reuse the proceeds of sale of the units for additional low-income housing needs.

The SHA has a homeownership program that is the focus of the ROSS Homeownership module. In concert with Manasota Goodwill's Homeownership Counseling, the ROSS Program's mission is to prepare residents to make a well educated home purchase. Residents are referred to Goodwill for HUD Certified counseling, which covers:

- Fair Housing Counseling
- Choosing a Lender
- Appraisals and Inspections
- Real Estate Settlement Procedures Act (RESPA)

After the course is completed, ROSS staff matches the participants with the appropriate program for their needs.

Residents can also apply for the Sarasota Housing Authority's homeownership option. This program is designed to promote and support homeownership by a first-time homeowner. Section 8 voucher assistance payments help the family pay the costs of homeownership, and may provide additional assurance for a lender, so that the family can finance the purchase of the home.

OHCD will specifically provide outreach to public housing residents to insure that they are aware of the Sarasota Downpayment Assistance Program and the educational opportunities provided by Consumer Credit Counseling.

## Housing Authority of the City of Sarasota (HACS)

SHA has adopted the following mission statement, contained in its PHA Plan for FY 2010-2015:

> *"The mission of the Housing Authority of the City of Sarasota is to provide safe, sanitary and decent affordable housing options and promote self-sufficiency to qualifying families. Sarasota Housing Authority is committed to serving in a manner that demonstrates professionalism, courtesy, respect, and caring.*

SHA also adopted goals for the next five years:

1. Maintain and achieve high performance ratings for financial and management aspects of the Public Housing Assessment System.
2. Maintain a standard performance rating for the physical quality of SHA's public housing (much of which is slated for redevelopment).
3. Achieve High Performer status for the Section Eight Management Assessment Program (SEMAP).
4. Eliminate current audit finding on the compliance of HCV (Section 8) tenant files.
5. Complete the Redevelopment of Janie Poe (FL008000002) in all three phases.
6. Begin the redevelopment of the Orange/Courts/Bertha Mitchell complex (FL008000001).
7. Have more SHA residents gain employment directly through the redevelopment construction process.
8. Develop the newly acquired parcel in Rosemary Park for affordable/mixed-income housing.
9. Look for opportunities to expand SHA's affordable housing inventory in order to assist more low-income families.
10. Maintain an aggressive self-sufficiency (ROSS) program through existing and future grants in order to increase the employment rate of SHA families and to increase the number of families who become economically self sufficient.
11. Identify and/or attract more resources from the community to provide additional services for our residents.

12.    SHA is in the midst of exploring the establishment of an agency-wide resident council that would represent every AMP through elected council members.

SHA's objectives are incorporated in this plan by reference.  OHCD is committed to help SHA meets its goals and objectives.  2.5 million dollars of the recently awarded NSP2 grant is being used to assist SHA with its goal to redevelop Janie Poe.  The second phase of Janie's Garden's is currently under construction.

## The six complexes managed by HACS are as follow:

1.    Orange Avenue – 60 units for families in fair condition.  Receives funds through an approved HUD Capital Fund Program. The building recently added new roofs, gutters and downspouts and was recently painted.

2.    The Courts – 100 units for families in fair condition.  Receives funds through an approved HUD Capital Fund Program.

3.    Bertha Mitchell – 100 units for families in fair condition.  Receives funds through an approved HUD Capital Fund Program. Updates include driveway and weather stripping of front and rear doors.  This property was recently awarded a Florida Disaster Grant which includes impact resistant doors to ensure that residents do not have to evacuate in the event of a hurricane.

4.    Janie Poe – 76 units for families in poor condition.  Receives funds through an approved HUD Capital Fund Program.  Updates include new roofs, gutters and downspouts, screens on all unit windows and new rear doors with weather stripping.  This complex is being completely rebuilt and will be named Janie's Garden.  Phase I has been completed and the second phase is currently under construction.

5.    Janie's Garden – 86 units for families in excellent condition as these were just constructed.  The second phase will include 10,500 square feet of retail space fronting Dr. Martin Luther King Jr. Way, 68 apartments and a stop for a proposed express bus service between north Sarasota and downtown. It is expected to be completed in late 2011.  When the third phase is complete, Janie's Gardens will have a mix of more than 220 subsidized and market-rate homes.

6.    McCown Towers – 100 units for the elderly in good condition. Receives funds through an approved HUD Capital Fund Program.  Recent renovations include a new roof, impact windows and sliding glass doors.  In addition, security measures were increased to include security cameras, an intercom system, an elevator pass card system and a new emergency generator.

SHA has also completed a Section 504 needs assessment, and in response to its findings, ensured that the parking lots of both Janie Poe and Orange Avenue were compliant.  In addition, the Bertha Mitchell units are now fully compliant with Section 504.

## Venice Housing Authority (VHA)

The VHA has adopted the following mission statement, contained in its Annual Plan for FY 2010.

> *"To promote adequate and affordable housing, economic opportunity and a suitable living environment free from discrimination specifically for the low income population in Sarasota County, Fl.*

The VHA also adopted goals for the next year:

VHA relocated all residents in preparation for HUD approved demolition and redevelopment of the entire site.  In order to increase the number of safe decent affordable available units from fifty to approximately 117 – 121 units, VHA will construct new housing in two phases over the next 1- 5 years.  Expansion of rental units, use of tax credits and application of non-federal dollars will be used to support the operation of the new housing.  Sixty units of senior housing and 55-65 family units will be constructed over the next five years with senior units first on line.

## Troubled Housing Authority

Neither SHA or VHA are currently considered troubled.

## NSP Rental Program

The City of Sarasota and Sarasota County have received NSP 1 and 2 funding.  These funds will be used to create 91 safe and sanitary affordable rental units.  To date, eight of these units have been rehabilitated and are being rented by low-income families.

| PUBLIC HOUSING IN SARASOTA COUNTY | | | | | |
|---|---|---|---|---|---|
| NAME | LOCATION | NO. OF UNITS | TYPE | INCOME TARGET | AGENCY |
| Orange Avenue | 1912 N. Orange Avenue, Sarasota | 60 | Family | 0-79% AMI | Sarasota Housing Authority |
| The Courts | 1912 N. Orange Avenue, Sarasota | 100 | Family | 0-79% AMI | Sarasota Housing Authority |
| Bertha Mitchell | 21-24 St. and Dixie Ave., Sarasota | 100 | Family | 0-79% AMI | Sarasota Housing Authority |
| Janie's Garden | Central Avenue/Janie Poe Drive, Sarasota | 86 Phase I/Phase II* 68 | Family | 60% AMI; Market Rate | Sarasota Housing Authority |
| Janie Poe | Central Avenue/Janie Poe Drive, Sarasota | 60 | Family | 0-79% AMI | Sarasota Housing Authority |
| McCown Towers/Annex | Blvd. of the Arts and Cocoanut Avenue, Sarasota | 175 | Elderly/ Disabled | 0-79% AMI | Sarasota Housing Authority |
| Section 8 HCV (Tenant-Based) | Scattered – County-wide | 1308 | Family/ Elderly/ Disabled | 0-50% AMI | Sarasota Housing Authority |
| VASH – Section 8 for Homeless Veterans (referred through the VA) | Scattered – County-wide | 60 | Homeless Veterans Referred by the VA | 0-79% AMI | Sarasota Housing Authority |
| Total Units | | 1957 | | | |

- Phase II of Janie's Garden's is currently under construction.

| SUBSIDIZED HOUSING DEVELOPMENTS IN SARASOTA COUNTY | | | | | |
|---|---|---|---|---|---|
| NAME | LOCATION | NO. OF UNITS | TYPE | AGENCY | INCOME TARGET |
| **Willow Creek Phase 1** | 6851 Willow Creek Circle, North Port | 120 | Elderly (Tax Credit) | Private Sector | 60% AMI |
| **Willow Creek Phase 2** | 6851 Willow Creek Circle, North Port | 104 | Elderly (Tax Credit) | Private Sector | 60% AMI |
| **University Club** | 3203 University Club Apartments | 192 | Family (Tax Credit) | Private Sector | 60% AMI |

| | | | | | |
|---|---|---|---|---|---|
| **Bayou Oaks** | Old Bradenton Road/Mecca Drive, Sarasota | 80 | Elderly (Tax Credit) | Private Sector | 60% AMI |
| **Calusa Springs** | 4994 Trott Circle, North Port | 95 | Family (Housing Credits 9%) | Private Sector | 60%AMI |
| **Victoria Pointe** | 3950 S Sumter Blvd, North Port | 42 | Family (Section 515/ Housing Credits 9%) | Private Sector | 60% AMI |
| **Villa San Marco** | 1030 Albee Farm Rd, Venice | 80 | Elderly (Sec. 202) | Private Sector | 60% AMI |
| **Jefferson Center** | 930 N. Tamiami Trail, Sarasota | 210 | Elderly (Sec. 202) | Private Sector | 80% AMI |
| **J.H. Floyd Sunshine Village** | 18th Street, Sarasota | 59 | Elderly (Sec. 202) | Private Sector | 40% AMI |
| **Villas Of North Port** | 5200 S. Biscayne Dr, North Port | 37 | Elderly (Sec 515) | Private Sector | 60% AMI |
| **Falls of Venice** | 1001 Center Rd, Venice | 243 | Family (Bonds) | Private Sector | Over 80% AMI |
| **Beneva Oak Apartments (G-I-M Housing)** | 650 N. Beneva Road, Sarasota | 40 | Elderly 28 Disabled 12 (Sec. 202) | Private Sector | 50% AMI |
| **Casa Santa Marta** | 1576 8th St., Sarasota | 78 | Elderly (Sec. 8 and 202) | Private Sector | 50% AMI |
| **Casa Santa Marta II** | 800 N. Lemon Avenue | 52 | Elderly (Sec. 8 and 202) | Private Sector | 50% AMI |
| **Orchard Place** | 1300 Lockwood Ridge | 40 | Disabled (Sec. 811) | Private Sector | 50% AMI |
| **Grande Court** | 5203 Greenwood Avenue, North Port | 126 | Family (Tax Credit) | Private Sector | Grande Court |
| **Total Units** | | 1598 | | | |

Riley Chase was lost as an affordable development when Vestcor Development Corp., defaulted on its $13.5 million loan in June 2009. The Apartment complex was bought by Bank of America. Additional losses are not predicted.

# LEAD-BASED PAINT HAZARDS

## Introduction

Young children are at the highest risk for ingesting lead from their environment, primarily because they put things into their mouths.  This hand-to-mouth behavior is common among children ages 9 to 72 months.  If there is lead in their environment, putting toys and other things in their mouths increases the chance of getting lead into their body.  Since a child's brain is developing until about the age of two years, lead poisoning is especially harmful during this time.

Lead is a toxin and at low levels can result in learning disabilities and lower IQ. When children have very high levels of lead in their blood (>70 micrograms per deciliter), they can get encephalopathy, an inflammation of the brain that can result in seizures, coma and even death.

The most common source of lead poisoning for children in the United States is lead from house paint.  As lead paint ages, it can deteriorate and mix with dust in the home. On the outside of the home, lead paint can deteriorate, fall to the ground and mix with soil near the house.  Lead can be found in paint in housing built prior to 1978.

## Not Widespread Problem in Sarasota County

Sarasota County has not had a history of lead-based paint hazards nor does there appear to be a widespread problem, according to the Sarasota County Health Department.

The Sarasota County Health Department tests all clients up to age six for lead exposure. Children over age six are tested only if they are high risk. Private physicians occasionally test for lead exposure and refer clients to the Health Department.

The Health Department tests for lead-based paint in residences and businesses using a chemical test kit. Staff follows up on any report of blood lead levels in children over 10 micrograms per deciliter (mg/dcl). Blood lead levels as low as 10 mg/dcl or more are associated with harmful effects on children's learning and behavior. The Health Department randomly tests facilities that serve children for lead-based paint.  No childcare centers have been found with exposed lead paint.

On February 9, 2011, officials at the Health Department reported that over the last five years, there have only been 19 cases of lead based paint poisoning in Sarasota County or 5 per 100,000 residents.  Eleven of these cases were male, while eight were female. 74% of reported cases were white, 16% were African American, and 11% were unknown.  Of these cases, 69% were in children ages 0-4.  Ten percent of the cases were adults.

## Methodology

In October of 2002, a study was released called "The Prevalence of Lead-Based Paint
Hazards in U.S. Housing" and was published in <u>Environmental Health Perspectives</u>.
According to this study, houses built up to 1998 all have some level of lead hazards.
However, the level of risk increases with the age of the house.  According to the
research:

- 68% of houses built prior to 1940 pose a hazard;
- 43% of homes built from 1940 through 1959 pose a hazard;
- 8% of homes built from 1960 through 1977 pose a hazard;
- 3% of homes built from 1978 to 1998 pose a hazard.

According to the Shimberg Center for Affordable Housing Sarasota County has:

-  3,604 homes built prior to 1940;
- 18,572 homes built between 1940 and 1959;
- 76,844 homes built between 1960 and 1979;
- 78,583 homes built between 1980 and 1998

Using the methodology and being somewhat conservative since it was necessary to
lump 1978 and 1979 in a higher hazard bracket:

- There are 2,450 homes built prior to 1940 with a lead-based paint hazard;
- There are 7,986 homes built from 1940 through 1959 with a lead-based paint
  hazard;
- There are 6,147 homes built from 1960 to 1979 with a lead-based paint hazard;
- There are 2,357 homes built from 1980 to 1998 with a lead-based paint hazard;
- Of the projected occupied housing units in 2005, there are a total of 18,940
  homes with lead-based paint, approximately 12%.

According to Shimberg, approximately 35% of all households are occupied by low-
income residents.  Based on this:

- An estimated 6,629 homes with a lead-based paint hazard are occupied by low
  income residents;

Lead-based paint hazard reduction will be integrated into all housing policies and
programs in Sarasota County. The Sarasota Consortium is taking a number of
measures to evaluate and reduce lead-based paint hazards. They include:

- Low-income homeowners who discover lead-based paint in their homes will
  qualify for a grant to remedy the risks posed by the lead.
- Individuals taking part in the Down Payment Assistance Program receive a copy
  of *Protect Your Family from Lead in Your Home.*
- Units rehabilitated using Federal funds will be required to abide by new HUD
  lead-based paint regulations.

# STRATEGIC PLAN

## Introduction

In accordance with 24 CFR Section 91.415, the Sarasota Office of Housing and Community Development has prepared a Strategic Plan that will cover a five-year period. It will bring together the needs and resources identified in a coordinated housing and community development strategy.

## Federal Goals

The following goals are the overall goals mandated by HUD's Consolidated Planning process in accordance with 24 CFR Section 91.1. The first overall goal is to provide and sustain decent housing for low- and moderate-income residents in Sarasota County. The second overall goal is to create and maintain a suitable living environment for citizens within Sarasota County. The third overall goal is to expand and retain economic opportunities principally for low- and moderate-income persons.

## Time Period

The Sarasota Consortium's Strategic Plan will cover a five-year period covering fiscal years 2011-12, 2012-13, 2013-14, 2014-2015 and 2015-16.

## Income Ranges

For strategic goals, the following definitions and income ranges apply.

Extremely low-income is 30% AMI and below;
Low-income is 31% to 50% AMI;
Moderate-income is 51% to 80% AMI; and
Middle-income is between 81%-120% AMI.

## Funding Resources

A combination of Federal, state, local, and private sector grants, and other resources are available to help address the needs outlined in this five-year plan.

The Consortium receives Federal resources from the Community Development Block Grant (CDBG) program, the HOME Investment Partnerships (HOME) program, and Continuum of Care funding.  Additional (competitive) funds may be available through the Emergency Shelter Grant (ESG) program, Section 202 housing grants for the elderly, HOPE VI grants for public housing and redevelopment, Section 811 grants for the disabled, and other sources.

The Consortium has also included program income funding from the State of Florida from State Housing Initiatives Partnership (SHIP) program distributed by the Florida Housing Finance Corporation. The Consortium also supports applications to the Housing Credit Program for the development of affordable rental housing.

The Sarasota Office of Housing and Community Development (OHCD) administers the HOME and SHIP funds on behalf of the Sarasota Consortium.  CDBG funds are also administered through the Office of Housing and Community Development, with two separate allocations for the County and the City of Sarasota. The cities of Venice and North Port participate with the county, through an inter-local agreement, in the annual allocation of CDBG funding.

Sarasota County receives funding for Section 8 vouchers, however, this funding is administered through the Sarasota Housing Authority.  The Sarasota and Venice housing authorities both receive operating and capital funding from HUD, which are administered by the housing authorities and their governing boards. The Sarasota Housing Authority also receives funding and administers the City of Sarasota Section 8 vouchers. The Venice Housing Authority has no Section 8 vouchers and currently has no public housing.  The Consolidated Plan supports the redevelopment of the Venice Housing Authority.

The Sun Coast Partnership to End Homelessness (SPEH) currently serves as the lead agency and administers funding for HUD's Continuum of Care Plan. The SPEH is currently leading a planning effort for Sarasota County's new 10-Year Plan to End Homelessness.  The Consolidated Plan supports this effort.

Federal and state funding anticipated to be received for the five-year time period is as follows, based on funding for Fiscal Year 2011-2012 for the CDBG, HOME and the estimated program income from the SHIP program. The Sarasota Office of Housing and Community Development administers this funding.

| FUNDING AVAILABLE | | |
|---|---|---|
| Source | One-Year Period | Five-Year Period (Estimated) |
| City CDBG | $    525,867 | $ 2,629,295 |
| County CDBG | $ 1,348,128 | $ 6,740,528 |
| HOME | $1,035,775 | $ 5,178,875 |
| SHIP | $   250,000 | $ 1,250,000 |
| Total | $ 3,159,770 | $ 15,798,698 |

It is anticipated the Consortium will generate program income from its various activities, including loans, interest payments, and other sources of income. Program income and/or recaptured funds generated through the SHIP, CDBG and HOME programs will be pooled to use on further affordable housing projects.

The anticipated funding available for the SHIP, CDBG and HOME programs are estimates. If additional funds beyond those budgeted, or if less funds under those budgeted are received through any of the sources (CDBG, HOME, SHIP), they will be allocated in the same percentage appropriate to their funding source in conformance with the appropriate strategy funded from that source for that fiscal year. (See "Strategic Plan Summary Charts".)

## General Priorities

The general priorities the Sarasota Consortium has adopted for its five-year Strategic Plan provides the vision for the establishment of specific goals and strategies for the Consolidated Plan.  The general priorities with strategies are as follows:

### *Economic Development and Recovery*
- Create Businesses/Jobs
- Develop Local Workforce
- Create Business and Job Opportunities

### *Preserve and Improve Housing, Neighborhoods and Quality of Life for Residents*
- Rehabilitate Affordable Housing Stock
- Improve Neighborhood Infrastructure
- Promote Affordable Housing Opportunities

### *Support Community Development*
- Stabilize Neighborhoods
- Leverage Federal, State, and Private funding Sources
- Sustain Community Partnerships

### *Strive to Meet the Needs of Underserved Residents*
- Provide Housing Opportunities and Services for the Homeless/Low-Income
- Increase the Independence of Special Need Populations
- Promote Fair Housing

### *Promote Sustainable Community*
- Promote Energy Efficiency
- Promote Access to Public Transportation Infrastructure
- Promote the use of Local Products and Workforce

These broad community goals and strategies can be combined into four main
categories:

- Affordable Housing;
- Special Needs;
- Homeless Activities; and
- Non-Housing Community Development.

## Basis for Priorities

The Consortium identified the general priorities for the five-year Consolidated Plan
using a process approved by both the City of Sarasota and County of Sarasota
Commissions. OHCD created a Staff Steering Committee (SCC) as a vehicle to hear
public input.   The Staff Steering Committee (SCC) consisted of the following
participating members:

- *Danny Schult, City of North Port;*
- *Valarie M. Raney, City of Venice Engineering Department;*
- *Elizabeth Damschroder, Sarasota County Government;*
- *Steve Kirk, Sarasota County Government;*
- *Jane Grogg, Sarasota County Government;*
- *David L. Smith, City of Sarasota; and*
- *Courtney Menendez, City of Sarasota*

The SCC and Sarasota Office of Housing and Community Development staff held the
following focus group meetings related to the Consolidated Plan:

- February 3, 2011, City of Venice City Hall, Economic and Community Development
  Needs;

- February 8, 2011, The Federal Building, Special Needs Housing and Services;

- February 10, 2011, City of North Port City Hall, Homeless Housing and Outreach;
  and

- February 15, 2011, The Federal Building, Sarasota, Affordable Housing Needs.

The focus groups were open to the public and advertised using the email listservs of the
City of Sarasota, City of North Port, City of Venice and Sarasota County.  In addition,
notice of the meetings were included in Sarasota County's electronic newsletter and in
flyers posted at municipal buildings.  The Sarasota Herald also ran a story concerning
the meetings.  All focus groups were well attended by the public.

In addition to the focus groups, OHCD also held two community visioning sessions.
These sessions were not focused on a broad topic, but meant to discuss all housing

and community development needs throughout the County.  They took place at the
following dates and locations:

- March 1, 2011, Robert L. Taylor Community Complex, Sarasota; and
- March 10, 201, City of North Port City Hall.

These sessions were also well attended and advertised using the email listservs of the
City of Sarasota, City of North Port, City of Venice and Sarasota County.  In addition,
notice of the meetings were included in Sarasota County's electronic newsletter and in
flyers posted at municipal buildings.

The SCC then chose high, medium, and low priorities for the 2011-2016 Consolidated
Plan, which are listed below.

| **High** | **Medium** | **Low** |
|---|---|---|
| Public Infrastructure | Increasing Homeownership | Neighborhood Beautification |
| Maintaining the Affordable Single-Family Housing Stock | Special Needs Housing | Increasing the Supply of new Affordable Single-Family Homes |
| Homeless Facilities | Maintaining Existing Rental Units | |
| Public Services | Increasing the Supply of Affordable Rental Units | |
| Economic Development | | |
| Public Housing Revitalization | | |
| Increasing Supply of Rental Subsidies | | |
| Public Facilities | | |

The SCC used the very specific priorities listed above to create the general priorities
and vision for the five year plan.

Though this process - along with an analysis of data contained in the Homeless Needs,
Special Needs, and Housing Needs and Market Analysis - the following points were
highlighted:

- There is a great need for economic development programs and activates;
- Job training is essential to improve the economic future of the county;
- There is a large unmet demand for all youth services;
- South Sarasota County requires Homeless Shelters, Prevention, Outreach, and
  Services to address their growing homeless issues;

- The redevelopment of the Venice Housing Authority is an important community priority;
- There is a continual need for general infrastructure improvements countywide;
- Residents throughout the county need assistance to prevent foreclosures;  and
- Rehabilitation of both homeowner and rental units is essential to improve countywide housing stock.

Priorities, as shown on the HUD-Required and Optional Tables, are based on priorities for Federal funding. State funding from SHIP may be spent on any of these priorities. (See "HUD-Required and Optional Tables".)

## Overall Obstacles

A tremendous amount of money would be needed to meet all of those needs combined. A lack of funding has been an obstacle to meeting all of the needs.

A second obstacle has been coordination, particularly with serving homeless and special needs populations. Gaps exist in service, data about populations is incomplete, various groups compete for funding from the private and the public sector, and there is a need for coordination of services to reach all portions of the county - particularly South County where there are fewer facilities.

A third obstacle has been a lack of economic investment, both public and private, in some areas of the county, including the targeted geographic areas.

## Geographic Locations

The vast majority of the Consortium's housing and homeless activities will be conducted on a countywide basis.

Community development activities will also be implemented countywide, but will target neighborhood revitalization efforts in the Newtown area of the City of Sarasota and Nokomis area of unincorporated Sarasota County.  The redevelopment of the Venice Housing authority is also a targeted strategy along with the creation of a business incubator in the City of North Port.

## Explanation of Strategies and Funding

The following strategies all represent minimum goals the Consortium seeks to achieve. They in no way prohibit the Consortium from exceeding those minimum goals. The dollar allocations are also merely estimates based on the best available information. These may be adjusted up or down based on availability of funds or changes in circumstances during the five-year planning period.

Many strategies are dependent on competitive funding sources. As a consequence, achievement of particular goals and execution of strategies will be dependent on competitive processes out of the control of the Consortium.

## Affordable Housing

The Sarasota Consortium has a number of strategies to accomplish its affordable housing goal.

This section seeks to describe:

- The basis for assigning relative priority to each category;
- Specific objectives and their intended impact on the housing market (homeownership, new rental units, new ownership units, rehabilitation of existing units, etc.);
- Proposed accomplishments specifying the number of extremely low-, low-, and moderate-income persons to whom the Sarasota Consortium will provide affordable housing over a specific period of time.

This plan establishes the basis for Federal priorities for Federal funds spent on housing and community development activities. SHIP funds, received by the Consortium from the State of Florida, may be spent on any of these priorities based on the Consortium's Local Housing Assistance Plan (LHAP) as updated.

The Sarasota Office of Housing and Community Development is responsible for the development of the LHAP.

The LHAP, as updated, is incorporated in the Consolidated Plan by reference. Any changes in the LHAP (which is required for state SHIP funding) do not require a change or an amendment to the Consolidated Plan.

**Goal to Be Accomplished –** To increase the supply of affordable housing for extremely low- and low-income households.

## Findings

The Housing Needs and Market Analysis show several problem areas in increasing the supply of affordable housing, which need to be addressed.

The cost of a rental apartment at Fair Market Rent is shown to be prohibitively high for low and moderate-income residents. This is also borne out by the 2005-2007 CHAS data, showing 59.4% of extremely low-income renters paying more than 50% of their income for housing (Severe Cost Burden).

The data shows the need for affordable rentals and ownership opportunities is countywide, with the need concentrated among lower-income households and minority households.

Potential solutions include rent subsidies (such as Section 8 vouchers) and the creation and rehabilitation of affordable rental units. Another solution is moving cost-burdened renters to affordable ownership using down payment assistance and other programs to build affordable units for ownership to income-eligible households.

However, it is becoming difficult for non-profit developers to build single-family homes for low-income households.  Currently the need to build new housing is very low since due to the Great Recession there a large influx of foreclosures on the market.  OHCD's CHDO program focuses mainly on acquiring existing homes and rehabilitating them for new low-income homeowners.  The CHDO program uses the same model as OHCD's Neighborhood Stabilization Program.

Data showed countywide a significant number of housing units were experiencing over-crowded conditions, lacking central heating, lacking complete kitchens, and lacking complete plumbing. The data shows this is especially the case among low-income households, specific targeted neighborhoods in the county and the cities, and minority households.

Potential solutions include rehabilitation of owner-occupied units, which has been successful in past years. The Consortium has focused most of its HOME allocation towards homeowner rehabilitation instead of Down Payment Assistance to address this unmet need.

A thread running through the entire Consolidated Plan process has been the need for an increase in affordable rental units and the need to rehabilitate homes in existing neighborhoods.  It was therefore decided that the bulk of Federal and State housing grants would be used to create affordable rental housing and to rehabilitate existing affordable single-family housing.

## Obstacles

- Competitive process for tax credit and other programs to develop affordable housing;
- Escalating insurance costs;
- A continual decrease in both State and Federal grant funding;
- Individuals unwilling to have a second mortgage on their homes in association with housing rehabilitation;
- Lack of equity in existing homes make it less likely that homeowners are interested in a second mortgage;
- Lack of equity in existing homes make it unlikely that OHCD will be able to recapture loan funds when homes are sold;

- Many individuals seeking assistance do not have clear title to property;
- Some extremely low-income residents unable or unwilling to participate in rehabilitation programs;
- Political obstacles to the development of housing through tax credits and other programs;
- Money management skills needed by new owners and renters participating in various programs; and
- "Not in my back yard" or "NIMBY" encountered when specific sites are selected for affordable multi-unit developments, particularly for whole families.

# Homeownership Activities

## Strategy 1

Rehabilitate 250 owner-occupied units.  This strategy will include general rehabilitation, emergency rehabilitation and barrier removal for both the elderly and the disabled.  It is projected that 50 of these households will be extremely low-income while 200 will be low-to moderate-income households.

### Time Period
50 units per year throughout the five-year period.

### Funding
$ 1,125,000  SHIP
$    452,947  County CDBG
$    218,698  City CDBG
$ 3,896,660  HOME

## Strategy 2
Rehabilitate five homes and resell to low-income homeowners in partnership with a CHDO organization.

### Time Period
One unit per year throughout the five-year period.

### Funding
$ 664,330 CHDO HOME

## Strategy 3

Assist 50 owner-occupied units with purchasing a backflow preventer.  This will ensure that more homeowners meet the health and safety standards mandated by the state of Florida.  It is projected that 20 of these households will be extremely low-income while 30 will be low-to-moderate income households.

## Resources
$    37,600  County CDBG
$    10,000  City CDBG

## Time Period
10 units per year throughout the five-year period.

# Rental Activities

## Strategy 1

Create 300 new affordable rental units.   The units will be as follows: 75 units for the
extremely low-income, 125 units for the low income residents and 100 for the moderate
income.   Elderly/frail elderly units will be encouraged under this strategy.  If monies are
not used yearly due to competitive nature of grant applications, they will be shifted into
other strategies to assist low-income families.

## Time Period
To be complete by Fiscal Year 2014-2015.

## Funding
$ 100,000 HOME
$ 500,000 County CDBG
$ 40,000,000 State Tax Credits (Competitive)

## Special Needs

With respect to the supportive needs of the non-homeless, this plan describes the
priority housing and supportive service needs of persons who are not homeless, but
require supportive housing.

Due to the fact that those in the special needs category often fall into homelessness,
funding for special needs housing may go to individuals and/or families with special
needs who are homeless or in danger of becoming homeless.

**Goal to Be Accomplished** – Increased housing opportunities for special needs
populations including the elderly, frail elderly, the physically disabled, the mentally ill,
the developmentally disabled, persons with alcohol and/or drug addictions, and persons
with HIV/AIDS and their families.

## Findings

(Basis for assigning the priorities, including geographic allocations.)

Special Needs populations are found countywide; therefore, assistance will take place countywide.

The Special Needs section documents high numbers of elderly and frail elderly in Sarasota County – with 44,491 priority units needed. The Special needs section also documents a high number of physically disabled residents and a potential need for 12,117 additional housing units. The Special Needs section documents a need for 3,000 additional units for the developmentally disabled. The Special Needs section documents a need for an additional 250 units for the mentally ill. The Special Needs section also shows 100 units needed for persons with alcohol and/or drug addictions. The Special Needs section also documents 770 units needed for HIV/AIDS population in Sarasota County.

## Obstacles

- Dramatic cut in State funding to support services required to enable independent living for individuals with special needs;
- State and Federal cuts in affordable housing grants;
- The growing elderly population in Sarasota County that will need increased services;
- The growing number of children born with autism that will need increased services;
- Undefined need for many special needs groups, i.e. substance abusers, elderly;
- The most easily served special needs clients are independent already – leaving the more disabled population now needing assistance;
- The resistance of a group home for the developmentally disabled by the state of Florida.  The developmentally disabled and service providers are interested in creating a communal living space for the developmentally disabled, however, the state of Florida considers this living situation to be institutionalism; and
- "Not in my back yard" or NIMBY may be encountered when evaluating potential site locations.

## Strategy 1

All existing affordable housing strategies are targeted to help the elderly.  Outreach efforts will encourage the elderly/frail elderly who are low-income to apply for the programs:

- Homeowner rehabilitation;
- Barrier removal to ensure that low-income homeowners can continue to live independently in their homes.

In addition, the Consortium will encourage a Section 202 program and/or tax credit programs to create an affordable rental development for the elderly.

## Strategy 2

A barrier removal program exists under the rehabilitation strategy for affordable housing.  Under this program, a low-income disabled individual or a family with a disabled member may apply for up to $15,000 dollars that is forgiven over 5 years to ensure independent living of the disabled individuals.  OHCD will target both the elderly and the physically disabled under this program.

## Homelessness

The Suncoast Partnership to End Homelessness, Inc. (SPEH) was designed to be the provider of the Continuum of Care System for Sarasota and Manatee Counties. The Continuum of Care (COC) is a community plan to organize and deliver housing and services to meet the specific needs of people who are homeless as they move to stable housing and maximum self-sufficiency.

The SPEH was created by community and governmental leaders to provide collaborative-based services to homeless people.  The Sarasota-Manatee Continuum of Care program is a partnership of over 100 agencies, partners and individuals from throughout Manatee and Sarasota Counties with the widest possible representation from the business, criminal justice, government, homeless and social service communities. The SPEH assesses community homeless needs, identifies gaps in service, monitors agency programs and researches best practices to improve the efficiency and effectiveness of programs to prevent and end homelessness in the community.

**Goal to Be Accomplished** – Due to the bi-county nature of the SPEH the gaps analysis includes both Sarasota and Manatee Counties.  However, due to the migratory nature of the homeless populations between the two counties, it will be impossible to fully address Sarasota County's homeless needs without fully understanding the needs that exist in Manatee.

## Findings
(Basis for assigning the priority, including geographic allocations)

An inventory of needs and available facilities demonstrated that there was an unmet need for emergency shelters for families. The gap identified in the Homeless Needs section is 884 units of emergency shelter, 880 units of transitional housing, and 800 units of permanent supportive housing.

The Consolidated Plan process outlined a huge deficit in homeless services and shelters in South County and set aside funding to help address this need.  In addition, there is an identified need for additional services in North County and funding has been allocated to address this need as well.  To build a North County homeless facility following the completion of the 10 year plan to end homelessness that will provide a

one-stop location for many homeless services.  The facility would be partially funded by the City of Sarasota, but not necessarily located in the City of Sarasota.

Also identified in the Gaps Analysis is a need for services for 75 homeless individuals who are chronically homeless, 31 who are severely mentally ill and 5 who regularly abuse substances.  There is a large decrease from the last Consolidated Plan, largely due to the emphasis placed on the chronic homeless.

The growing demographic homeless are the families who have lost their homes or are about to lose them due to the Great Recession.  These households are difficult to quantify because many of them are still living in homes about to be foreclosed upon or are doubled up with family members.  Part of the challenge in the next five years will be locating these families and providing them homeless prevention services.  Homeless prevention funds are included in this Consolidated Plan as well as funding to implement the new 10-Year Plan to end Homelessness

## Obstacles

- Difficulty locating and serving families about to be foreclosed upon to prevent homelessness;
- The lack of incentive for homeowners to remain in their homes that have lost up to 2/3 of its value;
- Potential cuts in both State and Federal grant funds;
- Few child care facilities open at night;
- Lack of adequate public and private funds to provide ongoing financial support, case management, and maintenance for shelters;
- Lack of funding to build the necessary homeless safety net in South County;
- Long-term funds to run all the necessary shelters needed in South County;
- Funding through grants such as Emergency Shelter Grants (ESG) is competitive;
- General public backlash against growing homeless population; and
- "Not in my back yard" or "NIMBY" may be encountered when evaluating potential site locations.

## Strategy 1

To increase accessibility of homeless individuals to services, the Consortium will give $442,790 dollars to SPEH to be used to assist homeless individuals throughout the community.  By giving these funds to SPEH, it is possible to ensure the best use for them under the COC planning process.  The funds will be used to assist 100 low income families end homelessness or prevent homelessness.  City CDBG funds can also be used to support the HMIS system.

## Time Period
To be accomplished by fiscal year 2016

## Funding
$321,200 in County CDBG funds
$121,590 in City CDBG funds

## Strategy 2

To build a homeless facility in South Sarasota County to provide emergency shelter and transitional housing.

## Time Period
To be completed by the end of fiscal year 2015

## Funding
$805,940 in County CDBG funds

## Strategy 3
To build a North County homeless facility following the completion of the 10 year plan to end homelessness that will provide a one-stop location for many homeless services. The facility would be partially funded by the City of Sarasota, but not necessarily located in the City of Sarasota.

## Time Period
To be completed by fiscal year 2015

## Funding
$300,000 in City CDBG

## Strategy 4
To assist the SPEH with hiring staff to implement the 10-Year Plan to End Homelessness. The community is in the planning process of creating a new 10-Year Plan to end Homelessness. If the plan is going to be successful, a project manager needs to oversee the long and short term goals of the plan. The funding provided is meant to help the position initially while matching funds are sought.

## Time Period
Funding runs from fiscal year 2012-2015

## Funding
$50,000 in County CDBG
$6,012 in City CDBG

## Non-Housing Community Development Plan
The Sarasota Consortium's non-housing Community Development Plan will focus on physical improvements of the Consortium's low-income areas, economic development, and social services.

The following information subdivides this strategy into individual CDBG-eligible categories:

## Acquisition

The Consortium will continue to acquire land for necessary public facility improvements, such as parks, storm drainage, roads, water, sewer and sidewalks. Acquisition may also be needed to assist housing programs and social service agencies.

## Disposition

The Consortium will continue to undertake disposition activities.

## Neighborhood Improvements

The Consortium will continue to make significant public improvements, such as road paving, sidewalks, lighting, storm drainage, public utilities, park and recreation improvements, community centers and other public facilities, and other improvements.

## Clearance

The Consortium will continue to demolish and remove unsafe structures.

## Public Services

The Consortium intends to run a Youth Employment program, offer business training, and support staffing at the North Port Social Service building.

## Public Facilities

The Consortium does not intend to build any public facilities, but may do so if the need arises.

## Interim Assistance

The Consortium does not plan to undertake any interim assistance, but may do so if necessary during the five-year planning period.

## Payment of Non-Federal Share

The Consortium does not plan to use CDBG to pay a non-federal share of another federal grant, but may do so if necessary during the five-year planning period.

## Urban Renewal Completion

The Consortium has no urban renewal projects, but may undertake such projects if necessary during the five-year planning period.

## Relocation

The Consortium has dedicated itself to the revitalization of the Newtown area and will undertake relocation activities if necessary to accomplish this goal.

## Loss of Rental Income

The Consortium has planned no activities that will result in loss of rental income, but may do so if necessary during the five-year planning period.

## Removal of Architectural Barriers

The Consortium will continue to remove architectural barriers, especially in conjunction with rehabilitation activities.

## Privately Owned Utilities

The Consortium will continue to participate in activities that involve privately owned utilities in providing or expanding services to low-income areas.

## Housing

The Consortium will continue to provide funding for housing delivery services in support of its HOME, SHIP, CDBG, HPRP, and NSP programs, and will support and pursue housing delivery services through ESG.

## Rehabilitation and Preservation

The Consortium will continue to provide funding for housing rehabilitation and preservation.

## Economic Development

The Consortium will work with the community to create larger business creation opportunities and build a business incubator in the City of North Port to stimulate economic development and job creation.

## Special Activities by Subrecipients

No special activities are planned, but may be planned if necessary during the five-year planning period.

## Planning and Capacity Building Activities

The Consortium will continue planning and capacity building programs.

## Administrative Costs

The Consortium will continue to administer the CDBG program though the Sarasota Office of Housing and Community Development.

## Rationale For Priorities

These priorities and strategies concentrate on meeting the public improvement needs of low-income residents, including those in targeted neighborhoods as identified by the City of Sarasota's Newtown Redevelopment Plan and Sarasota County's Neighborhood Initiative Program.

# Implementation and Coordination

## Infrastructure

The neighborhood and community plans, to be targeted for assistance in conjunction with this plan, are as follow:

1. Newtown Neighborhood Community Development Plan: The Newtown CDBG area is bounded by Myrtle Street, Seaboard Railroad Line, Twin Drive, and Tuttle Avenue. Needs include improvements to roads, improvements to drainage, construction of sidewalks, lighting, housing and economic development. That plan is incorporated in this plan by reference.

2. The Nokomis Center Revitalization Plan:  The revitalization plan called for many improvements including sidewalks.  The focus of CDBG funds will be to improve sidewalks throughout the low-income areas of Nokomis.  That plan is incorporated in this plan by reference.

Additional funding has been set aside for needed infrastructure projects as yet undetermined.  As additional priorities are determined, they will be included and advertised in the annual action plan.

## Strategy 1

Construct infrastructure improvements in 7 low- to moderate-income neighborhoods and/or communities.  The long-term goal of these projects will be to cut crime rates and code violations while creating a suitable living environment for inhabitants of the neighborhoods.

## Obstacles
- Competitive process for limited resources.
- Neighborhood plans need on-going commitment, support, and updating.
- Disagreements over needs, priorities, and goals for neighborhoods.

## Time Period
To be complete by Fiscal Year 2016.

## Funding
$ 2,435,740 County CDBG
$740,532 in City CDBG

## Economic Development

The need to support economic development is a high priority for residents, staff, and elected officials.  Every public meeting highlighted the need for economic development and job training to improve the quality of life for low-income residents throughout Sarasota County.

## Strategy 1
Build a business incubator in the City of North Port to support new business and expanded business opportunity in South County.

## Obstacles
- Determining the correct type of business incubator;
- Competition for limited funds;
- The development of a new organization to oversee the business incubator;
- Long-term financial viability for the incubator;

## Time Period
Completed by Fiscal Year 2015

## Resources
$500,000 City CDBG

## Strategy 2
Provide business/job training in the City of Sarasota sponsored business incubator.

## Obstacles
- State and Federal Resources are shrinking; and
- Employment opportunities are limited once job training is finished.

## Time Period
Program will run throughout the entire Consolidated Plan

## Funding
$124,048 City CDBG

## Strategy 3
Fund economic development projects that will increase employment opportunities for low-income residents.

### Obstacles
- Willingness of business to relocate or start up in low-income neighborhoods;
- Difficulty of creating one job per $5,000 spent in CDBG funding; and
- Slow nationwide economic development.

### Time Period
Program will run until fiscal year 2016

### Funding
$440,000 City CDBG

## Strategy 4
Provide job skills and employment to low-income teenagers in the City of Sarasota. This eight week program gives children an opportunity to learn employment skills that will help them improve their long-term economic future.

### Obstacles
- Diminishing Federal funding; and
- Competing with existing and upcoming priorities as social service needs expand.

### Time Period
The Summer Youth Employment Program runs every year in the Consolidated Plan.

### Funding
$ 130,060

## Social Services

As the Great Recession took its toll on the residents of Sarasota County, the need for increased coordinated social services became apparent as local resources shrunk to address the needs.  The Housing Needs and Market Analysis showed the need for increased social service support due to the large increase in unemployment.

### Obstacles
- Shrinking Federal, State, and local resources to address the growing need for support;
- Competition among competing resources; and

- Fifteen percent cap on Community Development Block Grant funds for social service activities.

## Strategy 1
Continue to employ 3 social service attendants at the North Port Social Service Building.

## Time Period
Through the entire Consolidated Plan time frame.

## Funding
$ 264,000

# Institutional Structure and Coordination

The Consolidated Plan is to be carried out through a combination of public, private, and non-profit organizations, many of which participated in the public participation process of the five-year plan.

Housing and community development needs were developed through the Citizen Participation Plan. Public hearings pertaining to the Consolidated Plan were conducted by the Sarasota Office of Housing and Community Development. The Sarasota Board of County Commissioners and the Sarasota City Commission will approve the application of the HUD formula grant program funds for various purposes agreed to in the Consolidated Plan.

A listing of these participating organizations (including governments, the private sector, non-profits and others) can be found in the "Summary of Public Participation" Section of this plan. These groups will be vital in implementing the five-year plan and developing the one-year Action Plans, annual Performance Reviews, and any proposed Substantial Amendments. Other groups and individuals not included on this list are welcome and encouraged to participate in the implementation of this five-year plan.

The Sarasota Consortium, through the Sarasota Office of Housing and Community Development, will continue to be the primary entity responsible for coordinating and implementing the five-year Consolidated Plan.

The Sarasota Office of Housing and Community Development has been working with non-profit agencies to construct affordable housing, improve neighborhoods, and establish services for all segments of the county population.

Lending institutions have participated in many successful programs, particularly the Down Payment Assistance program.

Goals will be reached, in large part, through the administration of programs

administered by the Sarasota Office of Housing and Community Development. This will be done, as it has in the past, with the coordination and partnership of county government, all municipalities, non-profit organizations, private foundations, and the private sector.

Some of the strengths of the delivery system of housing and community development programs include:

- The number of foundations in the community willing to actively participate in a variety of activities benefiting the community;
- The strong partnership that provides homeless services in North Sarasota County;
- A variety of non-profit organizations active in the community;
- Dedicated organizations devoted to the homeless and low-income individuals and families.

Some gaps and weaknesses in the delivery system include:

- Lack of builders engaged in construction and rehabilitation of affordable housing;
- Lack of Community Housing Development Organizations (CHDOs) throughout the community;
- Lack of contractors and subcontractors owned by minorities and/or women.

The following is a brief description of some of the programs the Sarasota Office of Housing and Community Development is, and will continue to be, involved with in the implementation of the five-year Consolidated Plan.

## HOME Investments Partnership Programs

The Sarasota Office of Housing and Community Development administers HOME funds in coordination with other federal and state programs. Funds are passed through approved Community Housing Development Organizations (CHDOs), municipalities, and nonprofit housing service providers.

## Community Development Block Grants (CDBG)

Coordinated and managed by the Sarasota Office of Housing and Community Development and passed through subrecipients, including municipal governments.

## State Housing Initiative Partnership (SHIP) Program

Florida program to aid in the production and preservation of affordable housing, numerous programs administered by the Sarasota Office of Housing and Community Development, which is responsible for SHIP's Local Housing Assistance Plan (LHAP). The Local Housing Assistance Plan (as updated) is incorporated in the five-year Consolidated Plan by reference.

## Single-Family Bond

Sarasota County currently participates with the Lee County Housing Finance Authority in administering the Single Family Bond Program. With several participating lenders, the program provides low-interest rates and down payment assistance for income- eligible households.

## Sarasota Grants in Aid Program

Sarasota County utilized proceeds from an ad valorem tax to support the Grants in Aid Program administered by Sarasota County government. Approximately $7 million is awarded per year to local agencies in support of their programs, which directly serve children, adults, or community service activities. The Sarasota Office of Housing and Community Development will work in concert with and coordinate activities with the Grants in Aid program on an ongoing basis.

## Community Service Block Grants

The Sarasota Office of Housing and Community Development was involved in the development of the Community Action Plan (CAP) as a part of the county's application for Community Service Block Grants. The lead agency is the Sarasota County Health and Human Services Business Center. The grants are administered by the Florida Department of Community Affairs to fund human service needs.

## Public and Assisted Housing

Sarasota County and the City of Sarasota have two separate entities to administer public and assisted housing programs.

Sarasota County consolidated its HUD Section 8 certificate and voucher program with the City of Sarasota's Housing Authority. The Section 8 program provides rent subsidies for low-income persons. The Sarasota Housing Authority (SHA) is a public housing authority separate from the City of Sarasota. It is governed by a board appointed by the mayor and confirmed by the Sarasota City Commission.

The Venice Housing Authority (VHA) is also a separate housing authority from the City of Venice, and is governed by a board appointed by the Venice City Commission.

The two public housing authority boards hire their own executive directors, who are responsible for hiring, contracting and procurement, provision of services, review of proposed development sites, comprehensive planning of the public housing authority and any proposed demolition or disposition of public housing developments.

The Sarasota Office of Housing and Community Development reviews the PHAs' Capital Grant Programs for consistency with the Consolidated Plan.  The Consortium

has been working very closely with the SHA to redevelop their housing and has set
aside $500,000 to help the Venice Housing Authority rebuild the public housing which
was demolished two years ago.

## Coordination Enhancement

Coordination activities will be enhanced through the implementation of several planning
activities listed in this five-year plan. Of note will be the in-depth look at both the
effectiveness and efficiency of current housing programs, the creation of a plan to end
chronic homelessness, the housing market analysis study, and an annual "Housing and
Community Development Summit" (See "Planning and Other Activities" in this Section.)

Groups invited to participate in the summit will include, but not be limited to, Sarasota
County government, all of its municipalities, the PHAs, non-profits, the private sector,
State housing experts and officials, public health, mental health, and social service
agencies.

These activities, and others that may be initiated by the public sector, private sector,
non-profits, or other interested parties, will enhance coordination between public and
assisted housing providers and governmental health, mental health, service agencies,
the State and the municipalities within the county.

## Public Housing Resident Initiatives

The Sarasota Consortium recognizes the importance of Public Housing Resident
Initiatives in encouraging the public housing residents' further involvement in the
management of public housing and in encouraging homeownership.

The Sarasota Consortium will continue to support Public Housing Resident Initiatives as
designed and maintained by both the Sarasota and Venice housing authorities.

The Sarasota Office of Housing and Community Development works with the PHAs and
non-profits in promoting homeownership through programs such as Down Payment
Assistance through its NSP programs.

## Public Housing Goal

Improve the quality of public housing units within the Consortium.  The Consortium has
been working very closely with the SHA to redevelop their housing and has set aside
$500,000 to help the Venice Housing Authority rebuild the public housing which was
demolished two years ago.

## Findings

Neither public housing agencies are considered distressed.

# Fair Housing

The Fair Housing Act prohibits discrimination in housing because of race or color, national origin, religion, sex, familial status, or handicap.

HUD is responsible for fair housing enforcement in Sarasota County and the incorporated cities of Venice and North Port. However, the City of Sarasota has chosen to enact a Fair Housing Ordinance, which has placed responsibility of enforcement within their Human Relations Board.

In 2011, the Consortium conducted fair housing testing throughout the County.  The results showed discrimination so it was decided to hire an outside agency to update the Impediments to Fair Housing Plan.  This plan should be in place by the end of October 2011.  Funding has been set aside in this Consolidated Plan to implement strategies in the IA to affirmatively further fair housing.

# Barriers to Affordable Housing

Sarasota County and the City of Sarasota established a citizens committee to identify barriers to affordable housing.  The committees examined established policies and procedures, ordinances, land development regulations and the adopted comprehensive plan and in December 2008 recommended specific actions or initiatives to encourage or facilitate affordable housing.  The City and the Sarasota County Commission adopted specific recommendations and they are currently being implemented.

In addition, the lack of public housing in the southern portion of the county is a significant barrier to affordable housing.  The Consolidated Plan sets aside $500,000 in County CDBG funds to assist the Venice Housing Authority to redevelop its public housing.  Currently the Southern portion of the County lacks all public housing.

In addition, OHCD is now part of the planning departments in both the City and the County and therefore there is a closer connection between City and County planning strategies and affordable housing.  OHCD also continues to work closely with the land trust that was created in Sarasota to ensure long-term affordability.

# Lead-Based Paint Hazards

Lead-based paint hazards are relatively low in Sarasota County.  However, since any lead based paint poisoning is unacceptable, llead-based paint hazard reduction will be integrated into all housing policies and programs in Sarasota County. The Sarasota Consortium is taking a number of measures to evaluate and reduce lead-based paint hazards. They include:

- Low-income homeowners who discover lead-based paint in their homes will qualify for a grant to remedy the risks posed by the lead;
- The Health Department will be annually reminded of the grant available to low-income homeowners to remove lead in their home;
- Individuals taking part in the Down Payment Assistance Program receive a copy of *Protect Your Family from Lead in Your Home; and*
- Units rehabilitated using Federal funds will be required to abide by the HUD lead-based paint regulations.

The Sarasota Consortium will support and encourage applications for lead-based paint abatement grants that will benefit the residents of Sarasota County, especially those of lower means. The Consortium supports the housing authorities and State, County, and City agencies in efforts to educate and inform the public of the hazards associated with lead-based paint.

# Anti-Poverty Strategy

The City of Sarasota will continue to revitalize the Newtown Neighborhood and reduce the number of poverty level families by implementing the Newtown Redevelopment Plan.  The "New Beginning in Newtown" is designed to build upon existing resources in the Newtown Neighborhood.  The program includes increased police patrols, an economic and social services component and neighborhood development.

The 2011-2016 Consolidated Plan supports a youth work training program and will provide job training opportunities to create jobs for low-income residents to reduce the number of poverty level families.   In addition, a new Section 3 plan will ensure that the community improves its process for awarding contracts to low-income residents of Sarasota County.

In addition, Sarasota County will strategically leverage CDBG funding to spur economic development throughout the county that will provide jobs to low-income residents.

# Planning and Other Activities

The Consortium will also pursue the following activities and plans during the next five years:

1. During the Consolidated Plan period, the City of Sarasota and Sarasota County will work with the Sarasota Housing Authority to continue to redevelop the existing public housing developments;
2. The Consortium will work with the Venice Housing Authority to rebuild public housing in South County;
3. The Consortium will implement action strategies identified in the new IA;
4. Throughout 2011-2016, OHCD will work with the Suncoast Partnership to implement

their new 10 Year Plan to End Homelessness.

5. Lastly, OHCD will organize and sponsor an annual Housing and Community Development Summit in which local governments, public housing authorities, providers of affordable housing, homeless services, special needs housing, private sector homebuilders and developers, and other interested parties can meet, exchange information, and openly discuss housing and community development issues.

# First Program Year
# Action Plan

The First Year Action Plan includes the SF-424 Form and Narrative Responses to Action Plan questions that CDBG, HOME, HOPWA, and ESG grantees must respond to each year in order to be compliant with the Consolidated Planning Regulations.

## Narrative Responses

GENERAL

## Executive Summary

In 2011, the Sarasota County Board of County Commissioners and the Sarasota City Commission approved the 2011 – 2016 Consolidated Plan.  The Consolidated Plan is a five-year road map that identifies housing, homeless, community and economic development needs and establishes a strategic plan for addressing these needs.  This Action Plan describes the resources that will be used and the activities that will be undertaken during fiscal year 2011 – 2012 to implement the 2011 – 2016 Consolidated Plan.

The funding resources included in this Action Plan include the City of Sarasota and Sarasota County Community Development Block Grant (CDBG), the HOME Investment Partnership Program (HOME), and State Housing Initiatives Partnership Program (SHIP).  The City of Sarasota no longer receives Housing Opportunities for Persons with AIDS (HOPWA) funding.  The Sarasota County Consortium does not receive Emergency Shelter Grants Program (ESG) funds.

On October 1, 2008, the City of Venice became an entitlement community under the CDBG program and began receiving a direct allocation from the U.S. Department of Housing and Urban Development.  However, the City of Venice is planning on rejoining the Consortium in FY 2011, so the entitlement of Venice is included in this Action Plan.

The objectives and outcomes are described in detail in the attached project funding charts.  The 2011 – 2016 Consolidated Plan will begin on October 1, 2011.

SHIP funding was cut from the state of Florida's budget, therefore only $250,000 in SHIP program income is included in this plan.

## General Questions

1. <u>Describe the geographic areas of the jurisdiction (including areas of low income families and/or racial/minority concentration) in which assistance will be directed during the next year.  Where appropriate, the jurisdiction should estimate the percentage of funds the jurisdiction plans to dedicate to target areas.</u>

During 2011 – 2012, CDBG funds will be directed to the following neighborhoods:

City of Sarasota – Redevelopment of the Robert Taylor recreation fields, a Summer Youth Employment Program, and a Business Training program will be targeted in the Newtown Neighborhood to implement the Newtown Redevelopment Plan.  These amounts add up to 65.7% of the cities CDBG funding.

Sarasota County – The County is setting aside 37% of its CDBG funding to help redevelop the Venice Housing Authority next year.   In addition, there is a set aside of 7.4% of the County's entitlement CDBG funding to design sidewalks in a low-income section of Nokomis.

The Sarasota Consortium does not have any targeted areas.

2. <u>Describe the basis for allocating investments geographically within the jurisdiction (or within the EMSA for HOPWA) (91.215(a) (1)) during the next year and the rationale for assigning the priorities.</u>

The decision to invest heavily in the redevelopment of the Venice Housing Authority is important because the southern portion of the county does not have any public housing since the Venice Housing Authority was demolished in 2009.

However, the data also shows the need for affordable rentals and ownership opportunities countywide, with the need concentrated among lower-income households and minority households.

The Continuum of Care operates in both Manatee and Sarasota Counties and the gap analysis for the homeless includes both counties.  Due to the migratory nature of the homeless populations between the two counties, it will be impossible to fully address Sarasota County's homeless needs without fully understanding the needs that exist in Manatee County.  Services and emergency shelters are needed for families and South Sarasota County residents.

The non-housing priorities and strategies concentrate on meeting the public improvement needs and expanding economic opportunities of low-income residents, including those in targeted neighborhoods as identified by the City of Sarasota's Newtown Redevelopment Plan and Sarasota County's Neighborhood Initiative Program.

3. Describe actions that will take place during the next year to address obstacles to
   meeting underserved needs.

The consortium will continue its advertising campaign to insure that underserved
residents are aware of the programs offered locally.  In addition, meetings will continue
with various service providers to search for new funding and better ways to serve
eligible families.

4. Identify the federal, state, and local resources expected to be made available to
   address the needs identified in the plan.  Federal resources should include Section 8
   funds made available to the jurisdiction, Low-Income Housing Tax Credits, and
   competitive McKinney-Vento Homeless Assistance Act funds expected to be
   available to address priority needs and specific objectives identified in the strategic
   plan.

The resources expected to be made available for FY 2011, including program income:

City of Sarasota CDBG:  $ 525,867
Sarasota County CDBG:  $ 1,348,125
Sarasota Consortium HOME:  $ 1,035,711
State Housing Initiatives Partnership Program:  $ 250,000

The HOME match will be satisfied with Florida's State Housing Initiatives Partnership
Program funding.

## Managing the Process

1. Identify the lead agency, entity, and agencies responsible for administering
   programs covered by the Consolidated Plan.

The City of Sarasota is the lead agency responsible for administering programs covered
by the Consolidated Plan. The Office of Housing and Community Development (OHCD)
was created to administer the programs covered by the Consolidated Plan as a result of
the consolidation of the City of Sarasota and Sarasota County's housing and community
development programs.

The Suncoast Partnership to End Homelessness is designed to be the provider of the
Continuum of Care system for both Sarasota and Manatee Counties.

Community development activities will be implemented by OHCD with the close
cooperation of the Newtown Redevelopment Office in the City of Sarasota and both the
Neighborhood Planning Division and Economic Development Division in Sarasota
County.

2.  <u>Identify the significant aspects of the process by which the plan was developed, and the agencies, groups, organizations, and others who participated in the process.</u>

The Sarasota Consortium's lead agency, the Sarasota Office of Housing and Community Development (OHCD), developed this five-year Consolidated Plan using a process approved by both the City of Sarasota and County of Sarasota Commissions. OHCD created a Staff Steering Committee (SCC) as a vehicle to hear public input. The Staff Steering Committee (SCC) consisted of the following participating members:

- *Danny Schult, City of North Port;*
- *Valarie M. Raney, City of Venice Engineering Department;*
- *Elizabeth Damschroder, Sarasota County Government;*
- *Steve Kirk, Sarasota County Government;*
- *Jane Grogg, Sarasota County Government;*
- *David L. Smith, City of Sarasota; and*
- *Courtney Menendez, City of Sarasota*

The SCC and Sarasota Office of Housing and Community Development staff held the following focus group meetings related to the Consolidated Plan:

- February 3, 2011, City of Venice City Hall, Economic and Community Development Needs;

- February 8, 2011, The Federal Building, Special Needs Housing and Services;

- February 10, 2011, City of North Port City Hall, Homeless Housing and Outreach; and

- February 15, 2011, The Federal Building, Sarasota, Affordable Housing Needs.

In addition to the focus groups, OHCD held two community visioning sessions. These sessions were not focused on a broad topic, but meant to discuss all housing and community development needs throughout the County. They took place at the following dates and locations:

- March 1, 2011, Robert L. Taylor Community Complex, Sarasota; and
- March 10, 201, City of North Port City Hall..

The following organizations were in attendance:

- City of Sarasota
- Sarasota County
- Greater Newtown CRC
- Sarasota Community Housing Trust
- GoodHomes
- Sarasota Housing Authority

- Venice Housing Authority
- Sarasota Habitat for Humanity
- Sarasota YMCA
- Suncoast Partnership to End Homelessness
- Salvation Army
- Living in Community
- United Way of Sarasota
- New Hope Church
- Community Health Improvement Partnership
- Community Coalition of Men
- City Space Cohousing
- Sarasota Front Porch
- Suncoast CC
- Healthy Start
- Season of Sharing

- Amyrillis Park Neighborhood Association
- Coastal Community Church
- North Port Feeds the Hungry
- USP Inc
- Coastal Renaissance
- Comprehensive Care Clinic
- Sarasota Senior Friendship Center
- Easter Seals
- Safe Place Rape and Crisis Center
- City of Northport
- City of Venice
- Laurel Civic Association
- Jobs Etc.
- NACA Nokomis Revitalization
- Coalition for the Homeless

In addition, the Consolidated Plan funding strategies were brought before both the City and County Commissions of Sarasota for preliminary approval on June 6, 2011 and June 7, 2011 respectively.

All projects funded by this Action Plan are consistent with the priorities originally selected, located on Page 5 of the 2011-2016 Consolidated Plan.

3. <u>Describe actions that will take place during the next year to enhance coordination between public and private housing, health, and social service agencies.</u>

As described on page 123 of the 2011 – 2016 Consolidated Plan, OHCD will take an in-depth look at both the effectiveness and efficiency of current housing programs, the creation of a plan to end chronic homelessness, the housing market analysis study, and an annual "Housing and Community Development Summit" (See "Planning and Other Activities" in this Section.).  OHCD meets, at least annually, with most of its partners to insure that its programs are coordinated with these agencies.

## Citizen Participation

1. <u>Provide a summary of the citizen participation process.</u>

Sarasota conducted two public meetings to discuss the Action Plan.  Both meetings were advertised in conformance with the approved Citizens Participation Plan.  The two meetings were held on June 30, 2011 at the Federal Building, 111 Orange Avenue, Sarasota Florida and on July 7, 2011 at the City of North Port's City Hall located at 4970 City Hall Blvd, North Port, FL.

2.   Provide a summary of citizen comments or views on the plan.

There were six official public comments on the draft Action Plan.  Two of the public
comments requested additional public service funding for youth/social programs, and
four letters of support for homeless funding.    All public comments requesting funds
were addressed.

3.   Provide a summary of efforts made to broaden public participation in the
     development of the consolidated plan, including outreach to minorities and non-
     English speaking persons, as well as persons with disabilities.

The public meetings and a summary of the draft Action Plan were advertised in the
newspaper of general circulation, the minority newspaper serving Sarasota County and
posted on the City and County's web sites.  In addition, the summary was sent out via
email by both the City and County neighborhood divisions, and a press release was
issued by Sarasota County.  All meetings were held in facilities that are accessible to
persons with disabilities.

4.   Provide a written explanation of comments not accepted and the reasons why these
     comments were not accepted.

NA

## Institutional Structure

1.   Describe actions that will take place during the next year to develop institutional
     structure.

The Consolidated Plan is being implemented through a combination of public, private
and non-profit organizations.  The Sarasota Board of County Commissioners has
provided funding to the Suncoast Partnership to End Homelessness.  The Consolidated
Plan also allocates funds to the Suncoast Partnership to End Homelessness.

## Monitoring

1.   Describe actions that will take place during the next year to monitor its housing and
     community development projects and ensure long-term compliance with program
     requirements and comprehensive planning requirements.

The Office of Housing and Community Development (OHCD) monitors its programs on
an ongoing basis. This includes the monitoring of purchase orders, procurement,
invoices, and site inspections in order to ensure all projects and activities using federal

dollars are in compliance with requirements of the programs involved, including minority business outreach and comprehensive planning requirements.

Citizens are encouraged to comment on the performance of local government and nonprofit agencies in implementing the Consolidated Plan programs and projects in meeting program objectives.

While the Consolidated Plan documents the proposed use of funds, the Consolidated Annual Performance and Evaluation Report (CAPER) will identify the progress and performance of projects, programs and services funded during the prior program year. These reports will be completed in accordance with the Citizen Participation Plan.

Citizens will have reasonable and timely access to information and records relating to the Consolidated Plan and its use of funds, in accordance with the Citizen Participation Plan.

OHCD will compile a list of all projects requiring long-term compliance with program requirements and will monitor those projects annually.  OHCD will perform on-site monitoring visits to sub-recipients at least annually to determine compliance with program guidelines and federal regulations.  All projects funded in this Action Plan that include rental or homeownership are inspected for code compliance by OHCD's housing inspectors or City/County building officials and all housing must be brought up to code if HOME or CDBG funds are used in the project.

A monthly financial report has been created to monitor expenditures and commitments of all funds.  This report tracks actual disbursements and provides a schedule for future activities.  In addition, a quarterly activity report has been developed to track public facilities and subrecipient projects to ensure that the timeliness requirement for all commitments and expenditures are met.  The report identifies the areas in need of special attention in order to achieve the scheduling goals and is made available to the City and County Commissioners and the public.

## Lead-based Paint

1. <u>Describe the actions that will take place during the next year to evaluate and reduce the number of housing units containing lead-based paint hazards in order to increase the inventory of lead-safe housing available to extremely low-income, low-income, and moderate-income families, and how the plan for the reduction of lead-based hazards is related to the extent of lead poisoning and hazards.</u>

Lead-based paint hazard reduction will be integrated into all housing policies and programs in Sarasota County. The Sarasota Consortium is taking a number of measures to evaluate and reduce lead-based paint hazards. They include:

- Low-income homeowners who discover lead-based paint in their homes will qualify for a grant to remedy the risks posed by the lead;

- The Health Department will be annually reminded of the grant available to low-income homeowners to remove lead in their home;
- Individuals taking part in the Down Payment Assistance Program receive a copy of *Protect Your Family from Lead in Your Home; and*
- Units rehabilitated using Federal funds will be required to abide by the HUD lead-based paint regulations.

The Sarasota Consortium will support and encourage applications for lead-based paint abatement grants that will benefit the residents of Sarasota County, especially those of lower means. The Consortium supports the housing authorities and State, County, and City agencies in efforts to educate and inform the public of the hazards associated with lead-based paint.

## HOUSING

## Specific Housing Objectives

*Please also refer to the Housing Needs Table in the Needs.xls workbook.

1. Describe the priorities and specific objectives the jurisdiction hopes to achieve during the next year.

2. Describe how Federal, State, and local public and private sector resources that are reasonably expected to be available will be used to address identified needs for the period covered by this Action Plan.

The tables beginning on page 163 provide a summary of the priorities and specific objectives that will be addressed during Fiscal Year 2011 – 2012 using both Federal and State resources.

## Needs of Public Housing

1. Describe the manner in which the plan of the jurisdiction helps address the needs of public housing and activities it will undertake during the next year to encourage public housing residents to become more involved in management and participate in homeownership.

The Action Plan sets aside $500,000 in County CDBG funds to assist the Venice Housing Authority to redevelop its public housing.  Currently the Southern portion of the County lacks all public housing.

2. If the public housing agency is designated as "troubled" by HUD or otherwise is performing poorly, the jurisdiction shall describe the manner in which it will provide financial or other assistance in improving its operations to remove such designation during the next year.

Neither Housing Authority is considered troubled.  Sarasota County has aside $500,000 in County CDBG funds to assist the Venice Housing Authority to redevelop its public housing.  Currently the Southern portion of the County lacks all public housing.

## Barriers to Affordable Housing

1. <u>Describe the actions that will take place during the next year to remove barriers to affordable housing.</u>

The lack of public housing in the southern portion of the county is a significant barrier to affordable housing.  This Action plan sets aside $500,000 in County CDBG funds to assist the Venice Housing Authority to redevelop its public housing.  Currently the Southern portion of the County lacks all public housing.

In addition, OHCD is now part of the planning departments in both the City and the County and therefore there is a closer connection between City and County planning strategies and affordable housing.  OHCD also continues to work closely with the land trust that was created in Sarasota to ensure long-term affordability.

## HOME/ American Dream Down Payment Initiative (ADDI)

1. <u>Describe other forms of investment not described in § 92.205(b).</u>

No other form of investment other than that described in Section 92.205(b) is planned.

2. <u>If the Participating Jurisdiction (PJ) will use HOME or ADDI funds for homebuyers, it must state the guidelines for resale or recapture, as required in § 92.254 of the HOME rule.</u>

The Sarasota Consortium, in compliance with Federal Regulations, has established resale restrictions and recapture provisions for the Down Payment Assistance Program.  The guidelines governing the local programs have been designed in conformance with Federal law.

Currently, the Sarasota Consortium uses both Sections 92.254 a5ii A1 and 3 to ensure long-term affordability depending upon the type of program and the amount of subsidy used in each project.  At the time the applicant sells, transfers, no longer lives in the property, or on the 30th anniversary of the execution of the note and the mortgage, the applicant must repay the original loan amount and, in addition, a share of appreciation in the value of the property, if any.  For Down Payment Assistance and Partnership Programs where less than $ 40,000 in subsidy is provided, OHCD recaptures just the initial subsidy.  In Partnership Programs where the subsidy is above $ 40,000, OHCD will recapture the initial subsidy and also a share of appreciation in the property if applicable.

The amount must be repaid whenever the property is sold and may, therefore, exceed the time limits of 15 years for existing and 20 years for new construction established by HUD.  The amount recaptured will be reduced by the amount of HOME principal payments, if any, made by the homeowner to the Consortium during the loan period.  However, OHCD does limit the recapture of funds to the net proceeds available from the sale of the home and will not seize the original homebuyer's non-housing assets to repay HOME funding.

To enforce this provision OHCD places a mortgage on the property that details these requirements.  These requirements are included in the "Truth-In-Lending" statement.

Households receiving assistance under the Down Payment Assistance Program must be first-time homeowners.  The total household income must not exceed 80% of the median income for the area and is adjusted by family size.  Properties eligible to be purchased must not exceed the maximum legal limit established by HUD and/or the SHIP Program. All funds recaptured under this provision will be used to assist other first-time homebuyers.  For units with larger subsidies, OHCD uses a resale restriction.

A Community Housing Trust (CHT) has been established at the encouragement of Sarasota County to promote the permanent affordability of housing units, especially those assisted with HOME, SHIP and NSP funds.  A deed restriction is placed on the unit to ensure that it is sold to another low-income family and all homes in the trust will remain affordable in perpetuity.

This will be done through the use of a 99-year ground lease that can be extended for 99 years.  Under the ground lease, the CHT will own the land, valued at the amount of subsidy, and the homeowner will only own the improvements, i.e. the house.

The CHT ensures that the homeowner receives a fair return on the property through a shared appreciation model.  Once the owner of the property informs the CHT that he/she would like to sell the home, then within 10 days an appraisal of the home must be performed.  The appraisal states the values contributed by the land and by the improvements i.e. the house, as separate amounts.

The home may not be sold for a price that exceeds the Purchase Option Price. The Purchase Option Price is the lesser of (a) the value of the improvements as determined by the appraisal or (b) the price calculated in accordance with the formula described below ("the Formula Price").

The Formula Price is determined by subtracting the initial appraised value of the home from the current appraisal.  This number is then multiplied by 25% to equal the fair market share of appreciation on the improvements in the home.  This figure is added to the initial purchase price of the home and is the Formula Price.

By using this model, the CHT is able to assure affordability and a fair return on homebuyer's investment into the unit.

Should the home be sold or no longer owner-occupied, then the homeowner has a legal obligation to offer the CHT a first right of refusal to purchase the home.  In addition, under the terms of the ground lease, the home must be resold to a qualified low-to-moderate income household.  The CHT must help the homeowner identify a qualified buyer or purchase the home themselves if the home is not sold in six months.  The CHT must continue to market the home to income-qualified households until it is sold.  When the initial subsidy is funded with HOME funds, the home must be sold to a household whose income is below 80% AMI and the household may not pay more than 30% of their income for mortgage and utilities.

3. If the PJ will use HOME funds to refinance existing debt secured by multifamily housing that is being rehabilitated with HOME funds, it must state its refinancing guidelines required under § 92.206(b).  The guidelines shall describe the conditions under which the PJ will refinance existing debt.  At a minimum these guidelines must:
   a. Demonstrate that rehabilitation is the primary eligible activity and ensure that this requirement is met by establishing a minimum level of rehabilitation per unit or a required ratio between rehabilitation and refinancing.
   b. Require a review of management practices to demonstrate that disinvestments in the property has not occurred; that the long-term needs of the project can be met; and that the feasibility of serving the targeted population over an extended affordability period can be demonstrated.
   c. State whether the new investment is being made to maintain current affordable units, create additional affordable units, or both.
   d. Specify the required period of affordability, whether it is the minimum 15 years or longer.
   e. Specify whether the investment of HOME funds may be jurisdiction-wide or limited to a specific geographic area, such as a neighborhood identified in a neighborhood revitalization strategy under 24 CFR 91.215(e)(2) or a Federally designated Empowerment Zone or Enterprise Community.
   f. State that HOME funds cannot be used to refinance multifamily loans made or insured by any federal program, including CDBG.

Refinancing is not anticipated.

4. If the PJ is going to receive American Dream Down Payment Initiative (ADDI) funds, please complete the following narratives:

   a. Describe the planned use of the ADDI funds.

b.  Describe the PJ's plan for conducting targeted outreach to residents and tenants of public housing and manufactured housing and to other families assisted by public housing agencies, for the purposes of ensuring that the ADDI funds are used to provide down payment assistance for such residents, tenants, and families.

c.  Describe the actions to be taken to ensure the suitability of families receiving ADDI funds to undertake and maintain homeownership, such as provision of housing counseling to homebuyers.

The ADDI program was not funded in 2011 and Sarasota will no longer receive these funds.

## HOMELESS

## Specific Homeless Prevention Elements

*Please also refer to the Homeless Needs Table in the Needs.xls workbook.

1.  Sources of Funds—Identify the private and public resources that the jurisdiction expects to receive during the next year to address homeless needs and to prevent homelessness. These include the McKinney-Vento Homeless Assistance Act programs, other special federal, state and local and private funds targeted to homeless individuals and families with children, especially the chronically homeless, the HUD formula programs, and any publicly-owned land or property.  Please describe, briefly, the jurisdiction's plan for the investment and use of funds directed toward homelessness.

The tables beginning on page 163 provide a summary of the priorities and specific objectives that will be addressed during Fiscal Year 2011 – 2012 using both Federal and State resources.  The Continuum of Care (COC) receives funding from HUD through the Super Notice Of Funding Availabilities (NOFA) competitive grant cycle and the McKinney-Vento Homeless Assistance Act Program.  The COC will also receive funding from Jane's Trust and the United Way of Sarasota and Manatee Counties. The funds are used to provide housing services to victims of domestic violence, people with mental illness, Tenant-Based Rental Assistance (TBRA) to families, coordinated services for homeless youth and children and to support the Continuum of Care's Homeless Management Information System (HMIS).

2.  Homelessness—In a narrative, describe how the action plan will address the specific objectives of the Strategic Plan and, ultimately, the priority needs identified.  Please also identify potential obstacles to completing these action steps.

The Sarasota Consortium has taken a leadership role to better address the needs of homeless individuals and those with children by working with Suncoast Partnership to End Homelessness (Partnership) in implementing the Homeless Management and Information System (HMIS) and better coordinating homeless services in Manatee and Sarasota Counties.  The HMIS information will help the bi-county community better understand the clients, the services needed and plan based on anticipated client counts.

To strengthen the delivery of services, the Consortium will work hand in hand with the Partnership to implement the new 10-Year Plan to end homelessness.  This plan was drafted at the same time as the 2011-2016 Consolidated Plan and the 2012 Action Plan and funding was set aside in this Action Plan to help implement the 10-Year Plan.

The barrier to be overcome is finding matching funds within the community to fully implement the plan.  There is currently great enthusiasm to end homelessness throughout Sarasota County, but without direct and sustained leadership, implementing the plan will be difficult.  The Consortium is committed to working with the Partnership to implement the 10-Year Plan.

3.  <u>Chronic Homelessness—The jurisdiction must describe the specific planned action steps it will take over the next year aimed at eliminating chronic homelessness by 2012.  Again, please identify barriers to achieving this.</u>

The Sarasota Consortium has developed an innovative concept to deal with chronic homelessness.  The Community Alternative Residential Treatment (CART) Program will utilize county general funds, CDBG, SHIP and non-profit funds in a three-part program designed to break the cycle of arrests of substance abusers.  The CART program involves First Step, a local drug treatment facility, the Salvation Army for counseling and continued treatment and an affordable housing substance free facility administered by Coastal / Renaissance for long term prevention.  The specific barrier to achieving the desired result is that some program participants may be unwilling or unable to change their lifestyle.

A Criminal Justice Committee has been formed and has identified several issues that appear to be creating chronic homelessness.  Steps are being taken to address those issues.  An example is the Manatee County Jail system which established a Discharge Planner position.   The caseworker who filled this position has met with over 1,300 inmates and successfully placed 40% of them upon discharge in the Manatee and Sarasota community. Currently the caseworker is meeting with 60-100 inmates per month with the majority being veterans and/or those in need of mental health services. There is support for a similar position in Sarasota County.

The results of the new 10 Year Plan to End Homelessness are still unknown.  The Consortium has place aside funding in the Action Plan to assist the Partnership in hiring an employee to implement the plan.  In addition, the Consortium will work with the

Partnership to seek new funding and create strategies to implement the goals of the new 10-Year plan once completed.

4. <u>Homelessness Prevention—The jurisdiction must describe its planned action steps over the next year to address the individual and families with children at imminent risk of becoming homeless.</u>

To strengthen the delivery of services for those at imminent risk of homelessness, the Consortium will be providing direct funding to the Continuum of Care to enhance the services now being provided.  These funds will be used to leverage other funds and resources to both provide services to homeless individuals and families and also to prevent low-income families from becoming homeless.

Funding will be used to assist persons that are homeless or those at risk for becoming homeless with rent, rental deposits, mortgage payments and utilities.   Agencies with skilled case managers are integral to the process by teaming the clients up with counseling, job training, food vouchers, household budgeting, credit counseling and other services that highly increase the success rate of the client(s).  Homeless prevention has evolved as an important and cost effective priority because it has been shown in national studies that the cost to assist a homeless person is typically seven times more expensive than the cost to prevent homelessness.

5. <u>Discharge Coordination Policy—Explain planned activities to implement a cohesive, community-wide Discharge Coordination Policy, and how, in the coming year, the community will move toward such a policy.</u>

The COC Leadership Council created and implemented a new Discharge Coordination Policy after extensive meetings in 2009 with non-profit agencies, the Justice System and Health Departments.  The Task Force identified practices/policies that result in discharge into homelessness and worked together to improve their procedures.  After an extensive analysis, the COC has implemented the following discharge planning policies:

## Foster Care:

SPEH has worked with Florida Coalition to develop formalized protocol for foster care discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices.

Currently, when a child ages out of foster care, he/she receives an Independent Living Services Transitional Services Plan which includes assistance and information on applying for life skills classes; transportation; school enrollment assistance; assistance with registering for employment at Workforce Development; identifying local employment opportunities; applying for job training and/or apprenticeship programs; continued care in the areas of physical health, mental health and education; obtaining

safe and stable housing; identifying community activities; and maintaining an ongoing relationship with the local system of care.

SPEH has also researched and produced a foster care report and developed partnerships with Children's Guardian Fund and Next Step programs. SPEH assists with grant writing to provide youth aging out of foster care with transition and educational expenses and support.

## Health Care:

Suncoast Partnership has worked with Florida Coalition for the Homeless to develop formalized protocol for health care discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices.

Currently, patients may be discharged from the hospital or transferred to another level of care, treatment, and services, to different health professionals, or to settings for continued services. The hospital's processes are based on the patients assessed needs. The hospital assesses the patients needs, plans for discharge or transfer, facilitates the process, and helps to ensure that continuity of care, which may include mental health or substance abuse treatment, other treatment, and services. Planning consists of a clear understanding of how to access services in the future. Information related to the care, treatment, and services provided is exchanged with other service providers.

Outreach mobile healthcare to homeless persons is provided daily at agencies and sites throughout Sarasota County. Sarasota Memorial Hospital will continue to contact the Salvation Army of Sarasota and arrange for homeless patients to enter the Salvation Army program for temporary housing, drug abuse counseling, job placement and case management.

## Mental Health:

Suncoast Partnership has worked with Florida Coalition for the Homeless to develop formalized protocol for mental health discharge planning and will continue to work towards collaborative partnerships, engagement of pertinent providers and best practices. Currently, discharge planning for all individuals receiving treatment includes transportation, access to stable living arrangements, assistance in obtaining aftercare follow up for medications and case management, assessment of medication availability, community program contact and referral information, referral to substance abuse treatment programs, and trauma or abuse recovery focused programs or other self-help groups.

First Step also has a discharge plan that involves housing, vocational assistance, supportive care and individualized support based upon individual client needs. Manatee Glens provides ongoing supportive services to discharged clients including referral to

housing agencies and the Salvation Army. They also provide rental assistance to qualified individuals.

## Corrections:

The Manatee and Sarasota County Sheriff's Office are implementing discharge planning policies and procedures that include continued care and follow-up after release. The plan begins upon recognition of a serious physical or behavioral health issue. Planning includes linkages and discussion on importance of follow-up.

Sarasota County Jail's multi-step discharge plan provides a bi-lingual book of referrals; an interview with Suncoast Workforce Board, applications to housing, and linkage to Salvation Army for housing and substance abuse support services.

Manatee County Jail established a Discharge Planner position and the caseworker who filled this position has met with over 1,300 inmates and successfully placed 40% of them upon discharge in the Manatee and Sarasota community. Currently the caseworker is meeting with 60-100 inmates per month with the majority being veterans and/or those in need of mental health services. There is support for a similar position in Sarasota County.

The Sarasota County Sheriff's Department has established jail pods for men and women who wish to recover from drug and alcohol addictions with the intention that this initiative will lead to long-term sobriety and a decrease in recidivism.

The CART Program is a partnership among 6 agencies in Sarasota County which focuses on diverting homeless individuals from the criminal justice system through a secure receiving center.  CART includes a 10-week residential services program, 150 hours of substance abuse treatment, mental health services, vocational assistance, health care, and counseling.

COMMUNITY DEVELOPMENT

## Community Development

*Please also refer to the Community Development Table in the Needs.xls workbook.

1. Identify the jurisdiction's priority non-housing community development needs eligible for assistance by CDBG eligibility category specified in the Community Development Needs Table (formerly Table 2B), Public Facilities, Public Improvements, Public Services and Economic Development.

A healthy community must have a good supply and range of quality housing, a sustainable economy, and a high quality of life.  These three objectives are not possible if a community lacks strong, vibrant neighborhoods and a robust local economy.  If

neighborhoods lack a strong sense of identity, it is more difficult to protect the housing stock and entice desirable businesses and highly skilled workers to the area.

Sarasota acknowledges the role that neighborhoods play in protecting the quality of life in our community. Both the City of Sarasota and the County of Sarasota have highly active neighborhood departments that determine at-risk neighborhoods and devise neighborhood strategy plans to promote neighborhood conservation and revitalization.

Due to the recession and widespread unemployment, Sarasota has decided to more closely exam the possibility of using Federal community development and affordable housing funding to strategically spur sustainable economic development throughout the county. A focus group of neighborhood and economic development experts was held to gain additional insight on how to best use limited funding for the maximum benefit of the entire community.

## Eligibility Areas:

If the Federal Community Development Block Grant (CDBG) is going to be used to promote neighborhood revitalization, it must be done in low-income areas. However, some flexibility does exist because communities are analyzed by block group, instead of census tract. Normally, a block group must consist of over 50% low to moderate-income (LMI) individuals to be eligible for CDBG funds.

However, when a locality has less than 10% of its block groups with 50% or greater LMI populations, then CDBG funds can be used in block groups that have greater than 45% LMI populations. Sarasota County has fewer than 10% LMI block groups so it follows the 45% rule. Since the City of Sarasota has more than 10% of its block groups with LMI populations, it follows the 50% rule.

The maps below show six areas of low-income concentrations in Sarasota County where CDBG funds can be used. The maps are listed as follows:

1. North County
2. Nokomis/Venice
3. Central Sarasota County
4. Southern Venice/North Port
5. North Port
6. Englewood

# Low- Income Concentrations North County



The majority of low-income block groups in North County lie in what is traditionally called the Newtown Community.  There are three block groups in this area that have a LMI population of more than 75 percent.  A low-income pocket also exists in the Pinecraft area.

## Low- Income Concentrations Nokomis/Venice



The Nokomis/Venice area of Sarasota County continues to have lower poverty rates than that of North Sarasota County. The majority of low-income populations remain around the core of downtown Venice.

## Low- Income Concentrations Central Sarasota County



Central Sarasota has the least amount of low-to moderate income census blocks in
Sarasota County.  The highest rate of poverty is 55.6% and lies in census block
001801.1.

# Low- Income Concentrations Southern Venice/North Port



South Venice has one census block with 100% poverty that OHCD has questioned. It can be seen in the above map. It has large areas that are above income so if a project is created in this area staff will conduct field surveys to ensure that it is actually low-income. Staff contacted HUD about this census block, but was assured that the data was correct.

## Low- Income Concentrations North Port



North Port is a relatively young city.  Built since 1970, it did not have the high concentration of poverty that the City of Sarasota and North Sarasota County did until the Great Recession.  However, its poverty rates have increased since the 2005-2010 Consolidated Plan.  The LMI populations occur throughout the city with the highest rate of poverty occurring in block group 2710.1 in the southern center of the city.  Due to the relatively low density in North Port, these block groups cover a larger geographic area.

## Low- Income Concentrations Englewood



Poverty rates in Englewood have also increased since the 2005-2010 Consolidated Plan. The majority of Englewood now has a low-to moderate income population with the highest rate of poverty in census block 002603.2. Sarasota County has large project planned in Englewood in the next few years that should help to address the need for revitalization in this area.

## Neighborhood Action Strategies:

In the past, the majority of CDBG dollars in both the City of Sarasota and Sarasota County have been used to support neighborhood redevelopment. The last Consolidated Plan focused much of the County CDBG funds into a water/sewer project in North Sarasota County and water lines in the Laurel neighborhood along with other smaller infrastructure projects such as sidewalks. With the water/sewer project now completed, there is now a chance to use CDBG funds for neighborhood revitalization.

Currently there are three ways for redevelopment funds to be channeled into neighborhoods.  The City of Sarasota has two divisions responsible for neighborhood planning and implementation, the Neighborhoods, Special Projects and Downtown Redevelopment Division and the North Sarasota/Newtown Redevelopment Division. The County of Sarasota has a Neighborhood planning division within their Development Services Business Center.  All three of these offices either write or implement existing neighborhood plans to promote quality of life and community stabilization in low to moderate-income areas.

## City of Sarasota Neighborhoods, Special Projects and Downtown Redevelopment Division

The City of Sarasota began planning for neighborhood revitalization with the Neighborhood Action Strategy (NAS) Program in 1999 within the Neighborhood Division. Through this program, neighborhood residents, landowners and businesses, with assistance of City staff, identified ways to improve conditions in their neighborhoods. City staff then recommended specific projects and funding strategies to the City Commission for approval.  Eight neighborhoods benefited from this program. These neighborhoods were chosen based upon a variety of demographic data including median household income, educational attainment, code violations and crime index.

Staff actively manages the implementation of action items from these NAS´s and tracks their progress while providing results to service users and providers. There are a total of 646 individual action items for the eight NAS neighborhoods.  Funds from the 2011-2016 Consolidated Plan will be used to further implement these plans to improve the quality of life for the residents of Sarasota.

## Newtown Redevelopment

The North Sarasota/Newtown Redevelopment Division within the City of Sarasota focuses a significant portion of its neighborhood efforts in the Newtown area.  The City's Newtown Redevelopment Office is located within the Newtown community and offers a variety of services to the neighborhood's residents and business owners.  The Newtown neighborhood has the majority of poverty and racial/ethnic concentrations in the City of Sarasota.

Newtown is just over one mile long and has the majority of the public housing in Sarasota County.  It is currently designated as an Enterprise Zone, a HUB Zone, and a Florida Front Porch Community.  The Newtown Redevelopment plan is a neighborhood redevelopment plan with a heavy emphasis on economic development.  Both the City and County of Sarasota have made significant commitments to implement the Newtown Redevelopment Plan.   Listed below are just seven activities that have occurred to implement the plan:

1. The City and County have awarded $16,951,200 to the Housing Authority of the City of Sarasota to redevelop 388 units of public housing that are located in

Newtown.  The funding is $1,500,000 in Tax Increment Financing, $5,000,000 in County Housing Trust Funds, $219,500 in City Housing Trust Funds, $4,420,000 in Penny Sales Tax, $3,825,999 in State Housing Initiatives Partnership Funding and $685,701 in City and County CDBG funds.  This local funding will leverage an additional $110,700,000 in private funding.

2.  The City has committed $786,535 in CDBG and CDBG-R funding to 17 commercial businesses serving the Newtown neighborhood to renovate the exteriors of the businesses and remove code violations.  A total of 15 businesses, most located within the traditional Newtown commercial district along the Dr. Martin Luther King Jr. Way have been approved for funding in the program.  This program should be complete by the end of 2011.

3.  The construction of the Robert Taylor Community Complex.  The City of Sarasota has committed over $11 million dollars in local funding and has received 4 separate EDI grants totaling $931,250 for the construction of a new community center serving the Newtown area.  The construction of the Robert Taylor Center began in October 2009 and will be completed by July 2011.

4.  The Sarasota School District has recently constructed new elementary and middle schools in the Newtown Neighborhood and will now construct a new high school.  The new school will enhance educational opportunities as it is being designed to enhance small learning communities.

5.  The City of Sarasota has committed $3,630,000 in local funding for Capital Improvements in Newtown and $917,000 for landscaping improvements for the Newtown Neighborhood in conjunction with the widening of U.S. 301.

6.  Sarasota County has constructed Public Water and Sewer lines, sidewalks, and a pedestrian bridge to serve the North Sarasota Neighborhood.  The past infrastructure improvements in the North Sarasota area totaled $6,615,124.  The City of Sarasota has also spent $1,791,000 on park improvements and a new parking lot for the Newtown commercial district.

7.  OHCD was awarded an NSP2 grant that will provide $23 million dollars to help stabilize and redevelop the Newtown area.   This funding has allowed OHCD to purchase several multi-family units that will greatly increase quality of life in the North Sarasota neighborhood.

## Sarasota County's Neighborhood Initiative Program

The Neighborhood Initiative Program selects neighborhoods to partner with county staff to create neighborhood improvement plans based on income, education, health, safety and code violations.  County staff first listens to the neighborhood's top concerns and then creates a strategy to address them by identifying and evaluating the neighborhood's strength and weaknesses. To develop the plan residents, business

owners and staff members from various agencies discuss each issue in detail during a
series of meetings.

To date, neighborhood plans have been created for the Laurel, North Sarasota,
Pinecraft, Venice Gardens, and Old Miakka neighborhoods.  There are also additional
areas eligible for CDBG funds that have already established community and
revitalization plans in Sarasota County.  Those neighborhoods include Nokomis, South
Venice, and Englewood.  County CDBG funds will be used to implement these plans.

Neighborhood conservation and revitalization is necessary to keep both growing and
built out communities strong.  Both the City and County of Sarasota are dedicated to
conserving the high quality of life that strong neighborhoods provide the Sarasota
community.

## Economic Development

The Community and Economic Development Focus Group brought to life the
importance of business incubators, additional training and educational opportunities for
residents, and the ability to use business loans to entice employers to the Sarasota
area. As the Consolidated Plan priorities are selected, the creation of jobs will be a top
priority.  A business incubator is currently being planned in the Newtown area and the
City of North Port has set aside funding in this Consolidated Planning period for another
one.

This Action Plan sets aside funding for a job training program for low-income residents
in the City of Sarasota as well as a summer youth job training program.

100% of all CDBG funds in this Action Plan will be used to benefit low-and moderate
income individuals.

## Racial Concentrations

There are racial concentrations within Sarasota County, according to 2005-2009
American Community Survey (ACS) data.

A racial or minority concentration is 10% more than the county average. See the
supporting maps for racial and minority concentrations below.

The predominant racial/cultural minority concentrations are the black and Hispanic
populations with most black and Hispanic residents living in the City of Sarasota.

| Racial Group | Sarasota County | Unincorporated County | City of Sarasota | City of Venice | City of North Port |
|---|---|---|---|---|---|
| **White** | 334,983 | 229,978 | 40,252 | 19,992 | 44,761 |
| **% of Total** | 91.16% | 94.35% | 77% | 96.19% | 88.37% |
| **Black** | 16,642 | 4,843 | 8,332 | 297 | 3,170 |
| **% of Total** | 4.53% | 1.99% | 15.94% | 1.43% | 6.26% |
| **American Indian/Alaskan Native** | 736 | 481 | 86 | 7 | 162 |
| **% of Total** | .2% | .2% | .16% | .003% | .32% |
| **Asian** | 4634 | 3353 | 743 | 272 | 266 |
| **% of Total** | 1.26% | 1.38% | 1.42% | 1.31% | .53% |
| **Native Hawaiian/Pacific Islander** | 67 | 37 | 0 | 0 | 30 |
| **% of Total** | .02% | .02% | 0% | 0% | .06% |
| **Other** | 6,592 | 3,298 | 1999 | 68 | 1,227 |
| **% of Total** | 1.79% | 1.35% | 3.82% | .33% | 2.42% |
| **Two or More** | 3,792 | 1,754 | 861 | 146 | 1,031 |
| **% of Total** | .72% | .72% | 1.65% | .70% | 2.04% |

**Racial Concentrations-Black Population**

| RACIAL CONCENTRATION – BLACK POPULATION | | | |
|---|---|---|---|
| **Area** | **2005-2009 Population** | **Number** | **Percent** |
| Census Tract 1.02 | 4,251 | 655 | 15.41% |
| Census Tract 2 | 4,773 | 2,073 | 43.43% |
| Census Tract 3 | 3,600 | 3,046 | 84.61% |
| Census Tract 10 | 3,076 | 872 | 28.35% |
| Census Tract 11.01 | 3,838 | 757 | 19.72% |
| Census Tract 11.02 | 4,366 | 1,121 | 25.68% |

*Source:* 2005-2009 ACS Data

According to the US Department of Housing and Urban Development (HUD), a racial concentration occurs if an area has a minority population that is greater than 10% of its countywide average population.  The Countywide black population is 4.53%.  The Census

tracts displayed above all have racial concentrations greater than 14.53% and are displayed on the map below.

## RACIAL CONCENTRATION – BLACK POPULATION



# Racial Concentrations-Hispanic Population

The Hispanic countywide population is 6.8%.  The Census tracts displayed below all have
racial concentrations greater than 16.8% and are displayed on the map below.

| RACIAL CONCENTRATION – HISPANIC POPULATION | | | |
|---|---|---|---|
| **Area** | **2005-2009 Population** | **Number** | **Percent** |
| Census Tract 1.02 (City of Sarasota) | 4,251 | 1,534 | 36.08% |
| Census Tract  4.01 | 3,890 | 887 | 22.80% |
| Census Tract  4.03 | 7,518 | 4,983 | 33.71% |
| Census Tract  4.05 | 3,341 | 731 | 21.87% |
| Census Tract  5.03 | 4,738 | 847 | 17.87% |
| Census Tract  11.02 | 4366 | 860 | 19.69% |
| Census Tract  16.02 | 3,409 | 594 | 17.42% |

# RACIAL CONCENTRATION – HISPANIC POPULATION



2. Identify specific long-term and short-term community development objectives (including economic development activities that create jobs), developed in accordance with the statutory goals described in section 24 CFR 91.1 and the primary objective of the CDBG program to provide decent housing and a suitable living environment and expand economic opportunities, principally for low- and moderate-income persons.

*Note:  Each specific objective developed to address a priority need, must be identified by number and contain proposed accomplishments, the time period (i.e., one, two, three, or more years), and annual program year numeric goals the jurisdiction hopes to achieve in quantitative terms, or in other measurable terms as identified and defined by the jurisdiction.

The tables beginning on page 160 provide a summary of the priorities and specific objectives that will be addressed during Fiscal Year 2011 – 2012 using both Federal and State resources.

## Antipoverty Strategy

1. <u>Describe the actions that will take place during the next year to reduce the number of poverty level families.</u>

The City of Sarasota will continue to revitalize the Newtown Neighborhood and reduce the number of poverty level families by implementing the Newtown Redevelopment Plan.  The "New Beginning in Newtown" is designed to build upon existing resources in the Newtown Neighborhood.  The program includes increased police patrols, an economic and social services component and neighborhood development.  This Action Plan supports a youth work training program and will provide job training opportunities to create jobs for low-income residents to reduce the number of poverty level families.  In addition, a new Section 3 plan will ensure that the community improves its process for awarding contracts to low-income residents of Sarasota County.

In addition, Sarasota County will strategically leverage CDBG funding to spur economic development throughout the county that will provide jobs to low-income residents.

| NON-HOMELESS SPECIAL NEEDS HOUSING |
|---|

## Non-homeless Special Needs (91.220 (c) and (e))
*Please also refer to the Non-Homeless Special Needs Table in the Needs.xls workbook.

1. <u>Describe the priorities and specific objectives the jurisdiction hopes to achieve for the period covered by the Action Plan.</u>

The SHIP program has been used to develop 126 special needs housing units during the past 10 years.  Participants at the Special Needs Focus Group informed City and County staff that special needs affordable housing needs have been mostly met in Sarasota County.   The most of the public input on this topic involved job creation, not affordable units.

2. <u>Describe how Federal, State, and local public and private sector resources that are reasonably expected to be available will be used to address identified needs for the period covered by this Action Plan.</u>

The tables beginning on page 163 provide a summary of the priorities and specific objectives that will be addressed during Fiscal Year 2011 – 2012 using both federal and state resources.

Other Narrative

## Minority Outreach Plan

The Office of Housing and Community Development (OHCD) has established the following minority outreach program within Sarasota County to encourage the participation, to the maximum extent possible, of minorities and women and minorities and women owned entities to participate in HOME funded activities.

1.   Known small, minority and women's business enterprises will be placed on all solicitation lists for services.

2.   Small, minority and women's businesses will be solicited whenever they are potential sources.

3.   Projects, when economically feasible will be divided into smaller tasks or quantities to permit maximum participation by small, minority and women's business enterprises.

4.   Delivery schedules will be established, where the requirement permits, which encourage participation by small, minority and women's business enterprises.

5.   The services of the Small Business Administration and the Minority Business Development Agency of the Department of Commerce will be utilized when appropriate.

Prime contractors with contracts in excess of $50,000 will be required to take the affirmative steps listed in 1 – 5 above.  In addition, a stronger Section 3 plan will increase opportunities for minorities throughout the community.

## Affirmative Marketing Procedures

The Office of Housing and Community Development has established the following affirmative marketing procedures and requirements for rental and homebuyer projects containing 5 or more HOME-assisted units.  These affirmative marketing procedures do not apply to families with Section 8 tenant based rental housing assistance or families with tenant-based rental assistance with HOME funds.

The Office of Housing and Community Development will notify the public, owners and potential tenants about Federal fair housing laws and Sarasota's affirmative marketing policy.  The Office of Housing and Community Development will use the Equal Housing Opportunity logo on its stationary, advertisements and press releases.

Each contract for financial assistance will require the owner to use the Equal Housing Opportunity logo in their advertising and display a fair housing poster (provided by the Office of Housing and Community Development) at the site.

Owners of rental property will be required to solicit applications from persons in the housing market area who are not likely to apply for the housing without special outreach. This requirement may be met by advertising in a minority publication or by contacting fair housing groups representing minorities.

The Office of Housing and Community Development and each owner must retain records for a 3 year period describing the actions taken to affirmatively market units.

The Office of Housing and Community Development will collect these records and, in its annual report to HUD, assess the success of the affirmative marketing procedures and take corrective actions where the affirmative marketing requirements are not met.

## Funding Tables

The tables beginning on page 158 provide a summary of how the Federal and State resources will be used to implement the 2011 – 2016 Consolidated Plan.

## Summary of Specific Annual Objectives

The tables beginning on page 185 are HUD forms designed to meet the Federal requirements related to performance measurements.

# Sarasota Consortium Five-Year Summary

Updated on 8/4/2011

| | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Entitlement Funds | $2,739,206 | $2,739,232 | $2,739,232 | $2,739,232 | $2,739,232 | $13,696,134 |
| Program Income | $420,500 | $420,500 | $420,500 | $420,500 | $420,500 | $2,102,500 |
| Total Revenues | $3,159,706 | $3,159,732 | $3,159,732 | $3,159,732 | $3,159,732 | $15,798,634 |
| **Expenditures** | | | | | | |
| Homeownership Activities | | | | | | |
| CHDO | $132,856 | $132,866 | $132,866 | $132,866 | $132,866 | $664,320 |
| Rehabilitation | $1,082,086 | $1,094,832 | $1,166,676 | $1,174,832 | $1,174,832 | $5,693,258 |
| Backflow Preventer Program | $22,600 | $25,000 | | | | $47,600 |
| Rental Activities | | | | | | |
| Rental Development | $50,000 | $50,000 | $0 | $0 | $0 | $100,000 |
| Venice Housing Authority | $500,000 | | | | | $500,000 |
| Homeless Activities | | | | | | |
| Homeless Facility | | | $300,000 | $805,940 | | $1,105,940 |
| Infrastructure | | | | | | |
| Robert L. Taylor | $300,000 | | | | | $300,000 |
| Infrastructure Improvements | $178,920 | $146,844 | $0 | $146,844 | $952,784 | $1,425,392 |
| Park Projects | $44,000 | $80,940 | $0 | $50,000 | $50,000 | $224,940 |
| Nokomis Sidewalks | $100,000 | $500,000 | $580,940 | $0 | $0 | $1,180,940 |
| Economic Development | | | | | | |
| General Economic Development | $0 | $150,000 | $0 | $145,000 | $145,000 | $440,000 |
| North Port Incubator | $0 | $250,000 | $250,000 | $0 | $0 | $500,000 |
| Public Services | | | | | | |
| Fair Housing Activities | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $37,500 |
| Youth Services | $26,012 | $26,012 | $26,012 | $26,012 | $26,012 | $130,060 |
| Job Training | $20,000 | $26,012 | $26,012 | $26,012 | $26,012 | $124,048 |
| Homeless Prevention | $88,558 | $88,558 | $88,558 | $88,558 | $88,558 | $442,790 |
| Staffing to Implement Homeless Plan | $6,012 | $25,000 | $25,000 | $0 | $0 | $56,012 |
| North Port Social Service Attendents | $52,800 | $52,800 | $52,800 | $52,800 | $52,800 | $264,000 |
| Recreation Services | $45,000 | | | | | |
| Administration | $503,362 | $503,368 | $503,368 | $503,368 | $503,368 | $2,516,834 |
| Total Expenditures | $3,159,706 | $3,159,732 | $3,159,732 | $3,159,732 | $3,159,732 | $15,753,634 |

    2011-2016 CONSOLIDATED PLAN     SARASOTA CONSORTIUM

# City of Sarasota CDBG Funds

| Revenues | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| Entitlement Funds | $505,867 | $505,857 | $505,857 | $505,857 | $505,857 | $2,529,295 |
| Program Income | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $100,000 |
| Total Revenues | $525,867 | $525,857 | $525,857 | $525,857 | $525,857 | $2,629,295 |

## Expenditures

| | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| **Homeownership Activities** | | | | | | |
| CHDO | | | | | | |
| Rehabilitation | $36,854 | $40,000 | $41,844 | $50,000 | $50,000 | $218,698 |
| Backflow Preventer Program | $5,000 | $5,000 | | | | $10,000 |
| **Rental Activities** | | | | | | |
| Rental Development | | | | | | |
| Venice Housing Authority | | | | | | |
| **Homeless Activities** | | | | | | |
| Homeless Facility | | | $300,000 | | | $300,000 |
| **Infrastructure** | | | | | | |
| Robert L. Taylor | $300,000 | | | | | $300,000 |
| Infrastructure Improvements | | $146,844 | | $146,844 | $146,844 | $440,532 |
| Park Projects | | | | | | |
| Nokomis Sidewalks | | | | | | |
| **Economic Development** | | | | | | |
| General Economic Development | | $150,000 | | $145,000 | $145,000 | $440,000 |
| North Port Incubator | | | | | | |
| **Public Services** | | | | | | |
| Fair Housing Activities | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $12,500 |
| Youth Services | $26,012 | $26,012 | $26,012 | $26,012 | $26,012 | $130,060 |
| Job Training | $20,000 | $26,012 | $26,012 | $26,012 | $26,012 | $124,048 |
| Homeless Prevention | $24,318 | $24,318 | $24,318 | $24,318 | $24,318 | $121,590 |
| Staffing to Implement Homeless Plan | $6,012 | | | | | $6,012 |
| North Port Social Service Attendents | | | | | | |
| Recreation Services | | | | | | |
| Administration | $105,171 | $105,171 | $105,171 | $105,171 | $105,171 | $525,855 |
| Total Expenditures | $525,867 | $525,857 | $525,857 | $525,857 | $525,857 | $2,629,295 |

# Sarasota County CDBG Funds

|  | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Entitlement Funds | $1,347,628 | $1,347,600 | $1,347,600 | $1,347,600 | $1,347,600 | $6,738,028 |
| Program Income | $500 | $500 | $500 | $500 | $500 | $2,500 |
| Total Revenues | $1,348,128 | $1,348,100 | $1,348,100 | $1,348,100 | $1,348,100 | $6,740,528 |
| **Expenditures** | | | | | | |
| Homeownership Activities | | | | | | |
| CHDO | | | | | | |
| Rehabilitation | $70,948 | $80,500 | $100,500 | $100,500 | $100,500 | $452,948 |
| Backflow Preventer Program | $17,600 | $20,000 | | | | $37,600 |
| Rental Activities | | | | | | |
| Rental Development | | | | | | |
| Venice Housing Authority | $500,000 | $0 | $0 | $0 | $0 | $500,000 |
| Homeless Activities | | | | | | |
| Homeless Facility | $0 | $0 | $0 | $805,940 | $0 | $805,940 |
| Infrastructure | | | | | | |
| Robert L. Taylor | | | | | | |
| Infrastructure Improvements | $178,920 | | $0 | $0 | $805,940 | $984,860 |
| Park Projects | $44,000 | $80,940 | $0 | $50,000 | $50,000 | $224,940 |
| Nokomis Sidewalks | $100,000 | $500,000 | $580,940 | $0 | $0 | $1,180,940 |
| Economic Development | | | | | | |
| General Economic Development | | | | | | |
| North Port Incubator | $0 | $250,000 | $250,000 | $0 | $0 | $500,000 |
| Public Services | | | | | | |
| Fair Housing Activities | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $25,000 |
| Youth Services | | | | | | |
| Job Training | | | | | | |
| Homeless Prevention | $64,240 | $64,240 | $64,240 | $64,240 | $64,240 | $321,200 |
| Staffing to Implement Homeless Plan | $0 | $25,000 | $25,000 | $0 | $0 | $50,000 |
| North Port Social Service Attendents | $52,800 | $52,800 | $52,800 | $52,800 | $52,800 | $264,000 |
| Recreation Services | $45,000 | | | | | |
| Administration | $269,620 | $269,620 | $269,620 | $269,620 | $269,620 | $1,348,100 |
| Total Expenditures | $1,348,128 | $1,348,100 | $1,348,100 | $1,348,100 | $1,348,100 | $6,695,528 |

# Sarasota Consortium HOME Funds

|  | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Entitlement Funds | $885,711 | $885,775 | $885,775 | $885,775 | $885,775 | $4,428,811 |
| Program Income | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $750,000 |
| Total Revenues | $1,035,711 | $1,035,775 | $1,035,775 | $1,035,775 | $1,035,775 | $5,178,811 |
| **Expenditures** | | | | | | |
| Homeownership Activities | | | | | | |
| CHDO | $132,856 | $132,866 | $132,866 | $132,866 | $132,866 | $664,320 |
| Rehabilitation | $749,284 | $749,332 | $799,332 | $799,332 | $799,332 | $3,896,612 |
| Backflow Preventer Program | | | | | | |
| Rental Activities | | | | | | |
| Rental Development | $50,000 | $50,000 | | | | $100,000 |
| Venice Housing Authority | | | | | | |
| Homeless Activities | | | | | | |
| Homeless Facility | | | | | | |
| Infrastructure | | | | | | |
| Robert L. Taylor | | | | | | |
| Infrastructure Improvements | | | | | | |
| Park Projects | | | | | | |
| Nokomis Sidewalks | | | | | | |
| Economic Development | | | | | | |
| General Economic Development | | | | | | |
| North Port Incubator | | | | | | |
| Public Services | | | | | | |
| Fair Housing Activities | | | | | | |
| Youth Services | | | | | | |
| Job Training | | | | | | |
| Homeless Prevention | | | | | | |
| Staffing to Implement Homeless Plan | | | | | | |
| North Port Social Service Attendents | | | | | | |
| Recreation Services | | | | | | |
| Administration | $103,571 | $103,577 | $103,577 | $103,577 | $103,577 | $517,879 |
| Total Expenditures | $1,035,711 | $1,035,775 | $1,035,775 | $1,035,775 | $1,035,775 | $5,178,811 |

# Sarasota Consortium SHIP Funds

|  | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Entitlement Funds | | | | | | |
| Program Income | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $1,250,000 |
| Total Revenues | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $1,250,000 |
| **Expenditures** | | | | | | |
| Homeownership Activities | | | | | | |
| CHDO | | | | | | |
| Rehabilitation | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,125,000 |
| Backflow Preventer Program | | | | | | |
| Rental Activities | | | | | | |
| Rental Development | | | | | | |
| Venice Housing Authority | | | | | | |
| Homeless Activities | | | | | | |
| Homeless Facility | | | | | | |
| Infrastructure | | | | | | |
| Robert L. Taylor | | | | | | |
| Infrastructure Improvements | | | | | | |
| Park Projects | | | | | | |
| Nokomis Sidewalks | | | | | | |
| Economic Development | | | | | | |
| General Economic Development | | | | | | |
| North Port Incubator | | | | | | |
| Public Services | | | | | | |
| Fair Housing Activities | | | | | | |
| Youth Services | | | | | | |
| Job Training | | | | | | |
| Homeless Prevention | | | | | | |
| Staffing to Implement Homeless Plan | | | | | | |
| North Port Social Service Attendents | | | | | | |
| Recreation Services | | | | | | |
| Administration | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $125,000 |
| Total Expenditures | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $1,250,000 |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Single Family Rehabilitation | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: | UOG Code |

Rehabilitation of owner-occupied low-income homes.

| Location: | Priority Need Category |
|---|---|

Citywide

**Select one:** Owner Occupied Housing ▼

Explanation:

**Expected Completion Date:**
(mm/dd/yyyy)

Only owner-occupied homes. Includes a barrier and lead-based paint removal grant.

Objective Category
- ● Decent Housing
- ○ Suitable Living Environmen
- ○ Economic Opportunity

Outcome Categories
- ☑ Availability/Accessibility
- ☑ Affordability
- ☑ Sustainability

**Specific Objectives**

1. Improve the quality of owner housing ▼
2. Increase range of housing options & related services for persons w/ special ▼
3. ▼

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Project-level Accomplishments** | 04 Households ▼ | Proposed | 3 | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 14A Rehab; Single-Unit Residential 570.202 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| | | | | | |
|---|---|---|---|---|---|
| **Program Year 1** | CDBG ▼ | Proposed Amt. | 36,854 | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Backflow Preventer Program | | |
|---|---|---|---|
| Description: | IDIS Project #: | UOG Code: | UOG Code |

Mini-loans to assist low-income homeowners with purchasing backflow preventers to become compliant with state law.

| Location: | Priority Need Category |
|---|---|
| Citywide | **Select one:** Owner Occupied Housing ▼ |
| | **Explanation:** |
| **Expected Completion Date:** | Mini-loans to assist low-income homeowners with purchasing backflow preventers to become compliant with state law and to help protect the environment. |
| (mm/dd/yyyy) | |

Objective Category
○ Decent Housing
● Suitable Living Environmer
○ Economic Opportunity

Outcome Categories
☐ Availability/Accessibility
☐ Affordability
☑ Sustainability

**Specific Objectives**

1. Improve the quality of owner housing ▼
2. ▼
3. ▼

| Project-level Accomplishments | 04 Households ▼ | Proposed | 10 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 14A Rehab; Single-Unit Residential 570.202 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 5,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Robert L. Taylor Improvements | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

General improvements to the Robert L. Taylor multi-use recreational facility.

| Location: | Priority Need Category | |
|---|---|---|
| 1845 34th Street, Sarasota | **Select one:** | Public Facilities ▼ |

**Explanation:**

**Expected Completion Date:**

(mm/dd/yyyy)

Objective Category
- ◯ Decent Housing
- ◉ Suitable Living Environment
- ◯ Economic Opportunity

General improvements to the Robert L. Taylor multi-use recreational facility.  Improvements to include rennovation of softball fields and other identified projects.

Outcome Categories
- ☑ Availability/Accessibility
- ☐ Affordability
- ☐ Sustainability

**Specific Objectives**

1. Improve quality / increase quantity of neighborhood facilities for low-income ▼

2. ▼

3. ▼

| Project-level Accomplishments | 11 Public Facilities ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 03E Neighborhood Facilities 570.201(c) ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 300,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Homeless Prevention | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Support of the HMIS system and homeless prevention activities.

| Location: | Priority Need Category | | |
|---|---|---|---|
| City of Sarasota | Select one: | Public Services ▼ | |
| | Explanation: | | |

| Expected Completion Date: | This funding helps to support the HMIS system that is used to track the homeless services provided to residents. |
|---|---|
| (mm/dd/yyyy) | |

Objective Category
○ Decent Housing
● Suitable Living Environment
○ Economic Opportunity

| Outcome Categories | Specific Objectives | |
|---|---|---|
| ☑ Availability/Accessibility | 1. Increase the number of homeless persons moving into permanent housing ▼ | |
| ☑ Affordability | 2. ▼ | |
| ☑ Sustainability | 3. ▼ | |

| Project-level Accomplishments | 09 Organizations ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 31E Supportive service ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 26,012 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Summer Youth Program | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: | UOG Code |

Program to teach low-income youths job skills.

| Location: | Priority Need Category |
|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | **Select one:** Priority Need Category ▼ |

**Explanation:**

| Expected Completion Date: | Program to teach low-income youths job skills. |
|---|---|
| (mm/dd/yyyy) | |

Objective Category
○ Decent Housing
○ Suitable Living Environment
● Economic Opportunity

**Specific Objectives**

Outcome Categories
☑ Availability/Accessibility
☐ Affordability
☑ Sustainability

1. Improve economic opportunities for low-income persons ▼
2. ▼
3. ▼

**Project-level Accomplishments**

| 01 People ▼ | Proposed | 10 | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 05D Youth Services 570.201(e) ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

**Program Year 1**

| CDBG ▼ | Proposed Amt. | 26,012 | | Fund Source: ▼ | Proposed Amt. | |
| | Actual Amount | | | | Actual Amount | |
| Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | Actual Amount | | | | Actual Amount | |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | Actual Units | | | | Actual Units | |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | Actual Units | | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Job Training | | | |
|---|---|---|---|---|
| Description: | IDIS Project #: | | UOG Code: | UOG Code |

Funding to assist low-income residents with job training and business skills.

| Citywide | Priority Need Category | |
|---|---|---|
| | **Select one:** | Public Services ▼ |
| | **Explanation:** | |
| **Expected Completion Date:** | Job training classes will be held in city sponsered business incubator. | |
| (mm/dd/yyyy) | | |

**Objective Category**
- ◯ Decent Housing
- ◯ Suitable Living Environment
- ⦿ Economic Opportunity

**Outcome Categories**
- ☐ Availability/Accessibility
- ☐ Affordability
- ☑ Sustainability

| Specific Objectives | |
|---|---|
| 1. Improve economic opportunities for low-income persons | ▼ |
| 2. | ▼ |
| 3. | ▼ |

| Project-level Accomplishments | 01 People ▼ | Proposed | 30 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 05H Employment Training 570.201(e) ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 20,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Jurisdiction**

CPMP Version 2.0

| Project Name: | Implement 10-Year Plan to End Homelessness | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Staffing assistance to implement the 10-Year Plan to End Homelessness.

| Location: | Priority Need Category |
|---|---|

| Countywide | **Select one:** | Public Services ▼ |
|---|---|---|

**Explanation:**

**Expected Completion Date:**

(mm/dd/yyyy)

Funding to help the CoC hire staff to implement the new 10-Year Plan to End Homelessness

┌ Objective Category ─────────
○ Decent Housing
◉ Suitable Living Environment
○ Economic Opportunity
└──────────────────────────

**Specific Objectives**

Outcome Categories
☑ Availability/Accessibility
☐ Affordability
☑ Sustainability

| 1. | End chronic homelessness | ▼ |
|---|---|---|
| 2. | | ▼ |
| 3. | | ▼ |

| Project-level Accomplishments | 09 Organizations ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| Assist CoC | | |

| Matrix Codes | ▼ | Matrix Codes | ▼ |
|---|---|---|---|
| Matrix Codes | ▼ | Matrix Codes | ▼ |
| Matrix Codes | ▼ | Matrix Codes | ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 6,012 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Fair Housing Activities | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Activities to affirmatively further fair housing.

| Location: | Priority Need Category |
|---|---|

Citywide

**Select one:** Public Services ▼

Explanation:

**Expected Completion Date:**
(mm/dd/yyyy)

Objective Category
○ Decent Housing
◉ Suitable Living Environment
○ Economic Opportunity

Activities to affirmatively further fair housing.

Outcome Categories
☑ Availability/Accessibility
☐ Affordability
☐ Sustainability

**Specific Objectives**

1. Improve access to affordable rental housing ▼
2. Increase range of housing options & related services for persons w/ special ▼
3. ▼

| Project-level Accomplishments | Other ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| Fair Housing Seminar | | |

| 05J Fair Housing Activities (if CDBG, then subject to 571 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 2,500 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

2011-2016 CONSOLIDATED PLAN    SARASOTA CONSORTIUM

Grantee Name: **City of Sarasota**

CPMP Version 2.0

| Project Name: | Administration | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Administration

| Location: | Priority Need Category | |
|---|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | **Select one:** | Planning/Administration ▼ |
| | Explanation: | |

**Expected Completion Date:**

(mm/dd/yyyy)

Administration

Objective Category
- ○ Decent Housing
- ○ Suitable Living Environment
- ○ Economic Opportunity

| Specific Objectives | |
|---|---|

Outcome Categories
- ☐ Availability/Accessibility
- ☐ Affordability
- ☐ Sustainability

1, ▼
2, ▼
3, ▼

| Project-level Accomplishments | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| Matrix Codes | ▼ | Matrix Codes | ▼ |
|---|---|---|---|
| Matrix Codes | ▼ | Matrix Codes | ▼ |
| Matrix Codes | ▼ | Matrix Codes | ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 105,171 | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|
| | | Actual Amount | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | CDBG Administration | | | | |
|---|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: | UOG Code |

| Location: | Priority Need Category |
|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | **Select one:** Planning/Administration ▼ |
| | Explanation: |

**Expected Completion Date:**
(mm/dd/yyyy)

Objective Category
- ● Decent Housing
- ○ Suitable Living Environment
- ○ Economic Opportunity

| Specific Objectives |
|---|
| 1. ▼ |
| 2. ▼ |
| 3. ▼ |

Outcome Categories
- ☐ Availability/Accessibility
- ☐ Affordability
- ☐ Sustainability

| Project-level Accomplishments | Accompl. Type: ▼ | Proposed | 0 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 31B Administration - grantee ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 269,620 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | HOME ▼ | Proposed Amt. | 103,557 | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | CHDO | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: | UOG Code |

15% setaside for CHDO activities.  Can include either new construction or purchase and rehabilitation of existing homes.

| Location: | Priority Need Category |
|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | **Select one:** Owner Occupied Housing ▼ |
| | Explanation: |
| **Expected Completion Date:** | 15% setaside for CHDO activities.  Can include either new construction or purchase and rehabilitation of existing homes. |
| (mm/dd/yyyy) | |

Objective Category
● Decent Housing
○ Suitable Living Environment
○ Economic Opportunity

| | Specific Objectives |
|---|---|
| Outcome Categories | |
| ☑ Availability/Accessibility | 1. Increase the availability of affordable owner housing ▼ |
| ☑ Affordability | 2. Improve the quality of owner housing ▼ |
| ☑ Sustainability | 3. ▼ |

| Project-level Accomplishments | 04 Households ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 12 Construction of Housing 570.201(m) ▼ | Matrix Codes ▼ |
|---|---|
| 14A Rehab; Single-Unit Residential 570.202 ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | HOME ▼ | Proposed Amt. | 132,866 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Homeowner Rehabilitation | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Rehabilitation of owner-occupied low-income homes.

| Location: | Priority Need Category | | |
|---|---|---|---|
| Countywide | **Select one:** | Priority Need Category ▼ | |
| | Explanation: | | |

| Expected Completion Date: | Rehabilitation of owner-occupied low-income homes. |
|---|---|
| (mm/dd/yyyy) | |

Objective Category
- ⦿ Decent Housing
- ◯ Suitable Living Environme
- ◯ Economic Opportunity

**Specific Objectives**

Outcome Categories
- ☑ Availability/Accessibility
- ☐ Affordability
- ☑ Sustainability

1. Improve the quality of owner housing ▼
2. Increase range of housing options & related services for persons w/ special ▼
3. ▼

| Project-level Accomplishments | 04 Households ▼ | Proposed | 30 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 14A Rehab; Single-Unit Residential 570.202 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 70,948 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | HOME ▼ | Proposed Amt. | 749,332 | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name:  **Sarasota County**

CPMP Version 2.0

| Project Name: | Backflow Preventer Program | | |
|---|---|---|---|
| Description: | IDIS Project #: | UOG Code: | UOG Code |

Mini-loans to assist low-income homeowners with purchasing backflow preventers to become compliant with state law.

| Location: | Priority Need Category |
|---|---|
| Countywide | **Select one:**  Owner Occupied Housing ▼ |
| | Explanation: |
| **Expected Completion Date:** | Mini-loans to assist low-income homeowners with purchasing backflow preventers to become compliant with state law. |
| (mm/dd/yyyy) | |

Objective Category
- ○ Decent Housing
- ● Suitable Living Environment
- ○ Economic Opportunity

Outcome Categories
- ☐ Availability/Accessibility
- ☐ Affordability
- ☑ Sustainability

| | Specific Objectives |
|---|---|
| | 1. Improve the quality of owner housing ▼ |
| | 2. ▼ |
| | 3. ▼ |

**Project-level Accomplishments**

| 04 Households ▼ | Proposed | 15 | | Accompl. Type: ▼ | Proposed |
|---|---|---|---|---|---|
| | Underway | | | | Underway |
| | Complete | | | | Complete |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed |
| | Underway | | | | Underway |
| | Complete | | | | Complete |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed |
| | Underway | | | | Underway |
| | Complete | | | | Complete |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 14A Rehab; Single-Unit Residential 570.202 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

**Program Year 1**

| CDBG ▼ | Proposed Amt. | 17,600 | | Fund Source: ▼ | Proposed Amt. |
|---|---|---|---|---|---|
| | Actual Amount | | | | Actual Amount |
| Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. |
| | Actual Amount | | | | Actual Amount |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units |
| | Actual Units | | | | Actual Units |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units |
| | Actual Units | | | | Actual Units |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Infrastrcture Improvements | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

The County is setting aside this funding for infrastrcture improvements in low-income census tracks.

| Location: | Priority Need Category |
|---|---|
| Countywide | **Select one:** Infrastructure ▼ |
| | Explanation: |
| **Expected Completion Date:** | The County is setting aside this funding for infrastrcture improvements in low-income census tracks. |
| (mm/dd/yyyy) | |

Objective Category
○ Decent Housing
● Suitable Living Environment
○ Economic Opportunity

| | Specific Objectives |
|---|---|
| Outcome Categories | 1. Improve quality / increase quantity of public improvements for lower income ▼ |
| ☑ Availability/Accessibility | 2. ▼ |
| ☐ Affordability | 3. ▼ |
| ☐ Sustainability | |

| Project-level Accomplishments | 11 Public Facilities ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 03 Public Facilities and Improvements (General) 570.20 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 178,920 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Redevlopment of Venice Housing Authority | | | |
|---|---|---|---|---|
| Description: | IDIS Project #: | | UOG Code: | UOG Code |

Funding will assist Venice Housing Authority rebuild public housing.

| Location: | Priority Need Category | |
|---|---|---|
| City of Venice | **Select one:** | Rental Housing ▼ |
| | Explanation: | |

| Expected Completion Date: | The Venice Housing Authority was demolished. This funding will enable the Venice Housing Authority seek additional funding. |
|---|---|
| (mm/dd/yyyy) | |

Objective Category
- ● Decent Housing
- ○ Suitable Living Environmen
- ○ Economic Opportunity

| Specific Objectives | |
|---|---|
| 1. Improve the quality of affordable rental housing | ▼ |
| 2. | ▼ |
| 3. | ▼ |

Outcome Categories
- ☑ Availability/Accessibility
- ☑ Affordability
- ☐ Sustainability

| | | Proposed | 50 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| Project-level Accomplishments | 10 Housing Units ▼ | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 14C Public Housing Modernization 570.202 ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| | | Proposed Amt. | 500,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| Program Year 1 | CDBG ▼ | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Park Improvements | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

Sarasota County is setting aside this funding for new park projects in low-income census blocks.

| Location: | Priority Need Category |
|---|---|

Countywide

**Select one:** Public Facilities ▼

Explanation:

**Expected Completion Date:**

(mm/dd/yyyy)

Sarasota County is setting aside this funding for new park projects in low-income census blocks.

Objective Category
- ◯ Decent Housing
- ◉ Suitable Living Environment
- ◯ Economic Opportunity

Outcome Categories
- ☑ Availability/Accessibility
- ☐ Affordability
- ☐ Sustainability

**Specific Objectives**

1. Improve quality / increase quantity of public improvements for lower income ▼
2. ▼
3.

| Project-level Accomplishments | 11 Public Facilities ▼ | Proposed | 1 | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 03F Parks, Recreational Facilities 570.201(c) ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 44,000 | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|
| | | Actual Amount | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |

Grantee Name: **Jurisdiction**

CPMP Version 2.0

| Project Name: | Nokomis Sidewalks | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: UOG Code |

Funding to design and build sidewalks in Nokomis.

| Location: | Priority Need Category |
|---|---|

Nokomis, FL

**Select one:** Infrastructure ▼

**Explanation:**

**Expected Completion Date:**

(mm/dd/yyyy)

This funding will be used to design sidewalks in a low-income section of Nokomis. There is additional funding in the Consolidated Plan to build the sidewalks.

Objective Category
○ Decent Housing
● Suitable Living Environment
○ Economic Opportunity

**Specific Objectives**

Outcome Categories
☑ Availability/Accessibility
☐ Affordability
☐ Sustainability

1. Improve quality / increase quantity of public improvements for lower income ▼
2. ▼
3. ▼

| Project-level Accomplishments | 11 Public Facilities ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 03L Sidewalks 570.201(c) ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 100,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Jurisdiction**

CPMP Version 2.0

| Project Name: | Laurel Service Attendants | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

CDBG funds will be used to hire program attendants to serve low-income clients and increase recreational opportunities for low-income youths at the Laurel Civic Association.

| Location: | Priority Need Category |
|---|---|
| Laurel, FL | **Select one:** Public Services ▼ |

**Explanation:**

Expected Completion Date:

(mm/dd/yyyy)

CDBG funds will be used to hire program attendants to serve low-income clients and increase recreational opportunities for low-income youths at the Laurel Civic Association.

Objective Category
- ○ Decent Housing
- ● Suitable Living Environment
- ○ Economic Opportunity

**Specific Objectives**

Outcome Categories
- ☐ Availability/Accessibility
- ☐ Affordability
- ☑ Sustainability

1. Improve the services for low/mod income persons ▼
2. ▼
3. ▼

| Project-level Accomplishments | 01 People ▼ | Proposed | 50 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 05 Public Services (General) 570.201(e) ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 45,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | North Port Social Service Attendants | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

CDBG funds will be used to hire program attendants to serve low-income clients at the North Port Social Service Center.

| Location: | Priority Need Category |
|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | Select one:  Public Services |
| | **Explanation:** |
| **Expected Completion Date:** | CDBG funds will be used to hire program attendants to serve low-income clients at the North Port Social Service Center. |
| (mm/dd/yyyy) | |

Objective Category
○ Decent Housing
◉ Suitable Living Environment
○ Economic Opportunity

Outcome Categories
☑ Availability/Accessibility
☐ Affordability
☐ Sustainability

**Specific Objectives**

1. Improve the services for low/mod income persons
2.
3.

| Project-level Accomplishments | 01 People | Proposed | 100 | | Accompl. Type: | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: | Proposed | | | Accompl. Type: | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: | Proposed | | | Accompl. Type: | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 05 Public Services (General) 570.201(e) | Matrix Codes |
|---|---|
| Matrix Codes | Matrix Codes |
| Matrix Codes | Matrix Codes |

| Program Year 1 | CDBG | Proposed Amt. | 52,800 | | Fund Source: | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: | Proposed Amt. | | | Fund Source: | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type | Proposed Units | | | Accompl. Type | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type | Proposed Units | | | Accompl. Type | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Homeless Prevention | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | UOG Code: | UOG Code |

CDBG funds are used to either prevent homelessness or rehouse homeless individuals.  Does not exceed three months.

| Location: | Priority Need Category |
|---|---|
| Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project. | **Select one:**    Public Services ▼ |

**Explanation:**

| **Expected Completion Date:** | CDBG funds are used to either prevent homelessness or rehouse |
|---|---|
| (mm/dd/yyyy) | homeless individuals.  Does not exceed three months. |

Objective Category
◉ Decent Housing
○ Suitable Living Environment
○ Economic Opportunity

| | **Specific Objectives** |
|---|---|
| Outcome Categories | 1. Increase the number of homeless persons moving into permanent housing ▼ |
| ☑ Availability/Accessibility | 2. ▼ |
| ☐ Affordability | 3. ▼ |
| ☐ Sustainability | |

| Project-level Accomplishments | 01 People ▼ | Proposed | 20 | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | Underway | |
| | | Complete | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 31G Short term rent mortgage utility payments ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| Program Year 1 | CDBG ▼ | Proposed Amt. | 64,240 | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Fair Housing Activities | | | |
|---|---|---|---|---|
| Description: | | IDIS Project #: | | UOG Code: | UOG Code |

Activities to affirmatively further fair housing.

| Location: | Priority Need Category |
|---|---|

Enter location, address, zip codes, census tracks, or other elements that will help to identify the location of the project.

**Select one:** Public Services ▼

**Explanation:**

**Expected Completion Date:**
(mm/dd/yyyy)

Activities to affirmatively further fair housing.

Objective Category
- ● Decent Housing
- ○ Suitable Living Environment
- ○ Economic Opportunity

**Specific Objectives**

Outcome Categories
- ☑ Availability/Accessibility
- ☐ Affordability
- ☐ Sustainability

1. Improve access to affordable rental housing ▼
2. ▼
3. ▼

**Project-level Accomplishments**

| Other ▼ | Proposed | 1 | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |
| Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | Underway | | | | Underway | |
| | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| Fair housing outreach | Fair Housing Training | |

| 05J Fair Housing Activities (if CDBG, then subject to 570 ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

**Program Year 1**

| Fund Source: ▼ | Proposed Amt. | 5,000 | | Fund Source: ▼ | Proposed Amt. | |
| | Actual Amount | | | | Actual Amount | |
| CDBG ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | Actual Amount | | | | Actual Amount | |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | Actual Units | | | | Actual Units | |
| Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | Actual Units | | | | Actual Units | |

Grantee Name: **Sarasota County**

CPMP Version 2.0

| Project Name: | Affordable Rental Development | | |
|---|---|---|---|
| Description: | IDIS Project #: | UOG Code: | UOG Code |

Funding to help build affordable rental complexes throughout Sarasota County.

| Location: | Priority Need Category | |
|---|---|---|
| Countywide | **Select one:** | Rental Housing ▼ |
| | Explanation: | |

| Expected Completion Date: | Funding to help build affordable rental complexes throughout Sarasota County. |
|---|---|
| (mm/dd/yyyy) | |

**Objective Category**
- ● Decent Housing
- ○ Suitable Living Environment
- ○ Economic Opportunity

| | Specific Objectives |
|---|---|
| **Outcome Categories** | 1. Increase the supply of affordable rental housing ▼ |
| ☑ Availability/Accessibility | 2. ▼ |
| ☑ Affordability | 3. ▼ |
| ☐ Sustainability | |

| **Project-level Accomplishments** | 10 Housing Units ▼ | Proposed | 50 | | Accompl. Type: ▼ | Proposed | |
|---|---|---|---|---|---|---|---|
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |
| | Accompl. Type: ▼ | Proposed | | | Accompl. Type: ▼ | Proposed | |
| | | Underway | | | | Underway | |
| | | Complete | | | | Complete | |

| Proposed Outcome | Performance Measure | Actual Outcome |
|---|---|---|
| | | |

| 05S Rental Housing Subsidies (if HOME, not part of 5% ▼ | Matrix Codes ▼ |
|---|---|
| Matrix Codes ▼ | Matrix Codes ▼ |
| Matrix Codes ▼ | Matrix Codes ▼ |

| **Program Year 1** | HOME ▼ | Proposed Amt. | 50,000 | | Fund Source: ▼ | Proposed Amt. | |
|---|---|---|---|---|---|---|---|
| | | Actual Amount | | | | Actual Amount | |
| | Fund Source: ▼ | Proposed Amt. | | | Fund Source: ▼ | Proposed Amt. | |
| | | Actual Amount | | | | Actual Amount | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |
| | Accompl. Type ▼ | Proposed Units | | | Accompl. Type ▼ | Proposed Units | |
| | | Actual Units | | | | Actual Units | |

Sarasota Consortium

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective / Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **DH-1** | **Availability/Accessibility of Decent Housing** | | | | | | |
| **DH-1 (1)** | Specific Objective: Increase the supply of affordable housing available for purchase or rent by lower income families. | HOME: 664,330 | Number of new or rehabilitated housing units produced by non-profit housing providers. | 2012 | 1 | | |
| | | | | 2013 | 1 | | |
| | | | | 2014 | 1 | | |
| | | | | 2015 | 1 | | |
| | | | | 2016 | 1 | | |
| | | | **MULTI-YEAR GOAL** | | 5 | 0 | 0% |
| | Specific Objective: Complete Robert L. Taylor project, Improve Infrastrcture in Low-income City neighborhood, Nokomis Sidewalk Project, Park Improvement Project, and County Infrastrcture Project. | City CDBG: $740,532 | | 2012 | | | |
| | | | | 2013 | | | |
| | | | | 2014 | | | |
| | | | | 2015 | | | |
| | | | | 2016 | | | 0% |
| | | County CDBG: $2,390,740 | Number of infrastructure projects completed. | 2012 | 2 | | |
| | | | | 2013 | 1 | | |
| | | | | 2014 | 2 | | |
| | | | | 2015 | 1 | | |
| | | | | 2016 | 1 | | |
| | | | **MULTI-YEAR GOAL** | | 7 | 0 | 0% |

2011-2016 CONSOLIDATED PLAN

SARASOTA CONSORTIUM

Sarasota Consortium

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective<br>Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **DH-1** | **Availability/Accessibility of Decent Housing** | | | | | | |
| DH-1 (2) | Specific Objective: Increase the number of rental housing units available to lower income renters. | HOME: $100,000 | Number of additional housing units created for low-income residents. | 2012 | 0 | | |
| | | | | 2013 | 100 | | |
| | | | | 2014 | 100 | | |
| | | | | 2015 | 0 | | |
| | | | | 2016 | 0 | | |
| | | | **MULTI-YEAR GOAL** | | **200** | **0** | 0% |
| | | | Number of new housing credit or bond financed rental units. | 2012 | 50 | | |
| | | | | 2013 | 50 | | |
| | | | | 2014 | 50 | | |
| | | | | 2015 | 50 | | |
| | | | | 2016 | 50 | | |
| | | | **MULTI-YEAR GOAL** | | **250** | **0** | 0% |
| | | County CDBG: $500,000 | Number of units created in Venice Housing Authority | 2012 | | | |
| | | | | 2013 | 100 | | |
| | | | | 2014 | | | |
| | | | | 2015 | | | |
| | | | | 2016 | | | |
| | | | **MULTI-YEAR GOAL** | | **100** | **0** | 0% |

Sarasota Consortium

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective / Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **DH-1** | **Availability/Accessibility of Decent Housing** | | | | | | |
| DH-1 (3) | Specific Objective: Increase the number of affordable housing units through rehabilitation, barrier removal, connection to safe and sanitary water or hurricane hardening. | City CDBG: 218,698 | Number of housing units rehabilitated. | 2012 | 50 | | |
| | | | | 2013 | 50 | | |
| | | County CDBG: 452,948 | | 2014 | 50 | | |
| | | | | 2015 | 50 | | |
| | | HOME: $3,896,660 | | 2016 | 50 | | |
| | | | **MULTI-YEAR GOAL** | | **250** | **0** | 0% |
| | | SHIP: $1,125,000 | | 2012 | | | |
| | | | | 2013 | | | |
| | | | | 2014 | | | |
| | | | | 2015 | | | |
| | | | | 2016 | | | |
| | Specific Annual Objective: Same as above. | | **MULTI-YEAR GOAL** | | | | |
| | | City CDBG: $ 10,000 | Number of housing units provided with backflow preventers. | 2012 | 10 | | |
| | | | | 2013 | 10 | | |
| | | County CDBG: $ 37,600 | | 2014 | 10 | | |
| | | | | 2015 | 10 | | |
| | | | | 2016 | 10 | | |
| | | | **MULTI-YEAR GOAL** | | **50** | **0** | 0% |

Sarasota Consortium

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective<br>Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **SL-1** | **Availability/Accessibility of Suitable Living Environment** | | | | | | |
| **SL-1 (1)** | Specific Objective: Homeless Prevention and Rehousing Activities. | City CDBG: $121,590 | Number of homeless individuals receiving assistance. | 2012 | 20 | | |
| | | | | 2013 | 20 | | |
| | | County CDBG: $321,200 | | 2014 | 20 | | |
| | | | | 2015 | 20 | | |
| | | | | 2016 | 20 | | |
| | | | MULTI-YEAR GOAL | | 100 | 0 | 0% |
| | Specific Objective: Begin Construction of South County Homeless Facility | County CDBG: $805,940 | Number of public facilities constructed. | 2012 | | | 0% |
| | | | | 2013 | | | |
| | | | | 2014 | 1 | | 100% |
| | | | | 2015 | | | |
| | | | | 2016 | | | |
| | | | MULTI-YEAR GOAL | | 1 | 0 | 0% |
| | Specific Objective: Begin Construction of North County Homeless Facility | City CDBG: $300,000 | | 2012 | | | |
| | | | | 2013 | | | |
| | | | | 2014 | 1 | | |
| | | | | 2015 | | | |
| | | | | 2016 | | | |
| | | | MULTI-YEAR GOAL | | 1 | | |

Sarasota Consortium

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **SL-1** | **Availability/Accessibility of Suitable Living Environment** | | | | | | |
| **SL-1 (2)** | Specific Objective: Increase the effectiveness and delivery of social services to lower income residents. | County CDBG: $264,000 | Number of low-income individuals assisted. | 2012 | 100 | | |
| | | | | 2013 | 100 | | |
| | | Source of Funds #2 | | 2014 | 100 | | |
| | Specific Annual Objective: Hire 1.5 program attendants to improve social service delivery in the North Port Social Services building. | Source of Funds #3 | | 2015 | 100 | | |
| | | | | 2016 | 100 | | |
| | | | **MULTI-YEAR GOAL** | | **500** | **0** | |
| | | | Number of strategic goals implemented. | 2012 | | | |
| | | | | 2013 | 1 | | |
| | | County CDBG: $50,000 | | 2014 | 1 | | |
| | Specific Objective: Staffing to Implement the 10-Year Plan to End Homelessness | City CDBG: $6,012 | | 2015 | 1 | | |
| | | | | 2016 | 1 | | |
| | | | **MULTI-YEAR GOAL** | | **4** | | |
| | | | | 2012 | 50 | | |
| | | | | 2013 | | | |
| | Staffing to increase low-income services at the Laurel Civic Association. | County CDBG: $45,000 | | 2014 | | | |
| | | | | 2015 | | | |
| | | Source of Funds #3 | | 2016 | | | |
| | | | **MULTI-YEAR GOAL** | | **50** | | |

2011-2016 CONSOLIDATED PLAN

SARASOTA CONSORTIUM

Sarasota Consortium

## Summary of Specific Annual Objectives

**New Specific Objective**

| Specific Obj. # | Outcome/Objective / Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **EO-1** | **Availability/Accessibility of Economic Opportunity** | | | | | | |
| EO-1 (1) | Specific Annual Objective: Increase economic opportunities for lower income residents through a summer youth employment program | City CDBG: $ 130,060 | Number of jobs produced. | 2012 | 20 | | |
| | | | | 2013 | 20 | | |
| | | Source of Funds #2 | | 2014 | 20 | | |
| | | | | 2015 | 20 | | |
| | | Source of Funds #3 | | 2016 | 20 | | |
| | | | **MULTI-YEAR GOAL** | | **100** | **0** | 0% |
| | | | Number of jobs created and filled by low-income residents. | 2012 | | | |
| | | | | 2013 | | | |
| | Specific Objective: Economic Development Activities that create jobs for low-income residents. | | | 2014 | 30 | | |
| | | | | 2015 | 30 | | |
| | | City CDBG: $ 440,000 | | 2016 | 30 | | |
| | | | **MULTI-YEAR GOAL** | | **90** | **0** | 0% |
| | Specific Annual Objective: Increase economic opportunities for lower income residents by creating a business incubator. | County CDBG: $500,000 | Number of properties aquired for a business incubator. | 2012 | | | |
| | | | | 2013 | | | |
| | | Source of Funds #2 | | 2014 | | | |
| | | | | 2015 | | | |
| | | Source of Funds #3 | | 2016 | 1 | | |
| | | | **MULTI-YEAR GOAL** | | **1** | **0** | |

Jurisdiction

*CPMP Version 2.0*

**New Specific Objective**

## Summary of Specific Annual Objectives

| Specific Obj. # | Outcome/Objective / Specific Annual Objectives | Sources of Funds | Performance Indicators | Year | Expected Number | Actual Number | Percent Completed |
|---|---|---|---|---|---|---|---|
| **EO-1** | **Availability/Accessibility of Economic Opportunity** | | | | | | |
| EO-2 (2) | Specific Objective: Increase economic opportunities for lower income residents by offering job training. | City CDBG: $124,048 | # of low-income residents provided business training. | 2012 | 20 | | |
| | | | | 2013 | 20 | | |
| | | Source of Funds #2 | | 2014 | 20 | | |
| | | | | 2015 | 20 | | |
| | | Source of Funds #3 | | 2016 | 20 | | |
| | | | **MULTI-YEAR GOAL** | | **100** | **0** | |
| | | Source of Funds #1 | Performance Indicator #2 | 2005 | | | |
| | | | | 2006 | | | |
| | | Source of Funds #2 | | 2007 | | | |
| | | | | 2008 | | | |
| | | Source of Funds #3 | | 2009 | | | |
| | | | **MULTI-YEAR GOAL** | | | **0** | |
| | | Source of Funds #1 | Performance Indicator #3 | 2005 | | | |
| | | | | 2006 | | | |
| | | Source of Funds #2 | | 2007 | | | |
| | | | | 2008 | | | |
| | | Source of Funds #3 | | 2009 | | | |
| | | | **MULTI-YEAR GOAL** | | | **0** | |

2011-2016 CONSOLIDATED PLAN

SARASOTA CONSORTIUM



# CPMP Non-State Grantee Certifications

**Many elements of this document may be completed electronically, however a signature must be manually applied and the document must be submitted in paper form to the Field Office.**

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## NON-STATE GOVERNMENT CERTIFICATIONS

In accordance with the applicable statutes and the regulations governing the consolidated plan regulations, the jurisdiction certifies that:

**Affirmatively Further Fair Housing** -- The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard.

**Anti-displacement and Relocation Plan** -- It will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and implementing regulations at 49 CFR 24; and it has in effect and is following a residential antidisplacement and relocation assistance plan required under section 104(d) of the Housing and Community Development Act of 1974, as amended, in connection with any activity assisted with funding under the CDBG or HOME programs.

**Drug Free Workplace** -- It will or will continue to provide a drug-free workplace by:
1. Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;
2. Establishing an ongoing drug-free awareness program to inform employees about –
   a. The dangers of drug abuse in the workplace;
   b. The grantee's policy of maintaining a drug-free workplace;
   c. Any available drug counseling, rehabilitation, and employee assistance programs; and
   d. The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;
3. Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph 1;
4. Notifying the employee in the statement required by paragraph 1 that, as a condition of employment under the grant, the employee will –
   a. Abide by the terms of the statement; and
   b. Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;
5. Notifying the agency in writing, within ten calendar days after receiving notice under subparagraph 4(b) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to every grant officer or other designee on whose grant activity the convicted employee was working, unless the Federal agency has designated a central point for the receipt of such notices. Notice shall include the identification number(s) of each affected grant;
6. Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph 4(b), with respect to any employee who is so convicted –
   a. Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or
   b. Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;
7. Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs 1, 2, 3, 4, 5 and 6.

**Anti-Lobbying** -- To the best of the jurisdiction's knowledge and belief:

8. No Federal appropriated funds have been paid or will be paid, by or on behalf of it, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement;

9. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, it will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions; and

10. It will require that the language of paragraph 1 and 2 of this anti-lobbying certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

**Authority of Jurisdiction** -- The consolidated plan is authorized under State and local law (as applicable) and the jurisdiction possesses the legal authority to carry out the programs for which it is seeking funding, in accordance with applicable HUD regulations.

**Consistency with plan** -- The housing activities to be undertaken with CDBG, HOME, ESG, and HOPWA funds are consistent with the strategic plan.

**Section 3** -- It will comply with section 3 of the Housing and Urban Development Act of 1968, and implementing regulations at 24 CFR Part 135.

_____    _____
Signature/Authorized Official       Date

| Suzanne Atwell |
Name

| Mayor |
Title

| 1565 1st Street |
Address

| Sarasota, FL  34236 |
City/State/Zip

| 941-954-4115 |
Telephone Number

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## Specific CDBG Certifications

The Entitlement Community certifies that:

**Citizen Participation --** It is in full compliance and following a detailed citizen participation plan that satisfies the requirements of 24 CFR 91.105.

**Community Development Plan --** Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)

**Following a Plan --** It is following a current consolidated plan (or Comprehensive Housing Affordability Strategy) that has been approved by HUD.

**Use of Funds --** It has complied with the following criteria:

11. Maximum Feasible Priority - With respect to activities expected to be assisted with CDBG funds, it certifies that it has developed its Action Plan so as to give maximum feasible priority to activities which benefit low and moderate income families or aid in the prevention or elimination of slums or blight. The Action Plan may also include activities which the grantee certifies are designed to meet other community development needs having a particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community, and other financial resources are not available);

12. Overall Benefit - The aggregate use of CDBG funds including section 108 guaranteed loans during program year(s) 2011, 2____, 2____, (a period specified by the grantee consisting of one, two, or three specific consecutive program years), shall principally benefit persons of low and moderate income in a manner that ensures that at least 70 percent of the amount is expended for activities that benefit such persons during the designated period;

13. Special Assessments - It will not attempt to recover any capital costs of public improvements assisted with CDBG funds including Section 108 loan guaranteed funds by assessing any amount against properties owned and occupied by persons of low and moderate income, including any fee charged or assessment made as a condition of obtaining access to such public improvements.

    However, if CDBG funds are used to pay the proportion of a fee or assessment that relates to the capital costs of public improvements (assisted in part with CDBG funds) financed from other revenue sources, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds.

    The jurisdiction will not attempt to recover any capital costs of public improvements assisted with CDBG funds, including Section 108, unless CDBG funds are used to pay the proportion of fee or assessment attributable to the capital costs of public improvements financed from other revenue sources. In this case, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds. Also, in the case of properties owned and occupied by moderate-income (not low-income) families, an assessment or charge may be made against the property for public improvements financed by a source other than CDBG funds if the jurisdiction certifies that it lacks CDBG funds to cover the assessment.

**Excessive Force --** It has adopted and is enforcing:

14. A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

15. A policy of enforcing applicable State and local laws against physically barring entrance to or exit from a facility or location which is the subject of such non-violent civil rights demonstrations within its jurisdiction;

**Compliance With Anti-discrimination laws --** The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations.

Jurisdiction

**Compliance With Anti-discrimination laws --** The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations.

**Lead-Based Paint --** Its activities concerning lead-based paint will comply with the requirements of part 35, subparts A, B, J, K and R, of title 24;

**Compliance with Laws --** It will comply with applicable laws.

_____       8-75-11
Signature/Authorized Official              Date

Suzanne Atwell
Name

Mayor
Title

1565 1st Street
Address

Sarasota, FL 34236
City/State/Zip

941-951-4115
Telephone Number

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## Specific HOME Certifications

The HOME participating jurisdiction certifies that:

**Tenant Based Rental Assistance --** If the participating jurisdiction intends to provide tenant-based rental assistance:

The use of HOME funds for tenant-based rental assistance is an essential element of the participating jurisdiction's consolidated plan for expanding the supply, affordability, and availability of decent, safe, sanitary, and affordable housing.

**Eligible Activities and Costs --** it is using and will use HOME funds for eligible activities and costs, as described in 24 CFR § 92.205 through 92.209 and that it is not using and will not use HOME funds for prohibited activities, as described in § 92.214.

**Appropriate Financial Assistance --** before committing any funds to a project, it will evaluate the project in accordance with the guidelines that it adopts for this purpose and will not invest any more HOME funds in combination with other Federal assistance than is necessary to provide affordable housing;


_Signature/Authorized Official_          _8-15-11_

                                          Date

| Suzanne Atwell |
Name

| Mayor |
Title

| 1565 1st Street |
Address

| Sarasota, FL  34236 |
City/State/Zip

| 941-951-4115 |
Telephone Number

☐ **This certification does not apply.**
☒ **This certification is applicable.**

# APPENDIX TO CERTIFICATIONS

Instructions Concerning Lobbying and Drug-Free Workplace Requirements

**Lobbying Certification**
This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**Drug-Free Workplace Certification**
1. By signing and/or submitting this application or grant agreement, the grantee is providing the certification.
2. The certification is a material representation of fact upon which reliance is placed when the agency awards the grant. If it is later determined that the grantee knowingly rendered a false certification, or otherwise violates the requirements of the Drug-Free Workplace Act, HUD, in addition to any other remedies available to the Federal Government, may take action authorized under the Drug-Free Workplace Act.
3. Workplaces under grants, for grantees other than individuals, need not be identified on the certification. If known, they may be identified in the grant application. If the grantee does not identify the workplaces at the time of application, or upon award, if there is no application, the grantee must keep the identity of the workplace(s) on file in its office and make the information available for Federal inspection. Failure to identify all known workplaces constitutes a violation of the grantee's drug-free workplace requirements.
4. Workplace identifications must include the actual address of buildings (or parts of buildings) or other sites where work under the grant takes place. Categorical descriptions may be used (e.g., all vehicles of a mass transit authority or State highway department while in operation, State employees in each local unemployment office, performers in concert halls or radio stations).
5. If the workplace identified to the agency changes during the performance of the grant, the grantee shall inform the agency of the change(s), if it previously identified the workplaces in question (see paragraph three).
6. The grantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific grant: Place of Performance (Street address, city, county, state, zip code) Check if there are workplaces on file that are not identified here. The certification with regard to the drug-free workplace is required by 24 CFR part 21.

| Place Name | Street | City | County | State | Zip |
|---|---|---|---|---|---|
| Federal Building | 111 S. Orange | Sarasota | Sarasota | FL | 34236 |
| City Hall | 1565 1st Street | Sarasota | Sarasota | FL | 34236 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

7. Definitions of terms in the Nonprocurement Suspension and Debarment common rule and Drug-Free Workplace common rule apply to this certification. Grantees' attention is called, in particular, to the following definitions from these rules: "Controlled substance" means a controlled substance in Schedules I through V of the Controlled Substances Act (21 U.S.C. 812) and as further defined by regulation (21 CFR 1308.11 through 1308.15); "Conviction" means a finding of guilt (including a plea of *nolo contendere*) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes; "Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, use, or possession of any

controlled substance; "Employee" means the employee of a grantee directly engaged in the performance of work under a grant, including:

a.  All "direct charge" employees;
b.  all "indirect charge" employees unless their impact or involvement is insignificant to the performance of the grant; and
c.  temporary personnel and consultants who are directly engaged in the performance of work under the grant and who are on the grantee's payroll. This definition does not include workers not on the payroll of the grantee (e.g., volunteers, even if used to meet a matching requirement; consultants or independent contractors not on the grantee's payroll; or employees of subrecipients or subcontractors in covered workplaces).

Note that by signing these certifications, certain documents must completed, in use, and on file for verification. These documents include:

1. Analysis of Impediments to Fair Housing
2. Citizen Participation Plan
3. Anti-displacement and Relocation Plan


_Suzanne Atwell_ (signature)                          8-15-11

Signature/Authorized Official                          Date


| Suzanne Atwell |
| --- |

Name

| Mayor |
| --- |

Title

| 1565 1st Street |
| --- |

Address

| Sarasota, FL  34236 |
| --- |

City/State/Zip

| 941-951-4115 |
| --- |

Telephone Number



# CPMP Non-State Grantee Certifications

**Many elements of this document may be completed electronically, however a signature must be manually applied and the document must be submitted in paper form to the Field Office.**

☐ This certification does not apply.
☒ This certification is applicable.

## NON-STATE GOVERNMENT CERTIFICATIONS

In accordance with the applicable statutes and the regulations governing the consolidated plan regulations, the jurisdiction certifies that:

**Affirmatively Further Fair Housing** -- The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard.

**Anti-displacement and Relocation Plan** -- It will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and implementing regulations at 49 CFR 24; and it has in effect and is following a residential antidisplacement and relocation assistance plan required under section 104(d) of the Housing and Community Development Act of 1974, as amended, in connection with any activity assisted with funding under the CDBG or HOME programs.

**Drug Free Workplace** -- It will or will continue to provide a drug-free workplace by:
1. Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;
2. Establishing an ongoing drug-free awareness program to inform employees about –
   a. The dangers of drug abuse in the workplace;
   b. The grantee's policy of maintaining a drug-free workplace;
   c. Any available drug counseling, rehabilitation, and employee assistance programs; and
   d. The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;
3. Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph 1;
4. Notifying the employee in the statement required by paragraph 1 that, as a condition of employment under the grant, the employee will –
   a. Abide by the terms of the statement; and
   b. Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;
5. Notifying the agency in writing, within ten calendar days after receiving notice under subparagraph 4(b) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to every grant officer or other designee on whose grant activity the convicted employee was working, unless the Federal agency has designated a central point for the receipt of such notices. Notice shall include the identification number(s) of each affected grant;
6. Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph 4(b), with respect to any employee who is so convicted –
   a. Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or
   b. Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;
7. Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs 1, 2, 3, 4, 5 and 6.

**Anti-Lobbying** -- To the best of the jurisdiction's knowledge and belief:
8. No Federal appropriated funds have been paid or will be paid, by or on behalf of it, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress

Jurisdiction

in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement;

9. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, it will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions; and

10. It will require that the language of paragraph 1 and 2 of this anti-lobbying certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

**Authority of Jurisdiction** -- The consolidated plan is authorized under State and local law (as applicable) and the jurisdiction possesses the legal authority to carry out the programs for which it is seeking funding, in accordance with applicable HUD regulations.

**Consistency with plan** -- The housing activities to be undertaken with CDBG, HOME, ESG, and HOPWA funds are consistent with the strategic plan.

**Section 3** -- It will comply with section 3 of the Housing and Urban Development Act of 1968, and implementing regulations at 24 CFR Part 135.

_(signature)_                          7/28/11

Signature/Authorized Official                Date

Nora Patterson

Name

Sarasota County Commission Chair

Title

1660 Ringling Blvd

Address

Sarasota, FL  34236

City/State/Zip

941-861-5000

Telephone Number

APPROVED AS TO FORM AND CORRECTNESS

_(signature)_

COUNTY ATTORNEY   TRW

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## Specific CDBG Certifications

The Entitlement Community certifies that:

**Citizen Participation --** It is in full compliance and following a detailed citizen participation plan that satisfies the requirements of 24 CFR 91.105.

**Community Development Plan --** Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)

**Following a Plan --** It is following a current consolidated plan (or Comprehensive Housing Affordability Strategy) that has been approved by HUD.

**Use of Funds --** It has complied with the following criteria:

11. Maximum Feasible Priority - With respect to activities expected to be assisted with CDBG funds, it certifies that it has developed its Action Plan so as to give maximum feasible priority to activities which benefit low and moderate income families or aid in the prevention or elimination of slums or blight. The Action Plan may also include activities which the grantee certifies are designed to meet other community development needs having a particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community, and other financial resources are not available);

12. Overall Benefit - The aggregate use of CDBG funds including section 108 guaranteed loans during program year(s) 2011, 2____, 2____, (a period specified by the grantee consisting of one, two, or three specific consecutive program years), shall principally benefit persons of low and moderate income in a manner that ensures that at least 70 percent of the amount is expended for activities that benefit such persons during the designated period;

13. Special Assessments - It will not attempt to recover any capital costs of public improvements assisted with CDBG funds including Section 108 loan guaranteed funds by assessing any amount against properties owned and occupied by persons of low and moderate income, including any fee charged or assessment made as a condition of obtaining access to such public improvements.

    However, if CDBG funds are used to pay the proportion of a fee or assessment that relates to the capital costs of public improvements (assisted in part with CDBG funds) financed from other revenue sources, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds.

    The jurisdiction will not attempt to recover any capital costs of public improvements assisted with CDBG funds, including Section 108, unless CDBG funds are used to pay the proportion of fee or assessment attributable to the capital costs of public improvements financed from other revenue sources. In this case, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds. Also, in the case of properties owned and occupied by moderate-income (not low-income) families, an assessment or charge may be made against the property for public improvements financed by a source other than CDBG funds if the jurisdiction certifies that it lacks CDBG funds to cover the assessment.

**Excessive Force --** It has adopted and is enforcing:

14. A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

15. A policy of enforcing applicable State and local laws against physically barring entrance to or exit from a facility or location which is the subject of such non-violent civil rights demonstrations within its jurisdiction;

**Compliance With Anti-discrimination laws --** The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations.

**Lead-Based Paint --** Its activities concerning lead-based paint will comply with the requirements of part 35, subparts A, B, J, K and R, of title 24;

**Compliance with Laws --** It will comply with applicable laws.

_____     7/28/11
Signature/Authorized Official          Date

Nora Patterson
Name

Sarasota County Commission Chair
Title

1660 Ringling Blvd
Address

Sarasota, FL  34236
City/State/Zip

941-861-5000
Telephone Number

APPROVED AS TO FORM AND CORRECTNESS
_____
COUNTY ATTORNEY   TRW

Jurisdiction

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## Specific HOME Certifications

The HOME participating jurisdiction certifies that:

**Tenant Based Rental Assistance --** If the participating jurisdiction intends to provide tenant-based rental assistance:

The use of HOME funds for tenant-based rental assistance is an essential element of the participating jurisdiction's consolidated plan for expanding the supply, affordability, and availability of decent, safe, sanitary, and affordable housing.

**Eligible Activities and Costs --** it is using and will use HOME funds for eligible activities and costs, as described in 24 CFR § 92.205 through 92.209 and that it is not using and will not use HOME funds for prohibited activities, as described in § 92.214.

**Appropriate Financial Assistance --** before committing any funds to a project, it will evaluate the project in accordance with the guidelines that it adopts for this purpose and will not invest any more HOME funds in combination with other Federal assistance than is necessary to provide affordable housing;

_(signature)_                                    7/28/11
Signature/Authorized Official        Date

Nora Patterson
Name

Sarasota County Commission Chair
Title

1660 Ringling Blvd
Address

Sarasota, FL  34236
City/State/Zip

941-861-5000
Telephone Number

APPROVED AS TO FORM AND CORRECTNESS
_(signature)_
COUNTY ATTORNEY  T R W

Jurisdiction

☐ **This certification does not apply.**
☒ **This certification is applicable.**

## APPENDIX TO CERTIFICATIONS

Instructions Concerning Lobbying and Drug-Free Workplace Requirements

**Lobbying Certification**
This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**Drug-Free Workplace Certification**
1. By signing and/or submitting this application or grant agreement, the grantee is providing the certification.
2. The certification is a material representation of fact upon which reliance is placed when the agency awards the grant. If it is later determined that the grantee knowingly rendered a false certification, or otherwise violates the requirements of the Drug-Free Workplace Act, HUD, in addition to any other remedies available to the Federal Government, may take action authorized under the Drug-Free Workplace Act.
3. Workplaces under grants, for grantees other than individuals, need not be identified on the certification. If known, they may be identified in the grant application. If the grantee does not identify the workplaces at the time of application, or upon award, if there is no application, the grantee must keep the identity of the workplace(s) on file in its office and make the information available for Federal inspection. Failure to identify all known workplaces constitutes a violation of the grantee's drug-free workplace requirements.
4. Workplace identifications must include the actual address of buildings (or parts of buildings) or other sites where work under the grant takes place. Categorical descriptions may be used (e.g., all vehicles of a mass transit authority or State highway department while in operation, State employees in each local unemployment office, performers in concert halls or radio stations).
5. If the workplace identified to the agency changes during the performance of the grant, the grantee shall inform the agency of the change(s), if it previously identified the workplaces in question (see paragraph three).
6. The grantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific grant: Place of Performance (Street address, city, county, state, zip code)
   Check if there are workplaces on file that are not identified here. The certification with regard to the drug-free workplace is required by 24 CFR part 21.

| Place Name | Street | City | County | State | Zip |
|---|---|---|---|---|---|
| Federal Building | 111 S Orange | Sarasota | Sarasota | FL | 34236 |
| Administration Building | 1660 Ringling Blvd | Sarasota | Sarasota | FL | 34236 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

7. Definitions of terms in the Nonprocurement Suspension and Debarment common rule and Drug-Free Workplace common rule apply to this certification. Grantees' attention is called, in particular, to the following definitions from these rules: "Controlled substance" means a controlled substance in Schedules I through V of the Controlled Substances Act (21 U.S.C. 812) and as further defined by regulation (21 CFR 1308.11 through 1308.15); "Conviction" means a finding of guilt (including a plea of *nolo contendere*) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes; "Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, use, or possession of any controlled substance; "Employee" means the employee of a grantee directly engaged in the performance of work under a grant, including:
   a. All "direct charge" employees;
   b. all "indirect charge" employees unless their impact or involvement is insignificant to the performance of the grant; and
   c. temporary personnel and consultants who are directly engaged in the performance of work under the grant and who are on the grantee's payroll. This definition does not include workers not on the payroll of the grantee

CPMP Non-State Grantee Certifications          10                          Version 1.3

Jurisdiction

(e.g., volunteers, even if used to meet a matching requirement; consultants or independent contractors not on the grantee's payroll; or employees of subrecipients or subcontractors in covered workplaces).

Note that by signing these certifications, certain documents must completed, in use, and on file for verification. These documents include:

1. Analysis of Impediments to Fair Housing
2. Citizen Participation Plan
3. Anti-displacement and Relocation Plan

_Nora Patterson_           7/28/11

Signature/Authorized Official       Date

| Nora Patterson |
Name

| Sarasota County Commission Chair |
Title

| 1660 Ringling Blvd |
Address

| Sarasota, FL  34236 |
City/State/Zip

| 941-861-5000 |
Telephone Number

APPROVED AS TO FORM AND CORRECTNESS

COUNTY ATTORNEY  TRW

# CITIZEN PARTICIPATION PLAN

## Introduction

In accordance with 24 CFR Section 91.105, the Sarasota Office of Housing and Community Development has prepared a Citizen Participation Plan to explain the opportunity all residents have to participate in the process of preparing the Consolidated Plan.

The Citizen Participation Plan outlines the process used to encourage the active participation of all residents of Sarasota County in the development of the Consolidated Plan, any substantial amendment to the Consolidated Plan and the Performance Report.   The plan is designed to encourage participation by low and moderate income persons, particularly those living in slum and blighted areas and in areas where CDBG funds are proposed to be used, and by residents of low and moderate income neighborhoods, defined as being neighborhoods that have a majority of residents earning less than 50% of the Area Median Income in the City of Sarasota and those meeting the exception criteria in Sarasota County.

The Sarasota Consortium will encourage the participation of all of its citizens, including minorities and non-English speaking persons, as well as persons with disabilities.   The Sarasota Consortium will encourage the participation of local and regional institutions and other organizations (including businesses, developers, and community and faith-based organizations) in the process of developing and implementing the Consolidated Plan.

Finally, the Sarasota Consortium will encourage, in consultation with public housing agencies, the participation of residents of public and assisted housing developments, in the process of developing and implementing the Consolidated Plan along with other low income residents of targeted revitalization areas in which the developments are located.

The Sarasota County Commission (County) and the City of Sarasota Commission (City) have agreed to form a consortium of geographically contiguous units of local governments for the purpose of administering housing and community development activities.   The County and the City through Interlocal Agreements have committed to jointly administer the Community Development Block Grant (CDBG), Neighborhood Stabilization Programs (NSP), HOME Investment Partnerships (HOME) program, and the State Housing Initiatives Partnership (SHIP) program through the Sarasota Office of Housing and Community Development.

The City and the County are responsible for the adoption of a Citizen Participation Plan setting forth the policies and procedures for citizen participation in the preparation of the Consolidated Plan. This adopted plan applies to both the City and the County.

# Development of the Consolidated Plan

## Introduction

Prior to the City and County adopting a Consolidated Plan, the Sarasota Consortium will make available to citizens, public agencies and other interested parties information that includes the amount of assistance that the Sarasota Consortium will receive (including grant funds and program income) and the range of activities that may be undertaken, including the estimated amount that will benefit persons of low and moderate income.

## Publication of the Proposed Consolidate Plan

The Consortium shall publish the proposed Consolidated Plan on the City of Sarasota's Office of Housing and Community Development website to give citizens, public agencies and other interested parties a reasonable opportunity to examine its contents and submit comments.   In addition, hard copies of the proposed Consolidated Plan will be placed and available for review in all Sarasota County libraries, the Sarasota County Board Records Offices (Sarasota and Venice locations), the Sarasota City Auditor and Clerk's Office, the Newtown Redevelopment Office and at the Sarasota Office of Housing and Community Development (OHCD).

To encourage citizen participation, an e-mail giving the location of the Consolidated Plan on the website will be sent to the following:

> Neighborhood Organizations Representing Low and Moderate Income Neighborhoods;
> Front Porch;
> The African American Chamber of Commerce;
> The Newtown Community Redevelopment Corporation;
> The Newtown Community Development Corporation;
> The Laurel Civic Association;
> The Sarasota NAACP;
> The Latin American Chamber of Commerce;
> The Suncoast Center for Independent Living;
> The Sarasota, Venice, North Port and Englewood Chambers of Commerce;
> The Suncoast Partnership to End Homelessness;
> Affordable Housing Providers and Developers participating in Consortium Programs;
> The Sarasota and Venice Housing Authorities;
> The cities of North Port and Venice;
> The Regional Planning Council; and
> The Florida Department of Community Affairs.

Private Citizens who request to be provided notice will also be placed on the e-mail notification.

A summary of the proposed Consolidated Plan will be published in *Sarasota Herald-Tribune* and *Tempo News*.   The summary will describe the contents and purpose of the Consolidated Plan, and will include a list of locations where copies of the entire proposed Consolidated Plan may be examined. The Consortium will print 10 free copies of the plan and provide those copies to citizens and interested parties as requested.

## Public Meetings

The Sarasota Consortium will hold two community visioning sessions and four focus groups on the following topics:

> Community and Economic Development;
> Affordable Housing;
> Specials Needs Affordable Housing; and
> Homeless Services.

These public meetings will be held to seek input from the community on issues and solutions for housing and community development throughout Sarasota County.   They will be held throughout Sarasota County at times and locations convenient to potential and actual beneficiaries and with accommodations for persons with disabilities.

A translator will be provided at the prior written request of an individual or organization representing non-English speaking persons. Written requests must be made to the Sarasota Office of Housing and Community Development a minimum of three days prior to meeting dates.

## Public Hearings

The Consortium will hold at least one public hearing during the development of the Consolidated Plan. The purpose of this specific public hearing will be to obtain the views of citizens on housing and community development needs, including priority non housing community development needs.   This hearing will be conducted before the proposed consolidated plan is published for comment.

## Comment Period

Citizens will be given at least 30 calendar days to comment on the Consolidated Plan.   The 30 day period will begin after the proposed Consolidated Plan is published in the *Sarasota Herald Tribune* and the *Tempo News.*

## Public Comment

The Sarasota Consortium will consider all comments received during the public comment period, in writing or orally at the public hearings, when preparing the final consolidated plan.

A summary of all comments or views received during the public comment period and a summary of any comments or view not accepted and the reasons the comments were not accepted will be attached to the final Consolidated Plan.

## Adopted Consolidated Plan

The adopted Consolidated Plan will be posted on the OHCD website.

# Substantial Amendments

## Introduction

The Consolidated Plan may be amended in order to make a substantial change in allocation priorities, in the method of distributing federal funds, or to carry out any activity using federal funds from program income that was not described in the Action Plan.

## The Criteria for a Substantial Amendment

The criterion for determining whether a change is considered a "Substantial Amendment" is:

When a change is made in the use of CDBG funds from one eligible activity to another; or
When the service area, budget, or beneficiaries are changed so that 50 percent or more of the intended beneficiaries no longer benefit from the project unless the change is made due to an increase or decrease in funding or if the project or activity is funded using other local, state or federal funds

## Public Notice of a Substantial Amendment

All substantial amendments will be published on the City of Sarasota's Office of Housing and Community Development (OHCD) website to give citizens, public agencies and other interested parties reasonable notice and the opportunity to comment on the substantial amendment.   Citizens will be given at least 30 calendar days to comment on the Substantial Amendment.   The 30 day period will begin after the proposed Substantial Amendment is published on the OHCD website.

In addition, OHCD will use email mailing lists maintained by neighborhood organizations representing low and moderate income areas to increase knowledge of the proposed changes.

## Public Comment

The Sarasota Consortium will consider all comments received during the public comment period, when preparing the substantial amendment for the approval of the City and / or County Commissions.

A summary of all comments or views received during the public comment period and a summary of any comments or view not accepted and the reasons the comments were not accepted will be attached to the substantial amendment of the Consolidated Plan.

# Performance Reports

## Introduction

Each year the Consortium will issue a Performance Report showing the progress it has made in implementing the Consolidated Plan.

## Publication

The annual Performance Report will be published on the City of Sarasota's Office of Housing and Community Development (OHCD) website to give citizens, public agencies and other interested parties reasonable notice and the opportunity to comment on the performance report.   Citizens will be given at least 15 calendar days to comment on the Performance report prior to its submission to HUD.   The 15 day comment period will begin after the proposed Performance Report is published on the OHCD website.

In addition, OHCD will use email mailing lists maintained by neighborhood organizations representing low and moderate income areas to promote a Public Hearing on the annual Performance Report.

## Public Hearings

The Consortium will hold a minimum of one public hearing to consider any comments or views of citizens in relation to the published Performance Report.

## Comment Period

The Sarasota Consortium will consider all comments received during the public comment period, prior to submitting the final Performance Report to HUD.   A summary of all comments or views received during the public comment period will be attached to the Performance Report.

## Public Hearings

As described above, the Consortium will conduct at least two public hearings per year to obtain citizens' views and to respond to proposals and questions and will be conducted at two different stages of the program year.

All public hearings will be advertised on the Office of Housing and Community Development website and in a display ad in the *Sarasota Herald-Tribune* and the *Tempo News.*   The ads published in the *Sarasota Herald-Tribune* will be published at least two weeks before the date of the public hearing.

The public hearings will be held at times and locations convenient to potential and actual beneficiaries and with accommodations for persons with disabilities.

A translator will be provided at the prior written request of an individual or organization representing non-English speaking persons. Written requests must be made to the Sarasota Office of Housing and Community Development a minimum of three days prior to hearing dates.

# Availability to the Public

The Sarasota Consortium will make the adopted Consolidated Plan, any Substantial Amendments, and Performance Reports available to the public by publishing them on the Office of Housing and Community Development website.   The documents will be placed in a form accessible to persons with disabilities, upon request.

# Access to Records

Citizens, public agencies, or any interested parties will have reasonable and timely access to information and records related to the Consolidated Plan and the use of assistance under the programs covered by the plan during the preceding five years to the closeout of a grant year.

Minutes from Public Meetings and Hearings will also be available through the Office of Housing and Community Development.

## Technical Assistance

The Consortium will provide for technical assistance to groups representative of low- and moderate-income persons that request such assistance in developing proposals for funding assistance covered by the Consolidated Plan.   Technical Assistance will be limited to providing information about the availability of funds and information on how to complete any application for funding.   The Sarasota Consortium will not prepare applications for funding for any group.

## Complaints

The Sarasota Office of Housing and Community Development will provide a written response to written complaints from citizens related to the Consolidated Plan, Amendments and Performance Reports. In the case of a petition, the Office of Housing and Community Development will provide a written response to the group or individual submitting the petition, rather than provide a written response to each individual person signing the petition.

Where practicable, the Sarasota Office of Housing and Community Development will deliver a written response to complainants within 15 working days.

## Anti-Displacement

The Consortium will seek to minimize displacement of persons and will assist persons displaced as a result of any housing and community development activity. Copies of the current Anti-Displacement Plans are included in the Consolidated Plan in the "Anti-Displacement Plans" Section.

# GLOSSARY OF TERMS

## A

**Accessibility**: All new construction of covered multifamily buildings must include certain Features of accessible and adaptable design. Units covered are all those in buildings with four or more units and one or more elevators, and all ground floor units in buildings without elevators.

**Affordable Housing**: Housing where the occupant is paying no more than 30 percent of gross income for housing costs, including utilities.

**AIDS**: The disease of acquired immunodeficiency syndrome or any conditions arising from the etiologic agent for acquired immunodeficiency syndrome.

## C

**Capital Grant Program (CGP):** HUD grant program via annual formula to large public housing authorities to modernize public housing units.

**Certification:**  A written assertion, based on supporting evidence, that must be kept available for inspection by HUD, by the Inspector General of HUD, and by the public. The assertion shall be deemed to be accurate unless HUD determines otherwise, after inspecting the evidence and providing due notice and opportunity for comment.

**CHAS:** Comprehensive Housing Affordability Strategy. Documented submitted to HUD in order to apply for certain HUD programs. The CHAS was replaced by the Consolidated Plan.

**Community Development Block Grant Program (CDBG):** Authorized by the Housing and Community Development Act of 1974 replacing several community development categorical grant programs. CDBG provides eligible metropolitan cities and urban counties (called "entitlement communities") with annual direct grants that they can use to revitalize neighborhoods, expand affordable housing and economic opportunities, and/or improve community facilities and services, principally to benefit low- and moderate-income persons.

**Community Housing Development Organization (CHDO):** A federally defined type of nonprofit housing provider that must receive a minimum of 15 percent of all Federal HOME Investment Partnership funds. The primary difference between CHDO and other nonprofits is the level of low-income resident participation on the Board of Directors.

**Comprehensive Improvement Assistance Program (CIAP)**: Program to provide funds to Public Housing Agencies to modernize public housing units.

**Consolidated Plan**: Developed by local and state governments with the input from

citizens and community groups, the Consolidated Plan serves four functions: 1) it is a planning document for each state and community, built upon public participation and input; 2) it is the application for funds under HUD's formula grant programs (CDBG, HOME, ESG, and HOPWA); 3) it lays out local priorities; and 4) it lays out a 3-5 year strategy the jurisdiction will follow in implementing HUD programs.

**Consortium:** An organization of geographically contiguous units of general local government that are acting as a single unit of general local government for purposes of the HOME program. The Sarasota Consortium consists of Sarasota County and the City of Sarasota.

**Continuum of Care**: A program to help more than 330,000 homeless Americans get housing, job training, childcare, and other services. The Continuum of Care, which is the centerpiece of the federal policy on homelessness, stresses permanent solutions to homelessness through comprehensive and collaborative community planning.

**Cost Burden:** The extent to which gross housing costs, including utility costs, exceed 30 percent of gross income, based on data available from the U.S. Census Bureau.

<u>E</u>

**Elderly**: A person who is at least 62 years of age.

**Emergency Shelter**: Any facility with overnight sleeping accommodations, the primary purpose of which is to provide temporary shelter for the homeless in general or for specific populations of the homeless.

**Emergency Shelter Grant (ESG):** A Federal grant program designed to help improve the quality of existing emergency shelters for the homeless, to make available additional shelters, to meet the costs of operating shelters, to provide essential social services to homeless individuals, and to help prevent homelessness.

**Entitlement**: An underlying formula governing the allocation of Block Grant funds to eligible recipients. Entitlement grants are provided to larger urban cities (i.e., population greater than 50,000) and larger urban counties (greater than 200,000).

**Environmental Assessment (EA):** A preliminary, written, environmental analysis required by EPA to determine whether a federal activity such as building airports or highways would significantly affect the environment; an EA may require preparation of more detailed Environmental Impact Statement.

**Environmental Impact Statement (EIS):** A document prepared by or for EPA which identifies and analyzes, in detail, environmental impacts of a proposed action. As a tool for decision-making, the EIS describes positive and negative effects and lists alternatives for an undertaking, such as development of a wilderness area.

**Extremely Low-Income Family**: Family whose income is between 0 and 30 percent of the median income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 30 percent of the median for the area on the basis of HUD's findings that such variations are necessary because of prevailing levels of construction costs or fair market rents, or unusually high or low family incomes.

**F**

**Fair Market Rents (FMR):** Rent Schedules published in the Federal Register which establish maximum eligible rent levels allowed under the Section 8 program by geographic area.

FMRs are gross rent estimates; they include shelter rent and the cost of utilities, except telephone. HUD sets FMRs to assure that a sufficient supply of rental housing is available to program participants. To accomplish this objective, FMRs must be both high enough to permit a selection of units and neighborhoods and low enough to serve as many families as possible. The level at which FMRs are set is expressed as a percentile point within the rent distribution of standard quality rental housing units. The current definition used is the 40th percentile rent, the dollar amount below which 40 percent of standard quality rental housing units rent. The 40th percentile rent is drawn from the distribution of rents of units which are occupied by recent movers (renter households who moved into their unit within the past 15 months). Newly built units less than two years old are excluded, and adjustments have been made to correct for the below market rents of public housing units included in the data base.

**Family:** US Census defines family as householder (head of household) and one or more other persons living in the same household who are related by birth, marriage or adoption.

**Family Self-Sufficiency Program**: A program enacted by the National Affordable Housing Act which directs Public Housing Agencies to use Section 8 assistance together with public and private resources to provide supportive services, to enable participating families to achieve economic independence and self-sufficiency.

**First-Time Homebuyer**: An individual or family who has not owned a home during the three-year period preceding the assisted purchase of a home that must be used as the principal residence of the homebuyer, except that any individual who is a displaced homemaker or a single parent may not be excluded from consideration as a first-time homebuyer on the basis that the individual, while a homemaker or married, owned a home with his or her spouse or resided in a home owned by the spouse.

**FmHA** – Farmers Home Administration or program it administers.

H

**HOME Investment Partnerships Program**: Provides funds to local governments and states for new construction, rehabilitation, acquisition of standard housing, assistance to homebuyers, and tenant-based rental assistance.

**Homeless Family With Children**: A family composed of the following types of homeless persons: at least one parent or guardian and one child under the age of 18; a pregnant woman; or a person in the process of securing legal custody of a person under the age of 18.

**Homeless Person**: A youth (17 years or younger) not accompanied by an adult (18 years or older) or an adult without children, who is homeless (not imprisoned or otherwise detained pursuant to an Act of Congress or a State law), including the following:

(1) An individual who lacks a fixed, regular, and adequate nighttime residence; and

(2) An individual who has a primary nighttime residence that is:

(i) A supervised publicly or privately operated shelter designed to provide temporary living accommodations (including welfare hotels, congregate shelters, and transitional housing for the mentally ill);

(ii) An institution that provides a temporary residence for individuals intended to be institutionalized; or

(iii) A public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

**Homeless Subpopulations**: Include but are not limited to the following categories of homeless persons: severely mentally ill only, alcohol/drug addicted only, severely mentally ill and alcohol/drug addicted, fleeing domestic violence, youth, and persons with HIV/AIDS.

**HOPE VI**: or the Urban Revitalization Program, enables demolition of obsolete public housing, revitalization of public housing sites and distribution of supportive services to the public housing residents affected by these actions.

**HOPWA:** Housing Opportunities for Persons with AIDS (HOPWA) program provides housing assistance and related supportive services for low-income persons with HIV/AIDS and their families. Grants are provided by formula allocations to States and metropolitan areas with the largest number of cases and incidence of AIDS; and also by competitive selection of projects proposed by State and local governments and

nonprofit organizations.

**Household:** One or more persons occupying a housing unit.

**Housing Problems:** Households with housing problems include those that 1. Have Physical Defects (lack complete kitchen, or bathroom) 2. Are Overcrowded (more than 1 person per room) 3. Are Cost Burdened (paying over 30% of gross income for housing costs including utilities).

**Housing Unit**: An occupied or vacant house, apartment, or a single room that is intended as separate living quarters.

L

**Large Family**: Family of five or more persons.

**Lead-Based Paint Hazard**: Any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency.

**Low Income**: Income that does not exceed 80 percent of area median income.

**Low-Income Families**: Low-income families whose incomes do not exceed 50 percent of the median family income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 50 percent of the median for the area on the basis of HUD's findings that such variations are necessary because of prevailing levels of construction costs or fair market rents, or unusually high or low family incomes.

**Low Income Housing Tax Credits (LIHTC)**: A way of obtaining financing to develop low-income housing. Government programs provide dollar-for-dollar credit toward taxes owed by the housing owner. These tax credits can be sold, or used to back up bonds that are sold, to obtain financing to develop the housing.

M

**Middle-Income Family**: Family whose income is between 80 percent and 95 percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 95 percent of the median for the area on the basis of HUD's findings that such variations are necessary because of prevailing levels of construction costs or fair market rents, or unusually high or low family incomes.

**Moderate-Income Family**: Family whose income does not exceed 80 percent of the median income for the area, as determined by HUD with adjustments for smaller and

larger families, except that HUD may establish income ceilings higher or lower than 80 percent of the median for the area on the basis of HUD's findings that such variations are necessary because of prevailing levels of construction costs or fair market rents, or unusually high or low family incomes.

**N**

**Neighborhood Stabilization Program (NSP):** Stimulus funding provided through HUD to revitalization neighborhoods devastated by the Great Recession.

**O**

**Overcrowding**: For purposes of describing relative housing needs, a housing unit containing more than one person per room, as defined by the U.S. Census Bureau, for which data are made available by the Census Bureau.

**P**

**Person With a Disability**: A person who is determined to:

(1) Have a physical, mental or emotional impairment that:

   (i) Is expected to be of long-continued and indefinite duration;

   (ii) Substantially impedes his or her ability to live independently; and

   (iii) Is of such a nature that the ability could be improved by more suitable housing conditions; or

(2) Have a developmental disability, as defined in section 102(7) of the Developmental Disabilities Assistance and Bill of Rights Act (42 U.S.C. 6001-6007); or

(3) Be the surviving member or members of any family that had been living in an assisted unit with the deceased member of the family who had a disability at the time of his or her death.

**Poverty Level Family**: Family with an income below the poverty line, as defined by the Office of Management and Budget and revised annually.

**Public Housing Agency (PHA):** Organization created by local government that administers HUD's Low-Income Public Housing Program and other HUD programs.

**Public Facilities Improvements and/or Equipment**: As defined in 24 CFR Section 570.201(c). Acquisition, construction, reconstruction, rehabilitation or installation of public facilities except as provided in 24 CFR 570.207 (a), carried out by the recipient or

other public or private non-profit. Also included as an eligible activity under this category would be equipment for the provision of public services as defined in 24 CFR Section 507.201(e).

## S

**Section 8**: Housing Assistance Payments Program, authorized by the Housing and Community Development Act of 1974.

**Section 202**: Loans for the construction or rehabilitation of housing for the Elderly and Handicapped, authorized by the Housing Act of 1950.

**Section 215:** Section 215 of Title II of the National Affordable Housing Act. Section 215 defines "Affordable" housing projects under the HOME program.

**Severe Cost Burden:** The extent to which gross housing costs, including utility costs, exceed 50 percent of gross income, based on data available from the U.S. Census Bureau.

**Standard Condition**: A housing unit that is not in violation of any local housing codes.

**State Housing Initiatives Partnership (SHIP) program**: Florida's housing program is designated to provide for 1. A sharing between the State and local governments of a portion of the revenue collected from the documentary stamp tax; 2. The establishment of public/private partnerships to build, rehabilitate, and preserve affordable housing; and 3. Maximum flexibility to local governments to determine the use of funds to better meet their responsibilities for affordable housing needs noted in their state Comprehensive Plans.

**Substandard Condition:** (Sarasota County). A unit as being without complete plumbing, complete kitchen facilities, or central heating, or with overcrowded conditions. (City of Sarasota) Structures with a building condition rating of less than or equal to .6 as determined by the Sarasota County Tax Appraiser.

**Substandard Condition and Not Suitable for Rehabilitation:** By local definition, dwelling units that are in such poor condition as to be neither structurally nor financially feasible for rehabilitation.

**Substandard Condition but Suitable for Rehabilitation:** By local definition, dwelling units that do not meet standard conditions but are both financially and structurally feasible for rehabilitation. This does not include units that require only cosmetic work, correction or minor livability problems or maintenance work.

**T**

**Tenant-Based (Rental) Assistance:** A form of rental assistance in which the assisted tenant may move from a dwelling unit with a right to continued assistance. The assistance is provided for the tenant, not the project. **Transitional Housing**: A project that is designed to provide housing and appropriate supportive services to homeless persons to facilitate movement to independent living within 24 months, or a longer period approved by HUD. For purposes of the HOME program, there is no HUD-approved time period for moving to independent living.

---

# SARASOTA COUNTY ANTI-DISPLACEMENT PLAN

The Community Development Block Grant (CDBG) and Home Investment Partnership program (HOME) provides federal funds to local governments to pay for programs to benefit the general public. But when those programs threaten to have a negative effect on some of the County's residents, they become less desirable to undertake. That is why it is the policy of Sarasota County to avoid or redesign projects that would cause the displacement of persons from their homes or place of business. For instance if a parcel or real estate is needed for a park or a public facility, all acceptable sites that are vacant will be evaluated prior to considering the purchase of occupied property.

Even though it is the intention of Sarasota County to cause no permanent relocation for a CDBG or HOME project, federal regulations still require the County to develop a relocation plan, in the unlikely event that displacement does occur. The following policies are presented to comply with the federal requirements.

Sarasota County will replace all occupied and vacant occupiable lower income housing demolished, converted to a use other than low-income housing or acquired through down payment assistance in connection with a project assisted with funds provided under the CDBG or HOME programs.

All replacement housing will be provided within three years of the commencement of the down payment assistance, demolition or rehabilitation relating to conversion. Before obligating or expending funds that will directly result in such activity or conversion, Sarasota County will make public in the local paper of general circulation and submit to the HUD Field Office the following information in writing:

1. A description of the proposed assisted activity;

2. The general location on a map and approximate number of dwelling units by size (number of bedrooms), that will be affected as a direct result of the assisted activity;

3. A time schedule for the commencement and completion of the demolition or conversion;

4. The general location on a map and approximate number of dwelling units by size (number of bedrooms) that will be provided as replacement dwelling units;

5. The source of funding and a time schedule for the provision of replacement dwelling units;

6. The basis for concluding that each replacement dwelling unit will remain a low/moderate-income dwelling unit for at least 10 years from the date of initial occupancy;

7. Information demonstrating that any proposed replacement of housing units with smaller dwelling units (e.g. a 2-bedrooms unit with two 1-bedroom units), or any proposed replacement of efficiency or single-room occupancy (SRO) units with units of a different size, is appropriate and consistent with the housing needs and priorities identified in the approved Consolidated Plan.

To the extent that the specific location of the replacement housing and other data in items 4 through 7 are not available at the time of the general submission, Sarasota County will identify the general location of such housing on a map and complete the disclosure and submission requirements as soon as the specific data are available.

The Office of Housing and Community Development (OHCD) is responsible for tracking the replacement of lower income housing and ensuring that it is provided within the required period. In addition, OHCD is also accountable for providing relocation payments and other relocation assistance to any lower-income person displaced by the demolition of any housing or the conversion of lower income housing to another use.

Consistent with the goals and objectives of activities assisted under the Act, Sarasota County will take the following steps to minimize the direct and indirect displacement of persons from their homes:

1. Coordinate code enforcement with rehabilitation and housing assistance programs.

2. Evaluate housing codes and rehabilitation standards in reinvestment areas to prevent undue financial burden on established owners and tenants.

3. Stage rehabilitation of apartment units to allow tenants to remain in the building/complex during and after the rehabilitation, working with empty units first.

4. Arrange for facilities to house persons who must be relocated temporarily during rehabilitation.

5. Adopt policies to identify and mitigate displacement resulting from intensive public investment in neighborhoods.

6. Adopt policies that provide reasonable protection for tenants faced with conversion to a condominium or cooperative.

7. Adopt tax assessment policies, such as deferred tax payment plans to reduce impact of increasing property tax assessments on lower-income owner-occupants or tenants in revitalizing areas.

8. Establish counseling centers to provide homeowners and tenants with information on assistance available to help them remain in their neighborhood in the face of revitalization pressures.

# CITY OF SARASOTA
# RESIDENTIAL ANTI-DISPLACEMENT PLAN

It is the goal of the City of Sarasota to minimize the displacement of families and homes as a result of Community Development Block Grant (CDBG) and HOME Investment Partnership program (HOME) activities.    The City will not undertake displacement without a written report prepared by the Office of Housing and Community Development to determine what other, if any, alternatives exist to accomplish the proposed project without displacement.    The City Manager of the City of Sarasota will review the report and will have final approval over any proposed displacement.

Should displacement occur, the City of Sarasota certifies that it will provide one for one replacement units and relocation assistance in conformance with 24 CFR 570.606.    For further information regarding the federal regulations concerning displacement, please contact the Office of Housing and Community Development, City of Sarasota, P.O. Box 1058, Sarasota, FL 34230.

Table 1A
# Homeless and Special Needs Populations

**Continuum of Care:  Housing Gap Analysis Chart Sarasota/Manatee County**

| | | Current Inventory | Under Development | Unmet Need/ Gap |
|---|---|---|---|---|
| | **Individuals** | | | |
| Example | **Emergency Shelter** | **100** | **40** | **26** |
| **Beds** | Emergency Shelter | 302 | 0 | 884 |
| | Transitional Housing | 589 | 0 | 880 |
| | Permanent Supportive Housing | 228 | 0 | 800 |
| | Total | 1,119 | 0 | 2,648 |
| | **Persons in Families With Children** | | | |
| **Beds** | Emergency Shelter | 129 | 0 | 0 |
| | Transitional Housing | 212 | 0 | 0 |
| | Permanent Supportive Housing | 22 | 0 | 0 |
| | Total | 363 | 0 | 0 |

**Continuum of Care:  Homeless Population and Subpopulations Chart**

| Part 1: Homeless Population | Sheltered | | Unsheltered | Total |
|---|---|---|---|---|
| | Emergency | Transitional | | |
| Example: | 75 (A) | 125 (A) | 105 (N) | 305 |
| 1. Homeless Individuals | 338 | 312 | 233 | 883 |
| 2. Homeless Families with Children | 29 | 68 | 8 | 105 |
| 2a. Persons in Homeless Families with Children | 65 | 142 | 23 | 230 |
| **Total** (lines 1 + 2a) | 403 | 454 | 256 | 1,346 |
| Part 2: Homeless Subpopulations | Sheltered | | Unsheltered | **Total** |
| 1.  Chronically Homeless | 26 | | 202 | 418 |
| 2.  Seriously Mentally Ill | 35 | | | |
| 3.  Chronic Substance Abuse | 34 | | | |
| 4.  Veterans | 23 | | | |
| 5.  Persons with HIV/AIDS | 1 | | | |
| 6.  Victims of Domestic Violence | 67 | | | |
| 7.  Youth | 19 | | | |

**U.S. Department of Housing
and Urban Development**

OMB Approval No. 2506-0117
(Exp. 4/30/2011)

### Table 1B
### Special Needs (Non-Homeless) Populations

| SPECIAL NEEDS SUBPOPULATIONS | Priority Need Level High, Medium, Low, No Such Need | Unmet Need | Dollars to Address Unmet Need | Multi-Year Goals | Annual Goals |
|---|---|---|---|---|---|
| Elderly | Medium | 20,000 | $800,000,000 | 0 | 0 |
| Frail Elderly | Medium | 6,500 | $260,000,000 | 0 | 0 |
| Severe Mental Illness | Medium | 250 | $10,000,000 | 0 | 0 |
| Developmentally Disabled | Medium | 3,000 | $120,000,000 | 0 | 0 |
| Physically Disabled | Medium | 12,117 | $484,680,000 | 0 | 0 |
| Persons w/ Alcohol/Other Drug Addictions | Medium | 100 | $4,000,000 | 0 | 0 |
| Persons w/HIV/AIDS | Medium | 770 | $30,800,000 | 0 | 0 |
| Victims of Domestic Violence | Medium | 1,754 | $70,160,000 | 0 | 0 |
| Other | | | | | |
| | | | | | |
| **TOTAL** | | 44,491 | $1,779,640,000 | 0 | 0 |

Estimated cost per unit is $40,000

Table 1C
## Summary of Specific Homeless/Special Needs Objectives
(Table 1A/1B Continuation Sheet)

| Objective # | Specific Objectives | Performance Measure | Expected Units | Actual Units |
|---|---|---|---|---|
| | **Homeless Objectives** | | | |
| 1 | To decrease the number of homeless families and prevent low-income families from becoming homeless. | Number of households assisted. | 250 | |
| 2 | **Special Needs Objectives** | 0 | 0 | |

Table 2A
# Priority Needs Summary Table

| PRIORITY HOUSING NEEDS (households) | | | Priority Need Level High, Medium, Low | Unmet Need | Goals |
|---|---|---|---|---|---|
| Renter | Small Related | 0-30% | H | 1,105 | 10 |
| | | 31-50% | H | 1,276 | 10 |
| | | 51-80% | H | 1,239 | 10 |
| | Large Related | 0-30% | H | 238 | 5 |
| | | 31-50% | H | 279 | 5 |
| | | 51-80% | H | 356 | 5 |
| | Elderly | 0-30% | H | 1,725 | 15 |
| | | 31-50% | H | 1,995 | 15 |
| | | 51-80% | H | 1,270 | 15 |
| | All Other | 0-30% | H | 2,697 | 45 |
| | | 31-50% | H | 1,070 | 95 |
| | | 51-80% | H | 3,384 | 70 |
| Owner | | 0-30% | H | 7,060 | 60 |
| | | 31-50% | H | 295 | 120 |
| | | 51-80% | H | 425 | 120 |
| Special Needs | | 0-80% | M | 44,491 | 0 |
| Total Goals | | | | | 600 |
| | | | | | |
| Total 215 Goals | | | | | 600 |
| Total 215 Renter Goals | | | | | 300 |
| Total 215 Owner Goals | | | | | 300 |

Table required by HUD for submission with the Consolidated Plan. High priorities **will** be funded by the locality with Federal funds either alone or in conjunction with other public or private funds

during the five-year plan. Medium priorities **<u>may</u>** be funded if funds are available by the locality with Federal funds either alone or in conjunction with other public or private funds during the five-year plan. Low priorities **<u>will not</u>** be funded with Federal dollars by the locality during the five-year plan, however these activities are eligible for state funding (i.e. SHIP funding) and the locality will consider consistency for other entities' applications for Federal assistance. Figures are drawn from a combination of CHAS data and consultation with local service providers.

Table 2B
# Community Development Needs

| PRIORITY COMMUNITY DEVELOPMENT NEEDS | Dollars to Address Unmet Priority Need |
|---|---|
| **PUBLIC FACILITY NEEDS** (projects) | |
| Senior Centers | |
| Handicapped Centers | |
| Homeless Facilities | $30 Million |
| Youth Centers | |
| Child Care Centers | |
| Health Facilities | |
| Neighborhood Facilities | |
| Parks and/or Recreation Facilities | $15 Million |
| Parking Facilities | |
| Non-Residential Historic Preservation | |
| **INFRASTRUCTURE** (projects) | |
| Water/Sewer Improvements | $10 Million |
| Street Improvements | $5 Million |
| Sidewalks | $2 Million |
| Solid Waste Disposal Improvements | |
| Flood Drain Improvements | $10 Million |
| **PUBLIC SERVICE NEEDS** (people) | |
| Senior Services | |
| Handicapped Services | |
| Youth Services | $500,000 |
| Child Care Services | $1 Million |
| Transportation Services | |
| Substance Abuse Services | $5 Million |
| Employment Training | |
| Health Services | |
| Lead Hazard Screening | |
| Crime Awareness | |

| ECONOMIC DEVELOPMENT | |
|---|---|
| ED Assistance to For Profits (businesses) | $10 million |
| ED Technical Assistance (businesses) | |
| Micro-Enterprise Assistance (businesses) | $100,000 |
| Rehab; Publicly - or Privately - Owned Commercial / Industrial (projects) | $5 Million |
| C/I* Infrastructure Development (projects) | |
| **PLANNING** | $500,000 |
| Planning | |
| **TOTAL ESTIMATED DOLLARS NEEDED**: | $94,100,000 |

\* Commercial or Industrial Improvements by Grantee or Non-profit

| Grantee Name: Sarasota<br><br>Program Year: 2011-2012 | Expected Annual Number of Units To Be Completed | Actual Annual Number of Units Completed | Resources used during the period | | | |
|---|---|---|---|---|---|---|
| | | | CDBG | HOME | ESG | HOPWA |
| **ANNUAL AFFORDABLE HOUSING GOALS (SEC. 215)** | | | | | | |
| Homeless households | 21 | | ☒ | ☐ | ☐ | ☐ |
| Non-homeless households | | | ☐ | ☐ | ☐ | ☐ |
| Special needs households | | | ☐ | ☐ | ☐ | ☐ |
| **ANNUAL AFFORDABLE RENTAL HOUSING GOALS (SEC. 215)** | | | | | | |
| Acquisition of existing units | | | ☐ | ☐ | | ☐ |
| Production of new units | 100 | | ☒ | ☒ | | ☐ |
| Rehabilitation of existing units | | | ☐ | ☐ | ☐ | ☐ |
| Rental Assistance | | | ☐ | ☐ | | ☐ |
| **Total Sec. 215 Affordable Rental** | 100 | | ☐ | ☐ | ☐ | ☐ |
| **ANNUAL AFFORDABLE OWNER HOUSING GOALS  (SEC. 215)** | | | | | | |
| Acquisition of existing units | 1 | | ☐ | ☒ | | |
| Production of new units | | | ☐ | ☐ | | |
| Rehabilitation of existing units | 58 | | ☒ | ☒ | | |
| Homebuyer Assistance | | | ☐ | ☐ | | ☐ |
| **Total Sec. 215 Affordable Owner** | 59 | | ☐ | ☐ | ☐ | ☐ |
| **ANNUAL AFFORDABLE HOUSING GOALS  (SEC. 215)** | | | | | | |
| Acquisition of existing units | 1 | | ☐ | ☒ | | ☐ |
| Production of new units | 100 | | ☒ | ☒ | | ☐ |
| Rehabilitation of existing units | 58 | | ☒ | ☒ | ☐ | ☐ |
| Homebuyer Assistance | 0 | | ☐ | ☐ | | ☐ |
| **Total Sec. 215 Affordable Housing** | 159 | | ☒ | ☒ | ☐ | ☐ |
| **ANNUAL HOUSING GOALS** | | | | | | |
| Annual Rental Housing Goal | 100 | | ☒ | ☒ | ☐ | ☐ |
| Annual Owner Housing Goal | 59 | | ☒ | ☒ | ☐ | ☐ |
| **Total Annual Housing Goal** | 159 | | ☒ | ☒ | ☐ | ☐ |

# SUMMARY OF PUBLIC PARTICIPATION

The Sarasota Consortium's lead agency, the Sarasota Office of Housing and Community Development (OHCD), developed this five-year Consolidated Plan using a process approved by both the City of Sarasota and County of Sarasota Commissions. OHCD created a Staff Steering Committee (SCC) as a vehicle to hear public input. The Staff Steering Committee (SCC) consisted of the following participating members:

- *Danny Schult, City of North Port;*
- *Valarie M. Raney, City of Venice Engineering Department;*
- *Elizabeth Damschroder, Sarasota County Government;*
- *Steve Kirk, Sarasota County Government;*
- *Jane Grogg, Sarasota County Government;*
- *David L. Smith, City of Sarasota; and*
- *Courtney Menendez, City of Sarasota*

The SCC and Sarasota Office of Housing and Community Development staff held the following focus group meetings related to the Consolidated Plan:

- February 3, 2011, City of Venice City Hall, Economic and Community Development Needs;

- February 8, 2011, The Federal Building, Special Needs Housing and Services;

- February 10, 2011, City of North Port City Hall, Homeless Housing and Outreach; and

- February 15, 2011, The Federal Building, Sarasota, Affordable Housing Needs.

The focus groups were open to the public and advertised using the email listservs of the City of Sarasota, City of North Port, City of Venice and Sarasota County.  In addition, notice of the meetings were included in Sarasota County's electronic newsletter and in flyers posted at municipal buildings.  The Sarasota Herald also ran a story concerning the meetings.  All focus groups were well attended by the public.

In addition to the focus groups, OHCD also held two community visioning sessions. These sessions were not focused on a broad topic, but meant to discuss all housing and community development needs throughout the County.  They took place at the following dates and locations:

- March 1, 2011, Robert L. Taylor Community Complex, Sarasota; and
- March 10, 201, City of North Port City Hall.

These sessions were also well attended and advertised using the email listservs of the City of Sarasota, City of North Port, City of Venice and Sarasota County.  In addition, notice of the meetings were included in Sarasota County's electronic newsletter and in flyers posted at municipal buildings.  The Sarasota Herald also ran a story concerning the meetings.

In addition, the Consolidated Plan funding strategies were brought before both the City and County Commissions of Sarasota for preliminary approval on June 6, 2011 and June 7, 2011 respectively.

Two separate Public Meetings to discuss the Consolidated Plan and accept public comment were held.  They took place at the following dates and locations:

- June 30,  The Federal Building, Sarasota; and
- July 7, 201, City of North Port City Hall.

According to the dictates of the Citizen Participation Plan, these meetings were advertised in the following locations:

- *Sarasota Herald-Tribune;*
- *Tempo News;*

The Consortium also published the draft Consolidated Plan on the City of Sarasota's website and provided hard copies of the proposed Consolidated Plan in all Sarasota County libraries, the Sarasota County Board Records Offices (Sarasota and Venice locations), the Sarasota City Auditor and Clerk's Office, the Newtown Redevelopment Office and at the Sarasota Office of Housing and Community Development (OHCD).

To encourage citizen participation, an e-mail giving the location of the Consolidated Plan on the website was sent to the following organizations:

- Neighborhood Organizations Representing Low and Moderate Income Neighborhoods;
- Front Porch;
- The African American Chamber of Commerce;
- The Newtown Community Redevelopment Corporation;
- The Newtown Community Development Corporation;
- The Laurel Civic Association;
- The Sarasota NAACP;
- The Latin American Chamber of Commerce;
- The Suncoast Center for Independent Living;
- The Sarasota, Venice, North Port and Englewood Chambers of Commerce;
- The Suncoast Partnership to End Homelessness;
- Affordable Housing Providers and Developers participating in Consortium Programs;

- The Sarasota and Venice Housing Authorities;
- The cities of North Port and Venice;
- The Regional Planning Council; and
- The Florida Department of Community Affairs.

Due in large part to this outreach effort, the following agencies, individuals, and groups provided input into the Consolidated Plan through correspondence, individual meetings with staff, participation in public meetings, and other communications.

| Name | Organization |
|------|--------------|
| Valerie Raney | City of Venice |
| David Smith | City of Sarasota |
| Courtney Mendez | City of Sarasota |
| Adnan Javed | Sarasota County |
| Jane Grogg | Sarasota County |
| John McCarthy | Sarasota County |
| Al Lane | City of North Port |
| Daniel Schult | City of North Port |
| Susan B | Resident |
| Kelly Delehanty | United Cerebral Palsy of Sarasota |
| Steve Kirk | Sarasota County |
| Steven Doug | Resident |
| Kameran Partridge | Easterseals of SW Florida |
| Olivia Thomas | Safe Place and Rape Crisis Center |
| Charlie Richards | CASL |
| Scott Eller | Coastal Behavioral Healthcare |
| Jennette Mills | Living in Community |
| Tracy Lux | Living in Community |
| Linda Williams | Living in Community |
| Tanya Lukowiak | Community Housing Trust |
| Michael Carlson | Sarasota Housing Authority |
| Bill Russell | Sarasota Housing Authority |
| Judith Wilcox | Habitat for Humanity |
| Phil Gorelick | Jewish Children and Families |
| Bryan Pope | Salvation Army |
| Don Vandra Krol | Neighborhood Gathering |
| Cheryl Doyle | Coalition for the Homeless |
| Diane Priatzriz | Coalition for the Homeless |
| Susan Owens | Homeless Coalition |
| Tom Jones | City of North Port |
| Linda Yates | City of North Port |
| Mark Yates | USP Inc |
| Ronald Roy | New Hope Church |
| Deborah Scott | New Hope Church |
| Meaghan Tingley | New Hope Church |
| Sandi Scribni | North Port Feeds the Hungry |
| Liz Wirsz | North Port Feeds the Hungry |

| Linda Jericka | Patriot Self Storage |
|---|---|
| Ellen McLaughlin | Sarasota Y |
| Lyane Hunsky | Resident |
| Diane Ramsnger | Community Health Improvement Partnership |
| Monica Becket | Resident |
| Elizabeth Warsky | Resident |
| Sandri Seribnch | Coastal Community Church |
| Charleen Kelleber | Resident |
| Sandra Terry | Laurel Civic Association |
| Paula Rhodes | Venice Housing Authority |
| Gerald Green | Community Coalition of Men |
| Veronica Morgan | City Space Cohousing |
| Ali Kleeber | Season of Sharing |
| Bill Kleeber | Resident |
| Thelma Upshaw | Amyrillis Park Neighborhood Association |
| Mike Kennedy | Suncoast CC |
| Richard Martin | Suncoast Partnership to End Homelessness |
| Ruth A. Brandwein, Ph.D., MSW | Resident |
| Carol Burmeister Prichard | Venice Interfaith Community Dinner Program |
| Jetson Grimes | Greater Newtown Community Redevelopment Corporation |
| Michael Carlson | Sarasota Housing Authority |
| Betty Graham | Resident |
| Mary Mack | Amyrillis Park Neighborhood Association |
| Margaret Mitchell | Amyrillis Park Neighborhood Association |
| Sandy Evertt | Resident |
| Alton Evertt | Resident |
| Beverly Phelps | Healthy Start |
| John Colon | Sarasota Housing Authority |
| Cynthia Hughes | Front Porch |
| David L. Baade | Fair Housing Continuum, Inc. |

Information for the five-year plan was also obtained from the following sources:

- 2000 Census;
- 2010 Census;
- 2005-2008 American Community Survey;
- 2005-2009 American Community Survey
- 2005 Sarasota Consolidated Plan;
- Fair Housing Continuum, Inc.
- "Affordable Housing Needs Assessment", Florida Department of Community Affairs, Shimberg Center for Affordable Housing;
- Comprehensive Housing Affordability Strategy (CHAS) Data, 2007;
- City of North Port Comprehensive Plan;
- City of Sarasota Comprehensive Plan;
- City of Venice Comprehensive Plan;

- "Priced Out in 2008: The Housing Crisis for People with Disabilities" – Consortium for Citizens with Disabilities Housing Task Force;
- "Out of Reach" 2010, National Low Income Housing Coalition;
- Sarasota County Community Action Plan;
- Sarasota County Comprehensive Plan;
- Sarasota County GIS Division;
- Sarasota PHA Plan;
- The Prevalence of Lead-Based Paint Hazards in U.S. Housing;
- Sarasota County Health Department
- U.S. Department of Housing and Urban Development;
- Venice PHA Plan.

Staff consulted with assisted housing, health, and social service agencies during focus groups to determine the resources available to address needs of chronically homeless persons.  In addition, the Sarasota County Health Department was consulted regarding lead paint issues and data.  Finally, a copy of the plan was submitted to the State and all municipalities in the Sarasota Consortium.

---

# Public Comments and Responses

Dear County Commission,


The 2011-2016 Consolidated Plan set aside $500,000 for a business incubator in the City of North Port. While I support having this funding set aside for North Port, I want to emphasis the need for vocational training as an important component of economic development.  I respectfully request that the plan be amended to designate the funding for a business development/vocational training facility.


Sincerely,


Linda Yates

North Port City Commissioner



**Suncoast Partnership**
**To End Homelessness**
*Serving Manatee & Sarasota Counties*

The Suncoast Partnership to End Homelessness (Partnership) has reviewed the draft FY 2011 – 2016 Sarasota Consolidated Plan, and we want to extend our thanks to the Office of Housing and Community Development (OHCD) and particularly Debra Figueroa for the many hours dedicated to research, community workshops and the development of the plan.

As the federally-designated lead agency of the Sarasota-Manatee Continuum of Care (CoC), we are pleased to find an alignment between goals and priorities of the draft Consolidated Plan and the community Continuum of Care Plan. The Partnership develops and submits an annual plan to the U. S. Department of Housing and Urban Development (HUD) to advance the community's effort to assist people that are homeless or at-risk of homelessness, and we are appreciative of the recommended funding in the Consolidated Plan that will continue to partially fund the administration of a quality community HMIS (Homeless Management Information System) and our Homeless Prevention initiative, developed six years ago, that was awarded a HUD award of excellence in 2007. We are also appreciative of allocations dedicated to the development or enhancement of homeless facilities and services in north Sarasota County, to develop a much-needed homeless facility in south Sarasota County, and additional funding to support affordable housing and needed community redevelopment.

As you are aware, the Partnership has been leading an effort in 2010 that will result in the adoption of a Ten Year Plan to Prevent and End Homelessness by the end of the year. It has been a remarkable process and to-date over 600 community members from all walks of life have participated in five work groups on Housing, Economic Stability, Health and Human Services, Safety and Outreach, and Prevention. Key to the success of the plan is the continuing involvement of community and governmental leaders and, of course, sufficient funding to realize our ambitious goals.

With that in mind, we look forward to working together to chart the course, closely monitor our mutual goals and priorities and to use identified funding allocations to leverage additional community funding to ensure a successful plan. As well, we wish to stay attuned as Consolidated Plan the feasibility and progress of other projects to determine if additional funding might be re-allocated through the annual plan process to accelerate Ten Year Plan initiatives to meet our ambitious goals.

In closing, we again thank you for including the Partnership in the development of the 2011 – 2016 Sarasota Consolidated Plan. We support the efforts of your office in the development of the plan and look forward to a continuing collaboration between the Sarasota Consortium and the Suncoast Partnership to ensure that our complement each other to achieve success in the years ahead.

Sincerely yours,

Richard Martin, Executive Director

1750 17th Street / K-1 ● Sarasota, FL 34234 ● Phone: (941) 955-8987 ● Fax: (941) 209-5595
www.suncoastpartnership.org

COMMENTS ON SARASOTA CONSORTIUM

2011-2016

Consolidated Plan

Submitted by

Ruth A. Brandwein, Ph.D., MSW

Dean and Professor Emeritus

Stony Brook University

Contact Information:

1503 Clower Creek Dr. HA 162

Sarasota, FL 34231

Rbrand24@aol.com

Thank you for the opportunity to comment on the Sarasota Consortium 2011-2016 Consolidated Plan, prepared by the Sarasota Office of Housing and Community Development OCHD).  As a retired professional who has spent over 40 years leading social service organizations and teaching the next generation of human services professionals, I have expertise in this area.

While I have only recently relocated to Sarasota County, I have taken a great interest in my new community, and in particular, family homelessness.  I have participated in Sarasota County's Civic 101 course, which has given me a good grounding in Sarasota government, and in the Suncoast Partnership to End Homelessness through the Ten Year Plan to Prevent and End Homelessness initiative.  I am also a member of my congregation's Social Action Committee, but I am submitting my remarks as an individual, rather than a representative of any organization.

Although I appreciate the hard work and thorough analysis that has gone into the proposed plan, and realize that there are many competing interests for limited funds, I have a few serious concerns about the priorities set forth in the plan.  I will confine my remarks to the Priority Needs as summarized in Table 2A and the Community Needs summarized in Table 2B.

In Table 2A, when the total unmet need for units of "Special Needs" housing is 14,931 for rental and owner-occupied is compared to the plan's 5-year goal of 600 units, and, the goal for the special needs population is 0--one doesn't know whether to laugh or cry.  It is obvious that this is totally inadequate.  Moreover, the statement in the Executive Summary that "all existing affordable housing strategies are targeted to help the elderly, where does that leave families? And what about non-senior differentially abled individuals?  The Executive Summary also states in #4: "Throughout 2005-2010 (I believe this should state 2011—2016) that OHCD will work with the Suncoast Partnership to implement their new plan [sic] 10 Year Plan to End Homelessness.  If I am reading your goals correctly, there is no way you will be even making a dent in ending homelessness in 10 years, when you are planning to create only 600 total units in the first  five years.

In studying Table 2B, "Community Development Needs" it becomes clear why you will not come close to meet the unmet housing needs for families.  You are proposing only proposing $1,105,940 for north and south County homeless facilities, however, I do commend you in proposing an emergency shelter and transitional housing facility for people that are homeless in south County where the need is great.  However, when so much more money is being spent on park and recreation facilities, street and sidewalk improvements and economic development assistance for for-profit businesses, it is clear where Sarasota County's priorities rest.  I appreciate the need for water, sewer, and flood drain improvements, but feel it is more important to increase the recommended allocation of $156, 072 for youth summer camp activities and allocated substantial funding for child care services because our youth are our future.  By providing youth services now, we avoid higher costs later in school dropouts, unemployment, substance abuse, crime, and homelessness.  In particular, inadequate child care means that single mothers who want to work will be unable to, or will be forced to leave their

children without adequate supervision.  We must invest in families now to prevent a cycle of poverty and social problems in the future.

Because of time constraints, I regret being unable to comment on any other portions of the plan, but in conclusion, I urge you reconsider Sarasota's County's priorities and provide additional funding for affordable permanent housing to prevent and end family homelessness and for child care and youth services.

Respectfully submitted,

Ruth A. Brandwein, Ph.D. MSW

*Carol Burmeister Prichard*
*1011 E. Gondola Drive, Venice, Fl. 34293*
*941-493-2597    cbp449@verizon.net*

July 22, 2011

Debra Figueroa
Office of Housing and Community Development
111 South Orange Avenue
Sarasota, Fl. 34236

Dear Debra,

I am writing in support of The Suncoast Partnership's Consolidated Plan for Sarasota County.

In December of 2008, I worked with representatives of several faith communities in South County to organize a community dinner program to feed the hungry in our community. Once the dinners started in April of 2009 it became evident the dinners were filling a great need for our guests. Almost 300 volunteers have heard their stories, helped them access other services, and developed a mutual sense of caring for each other. Our once a week dinners serve an average of 50-60 regular guests, and we still see new faces every week – the newly unemployed, victims of foreclosures, those who have lost everything although they previously had a good paying job. Recently we teamed up with The Center of Hope and the Red Cross to work with the city in order to start an emergency cold weather shelter in Venice.

When the Suncoast Partnership to End Homelessness hosted a series of meetings for the public to provide input into their 10 year plan, about a dozen individuals from South County attended the meetings. We were concerned that South County tends to be forgotten in county activities, funding, etc., so we expressed our concerns and shared the needs as we see them in South County.

A recent email from Sarah Schumaker, Project Administrator for the Consolidated Plan, explained that Sarasota's plan includes an earmark for $500,000 in the first year for Venice Housing Authority to rebuild low cost housing. Another South County earmark is $800,000 for a shelter in FY 2015. A number of individuals in South County want to continue their involvement with Suncoast Partnership and want to thank them for hearing what the needs are here and including earmarks for South County in their 10 year plan. We support what the Partnership is doing and look forward to a continuing relationship with them as we work with the cities and county to address issues of homelessness.

Sincerely,

*Carol Burmeister Prichard*

Carol Burmeister Prichard, Director
Venice Interfaith Community Dinner Program

RECEIVED
JUL 25 2011

**2011-2016 Consolidated Plan Public Comments**
**South County Public Meeting**
**July 7, 2011**

1. Sandy Scribner from Coastal Community Church supported the homeless funding set aside in the 2011-2016 Consolidated Plan.  She thought the highest priority for the funding should be a one-stop shop for meal distributions and hygienic care, i.e. clean clothes, showers, and limited medical care.

2. Elizabeth Wirty from Feeding the Hungry thought there needed to be an immediate solution in South County for both a homeless shelter and feeding the homeless.

*Fax: 941-483-3668*
*www.laurelcivic.org*
*A Nonprofit organization* ***"Shaping Foundations for Successful Lives"***

---

Sent: 7/20/2011 10:01:20 P.M. Eastern Daylight Time
Subj: 2011-2016 CONSOLIDATED PLAN REQUEST

P.O. Box 511, 509 Collins Road, Laurel, FL 34272
941-483-3338 (Tel), 941-483-3668 (Fax),
Tax ID: 65-0187752
laurelcivic@aol.com, www.laurelcivic.org



July 20,
2011

Dear Commissioner Thaxton and Interim County Administrator Lewis,

Our organization would like to respectfully request funding in the 2011-2016 Consolidated Plan to fund a full time service position for the Laurel Civic Association. We are guest in the Sandra Sims Terry Community Center and the County staff member who ran the facility is retiring. There are no plans to replace his position. This will leave the Laurel Civic Association without a means to run the myriad of social and youth programs that are funded through grants and donations.

The Association is currently supporting a free summer youth camp in collaboration with Parks and Recreation. Laurel Civic Association provides a homework assistance program, a feeding program for children after school, LIHEAP (Low Income Home Energy Assistance Program), USDA (Free commodity food distribution each month + food collected in the 2011 Letter Carriers Food Drive), community advocacy, elderly assistance, installations of waterlines, educational assistance, and help with job readiness residents in mid-Sarasota County.

Without assistance, these programs will be severely hampered or go away all together without a place to provide these services. I invite you to come down and see what this organization has added to this community and the county since it's birth in 1969.

*Sandra Terry, Executive Director*
*Laurel Civic Association, Inc*
509 Collins Rd., P. O. Box 511
Laurel, Fl 34272
941-483-3338
941-483-3332 Direct Line
Fax: 941-483-3668
www.laurelcivic.org
A Nonprofit organization *"Shaping Foundations for Successful Lives"*

A COPY OF THE OFFICIAL REGISTRATION #CH6004 AND FINANCIAL INFORMATION MAY BE OBTAINED FROM THE DIVISION OF CONSUMER SERVICES BY CALLING TOLL-FREE 1-800-435-7352 WITHIN THE STATE. REGISTRATION DOES NOT IMPLY ENDORSEMENT, APPROVAL, OR RECOMMENDATION BY THE STATE. THE LAUREL CIVIC ASSOCIATION, INC. RETAINS 100% OF ALL CONTRIBUTIONS RECEIVED.

July 24,2011

TO: County Commissioners
RE:  Letter from Sandra Terry Sims In support of Consolidated Plan Funding

COMMISSIONERS:

I must add my comments in this most important detail of Community Service.  I married
into the community in 1952.  A Johnny-come-lately I am NOT.

I have never ever seen anything close to the values of these programs and the thought that
they might GO AWAY is unthinkable.   I have never had anything to do with a
community that is more dedicated than what the Laurel Civic Association and every one
of its endeavors embody.

I realize that times are tough, but all the more important that the simple solutions
continue, simple and simply less costly.

Is there a chord to touch?  Certainly there must be!

Sincerely,
Carolyn Chandler\
220 Chandler Rd
Nokomis, Fl 34275



**OHCD**
**Office of Housing &**
**Community Development**

*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Carol Burmeister Prichard, Director
Venice Interfaith Community Dinner Program
1011 E. Gondola Drive
Venice, FL 34293

Dear Ms. Burmeister,

Thank you for your support of the 2011-2016 Consolidated Plan.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development



**OHCD**
**Office of Housing &**
**Community Development**

*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Laurel Civic Association, Inc.
P.O. Box 511
509 Colins Road
Laurel, FL 34272

Dear Ms. Terry:

Thank you for your commitment to the Laurel community. Your request for County Community Development Block Grant funds to hire a full-time service position for eligible low-income activities was approved by the County Commission on July 27, 2011. Staff looks forward to working with you to develop an eligible program position.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development



# OHCD
## Office of Housing &
## Community Development
*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Honorable Commissioner Yates
4970 City Hall Boulevard
City of North Port, Fl 34286

Dear Ms. Yates,

Thank you for your comments on the 2011-2016 Consolidated Plan.  While the County Commission did not change the name of the funding set aside for the business incubator in North Port, staff will work closely with North Port residents and key City of North Port staff to determine the best possible use of the CDBG funds when they are available in 2013 and 2014.  I appreciate your involvement in our Consolidated Planning process.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development



**OHCD**
**Office of Housing &**
**Community Development**

*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Richard Martin
Executive Director
Suncoast Partnership to End Homelessness
1750 17th Street
K-1
Sarasota, FL 34234

Dear Mr. Martin,

Thank you for your support of the 2011-2016 Consolidated Plan. We look forward to working with you to implement the 10 Year Plan to Prevent and End Homelessness.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development



# OHCD
## Office of Housing & Community Development
*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Ruth A. Brandwein, Ph. D., MSW
Dean and Professor Emeritus
1503 Clower Creek Drive. HA 162
Sarasota, FL 34231

Dear Dr. Brandwein

Thank you for your comments on the 2011-2016 Consolidated Plan. The County Commission has set aside an additional $80,000 in the 2011-2012 Action Plan for youth/low income services in the Laurel community.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development





# OHCD
## Office of Housing &
## Community Development

*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Sandi Scribner
6092 Myrtlewood Road
North Port, FL 34287

Dear Ms. Scribner,

Thank you for your comments on the 2011-2016 Consolidated Plan.  The County Commission did fund the full amount suggested for homeless funding.  The $805,940 in County Community Development Block Grant funding is set aside for fiscal year 2015 and OHCD will work with the residents of South County and Suncoast Partnership to End Homelessness to find the best possible use of the funds.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development







**OHCD**
**Office of Housing &**
**Community Development**
*City of Sarasota & Sarasota County Government*

111 South Orange Avenue • Sarasota, FL 34236
P.O. Box 1058 • Sarasota, FL 34230
941/951-3640 • Fax 941/951-3648

August 15, 2011

Elizabeth Wirsz
7851 Howser Court
North Port, FL 34287

Dear Ms. Wirsy,

Thank you for your comments on the 2011-2016 Consolidated Plan. The County Commission did fund the full amount suggested for homeless funding. The $805,940 in County Community Development Block Grant funding is set aside for fiscal year 2015. Though there is a dire need for additional homeless services in South County, the Commission was hesitant to fund the homeless shelter before the completion and initial implementation of the 10 Year Plan to Prevent and End Homelessness.

Sincerely,

Donald D. Hadsell, Director
Sarasota Office of Housing and Community Development



Sarasota County


EXHIBIT 2

# Homeless Services Gaps Analysis

## of

## Sarasota County

〜 〜 〜

# Presentation of Findings and Action Plan Recommendations

## to the

## County of Sarasota and the Cities within Sarasota County

## by

## Robert G. Marbut Jr., Ph.D.

〜 〜 〜 〜

**Draft Written Report  -  November 20, 2013**
**Presentations  -  November 25, 2013**
**Final Written Report  -  November 26, 2013**

Prepared by Robert G. Marbut Jr., Ph.D.
www.marbutconsulting.com

# <u>Table of Contents</u>

Title Page ................................................................................................................. 1

Table of Contents ....................................................................................................... 2

Summary of Recommendations ................................................................................. 3

Project Scope of Work ............................................................................................... 6

Initial Observations ................................................................................................... 8

Strategic Action Recommendations ......................................................................... 13

Immediate Next Steps .............................................................................................. 26

Exhibit 1 - Public Safety Triage and Stabilization Site Evaluation Criterion ............ 27

Exhibit 2 - Locations Evaluated for Public Safety Triage and Stabilization Unit ....... 29

Exhibit 3 - Program/Agency Site Visits, Tours, Meetings and Conference Calls ....... 38

Exhibit 4 - *The Seven Guiding Principles of Homeless Transformation* .................... 53

Exhibit 5 - Robert G. Marbut Jr., Ph.D. Biography ................................................... 55

# <u>Summary of Recommendations</u>

1 - The entire Sarasota County Community needs to move from a *Culture of Enablement* to *a Culture of Engagement* in all aspects.  This includes service agencies, volunteers, staffs, donors, funders, government agencies, programs, residents, tourists and the homeless community.  Free food handouts and cash from panhandling - although well intended by nice folks - actually perpetuates and increases homelessness through enablement.  Rather, street handouts, food and cash donations should be redirected to high performing agencies.  The mission should no longer be to "serve" the homeless community, instead the mission should be to dramatically and consequentially increase "street graduation" rates.  A media and public awareness campaign needs to be developed to educate and encourage the community to move from a culture of enablement to a culture of engagement.

2 - Establish an *Emergency Intake Portal for Families with Children* for the North County area in the City of Sarasota.  This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in North County.  The Portal would provide intake, stabilization, emergency housing, master case management and referral services.  All homeless families and children in the North County area would start at this intake portal.

3 - Establish an *Emergency Intake Portal for Families with Children* for the South County area in Englewood (or North Port), then create satellite operations in Venice/Nokomis and North Port (or Englewood ).  This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in South County.  The Portal would provide intake, stabilization, emergency housing, master case management and referral services.  All homeless families and children in the South County area would start at this intake portal.

4 - Establish a 24/7/168/365 Men's and Women's *Public Safety Triage and Stabilization Unit* which would be a "come-as-you-are" emergency shelter.  The Sarasota Sheriff's Office should be asked to be the lead coordinating agency.  This would become the main intake portal for adult homeless men and women.  All adult services county-wide should "spoke off" of this main hub.  Once operational, all county-wide street feeding programs, food pantry programs and day-time service centers for adult homeless men and women need to be relocated within the Public Safety Triage and Stabilization Unit ("Sarasota Safe Harbor").  This should also be the location of the Master Case Managers for adult homeless men and women.

Note:  Throughout this report "Sarasota" is used to refer to the overall Sarasota "community" living within Sarasota County.  If an issue specifically relates to the City of Sarasota or to Sarasota County it is then specifically stated.

5 -  Two different Master Case Management "systems" need to be developed: one for families with children (including unaccompanied minors) and a second one for adult men and women. The two Master Case Management systems need to be embedded within the intake portals and the triage stabilization unit. "Master case management" and "agency level case management" are often wrongly presented as the same functionality. There is a major difference between master case management and agency level case management - the first is holistic case management across the entire system of all agencies while the second is only within an individual agency.

6 -  The Homeless Management Information System (HMIS) needs to be transformed from a "Score Keeping Model" to a "Proactive Case Management Model." To accomplish this, the software program needs a couple component upgrades and a system-wide-all-agency information release form should be utilized by all agencies. Additionally, in order to promote universal agency participation, funding to service agencies by foundations, government agencies, United Way and the Continuum of Care should become contingent on being proactive participants in HMIS.

7 -  A seasonally targeted program should be developed to address seasonal shortages in food supplies within the All Faiths Food Bank. This effort should promote cash and food donations before seasonal residents move north for the season. This "empty your pantry before you go north" program should be promoted through a comprehensive public service campaign.

8 -  Redirect "Street Feeding and Street Services" to be aligned with holistic service programs. Street feeding and street services, although well-intentioned and good-hearted, actually "enables" homeless individuals rather than "engages" homeless individuals into 24/7 holistic program services. Providing camping supplies and/or feeding in the parks, at street corners, at beaches and behind restaurants exacerbates and promotes homelessness, thus increasing the number of homeless individuals. Organizations providing street services need to be encouraged to relocate their adult services to Sarasota Safe Harbor.

9 -  Ordinances should be harmonized and standardized throughout the County. These ordinances should be drafted in such away as to promote engagement into holistic programs, and not "criminalize" the condition of homelessness. It is very important to note that due to a series of court rulings (often referred to as "Pottinger"), Law Enforcement Agencies (LEAs) and Law Enforcement Officers (LEOs) will not be able to enforce most ordinances until Sarasota Safe Harbor is fully operational on a 24/7/168/365 basis.

10 - Once Sarasota Safe Harbor and the Family Portals are almost ready to open, "homeless outreach teams" (HOTs) should then be activated 2-4 weeks before the opening of these new facilities.  Street outreach teams will be critical to the success of the overall system.  The best HOTs pair a social service worker with a police officer.  Additionally, every LEO in the County should go through an appropriate level of homeless engagement and sensitivity training.

11 - Increase the number of "longer term" housing placements across the spectrum for men, women, families with children and unaccompanied minors.  To be successful, there needs to be an increase in inventory capacity as well as improvements in service programs to better prepare individuals and families for the challenges they will face.

12 - Governance and leadership of the new and improved holistic homeless service system is critical.  In order to reduce role ambiguity and to improve service delivery it is recommended that two governance systems be established - one for families with children which includes unaccompanied minors and a second one for adult men and women.

# **Project Scope of Work**

The Project Scope of Work was divided into seven phases.  Below is from the executed contract:

**1.  Phase 1 - Inventory.**

Consultant shall perform an inventory of all homeless services in Sarasota County and conduct visits to all homeless services providers.  Many of these visits will be conducted during normal work hours.  Additionally Consultant will visit sites during the off hours, on the weekends and the evenings, when the front line staff continues to provide services. Consultant agrees to provide an activity log noting the date and time of the visits to the homeless service providers that will be submitted monthly to the County no later than the submittal of the invoice for payment.

**2.  Phase 2 - Needs Assessment.**

Consultant shall conduct a needs assessment of types of services (qualitative) and capacity of services (quantitative) needed in Sarasota County.  This will require street level observation and analysis of as much data as Consultant can gather from the point-in-time-homeless counts, 211 information, HMIS (Homeless Management Information System), agency reports, etc.  Consultant agrees to provide an activity log noting the date and time of such street observations and visits to service providers that will be submitted monthly to the County no later than the invoices for payment.

**3.  Phase 3 - Gap Analysis.**

Consultant shall conduct a gap analysis of services between inventory and needs.  This often requires a lot of follow-up that may be done by phone and e-mail.  If the gap analysis includes a recommendation for new facilities, the Consultant shall identify the type, size and general location for each facility as well as review potential sites for consideration. Consultant agrees to provide a written report regarding such Gap analysis.

**4.  Phase 4 - Strategic Framing.**

Consultant shall perform strategic framing of the Action Plan.  This will require Consultant to conduct in person meetings with government staff members, elected officials, business leaders, faith based entities, civic groups, educational groups, other agencies and homeless individuals.  The Consultant will use his knowledge of national best practices to frame the proposed Strategic Action Plan.  Consultant agrees to provide an activity log noting the date and time of such in person meetings that will be submitted monthly to the County no later than the invoices for payment.

**5.  Phase 5 - Prepare a Draft Strategic Action Plan.**

Consultant shall prepare a draft Strategic Action Plan.  A copy of the Draft Strategic Action Plan shall be provided to the City and County for review and/or comment.

**6.  Phase 6 - Comment and Best Practices.**

Consultant shall present a draft Strategic Action Plan for comment and discussion.  This phase will require Consultant to conduct numerous one-on-one briefings to government staff members, elected officials, businesses, faith based entities, civic groups, educational groups and other agencies.

**7.  Phase 7 - Complete and Present Action Plan.**

Consultant shall finalize the Strategic Action Plan and submit the Strategic Action Plan to the County and City.  This shall include a presentation at a City Commission and County Commission meeting, joint meeting or workshop.

**Note About Scope of Work:**

This proposal was for the "study" phase only and did <u>not</u> include any services for detailed budget development, design, implementation of findings and operational activities.

## **Initial Observations**

- This researcher was struck by the lack of real, validated and actionable data within Sarasota County. Most everybody and every agency had anecdotes, but few had validated hard data, and when validated data was available it was mostly about "outputs" not "outcomes." Additionally, there was no validated unduplicated data between agencies on a system-wide County basis.

 Anecdotes can inform the research process, but anecdotes should never be used to develop policies.

 On July 17, 2013, this researcher asked 13 agency directors and/or program directors how many "unsheltered" homeless adult men and women there were in the County. Estimates ranged widely, from 50 to 3,800. Of the 13 "guesses" given, the 3 closest guesses were within 150 of each other, yet these three guesses understated the true number by 400%.

 Part of the problem is many of the homeless service agencies are not part of the HMIS system, and the agencies that use HMIS often fail to provide real-time data entry.

 It would be impossible to develop a comprehensive action plan without validated unduplicated system-wide data. Therefore, one of the first orders of business was to gather validated actionable data sets for adults and for families with children.

- The Suncoast Partnership to End Homelessness, in collaboration with 28 local agencies, conducted a comprehensive survey for homeless adults. The survey counted individuals in Sarasota County who were living on the streets, in encampments, the jail, temporary shelters and transitional shelters during the week of September 15-21, 2013.

 The count was conducted using first name, last name, gender and age of each individual, thus assuring a highly accurate count of homeless adult males and females. Individuals were then de-duplicated between agencies, thus providing a list of unduplicated individuals in Sarasota during the time of the survey. Because of the internal survey methodology, the count is highly accurate and any errors would be in undercounting.

 Key significant macro-level findings are:
   + There are at least 1,460 single homeless adults in the County
   + There is a shortage of at least 1,187 beds/mats for adults (does not include families)
   + 21% of the jail population is homeless
   + 85.6% of the adult population is from North County (North of Osprey - includes Jail)
   + When you exclude the Jail population, 82.8% of all adults are from North County
   + Only 2.3% of the adult population moves between North and South County

- The North-South County percentage split of homeless adults is validated and reinforced by HMIS data of "Known Last Address" by zip code (jail not included). The HMIS data shows the following:
  + 85.2% of the adult population that lived in Sarasota County is from North County
  + 65.0% of the adult population that lived in Sarasota County is from City of Sarasota
  + Using adults from all zip codes in Florida:
    * 49.4% are from the City of Sarasota
    * 26.6% are from the balance of Sarasota County
    * 24.0% are from everywhere else in Florida


- The North-South County percentage split of homeless adults is also supported by Sarasota County Fire Department (SCFD) response calls. Of all the homeless calls made by SCFD, 71.8% were inside the City of Sarasota proper.


- An analysis of Jail booking data from September 1, 1012 to September 1, 2013 found that 57.5% of all the individuals booked into the Jail were arrested (and/or had their originating arrest) in the City of Sarasota. Furthermore, 80.4% were arrested (and/or had their originating arrest) in North County (north of Bee Ridge Road).


- There are three major problems with non-violent homeless adults being sent to jail rather than a "come-as-you-are" emergency shelter:
  1- Homeless do not receive programming that is needed to graduate from the streets
  2- It costs 3-5 times more to house a homeless person in jail than in a 24/7 shelter
  3- Non-violent homeless individuals crowd out beds needed for violent criminals


- National best practices indicate that communities need to have at least one 24/7 "come-as-you-are" low-demand emergency shelter. Yet, Sarasota County does not have a true 24/7/168/365 emergency shelter for adult men and women.


- Because there is not a true 24/7/168/365 emergency shelter for adults in Sarasota County, many programs like the Resurrection House, The Center of Hope, Community Assistance Ministry (CAM) and others have sprung up to fill the service void. Unfortunately, taken together, the lack of emergency 24/7 programming combined with part-time day-programs have created a culture that is more often enabling than it is engaging.

-   It should be remembered that it is the weather, not programming services, that initially draws homeless individuals to Sarasota.  Communities with beaches, palm trees and golf courses will always attract homeless individuals because of the nice climate.  Then if the community is enabling, homeless individuals will continue to stay on the streets and in encampments.

-   Exacerbating the draw of the weather, is the fact Sarasota as a "community" enables homelessness rather than engage homeless individuals.  Street feeding and other street service efforts (eg distribution of clothing, backpacks, blankets, tents, etc.), although well-intentioned and good-hearted, are very enabling and do not engage homeless individuals into service programming.  Street feeding and services in parks, at beaches, at street corners and under bridges when not aligned with transformational services actually exacerbates homelessness and increases the number of homeless individuals on the street.  There is an excessive amount of street feeding efforts in Sarasota.  This culture of enablement needs to change to a culture of engagement.

-   Compared to other communities in the USA, the encampments within Sarasota County are relatively non-violent.  Beyond crime statistics, supporting evidence of this finding is the relatively higher percent of women in encampments and the relatively lower ratio of dogs:person compared to other communities (dogs are alarm systems - less dogs indicates less fear of violence).

-   Tragically, there is a very high number of homeless families with children and homeless unaccompanied minors in Sarasota County.  Last school year, there were 907 unduplicated homeless K-12 students of which 87 were unaccompanied youth in Sarasota County public schools.  It should be noted that these numbers do no include siblings below the age of 5.

    This means more than 5 students become homeless every school-day in Sarasota County.

-   Using similar methodology as above to de-duplicate individuals (eg only count one person one time), the Sarasota Y led an effort of 13 agencies to develop a comprehensive statistical understanding of homeless families with children during the first two months of the 2013-14 school year (August 20 to October 20, 2013).  This survey found the following for this two month period:
    +   3 families with 7 children were in cars or campgrounds
    +   73 families with 127 children were in motels (this group was often in cars before)
    +   37 families with 99 children were in shelters
    +   45 families with 61 children were in transitional housing programs
    +   190 families with 343 children were "doubled-up" (loss of housing)
    >   Total > 348 families with 637 children

Martbut Report - 10

- In the same Sarasota Y survey of families with children in Sarasota County, families that were at imminent risk to becoming homeless were also surveyed (defined as an family who will imminently lose their primary nighttime residence within 14 days):
  + 71 families with 156 children were at imminent-risk of becoming homeless
  > Combined Total > 419 families (793 children and 528 adults) facing homelessness

  Other Information gathered from this survey:
  + The average age of a child facing homelessness in Sarasota County is 10
  + 20% of children facing homelessness in Sarasota County are age 0-5

- Many families actively try to avoid the Department of Children and Families (DCF) and police for fear of having their children taken from them by the State.

- Sarasota does not have a Master Case Management system for families with children (including unaccompanied minors) nor for adult men and women.

  "Master case management" and "agency level case management" are often wrongly presented as the same functionality. There is a major difference between master case management and agency level case management - the first is holistic case management across the entire system of all agencies while the second is only within an individual agency.

- The Sarasota Homeless Management Information System (HMIS) provides a helpful passive "score-keeper" function but it is not used as a "proactive case management tool." As HMIS systems go across the USA, Sarasota's HMIS is one of the better systems; however, it must become a more robust tool in order to improve inter- and intra-agency service delivery.

  There are three major weaknesses that lower the optimization of Sarasota's HMIS system:
  1- The software program lacks a couple of needed component upgrades
  2- There is no system-wide-all-agency master release form
  3- Many agencies do not use HMIS for a variety of reasons

- There are seasonal shortages in food inventories at the All Faiths Food Bank. This occurs when seasonal residents move north at the end-of-season. During this out-migration, food inventories and cash donations hit critically low levels.

- Food shortages are likely to be exacerbated by an increased demand triggered by the recent cuts in the USDA Supplemental Nutrition Assistance Program (SNAP - Food Stamps) contained within the Farm Bill.

- The cost of housing within Sarasota has increased significantly over the last few years, yet local wages have remained stagnant.

  According to Axiometrics (an apartment data research company) as reported in the Herald-Tribune, the average occupancy is nearly 97% which has lead to rental rate increases of 6.7% this year (6th fastest in the nation and nearly double the USA average).  In terms of single-family housing median sales prices in Sarasota increased 24% to $217,000.

  According to researchers at the University of Florida, a family would have to make $39,804 in order to live in a two-bedroom apartment costing $995.  Assuming 2,000 hours of work in year for one person, this would be an hourly wage of $19.90.

- The greater Sarasota community is a highly engaged and caring community.  The Gulf Coast Community Foundation's *Homeless Children and Family's Initiative* and it *Homeless Prevention Funding* have filled critical service gaps to improve the plight of families with children.  The annual *Season of Sharing* facilitated by the Community Foundation of Sarasota County, the Sarasota Herald-Tribune and many other organizations is a fabulous program, and is one of the best prevention efforts in the USA.  The homeless situation in Sarasota County would be much worse than it is today if these outstanding programs did not exist.

- Funding has been "agency-centric" not "system-centric."  Furthermore, for the most part, funding has been based on "out-puts" and not "out-comes."  The County's Human Services Department has started transitioning its contracts to out-comes.

  Exacerbating this situation is the fact that most agencies "compete" for success-recognition rather than "share" in the success of the overall system.

- If community leaders choose to take no action it is very likely that the number of homeless families and individuals will increase 15-25% over the next 2-3 years (because of increases in the number of combat veterans, increases in domestic violence and poor employment rates).  Therefore, choosing to take no action or getting bogged down with the "implementation-politics" will act to increase the number of homeless folks in Sarasota County, especially in the City of Sarasota.

# <u>Strategic Action Recommendations</u>

## <u>1 -  Move from a *Culture of Enablement* to a *Culture of Engagement*</u>

The entire Sarasota County Community needs to move from a *Culture of Enablement* to *a Culture of Engagement* in all aspects.  This includes service agencies, volunteers, staffs, donors, funders, government agencies, programs, residents, tourists and the homeless community.  Free food handouts and cash from panhandling - although well intended by nice folks - actually perpetuates and increases homelessness through enablement.  Rather, street handouts, food and cash donations should be redirected to high performing agencies.  The mission should no longer be to "serve" the homeless community, instead the mission should be to dramatically and consequentially increase "street graduation" rates.  A media and public awareness campaign needs to be developed to educate and encourage the community to move from a culture of enablement to a culture of engagement.

- If the greater Sarasota community keeps doing the same activities in the same ways, the number of street-level chronic homeless individuals will dramatically increase and likely become more aggressive and embolden.  There needs to be an across-the-board *"Change in Thinking and a Change in Doing*."

- The mission should no longer be to "serve" the homeless community, instead the mission should be to dramatically and consequentially increase "street graduation" rates.  A street graduation occurs when an individual moves from living on the street (or in an encampment) into a sustainable quality of life that allows the individual to be a productive citizen of the community.

- The entire community needs to move from a culture of enablement to a culture that engages homeless individuals in all aspects of daily life.  Free food handouts and cash from panhandling - although well intended by nice folks - actually perpetuates and increases homelessness through enablement.  Rather than street handouts, food and cash donations should be redirected to high performing agencies.

- The leadership within the civic, local government, funder, advocate, service provider, law enforcement and homeless communities need to embrace transformational best practices that have worked throughout the USA.

- Homeless individuals who want help, should be provided engaging help.  Individuals who turn down help, should not be enabled.

- "Hanging-out" should be replaced by "program participation."  Every effort possible must be made to engage individuals into programming.

- If Sarasota successfully shifts from a culture of enablement to a culture of engagement, news of this shift will be passed to homeless individuals nationwide. Individuals who want to avoid engagement will be reluctant to come to Sarasota despite the attractions of the weather. Thus, the rate of in-bound homeless individuals will decrease.

- Engagement should never be mean - instead engagement should always be kind, caring and compassionate.

- A coordinated strategic "systems-approach" throughout Sarasota County should be implemented (not agency-centric nor a series of isolated "one-off" arrangements). This is accomplished quickly and effectively through changes in funding requirements and standards. Decisions should be made based on performance and not be based on historic funding levels. Funding should always be transparent and accountable. Service providers need to work together as partners within a single coordinated holistic system in order to better help homeless people move from the streets and encampments into formal service programs.

## 2 - Establish a North County *Emergency Intake Portal for Families with Children*

Establish an *Emergency Intake Portal for Families with Children* for the North County area in the City of Sarasota. This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in North County. The Portal would provide intake, stabilization, emergency housing, master case management and referral services. All homeless families and children in the North County area would start at this intake portal.

- The North Family Portal should serve families of any kind that have children under the age of 18. Unaccompanied youth should also be provided the same services as families with children.

- This Intake Portal needs to be "operational" 24/7/168/365. Overnight and weekend staffing can be "on-call" as long as response times are less than 10 minutes. Staffing should be shifted to fit the demand which will require full-time staffing around "crisis times" such as Thursday, Friday and Saturday nights as well as around holidays.

- This Portal should provide emergency food, clothing, hygiene, housing and logistical services on site.

- There should be formal referral protocols for medical, mental health and behavioral services.

- In regards to housing, the goal should be to place a family into transitional and/or supportive housing within a week of arrival.

- The Master Case Managers for families with children should be located within the North Family Portal.

- Based on site surveys to date, it would be best to co-locate the North Family Portal within the proposed "Family Village" which is targeted to be within the square block bounded by MLK Jr. Street - Tuttle Avenue - 25th Street - Chester Avenue.  The "Family Village" concept is being developed by Harvest House.

- Based on research to date, Harvest House should be designated the lead service agency for the North Family Portal as well as for the "Family Village."  Harvest House should be encouraged to collaborate with as many other agencies as possible.

- Because of their direct work over the last two years with families with children, Gulf Coast Community Foundation should become the lead convening and supporting agency for the North Family Portal.


### 3 - Establish a South County *Emergency Intake Portal for Families with Children*

Establish an *Emergency Intake Portal for Families with Children* for the South County area in Englewood (or North Port), then create satellite operations in Venice/Nokomis and North Port (or Englewood ).  This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in South County.  The Portal would provide intake, stabilization, emergency housing, master case management and referral services.  All homeless families and children in the South County area would start at this intake portal.

- The South Family Portal would provide the same types of services at the North Family Portal.

- Based on research to date, the Jubilee Center (St. David's Episcopal Church) in Englewood could be designated the lead service agency for the South Family Portal and encouraged to collaborate with as many other agencies as possible.

- Because of geographics and demand, two part-time satellite operations should be set up in the South County.  Ideally, one would be at the Human Services Campus in North Port and one at the Gulf Coast Community Foundation in Venice.  This could be in the form of a small office and access to existing reception services.

- Based on the service census and geo-demographics changes, the system needs to be prepared to adjust locations between Englewood, Venice/Nokomis and North Port as indicated.  There likely may be a need to add additional housing in South County.  The key is to be nimble and adjust quickly to changing needs.

- Because of their direct work over the last two years with families with children, Gulf Coast Community Foundation should become the lead convening and supporting agency for the South Family Portal.


### 4 - Establish a *Men's and Women's Public Safety Triage and Stabilization Unit*

Establish a 24/7/168/365 Men's and Women's *Public Safety Triage and Stabilization Unit* which would be a "come-as-you-are" emergency shelter. The Sarasota Sheriff's Office should be asked to be the lead coordinating agency. This would become the main intake portal for adult homeless men and women. All adult services county-wide should "spoke off" of this main hub. Once operational, all county-wide street feeding programs, food pantry programs and day-time service centers for adult homeless men and women need to be relocated within the Public Safety Triage and Stabilization Unit ("Sarasota Safe Harbor"). This should also be the location of the Master Case Managers for adult homeless men and women.

- National best practices indicate that communities need to have at least one 24/7 "come-as-you-are" emergency shelter (sometimes referred to as a low-demand-shelter). Yet, Sarasota County does not have a true come-as-you-are 24/7 facility.

- This public safety triage and stabilization unit would be modeled after Pinellas Safe Harbor and Prospects Courtyard (San Antonio), and to a lesser extent CASS (Phoenix), Star of Hope (Houston), St. Patrick Center (St. Louis) and The Bridge (Dallas).

- Because so many operational folks within Sarasota have been to Pinellas Safe Harbor (PSH) and understand the basic concepts of PSH, a suggested operational name for this facility is Sarasota Safe Harbor (SSH). The following is a list of other suggested possible names:
    + Bridges to a New Beginning
    + Bridges to Healing
    + Bridges to Home
    + Bridges to Life
    + First Choice
    + First Day
    + First Help
    + First Place
    + Prospects Courtyard
    + Safe Beginnings or Sarasota Safe Beginnings
    + Starting Place or Starting Point
    + Safe Start or Sarasota Safe Start

- The Sarasota Sheriff's Office should be asked to be the lead agency.

- Sarasota Safe Harbor should act as the master community intake-portal for all adult homeless men and women.

- Because of the increasing number of homeless, Sarasota Safe Harbor should be opened as fast as possible.

- Sarasota Safe Harbor needs to include a 24/7 intake-portal and have a wide variety of holistic services adult men and women.

- It is critical to co-locate as many holistic homeless service programs and agencies as possible within Sarasota Safe Harbor. Homelessness is too big a challenge for one agency to address alone in isolation. All non-24/7 agencies/programs like CAM, Resurrection House and the Center of Hope that are serving homeless adults within the entire County should relocate all their adult services to Sarasota Safe Harbor. This includes all types of street feeding programs, food pantry programs and day-time service centers for adult homeless men and women. It is critical for all agencies to be part of a "strategic system" and not be wed to specific locations. Like great sport teams, individual agencies need to adopt a team-winning attitude in which the team is first while individual agencies are second.

   Existing 24/7 programs such as Harvest House and Salvation Army would not be included in this co-location effort.

- "Specialty service providers" and "referral service providers" should also be located at Sarasota Safe Harbor on a part-time basis.

- All agencies, programs and service providers within Sarasota Safe Harbor should adopt the "culture of transformation" in all aspects of their operations.

- A master case management system needs to be created. Master Case Managers should conduct the initial intakes into the HMIS system, do initial and ongoing assessments, develop the individual recovery-action-plans and be proactive "navigators" of the recovery-action-plans. Master Case Managers would develop and customize all aspects of the recovery-action-plans for each homeless individual receiving services. Master Case Managers would then proactively monitor and manage each recovery-action-plan. Based on research to date, 9-12 Master Case Managers should operate at Sarasota Safe Harbor.

- To assure success, a commercial grade kitchen should be built at Sarasota Safe Harbor.

- The following services should be included within the Sarasota Safe Harbor (full-time and/or part-time):

  + Engagement Into the Sarasota Safe Harbor:
    * Outreach - interface with Homeless Outreach Teams (HOTs)
    * Intake, registration and assessment
    * Master Case Management

  + Medical:
    * Medical (on-campus and off-campus referrals)
    * Dental (off-campus referrals)
    * Vision (mostly off-campus referrals)
    * Pharmacy services (on-campus)
    * Mental health (on-campus and off-campus referrals)
    * Addictive disorders and substance abuse services (on-campus and off-campus referrals)

  + Job Placement Services:
    * Legal services and ID recovery
    * Life skills training
    * Job skills training (includes interview and resume training)
    * Job placement, coaching and enlisting business community support for jobs

  + Hygiene Services:
    * 24/7 bathrooms
    * Showers
    * Hygiene skills training and services
    * Hair cut services (to be presentable for job interviews)

  + Overnight Sleeping:
    * Low demand sheltering
    * Transitional living

  + Feeding:
    * Establishment of a commercial kitchen
    * Food and meals
    * Coordination of meals (delivery and prep from non-profits and churches)

    +  Other Support Services:
-       *   Clothing closet
-       *   Housing out-placement
-       *   Veteran services
-       *   Daytime activities
-       *   Property storage
-       *   Donation center

    +  Administration:
-       *   Administrative services for the Sarasota Safe Harbor
-       *   Security
-       *   Storage
-       *   Volunteer coordination
-       *   Community service work crews and Sarasota Safe Harbor work crews

- Sarasota Safe Harbor must be a "Good Neighbor."

- A robust "buffer" around the Sarasota Safe Harbor needs to be developed. A physical fencing barrier needs to line Sarasota Safe Harbor. If possible, foliage or other screening should be integrated within the fencing system to create a visually aesthetic barrier. Additionally, the structures within Sarasota Safe Harbor need to be laid out in such away as to create positive ergonomic flow and defensible space.

- For safety reasons, the queuing for intake must occur inside of Sarasota Safe Harbor and not on the street.

- Safety, health and hygiene are all negatively impacted by dirty, soiled and cluttered environments. Therefore, Sarasota Safe Harbor needs to embrace national best practices of "*Look, Feel and Smell*" standards:
  - + all areas need to be organized neatly and uncluttered (look)
  - + all areas need to be warm and nurturing (feel)
  - + all areas need to smell like a nice home - should not smell dirty and soiled, nor should it smell like cleaning solutions (smell)

- Having high standards dignifies the folks being helped while fostering higher standards for staff and volunteers. Individuals respond to their surroundings. Neat, clean and warm feeling environments lead to more positive outcomes than dirty, soiled and cluttered environments. Embracing a high environmental quality also helps in being a good neighbor.

- How a facility is operated is as equally important to where a facility is sited. The goal is to reduce the hanging-out and minimize the "crumb-trail" between service agencies by encouraging individuals to come into programming.

- High quality environments also increase resources to agencies in the following four ways:
  + increases volunteers
  + increases funding
  + increases staff member and volunteer productivity
  + extends the useful life of the physical plant and infrastructure

- Exhibit 1 (Public Safety Triage and Stabilization Site Evaluation Criterion) outlines the criterion used to evaluate possible locations for Sarasota Safe Harbor. Exhibit 2 (Locations Evaluated for Public Safety Triage and Stabilization Unit) contains the report on sites evaluated.

## 5 - Develop Two Master Case Management Systems

Two different Master Case Management "systems" need to be developed: one for families with children (including unaccompanied minors) and a second one for adult men and women. The two Master Case Management systems need to be embedded within the intake portals and the triage stabilization unit. "Master case management" and "agency level case management" are often wrongly presented as the same functionality. There is a major difference between master case management and agency level case management - the first is holistic case management across the entire system of all agencies while the second is only within an individual agency.

- Sarasota County lacks a true master case management system.

- Each homeless individual and family needs their own Master Case Manager who creates a customized action plan to recovery. Master Case Managers then need to proactively monitor and manage each recovery-action-plan across service providers. These Master Case Managers need to have the full authority to place and move individuals and families throughout the integrated-system, and to adjust recovery-action-plans as needed.

- "Master case management" and "agency level case management" are often wrongly presented as the same functionality. There is a major difference between master case management and agency level case management - the first is holistic case management across the entire system of all agencies while the second is mostly within an individual agency.

- Two county-wide master case management systems need to be created: one for men and women and one for families with children (including unaccompanied youth). These systems need to become the entry-portals into the service system and include centralized HMIS intake. The two Master Case Management systems need to be embedded within the North and South Family Intake Portals, the North and South Family Villages, Sarasota Safe Harbor and all other agencies within the systems receiving funding.

**6 - Transform HMIS from a "Score Keeper" to a "Proactive Case Management Tool"**

The Homeless Management Information System (HMIS) needs to be transformed from a "Score Keeping Model" to a "Proactive Case Management Model." To accomplish this, the software program needs a couple component upgrades and a system-wide-all-agency information release form should be utilized by all agencies. Additionally, in order to promote universal agency participation, funding to service agencies by foundations, government agencies, United Way and the Continuum of Care should become contingent on being proactive participants in HMIS.

- Sarasota HMIS has provided a helpful "score-keeper" function. However, the HMIS needs to move from being a passive score-keeper to being a proactive case management tool within a truly integrated Master Case Management System.

- The actual software needs to be up graded to include eligibility and external database interface modules.

- Data entry needs to be "real-time" and universal across agencies.

- An "universal release" should be developed and utilized by ALL homeless agencies who receive funding from the Continuum of Care Federal Agencies (already required), Sarasota County, Cities, Community Foundation of Sarasota County, Gulf Coast Community Foundation, United Way and Season of Sharing funds. Funding should be contingent on pro-active HMIS participation and real-time data entry.

- HMIS needs sustained staffing resources to enhance the functionality, sophistication and capacity needed to become a proactive case management tool. It is recommended that one or more of the community foundations provide the needed resources to improve the HMIS system.

**7 - Empty Your Pantry Before You Go North**

A seasonally targeted program should be developed to address seasonal shortages in food supplies within the All Faiths Food Bank. This effort should promote cash and food donations before seasonal residents move north for the season. This *"empty your pantry before you go north"* program should be promoted through a comprehensive public service campaign.

- Food and cash contributions are needed in order to provide year-round resiliency.

- Before leaving to go north, residents should be encouraged to "empty their pantry" and make a small cash contribution to help cover the purchase of meat and perishables.

- Awareness programs and out-reach initiatives need to be developed to address the seasonal shortages when a large numbers of seasonal residents head north.

## 8 - Redirect and Align "Street Feeding" Efforts with Holistic Service Programs

Redirect "Street Feeding and Street Services" to be aligned with holistic service programs. Street feeding and street services, although well-intentioned and good-hearted, actually "enables" homeless individuals rather than "engages" homeless individuals into 24/7 holistic program services. Providing camping supplies and/or feeding in the parks, at street corners, at beaches and behind restaurants exacerbates and promotes homelessness, thus increasing the number of homeless individuals. Organizations providing street services need to be encouraged to relocate their adult services to Sarasota Safe Harbor.

- Street feeding, although well-intentioned and good-hearted, "enables" homeless individuals rather than engaging homelessness. Feeding in the parks, at street corners, at beaches and behind restaurants/bars/buildings exacerbates and promotes homelessness, thus actually increasing the number of homeless individuals.

- Groups and individuals feeding homeless individuals need to move from enabling behaviors to engaging efforts by holistically aligning feeding efforts with engaging services. Street feeding organizations need to be encouraged to relocate and redirect their services to Sarasota Safe Harbor in order to align with holistic service programs.

- Wholesale food suppliers, caterers, grocery stores, restaurants and hotels need to be encouraged to assist strategic initiatives rather than efforts that enable homelessness.

- A media and public awareness campaign needs to be developed to encourage the community to move from a culture of enablement to a culture of engagement.

- The negative repercussions of street feeding are also true for cash handouts and panhandling.

## 9 - Harmonize and Standardize Ordinances Throughout the County

Ordinances should be harmonized and standardized throughout the County. These ordinances should be drafted in such away as to promote engagement into holistic programs, and not "criminalize" the condition of homelessness. It is very important to note that due to a series of court rulings (often referred to as "Pottinger"), Law Enforcement Agencies (LEAs) and Law Enforcement Officers (LEOs) will not be able to enforce most ordinances until Sarasota Safe Harbor is fully operational on a 24/7/168/365 basis.

- Because of Pottinger, many County and municipal ordinances cannot be enforced until Sarasota Safe Harbor opens.

- Ordinances should not be used to "criminalize homelessness," but instead be used as tools to engage homeless individuals into programs such as Sarasota Safe Harbor.

- In order to streamline and clarify use of ordinances, it is strongly recommended that the County adopt the ordinances and than have all the municipalities adopt the County's ordinances.

- This will allow LEAs, LEOs, homeless individuals and the general public to all understand the same set of rules throughout the County and thus help to reduce geographic "shopping."

### 10 - Create Homeless Street Outreach Teams and Train All LEOs within the County

Once Sarasota Safe Harbor and the Family Portals are almost ready to open, "homeless outreach teams" (HOTs) should then be activated 2-4 weeks before the opening of these new facilities. Street outreach teams will be critical to the success of the overall system. The best HOTs pair a social service worker with a police officer. Additionally, every LEO in the County should go through an appropriate level of homeless engagement and sensitivity training.

- HOTs should be the initial point of contact with both chronic homeless and inebriates living on the streets, in parks and in encampments.

- Homeless outreach teams will be critical to the success of the overall system and will be the primary tactical engagement tool for street level engagement of individuals into 24/7 service programs.

- For a variety of reasons the best HOTs pair a social service worker with a police officer.

- It would likely be a waste of valuable resources to deploy teams any earlier than 2-4 weeks before the opening of these new facilities since there will be nowhere to successfully send individuals and families,

- In addition to the specialized HOTs, every LEO in the County should go through an appropriate level of homeless engagement and sensitivity training. LEOs operating in high homeless corridors should get more training than LEOs operating in low homeless areas.

## 11 - Increase "Longer Term" Housing Placements

Increase the number of "longer term" housing placements across the spectrum for men, women, families with children and unaccompanied minors.  To be successful, there needs to be an increase in inventory capacity as well as improvements in service programs to better prepare individuals and families for the challenges they will face.

- Sarasota County lacks affordable housing especially for the working poor, and the loss of affordable housing has hurt families with children the most.

- Over the last 20 years, a substantial number of affordable housing units have been lost within the County.  Some of this has occurred because of urban conversion to higher-end housing and retail establishments; while some has been caused because of new hurricane and flood plain building codes.

- Harvest House has operated the most successful housing initiative in Sarasota by adding about one bed unit per week over the last five years.  Harvest House should be encouraged and incentivized to double their rate of production to an average of two bed units per week.

- The "Family Village" proposed by Harvest House should be fully supported and opened as fast as possible.  The proposed location of the "Family Village" is a square block bounded by MLK Jr. Street - Tuttle Avenue - 25th Street - Chester Avenue.  This location is within 4 blocks of an elementary school, a day care, a library and a park.

- A site or a series of smaller locations need to be identified in South County for families with children.

- Family Promise has a very successful nationally proven holistic model for families with children.  This effort needs to be scaled up to increase the number of families in programming.  If possible, Family Promise should add an affiliate in South County and add another line of care in the County utilizing larger church congregations.

- The Sarasota Y has been doing due diligence on developing an unaccompanied youth housing and service center.  The Sarasota Y should be encouraged to build on the success of its Sarasota Y Youth Shelter and move forward with a more encompassing unaccompanied youth center.

- Other groups like Project 180, Catholic Diocese of Venice and the Salvation Army have been exploring the creation of longer term housing options in the County.  These efforts should be supported as much as possible.

## **12 - Create a High Quality and Sustainable Governance System**

Governance and leadership of the new and improved holistic homeless service system is critical. In order to reduce role ambiguity and to improve service delivery it is recommended that two governance systems be established - one for families with children which includes unaccompanied minors and a second one for adult men and women.

- It is recommended that the County of Sarasota continue to support the efforts of the newly created position of Director of Homeless Services.  The person in this role should work to create synergistic strategic coordination between and among the Suncoast Partnership to End Homelessness, all government agencies, all service providers, the general public, funders, community foundations, the homeless community and interested stakeholders.

- The Suncoast Partnership to End Homelessness should continue as the official HUD Continuum of Care agency-of-record and actively work with the County's Director of Homeless Services.

- It is recommended that the Sheriff become the operational lead of Sarasota Safe Harbor.

- The County, all cities, United Way, community foundations, other funders, faith based agencies and the general public should all be encouraged to support Sarasota Safe Harbor, specifically by helping to fund Master Case Managers and by providing meals at Sarasota Safe Harbor.

- The four large foundations have critical roles to play in terms of sustainability and leadership. It is recommended that the Community Foundation of Sarasota County continue to be the leader with the Sarasota Herald-Tribune in prevention efforts vis-a-vis the *Season of Sharing*. Additionally, it is recommended that Gulf Coast Community Foundation build on its past efforts and be the leader with families with children (including unaccompanied minors).

  The Selby Foundation is encouraged to actively participate possibly with capital funding support of Sarasota Safe Harbor and the Patterson Foundation maybe be able to help with the overall strategic communications strategy.

# **Immediate Next Steps**

- Get started and do not get bogged down in politics.  Simply just start!!

- The Sarasota County Commission, on behalf of all the overall Sarasota community, votes to accept or amend or reject the 12 Strategic Recommendations "in-concept."

- Start implementing the 12 Strategic Action Recommendations as approved or amended.

- Hire consultants as needed (eg architects, contractors, SME, etc.).

- Site (including Phase I Environmental Site Assessment Reports and budget estimates), finalize, fund and set up the site for Sarasota Safe Harbor.

- The County and cities should formally ask the Sheriff to take-on the lead agency role at Sarasota Safe Harbor.

- Site, finalize, fund and set up the sites for the North and South Family Intake Portals and family villages.

- The Boards of the Gulf Coast Community Foundation and the Community Foundation of Sarasota vote to accept or amend or reject the suggested functional roles for their respective foundations.

- Finalize master case management structure then hire and train Master Case Managers.

- Train LEAs and LEOs.

- Operationalize Homeless Outreach Teams (HOTs).

- Start venuization and operations of facilities.

- Institute governance and operational system improvements as well as other approved recommendations.

- Start public awareness campaign (enablement culture –> engagement culture).

## Exhibit 1 -
## Public Safety Triage and Stabilization Site Evaluation Criterion

Based on my research and observations to date, a Public Safety Triage and Stabilization Unit is critically needed in order to successfully address street-level and chronic homelessness in Sarasota.

A Public Safety Triage and Stabilization Unit, sometimes called a "come-as-you-are-shelter" or a "low-demand-shelter" should include a holistic and comprehensive 24/7 programming.

It is very important to understand that homeless individuals do not "graduate" from street life back into general society if they are enabled to stay on the streets, in parks or in encampments. Likewise, homeless individuals do not graduate from street-life while being incarcerated.

The most successful and proven way to increase the rate of street graduations is for individuals to be in formal programs that provide holistic, transformational services 24 hours a day, seven days a week. Holistic and transformational means comprehensive services including master case management, behavioral health, substance abuse treatment, life skills training, job training, job placement, etc.

This researcher waited to start possible site evaluations until after the results from a comprehensive, countywide field study of unsheltered homeless adults was completed. Without this data in hand, it would have been impossible to evaluate specific locations.

Based on national best practices found in dozens of other communities, the following are the criterion that was used to evaluate sites:

- In order to reduce pedestrian and bicycle traffic passing through neighborhoods, and to increase efficiencies within the overall service system, this Triage and Stabilization Unit ideally should be located within a short walking distance of existing programs, preferably between service agency anchors.

- In order to maximize jail diversion for individuals whose legal involvement may be a result of untreated mental illness or substance abuse disorders, the Public Safety Triage and Stabilization Unit should be within a short drive of the County Jail.

- In order to improve neighborhood quality of life, it is critical to have existing ergonomic natural and/or industrial buffers around the facility and/or have the ability to create buffers.

- In order to save money and ramp-up quickly, the site needs to be readily available for use (eg there needs to be a willing seller and/or the property be owned by local government).

- In order to be a good steward of taxpayers' dollars, the cost of acquiring the land needs to be affordable.

- In order to be cost effective, the cost to build and/or renovate and/or install buildings needs to be affordable.

- In order to be cost effective, the establishment of support infrastructure and utilities needs to be affordable.

- In order not to waste taxpayers' dollars, the facility needs to be "right sized." We do not want to over-build a facility that has wasted space nor do we want to under-build a facility in such a way that hinders program and operational functionality.

- In order to start helping individuals, reduce fatalities and get community relief as soon as possible, the ramp-up time of a site should be short.

- Are there are any site-specific impediments that might stop or delay the "go-live" date of its operation?

It is important to note that this researcher never saw a map of any political districts within Sarasota County. Staffs of the County and the Cities within the County were asked not to provide any maps that contained political districts.

The main goal is to pick the site that is in the best overall interest of Sarasota and one that promotes the operational success of Sarasota Safe Harbor. The hope is the site selection will not get bogged down by NIMBY'ism nor political rivalries.

**Exhibit 2 -**
## Locations Evaluated for Public Safety Triage and Stabilization Unit

As is true in most public-good site location efforts anywhere in the USA, there is no "ideal" location.  It is therefore important to remember the mission is to come up with the most viable location that is available, and not to endlessly pursue a hypothetical location that does not exist in the real world.

The good news is after evaluating over 65 possible sites, there is one "near perfect" location as well as three outstandingly good locations to choose from.

The task of this researcher is to recommend potential sites that are in the best overall interest of the residents of Sarasota County, and to recommend a site that promotes the operational success of Sarasota Safe Harbor.

This researcher was given potential locations be realtors, advocates, service agency staffers, property owners, elected officials, government staffers and members of the general public. Additionally, this researcher drove throughout targeted areas of the County to identify possible sites.

Evaluation criterion for this effort is outlined in Exhibit 1.

### *Optimal and Available (numeric address order)*

#### 1003 North Washington Boulevard
- Adjacent to service core
- Near Jail
- Some buffers exist, but more buffering would have to be constructed
- Great site access
- Ingress and egress from 301 and 10th Street would be dangerous, 11th Street entry is possible
- Land layout is excellent with no structures
- 3.2 acres
- Zoning:  ICD (Intensive Commercial District)
- Future Land Use:  PIC (Production Intensive Commercial)
- Water:  6" line in US 301 and 14" line in 10th St.
- Sewer:  line in 10th St.
- Evacuation Zone:  eastern 1/5 of parcel is "E"
- Flood Zone:  X (minimal flooding)
- Modulated system could work ($650,000 to $985,000)
- List price is $750,000

**1121 Lewis Avenue**
- Near service core
- Near Jail
- Existing buffers on all sides
- Good site access
- Excellent ingress and egress
- Two existing structures with 26,000 usable sf
- 1.47 acres
- Zoning:  IGD (Industrial General District)
- Future Land Use:  Urban Edge from PIC (Production Intensive Commercial) on 9/16/2013
- Water:  8" line in N. Jefferson
- Sewer:  line in N. Jefferson
- Evacuation Zone:  None
- Flood Zone:  X (minimal flooding)
- Interior demolition would have to occur (one budget estimate received was for $36,000)
- Would have to add some modulated structures (very tight foot print)
- List price is $550,000
- Totally air conditioned/insulated
- Has been on market for a long time / on 3rd broker


**1330 North Osprey Avenue and/or 1530 North Osprey Avenue**
- Adjacent to service core
- Near Jail
- Great existing buffers exist, and plenty of space to add more buffering
- Great Site access
- Great ingress and egress
- Land layout is excellent
- 2.14 and 4.5 acres
- Zoning:  G / IGD (Industrial General District)
- Future Land Use:  PIC (Production Intensive Commercial)
- Water:  8" line in N. Osprey
- Sewer:  line in N. Osprey
- Evacuation Zone:  None (Zone "E" touches the south western corner of the parcel)
- Flood Zone:  X (minimal flooding)
- Modulated system could work ($650,000 to $985,000)
- 1330 property owned by the City of Sarasota
- 1530 property owned by UPS (we would not need the UPS property to have site work)
- This is an ideal location
- Least expensive land option evaluated
- Of all the possibilities in the County, this is the best overall viable location

**1800 East Avenue**
- Near service core
- Near Jail
- Existing buffers on all sides
- Good site access
- Excellent ingress and egress
- 2.3 usable acres . . . land footprint doable (a bit tight, but doable)
- Zoning:  I (Industrial)
- Future Land Use:  PIC (Production Intensive Commercial)
- Water:  8" line in N. East Ave
- Sewer:  lines in N. East Ave and 19th St.
- Evacuation Zone:  None
- Flood Zone:  X (minimal flooding)
- Modulated system could work ($650,000 to $985,000)
- List price is $299,000
- Adjacent to an existing encampment
- Biggest concern is existing commercial condo association would have to approve use

### *Possibly Viable and/or Possibly Available (numeric address order)*

**295 - 625 South School Avenue**
- Near service core
- Near Jail
- Buffering would be difficult and limited
- Good site access
- Would have to be develop acceptable ingress and egress
- A variety of existing structures ranging from 1,116 to 29,033 sf
- A total of 9.55 acres
- Very expensive to purchase
- Would have to add some modulated structures

**1022 Central Avenue**
- Adjacent to service core, across the street from Salvation Army
- Near Jail
- Nice buffering could be built
- Great site access
- Great ingress and egress
- Modulated system could work ($650,000 to $985,000)
- Good land footprint
- Best overall location, but has an operating concrete plant

Martbut Report - 31

**1060 Goodrich Avenue**
- Adjacent to service core
- Near Jail
- Some buffers exist, but more buffering would have to be constructed
- Good site access
- Ingress and egress is good
- Land layout is good
- Modulated system could work ($650,000 to $985,000)
- List price is $350,000
- All the benefits of 1003 N. Washington with better ingress and egress, but site is small

**1502/1562 North Lime Avenue**
- Near service core
- Near Jail
- Would be hard to add additional buffering
- Good site access
- Poor ingress and egress
- Existing 34,000 sf of connected structures
- Layout of existing structures not ideal, would need remodeling
- Has been on the market a long time
- 1562 list price is $750,000

**1761 17th Street**
- Adjacent to service core
- Near Jail
- Would need to construct buffering
- Great site access
- Poor ingress and egress
- One existing 4,300 sf structure
- Great land footprint (2.1 acres)
- Modulated system could work ($650,000 to $985,000)
- Active Loyal Order of Moose Sarasota lodge

**3941 Butler Avenue**
- Has the benefits of 1923 Myrtle Street without some of the negatives
- Far from the service core
- Far from Jail
- Great land layout
- Excellent ingress and egress
- Great buffers and can add more buffers
- Opportunity to integrate neighboring properties into supportive housing
- List price is $700,000 for southern parcel and $390,000 for northern parcel
- Location would increase operating costs


### *Not-Viable and/or Not-Available (numeric address order)*


**32nd Street and 301 (Northwest Corner)**
- Ruled out - too small of a land foot print


**301 and Laurel Street**
- Ruled out - too small of a land food print


**710 North Lemon Avenue**
- Ruled out - too small of building
- Ruled out - too small of land foot print


**1012 North Orange Avenue**
- Ruled out - too small of building
- Ruled out - too small of land foot print


**1325 North Lime Avenue**
- Ruled out - too small of building
- Ruled out - too small of land foot print
- Could be used in conjunction with 1502/1562 North Lime Avenue


**1326 Mango Avenue**
- Ruled out - too small of building
- Ruled out - too small of land foot print

**1401 Fruitville Road**
- Ruled out - list price is $7,000,000


**1501 Orange Avenue (vacant land to the south)**
- Ruled out - owner has long terms plans for property
- Great location


**1761 12th Street**
- Ruled out - existing location of City of Sarasota Public Works Department
- Near perfect location


**1864 17th Street**
- Ruled out - not fully available
- Ruled out - would require extensive renovation
- Great location


**1872 18th Street**
- Ruled out - too small of building
- Ruled out - too small of land foot print
- Ruled out - new owners want to keep property


**1923 Myrtle Street**
- Ruled out - too many negatives
- Far from the service core
- Far from Jail
- Structure locations on property reduce usable land space
- Very poor ingress and egress
- No true buffers and would be hard to add buffering
- Location would increase operating costs


**2192 Princeton Street**
- Ruled out - too small of building
- Ruled out - too small of land foot print
- Ruled out - list price is $1,197,000

**2020 Main Street (adjacent space)**
- Ruled out - land foot print too small
- Outstanding location

**2046 Dr. Martin King Jr Way**
- Ruled out - environmental timing issues
- Great location and owned by the City of Sarasota

**2220 8th Street**
- Ruled out - list price is $1,540,000
- Ruled out - land foot print very small

**2200 Ringling Boulevard**
- Ruled out - existing location of County Health and Human Services
- Ruled out - would require extensive renovation (costly and take a long time)

**2260 Ringling Boulevard**
- Ruled out - too expensive
- Too much land
- Too much structure
- This is an ideal site, if a smaller portion of the building could be used, it would then be doable

**4644 North Tamiami Trail**
- Ruled out - list price is $2,250,000
- Ruled out - significantly higher operating costs
- There would be many operational challenges that would likely raise costs

**6926 15th Street East Sarasota**
- Ruled out - too from service core and jail
- Ruled out - in Manatee County
- Ruled out - too small of building
- Ruled out - too small of land foot print

**7200 Health Drive**
- Ruled out - too from service core and jail
- Ruled out - in Charlotte County


**Boulevard of the Arts - Florida Avenue - May Lane - Coconut Avenue Block**
- Ruled out - land would be too expensive
- Ruled out - new owner has plans for property
- A great location near the service core


**East of IH-75 Properties (20+)**
- Ruled out - high purchase costs
- Ruled out - high construction costs for utility extensions
- Ruled out - high relocation costs of other agencies
- Ruled out - higher operating costs
- If money was not an object, there are many properties east of Interstate Highway that might work if the existing service agencies within the service core could be relocated to same "campus."

  At the minimal, we would need to relocate the Salvation Army, First Step, the Crisis Stabilization Unit, part of the Glasser/Schoenbaum Human Services Campus, at least one court, part of the State Attorney's Office, part of the Public Defenders' office, part of the Sheriff's operation and Resurrection House.

  Building a "campus" where all homeless services are located under one roof is the ideal model and is what San Diego, San Antonio, Phoenix, Reno, St. Louis and Dallas have done to address their homeless problems.  It should be noted that all 6 of these campuses were built within or on the edge of the CBD (Central Business District), with construction costs ranging from $35-125 million (in 2013 dollars).


**Future Site of County Emergency Operations Center**
- Ruled out - turning dirt on construction is set for 4Q/2013
- Far from service core


**North Gate Business Park (5 different properties)**
- Ruled out - properties are very expensive
- Ruled out - bad access
- Far from service core

**Payne Park / Payne Park Auditorium**
- Ruled out - since an existing park
- Ruled out - too small of a building


**Sarasota Airport (several sites on and near the SRQ Airport)**
- Ruled out - significantly higher operating costs
- Ruled out - high land costs
- Ruled out - many operational challenges that would likely raise costs


**Venice Properties (Old Albertson's, Old K-Mart, Venice Airport and Circus Arena)**
- Ruled out - high construction costs
- Ruled out - much higher operating costs
- Similar challenges to East of IH-75 sites
- Operationally would not work well since 71-86% of homeless adults are in North County
- If money was not an object, properties in Venice might work if the existing service agencies within the service core could be relocated to same "campus."

At the minimal, we would need to relocate the Salvation Army, First Step, the Crisis Stabilization Unit, part of the Glasser/Schoenbaum Human Services Campus, at least one court, part of the State Attorney's Office, part of the Public Defenders' office, part of the Sheriff's operation and Resurrection House.

Building a "campus" where all homeless services are located under one roof is the ideal model and is what San Diego, San Antonio, Phoenix, Reno, St. Louis and Dallas have done to address their homeless problems. It should be noted that all 6 of these campuses were built within or on the edge of the CBD (Central Business District), with construction costs ranging from $35-125 million (in 2013 dollars).

**Exhibit 3 -**
**Program/Agency Site Visits, Tours, Meetings and Conference Calls (partial listing)**

John Annis
Community Foundation of Sarasota County
Vice President Community Investment


Wayne R. Applebee
Sarasota County
Human Services Policy Coordinator


Hon. Suzanne Atwell
City of Sarasota
City Commissioner


Hon. Joseph A. Barbetta
Sarasota County
County Commissioner


Karin Barbito
Trinity Presbyterian Church - Community Assistance Ministry (CAM)
Director


Michael Barfield
ACLU of Florida
Vice President


Melissa Barrett
City of Venice
Homeless Advocate


Tom Barwin
City of Sarasota
City Manager

Brandon Bellows
The Suncoast Partnership to End Homelessness
IT/HMIS Manager


David Beesley
First Step Addiction Recovery Programs
President/Chief Executive Officer


Danny Bilyeu
Congressman Vern Buchanan
Field Representative


Hon. Jim Blucher
City of North Port
Vice-Mayor


Kathy Bolam
Sarasota County
Resident


Ruth A. Brandwein
National Association of Social Workers - Florida
Legislative Chair


Hon. Jim Brown
Town of Longboat Key
Mayor


Marlon C.J. Brown
City of Sarasota
Deputy City Manager


Colonel Steve Burns
Sarasota County Sheriff''s Office
Chief Deputy

Tammy and Frank Burns
His Open Door / South Shore Community Church
Director / Executive Pastor


Hon. Paul Caragiulo
City of Sarasota
City Commissioner


Paula Carney
Senior Living Solutions of Venice
Certified Senior Advisor


Rosemary Chase
Serene Design
Designer


Camille Chapman
Family Promise of Sarasota
Program and Marketing Assistant


Rose Chapman
Jewish Family & Children's Service of Sarasota-Manatee, Inc.
President/CEO


Hon. Susan Chapman
City of Sarasota
City Commissioner


Dan Clark
City of Sarasota
Resident


Jennifer Cohen
North Port
Community Activist

John A. Colon
Wells Fargo
Senior Vice President - Investments


Rev. Joe Davis
Nightlife Center
Founder of Teen Center and Student Ministry


Bishop Frank J. Dewane
Diocese of Venice in Florida
Bishop


Bernadette D. DiPino
Sarasota Police Department
Chief of Police


Hon. Ken Doherty
Charlotte County
County Commissioner


Mary Dougherty-Slapp
GCBX
Executive Director


David Dubendorf
Sarasota Police Department
Homeless Liaison Officer


Sigmund Echtler
GoodHands International Inc.
Director


Hon. Larry L. Eger
Public Defender
Twelfth Judicial Circuit

Robert Egger
L.A. Kitchen / D.C. Kitchen / "Begging for Change"
President / Founder / Author


Claas Ehlers
Family Promise
Director Affiliate Services


Elizabeth Fisher
Selah Freedom
Co-Founder


Wendy Fitton
Family Promise of Sarasota
Network Manager


Elizabeth S. Flower
City of Sarasota
Resident


Sandra J. Frank, JD
All Faiths Food Bank
Executive Director


Major Ethan Frizzell
The Salvation Army
Sarasota Area Commander


Jim Good
Sarasota Hope House
Co-Founder


Philip D. Gorelick
Jewish Family & Children's Service of Sarasota-Manatee, Inc.
Vice President of Programs

Elisa Graber
iberiabank
Community Reinvestment Act Liaison


Vallerie Guillory
Trinity Without Borders
Founder


Teri A. Hansen
Gulf Coast Community Foundation
President/CEO


John B. Harshman
Harshman & Company, Inc.
Broker


Nicole Hartsock
The Sarasota Y Youth Shelter
Director


Pam Hawn
Hope Kids Community
Founder and Director


Kameron Hodgens, Ph.D.
Easter Seals Southwest Florida
Vice President of Program & Services


Angela M. Hogan
Charlotte County Homeless Coalition
Chief Executive Officer


Merrill Hollinger
Englewood
Business Owner

Rick Hughes
Goodwill - Manasota
Director of Community Outreach


Debra M. Jacobs
The Patterson Foundation
President / CEO


Roxie Jerde
Community Foundation of Sarasota County
President and CEO


Sarabeth Kalajian
Sarasota County Library System
Director


William (Bill) Killian
Sarasota Resident
Corporate Governance Consultant


Phillip King
The Glasser/Schoenbaum Human Services Center
Executive Director


Alice-Mary (Ali) Kleber
Sarasota Resident / Resurrection House
Community Activist / Volunteer


David Klimut
The Suncoast Partnership to End Homelessness
Special Projects Developer


Hon. Thomas M. Knight
Sarasota County
Sheriff

Pat Knox
St. David's Episcopal Church - Englewood
Jubilee Center Outreach Ministry Coordinator


Heather Thomas Lazar
Safeguard Properties
Community Relations Liaison


Roger Lee
Sarasota Hope House
Co-Founder


Major Jim Lilly
Sarasota County Sheriff's Office
Division Commander Corrections and Court Services


Jon Lombardi
The Suncoast Partnership to End Homelessness
IT/HMIS Administrator


Leslie Loveless
The Suncoast Partnership to End Homelessness
Executive Director


Lee Ann Lowery
Sarasota County
Assistant County Administrator


Greg Luberecki
Gulf Coast Community Foundation
Director of Marketing and Communications


Scott Malcom
All Faiths Food Bank
Director of Operations

Hon. Carolyn Mason
Sarasota County
County Commissioner


Michelle Matro
City of Sarasota
Resident and Business Consultant


Cindy Mattson
The Salvation Army
Case Manager (North Port)


Pastor Lynette McCleland
The Center of Hope
Co-Pastor


Nancy McElmeel
Sarasota County
Resident and Property Owner


John M. McKay
Former Florida Senate President
Former Goodwill Board of Directors


Hon. Kit McKeon
City of Venice
Council Member


Ellen McLaughlin
The Sarasota Y - Schoolhouse Link
Program Director


Dan H. McLeroy Jr.
Harry E. Robbins Associates Inc.
Commercial Division

Jackie McNeil
The Suncoast Partnership to End Homelessness
Office Manager


Jack Minge, III
Coastal Behavioral Healthcare
Chief Executive Officer


Erin Minor
Harvest House Transitional Centers
Executive Director


Pastors Jim and Peggy Minor
The Harvest Tabernacle
Pastors


Matthew Minor
Harvest House Transitional Centers
Director, Program Development


Marlene P. Minzey
First Step Addiction Recovery Programs
Vice President - Special Services


Keith and Linda Monda
Sarasota County
Community Leaders


Kim Morrison
Kim Morrison Designs
Principal


Don Musilli
Englewood - Cape Haze Chamber of Commerce
Executive Director

Liz Nolan
Sarasota County Library System
Selby Library Manager


Dale Orlando
Community Psychologist / Gillespie Park
Advocate / Neighborhood Activist


Melodie Palmer
Hope Kids Community
Boardmember


Dr. Sarah Pappas
Selby  Foundation
President


Hon. Nora Patterson
Sarasota County
County Commissioner


Rev. Dr. Tom Pfaff
Sarasota Ministerial Association
Co-Founder and Chair


The Rev. Jim Popham
St. David's Episcopal Church - Englewood
Priest


Curt Preisser
Sarasota County
Communications


Carol Burmeister Prichard
Interfaith Outreach, Inc.
Co-founder

Mark Pritchett
Gulf Coast Community Foundation
Senior Vice President for Community Investment


David A. Proch
Resurrection House
Executive Director


Randall H. Reid
Sarasota County
County Administrator


Barbara Richards
Project 180
Director


Lynn Robbins
Coldwell Banker
Realtor


Clyde Roberts
City of Venice
Resident


Hon. Christine Robinson
Sarasota County
County Commissioner


Susanne Rodriquez
Hope Kids and Nightlife Center
Supporter and Homeless Advocate


Bob Rosinsky
Goodwill Manasota
President

Peter Routsis-Arroyo
Catholic Charities Diocese of Venice, Inc.
CEO


William (Bill) Russell
Housing Authority
Executive Director


Michael Saunders
Michael Saunders & Company
Founder & CEO


Morton Siegel
Siegel & Moses PC
Principal


Steve Scott
Sarasota
Citizen


Hon. Willie Shaw
City of Sarasota
Vice Mayor and City Commissioner


Hon. Dave Sherman
City of Venice
Council Member


Megan Shore, Ph.D.
King's University College
Researcher and Part Time Sarasota Visitor


Walt Smith
Twelfth Judicial Circuit Court of Florida
Court Administrator

Zulma Solero
City of North Port
Homeless Services Manager


Matt Sperling
Gillespie Park
Resident - Activist


Bill Spitler
Sarasota County Sheriff's Office
Director Research/Planning


Corinne Stannish
Sarasota Police Department
Captain Support Services


Shannon Staub
Library Foundation for Sarasota County
President


Adele Stones
Sarasota County Resident
MSW


Les Stratford
Coastal Behavioral Healthcare
Primary Care/Behavioral Health Integration Director


Kurt Stringfellow
The Sarasota Y
President/CEO


David Sutton
The Salvation Army
Director of Programs/Facilities

Paul Sutton
Sarasota Community Alliance Homeless Committee / Sarasota Police Department
Chair / Retired Captain


Amy Thatcher
Coastal Behavioral Healthcare
Director, North County Services


Jon Thaxton
Gulf Coast Community Foundation
Director of Community Investment


Pauline Tracy
Sarasota County Health Department - Human Services
Human Services Manager


Phil Turner
Angels' Attic / Throne of Grace
Member / Member


Jessica Ventimiglia
United Way 2-1-1 of Manasota, Inc.
Executive Director


Rick A. Ver Helst, Psy.D.
Coastal Behavioral Healthcare
COO / CIO


And Hundreds of Other Citizens and Residents Throughout Sarasota County . . .

# Exhibit 4 -
# The Seven Guiding Principles of Homeless Transformation

### *The Measuring Stick*
#### *Moving from Enablement to Engagement*

After visiting 237 homeless service providers in 12 states and the District of Columbia, the following *Seven Guiding Principles* were commonly found to be the best practices in the USA. These *Seven Guiding Principles of Homeless Transformation* are used as key measuring sticks when reviewing homeless service providers in Sarasota as well as the overall service network within Sarasota County.

1. ## Move to a Culture of Transformation (versus the Old Culture of Warehousing):

   Homeless individuals must be engaged and no longer enabled. Everybody within the services delivery system (eg general public, media, elected politicians, appointed officials, monitors, boards, staffs and volunteers of service agencies and most importantly the homeless themselves) must embrace a culture of transformation. A culture, that through the help of others, homeless individuals can transform and integrate themselves back into society. For moral and fiscal reasons, homelessness must become an unacceptable condition that is not tolerated in the USA.

2. ## Co-location and Virtual E-integration of as Many Services as Possible:

   In order to increase success, all services within a service area must be e-integrated. Virtual e-integration improves coordination of services, enhances performance, reduces "gaming" of the system, engages individuals on the margin of society and increases cost efficiencies within and between agencies. Furthermore, whenever financially possible, services should be co-located. Co-location goes beyond virtual e-integration by increasing the number of "service hits" into a shorter period of time through the reduction of wasted time in transit and minimization of mishandled referrals. Co-location also increases the supportive "human touch."

3. ## Must Have a Master Case Management System That is Customized:

   Because there are so many different service agencies helping homeless individuals (eg government at multi-levels, non-profits and faith-based), it is critical that ONE person coordinates the services an individual receives and to do so in a customized fashion. The types of service provided is critical, but what is more important is the sequencing and frequency of customized services.

**4.  Reward Positive Behavior:**

Positive behavior of individuals should be rewarded with increased responsibilities and additional privileges.  Privileges such as higher quality sleeping arrangements, more privacy and elective learning opportunities should be used as rewards.  It is important that these rewards be used as "tools" to approximate the "real world" in order to increase sustainable reintegration into society.

**5.  Consequences for Negative Behavior**:

Too often there are no consequences for negative behavior of individuals.  Unfortunately, this sends a message that bad behavior is acceptable.  Within the transformational process, it is critical to have swift and proportionate consequences.

**6.  External Activities Must be Redirected or Stopped:**

External activities such as "street feeding" must be redirected to support the transformation process.  In most cases, these activities are well-intended efforts by good folks; however, these activities are very enabling and often do little to engage homeless individuals.

**7.  Panhandling Enables the Homeless and Must Be Stopped:**

Unearned cash is very enabling and does not engage homeless individuals in job and skills training which is needed to end homelessness.  Additionally, more often than not, cash is not used for food and housing but is instead used to buy drugs and alcohol which further perpetuates the homeless cycle.  Homeless individuals who are panhandling should be engaged into the transformational process.  Furthermore, most panhandlers are not truly homeless but are preying on the good nature of citizens to get tax-free dollars.

# Exhibit 5 -
# Robert G. Marbut Jr., Ph.D. Biography

First as a volunteer, then later as a San Antonio City Councilperson and a homeless service agency President/CEO, Dr. Robert Marbut has worked on homeless issues for over three decades.

In 2007, frustrated by the lack of real improvement, and as part of the concept development for the Haven for Hope Campus, Dr. Marbut conducted a nationwide best practices study of homeless services. After personally visiting 237 homeless service facilities, in 12 states and the District of Columbia, he developed *The Seven Guiding Principles of Homeless Transformation*. Since then, Dr. Marbut has visited a total of 633 operations in 21 states plus Washington, DC and Mexico City, DF.

These Seven Guiding Principles of Transformation are used in all aspects of his work to create holistic, transformative environments in order to reduce homelessness.

Dr. Marbut was a White House Fellow to President George H.W. Bush and a former Chief of Staff to San Antonio Mayor Henry Cisneros.

He earned a Ph. D. from The University of Texas at Austin, Austin, Texas in International Relations (with an emphasis in international terrorism and Wahhabism), Political Behavior and American Political Institutions/Processes from the Department of Government.

He also has two Master of Arts degrees, one in Government from The University of Texas at Austin and one in Criminal Justice from the Claremont Graduate School. His Bachelor of Arts is a Full Triple Major in Economics, Political Science and Psychology (Honors Graduate) from Claremont McKenna (Men's) College.

Dr. Marbut also has completed three post-graduate fellowships, one as a White House Fellow (USA's most prestigious program for leadership and public service), one as a CORO Fellow of Public and Urban Affairs and one as a TEACH Fellow in the Kingdom of Bahrain and the State of Qatar (1 of 13 USA educators selected).

**Contact Information:**

Robert G. Marbut Jr., Ph.D.
6726 Wagner Way
San Antonio, TX 78256

www.MarbutConsulting.com
MarbutR@aol.com
210-260-9696

November 26, 2013 (9:46am)
C:\Users\Robert G Marbut Jr\Documents\RGMDocsPix\Consulting\Sarasota\StudyPhaseReports\SarasotaStudyPhaseReportFINAL.wpd

Martbut Report - 55

EXHIBIT 3

# Action Plan Recommendations Report Card

## for the

## County of Sarasota

## "A Tale of Two Initiatives"

## by

## Robert G. Marbut Jr., Ph.D.

~~ ~~ ~~

**Written Report  -  June 19, 2015**
**Presentation  -  June 23, 2015**

Prepared by Robert G. Marbut Jr., Ph.D.
www.MarbutConsulting.com

# **<u>Table of Contents</u>**

Title Page ................................................................................................................. 1

Table of Contents ..................................................................................................... 2

Project Scope of Work .............................................................................................. 3

Report Card Executive Summary ............................................................................. 4

Report Card by Strategic Action Recommendation .................................................. 5

Exhibit 1 - Public Safety Triage and Stabilization Site Evaluation Criterion ............................. 21

Exhibit 2 - A Note About Possible Public Safety Triage and Stabilization (CAYA) Sites ......... 23

Exhibit 3 - *The Seven Guiding Principles of Homeless Transformation* ..................................... 24

Exhibit 4 - Robert G. Marbut Jr., Ph.D. Biography ...................................................... 26

# **Project Scope of Work**

Below is from the executed contract:

An Executive Analysis of the Sarasota County's Progress on the "Homeless Services Gap Analysis."

Project Phases:  The Project will be divided into four phases, as described below:

Phase 1 (April 2015) Pre-Site Visit Research:   Vendor in coordination with the Director of Homeless Services will send out a written survey to 15-20 homeless service providers asking a variety of questions regarding the 12 Action Plan Recommendations Steps that were formally adopted by Sarasota County.  After compilation and evaluation of surveys, selected conference calls will be made with targeted service providers.

Phase 2 (May 2015) Site Visit Research and Review:   Vendor shall conduct one extended site visit that is a minimum of 3 days and  one additional site visit,  of at least one day, to assess the current homeless situation in Sarasota County.  This assessment will require Vendor to conduct street-level observations of areas where individuals experiencing homelessness congregate, to attend meetings with key people working on homeless issues in the County, to conduct interviews with selected agencies serving the homeless population, to meet with selected law enforcement officers and to meet with others who have significant knowledge of the current homelessness situation within the County.  In addition, Vendor will hold two public forums, one in North County and one in South County, for the public to provide input for consideration.  All of this information from the survey, conference calls, site visit and public forums will be reviewed through the matrix of the 12 Action Plan Recommendations.  The Director of Homeless Services will help arrange the meetings and interviews and will work closely with the Vendor during the Research and Review Phase.

Phase 3 (May - June 2015) Written "Report Card":   Vendor will draft a written report providing a "Report Card" on the 12 Action Step Recommendations based on his findings during the Phases 1 and 2 for addressing homelessness within Sarasota County.  In addition, the report should address critical features of the "Housing First" model and how, if any, the program integrates with original 12 Action Plan Recommendations.

Phase 4 (June - July 2015) In-person Presentation of Written Report Card:   Vendor will conduct one trip to Sarasota to make an in-person presentation of his Report Card to the Sarasota County Commission on a mutually agreeable date.

## Report Card Executive Summary

Overall Grades:

- A . . . for Families with Children Experiencing Homelessness (Recs 2, 3 and 7)

- B . . . for Administrative and Support Functions (Recs 1, 5, 6, 11 and 12)

- F . . . for Single Adults Experiencing Homelessness (F for Rec 4 | I for Recs 8, 9 and 10)

| Individual Recommendation Grades | |
|---|---|
| Recommendations | Grades |
| 1- Move from a Culture of Enablement to a Culture of Engagement | B |
| 2- Establish a North County Emergency Intake Portal for Families with Children | A+ |
| 3- Establish a South County Emergency Intake Portal for Families with Children | A- |
| 4- Establish a Men's and Women's Public Safety Triage and Stabilization Unit | F |
| 5- Develop Two Master Case Management Systems | A- for Families<br>Incomplete for Single Adults<br>(Pending Recommendation 4) |
| 6- Transform HMIS from a "Score Keeper" to a "Proactive Case Management Tool" | B+ |
| 7- Empty Your Pantry Before You Go North | A+ |
| 8- Redirect and Align "Street Feeding" Efforts with Holistic Service Programs | Incomplete (Pending Recommendation 4) |
| 9- Harmonize and Standardize Ordinances Throughout the County | Incomplete (Pending Recommendation 4) |
| 10- Create Homeless Street Outreach Teams and Train All LEOs within the County | Incomplete (Pending Recommendation 4) |
| 11- Increase "Longer Term" Housing Placements | C |
| 12- Create a High Quality and Sustainable Governance System | B |

# Report Card by Strategic Action Recommendation

## 1 -  Move from a *Culture of Enablement* to a *Culture of Engagement*

The entire Sarasota County Community needs to move from a *Culture of Enablement* to *a Culture of Engagement* in all aspects.  This includes service agencies, volunteers, staffs, donors, funders, government agencies, programs, residents, tourists and the homeless community.  Free food handouts and cash from panhandling - although well intended by nice folks - actually perpetuates and increases homelessness through enablement.  Rather, street handouts, food and cash donations should be redirected to high performing agencies.  The mission should no longer be to "serve" the homeless community, instead the mission should be to dramatically and consequentially increase "street graduation" rates.  A media and public awareness campaign needs to be developed to educate and encourage the community to move from a culture of enablement to a culture of engagement.

## Grade B:

-   There are many examples of how the greater Sarasota community has changed the way it thinks and provides homeless services.  Many individuals, agencies and funders have embraced transformational best practices, and are shifting from a culture of enablement to a culture of engagement.

-   The Sarasota Family Haven Alliance represents one of the most successful collaborations in recent Sarasota history.  Traditional inter-agency silos have been shattered.  The Family Haven Alliance created and led by the Gulf Coast Community Foundation in consultation with the County's Director of Homeless Services has been a great example of the transformation to new thinking and new doing.  The results in this area are nothing less than stellar.

    The Family Haven Alliance is composed of the following agencies:
    -   Catholic Charities
    -   Harvest House Transitional Centers
    -   JFCS of the Suncoast
    -   The Salvation Army of Sarasota
    -   Schoolhouse Link (Sarasota Family YMCA)
    -   Suncoast Partnership to End Homelessness (SPEH)
    -   United Ways 2-1-1 of Manasota

-   The Season of Sharing, led by the Community Foundation of Sarasota County, has made many internal process and system changes to ensure engagement rather than enablement.  Additionally, the Community Foundation of Sarasota County fast-forwarded a plan to require

all of their Season of Sharing "fiscal agents" to use a common reporting/tracking tool thus improving the internal coordination of services. These enhancements to Season of Sharing will have major multi-year positive impacts to a wide range of agencies, and most importantly to the individuals and families receiving assistance.

Emergency assistance dollars, which are often the hardest to come by, are helping to keep individuals and families in their homes. The Community Foundation of Sarasota County has found that it takes $8,000 or more to get a family back in their home once they are out of their home. In contrast, it is taking an average of about $750 in emergency assistance for case appropriate families to stay in a home. Prevention is much more cost effective and much better on the human psyche of the family members. Season of Sharing continues to be one of the best, if not the best, emergency homeless prevention programs in the USA.

- The Patterson Foundation led a seven month intensively focused effort called "Recoding Organizational DNA" which focused on helping agencies move:
  - from Agency-Centric to System-Centric Activities,
  - from Out-put Measurements to Out-come Measurements,
  - from Enabling to Engaging Behavior.

The CEOs Agency Workgroup is an additional spin-off positive by-product of the Recoding Organizational DNA initiative.

Recoding Organizational DNA included chairs, board members, presidents, executive directors, staff and volunteers from the following agencies:
  - All Faiths Food Bank
  - Catholic Charities, Diocese of Venice, Inc.
  - The Center of Hope of South County, Inc.
  - Coastal Behavioral Healthcare, Inc.
  - Family Promise of Sarasota
  - The Glasser/Schoenbaum Human Services Center
  - Goodwill Manasota, Inc.
  - Harvest House Transitional Centers
  - Hope Kids Community
  - Jewish Family & Children Services of the Suncoast
  - Legal Aid of Manasota, Inc.
  - Resurrection House, Inc.
  - The Sarasota Family YMCA
  - Suncoast Partnership to End Homelessness, Inc.
  - Trinity Without Borders, Inc.
  - United Way 2-1-1 of Manasota, Inc.

- An example of this new system approach is instead of submitting multiple individual funding proposals from each agency, the County asked the Family Haven Alliance agencies to submit a singular unified and joint proposal for consideration by the County. This approach provides a significantly more holistic and strategic approach to funding targeted activities for families with children.

- Overall a new "language" of engagement is being used within most intra-agency and inter-agency interactions. A new common "language" is helpful in order to facilitate the move from "serving" the homeless community to working to "engage" the homeless community, with the mission to decrease overall and "street-level" homelessness while increasing "street graduation" rates.

- Beyond a common language, the agencies now share and use the same assessment tool, the same intake process and the same referral processes.

- As for citizen, faith-based and community service groups, the transition to a new culture has not been as robust, especially in areas such as "street feeding" and day center types of activities. The challenge is, without a 24/7 come-as-you-shelter, there is no positive alternative location with which to re-direct street-feeding efforts (see Recommendations 4 and 8).

- As for individuals experiencing homelessness, "hanging-out" is still a major challenge since a 24/7 Come-As-You-Are Center (see Recommendation 4) does not exist in which to direct engagement from their current locations in the City of Sarasota (eg the central business district and around the Salvation Army).

- It will be critical to have a comprehensive community awareness campaign once the Come-As-You-Are Center is ready to open and becomes operational. Gulf Coast Community Foundation, the Community Foundation of Sarasota County and the County are in an active planning process to develop a comprehensive awareness campaign. Ideally the roll-out of the awareness campaign should coincide with the opening of the Come-As-You-Are Center.

### 2 - Establish a North County *Emergency Intake Portal for Families with Children*

Establish an *Emergency Intake Portal for Families with Children* for the North County area in the City of Sarasota. This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in North County. The Portal would provide intake, stabilization, emergency housing, master case management and referral services. All homeless families and children in the North County area would start at this intake portal.

**<u>Grade A+</u>:**

- Under the leadership of the Gulf Coast Community Foundation, in coordination with the County, CEOs of the seven lead agencies all signed a Memorandum of Agreement to work together within a collaborative team named the Family Haven Alliance.  This is a first in Sarasota County.

- The Sarasota Family Haven Alliance has provided a venue where agencies can specialize in the services that they do best, and coordinate with other agencies to provide services that they excel in.  The Alliance has inspired donors to give additional funding and engaged citizens to care.

- The Harvest House Family Haven - North County Family Emergency Center is up and operational.  What is so amazing beyond its operational success is the fact that the center was opened on October 1, 2014 which was less than 11 months of the formal presentation of this recommendation.

- Since the opening on October 1, 2014 to the last day of April 2015, the Harvest House Family Haven portal has provided services for 146 families (330 children and 178 adults, 508 total individuals).  Of all the children, 76.9% were 10 years of age or younger.

- Harvest House Family Haven has proved to be so efficient and effective that it is about to measure the "time to service" (eg from crisis point to arrival at the Family Haven) in minutes, not days nor weeks.

- One of the most remarkable accomplishments that has resulted in the Sarasota Family Haven Alliance initiative is the substantial way in which the community has joined together in a common cause, with a common solution, and how that energy has translated into financial action.

- As for the "Family Village" recommendation for developing a transitional housing complex on the square block bounded by MLK Jr. Street - Tuttle Avenue - 25th Street - Chester Avenue, it is moving forward.  Harvest House gained control of this property in April 2015 and has started renovation on the first 8 of 18 units.  Contributions from the Community Foundation of Sarasota County, private contributors and the County will create transitional housing opportunities for more than 75 individuals within families.

- Gulf Coast Community Foundation continues to be the convener of the Family Haven Alliance.  Gulf Coast Community Foundation has been convening monthly meetings with 35 "Transformational Service" agencies for more than two years to better coordinate service delivery thus filling the gaps in services and reducing the duplication/overlap of services. Under that Family Haven Alliance umbrella, the case managers of the lead agencies meet once a week, supervisors meet almost every other week and CEOs meeting bi-monthly.  As

the system matures, the need for meetings will decrease and the communication systems will likely be streamlined.  The goal should be to meet less, and communicate more.  Overall, Gulf Coast Community Foundation has funded and committed one-time funding of more than $1.4 million in new services within the Family Haven Alliance.

- The YMCA Board and staff have been doing due diligence research in developing a 20-bed facility for unaccompanied youth/minors.  This facility would ideally be connected to the YMCA's existing emergency Youth Shelter.  The YMCA is confident they can fund the construction of such a shelter, but has yet to identify sustainable funding sources for ongoing operations.

## 3 - Establish a South County *Emergency Intake Portal for Families with Children*

Establish an *Emergency Intake Portal for Families with Children* for the South County area in Englewood (or North Port), then create satellite operations in Venice/Nokomis and North Port (or Englewood ).  This would become the "emergency room" for any homeless family with children and any unaccompanied minors residing in South County.  The Portal would provide intake, stabilization, emergency housing, master case management and referral services.  All homeless families and children in the South County area would start at this intake portal.

## Grade A-:

- The Catholic Charities Family Haven - South County Family Emergency Center is up and operational in North Port.  It is also amazing that this center opened on March 6, 2015 which was less than 16 months from the formal presentation of this recommendation.

- Since the opening on March 6, 2015 to the last day of April 2015, the Catholic Charities Family Haven portal has provided services to 45 families (105 children and 58 adults, 163 total individuals).  Of all the children, 60.0% were 10 years of age or younger.

- Because of the geographical distances between North Port, Englewood and Venice/Nokomis, there are logistical issues of getting families to North Port.  The original report recommended having three small-satellite operations.  A possible more cost effective alternative to this original recommendation could be to establish point-to-point transportation pick-ups on an as needed basis from Englewood and Venice/Nokomis to the Catholic Charities North Port Family Haven.  Adding a transportation component could allow operations to be optimized within the currently existing South Portal.

- The soon-to-open Family Promise program in South County will also provide program opportunities for families within the Venice/Nokomis area.

**4 - Establish a _Men's and Women's Public Safety Triage and Stabilization Unit_**

Establish a 24/7/168/365 Men's and Women's _Public Safety Triage and Stabilization Unit_ which would be a "come-as-you-are" emergency shelter.  The Sarasota Sheriff's Office should be asked to be the lead coordinating agency.  This would become the main intake portal for adult homeless men and women.  All adult services county-wide should "spoke off" of this main hub.  Once operational, all county-wide street feeding programs, food pantry programs and day-time service centers for adult homeless men and women need to be relocated within the Public Safety Triage and Stabilization Unit ("Sarasota Safe Harbor").  This should also be the location of the Master Case Managers for adult homeless men and women.

**Grade F:**

- The failure to overcome NIMBY'ism issues and the inability to reach an agreement with the City of Sarasota resulted in no action on this recommendation.

- Sadly, the failure to move forward with Recommendation 4 has negative impacts on the ultimate successes of Recommendations 5, 8, 9, 10 and 12, and to a lesser extent Recommendations 1 and 11.

- According to year-over-year Point-In-Time-Count data (PITC), the overall homeless rate in Sarasota County went up 17.4% and unsheltered adult street-level homelessness went up from 320 in 2014 to 324 in 2015.  It is important to note that it is nationally known that the PITC generally undercounts the number of individuals experiencing homelessness.

  There are two very important issues that need to be pointed out.  First, according to multiple sources (eg SPEH staff and individual counters) the City of Sarasota Police Department conducted "sweeps" before and maybe even during the 24-hour data count window this year.  If true, this means there would have been an even higher increase in street-level homelessness.  Second, even if the potentially tainted and suppressed data set is used, all the efforts made over the last year by the City of Sarasota did not reduce the number of individuals experiencing street-level homelessness.

- One known data set that is very accurate is the Sarasota County Fire Department's monthly "Response to Homeless Population" reports.  This monthly report provides very useful and validated data.  This is a very good data set since the Fire Department tracks the exact location of each individual experiencing homelessness.  This data has been collected for the last 22 months and is a great proxy data set for the overall homeless population size, changes in homeless population size and locations of the homeless community.

  The Fire Department data shows that calls for service to individuals experiencing homelessness in the City of Sarasota went up 28.3% from July 2013 to May 2014 vs. June

2014 to April 2015 (the first 11 months of data collection vs. the last 11 months of data collection).  This would indicate that the real increase in street-level homelessness within the City of Sarasota is close to 28.3% and/or aggressive/risky behavior has increased emergency medical care needs by 28.3% (most likely a combination of both).

- Additionally, the Fire Department data set for May 2014 to April 2015 shows that the City of Sarasota still has the vast majority of homeless individuals within the County with 75.8% of all County service calls being within the City of Sarasota proper.  This number is up from 71.8% from the first report made in November 2013 and matches several other data sets.

- The anecdotal stories told to this researcher as well as street-level observations made by this researcher all indicate increasing levels of homelessness within the City of Sarasota proper.

- Additionally, street-level observations and reports indicate the homeless community is becoming more aggressive and violent.  Since the drafting of the initial report, a person was murdered in North Port, a person was stabbed in the neck at the Selby Library, a person was thrown through a downtown Sarasota store front window and a person died of massive bee bites just feet away from one of the recommended CAYA sites.  All four of these incidents involved individuals who were experiencing homelessness.

- In order to break this log jam, Marbut Consulting proposes three possible alternatives within Exhibit 2 on Page 23.


## 5 - Develop Two Master Case Management Systems

Two different Master Case Management "systems" need to be developed:  one for families with children (including unaccompanied minors) and a second one for adult men and women.  The two Master Case Management systems need to be embedded within the intake portals and the triage stabilization unit.  "Master case management" and "agency level case management" are often wrongly presented as the same functionality.  There is a major difference between master case management and agency level case management - the first is holistic case management across the entire system of all agencies while the second is only within an individual agency.


## Grade A- for Families | Grade Incomplete for Single Adults (Pending Recommendation 4):

- Through the leadership of the County, Gulf Coast Community Foundation, the Community Foundation of Sarasota County, County staff, the SPEH and United Ways 2-1-1 of Manasota, all the agencies using HMIS (Homeless Management Information System) have developed an excellent master case management system for families that continues to be improved.

    NOTE:  This recommendation is very interconnected with Recommendation 6 below.

- For families with children, there is now a unified and streamlined process for assessment, intake and referral.

- The Family Haven Alliance started using the Service Prioritization Decisions Assistance Tool (SPDAT) which is an evidence-informed survey and software tool.  This tool works very well for adults in the USA.  However, this tool has proven to be a bit "clunky" for families.  The Family Haven Alliance has been talking to the developers of this tool to make it more user friendly for families.

- The Family Haven Alliance systematically reviews all their processes, procedures, guidelines and unique individual cases in order to make improvements at a series of regular meetings (eg case managers weekly, supervisors bi-weekly, executive directors bi-monthly and larger stake-holder group bi-monthly).

- In terms of an adult master case management system, no action has been taken since there has been no action taken on Recommendation 4 (eg Come-As-You-Are Center).  Until the Come-As-You-Are Center becomes a reality, it will be hard if not impossible, to set up an adult master case management system.

  The good news is, since so many improvements have been made in regards to HMIS/2-1-1 and since so many agencies overlap between families and adults, we would expect that an adult master case management system can be developed very quickly.  Additionally, for a variety of reasons, case management systems for families are much more complex than case management systems are for single adults.


**6 - Transform HMIS from a "Score Keeper" to a "Proactive Case Management Tool"**

The Homeless Management Information System (HMIS) needs to be transformed from a "Score Keeping Model" to a "Proactive Case Management Model."  To accomplish this, the software program needs a couple component upgrades and a system-wide-all-agency information release form should be utilized by all agencies.  Additionally, in order to promote universal agency participation, funding to service agencies by foundations, government agencies, United Way and the Continuum of Care should become contingent on being proactive participants in HMIS.


**Grade B+:**

- There have been many major upgrades and system improvements to the HMIS system, including integrating 2-1-1 and HMIS especially as it relates to families with children.  Full implementation of the HMIS upgrades had waited for the launch and re-purposing of the United Way 2-1-1 and SPEH's Bowman single point of entry format at 2-1-1.  This was completed last month.  Full integration is likely to occur within 4 months.

Martbut Sarasota Report Card - 12

- Because of an increased call volume related to families with children, the Community Foundation of Sarasota County funded an additional case manager for 2-1-1.

- Major improvements have been made:
  - an universal inter-agency data release has been developed and mobilized for families,
  - universal entry is occurring for families,
  - real-time entry has increased,
  - accuracy continues to improve,
  - reports are becoming more useful and timely, but are still a bit "clunky."

- Sarasota County now requires the use of HMIS within all homeless service agency contracts.

- In terms of families, HMIS is being transformed from a passive "score-keeper" to being a proactive case management tool within a truly integrated Master Case Management System. Additional needed improvements have been identified and are in the queue to fix/patch/upgrade.

- Overall, the HMIS system is moving in the right direction, but has more work to complete. SPEH needs to continue to improve its systems workflow in order to increase efficiencies and to make the overall system more user friendly for the partner agencies.

- If improvements continue to be made, this will become the best master case management software system for families in the USA.


### 7 - Empty Your Pantry Before You Go North

A seasonally targeted program should be developed to address seasonal shortages in food supplies within the All Faiths Food Bank. This effort should promote cash and food donations before seasonal residents move north for the season. This *"empty your pantry before you go north"* program should be promoted through a comprehensive public service campaign.


### Grade A+:

- The "CASH and Cans" (Campaign Against Summer Hunger) through herculean efforts of the All Faiths Food Bank, Gulf Coast Community Foundation and many others has become such a success that it has become the national best practice in this area.

- In 2014, the first year of CASH and Cans, the campaign raised $1.2 million cash and collected 827,000 pounds of food. Nine new mobile pantries distributed 147,992 meals to families. The newly created Summer Backpack program had 18 sites and distributed food to 3,449 children. The newly deployed Sprout Mobile Farm Market distributed more than

84,000 units of fresh produce to 3,460 people (including 1,032 children).  Partner Summer Feeding Agencies provided 1,172,222 units of food and 985,781 meals to fed 12,972 people (including 3,972 children).  The enhanced School District Summer Programs provided 288,883 meals to 3,000+ children.

In total more than 15,500 children regularly received food in the Summer of 2014 compared to just 5,200 meals for the whole Summer of 2013.

- The CASH and Cans program was so successful that it won the Secretaries Award (Secretaries of HUD and USDA) for public-philanthropic partnership.  The campaign was intentionally designed to be repeated annually in Sarasota, and easily scaled so that it can be replicated in other communities.  As a result of this campaign, the food bank did not run out of food over the summer, and the community saw a 300% increase in the number of children receiving food over the summer break.

- To date in 2015, CASH and Cans has raised $1.2 million and 935,000 pounds of food, with donations still coming in.  Since several big-ticket start-up equipment items were purchased within the 2014 budget (eg trucks, food equipment, etc.), then means there will actually be more funds spent in 2015 on direct food and services to help individuals in need.

- Because of realized system improvements, All Faiths Food Bank has managed this increase in operating tempo with just volunteers and seasonal staff hiring.  The Food Bank has not increased the full-time, year-round staffing level of the Food Bank.

### 8 - Redirect and Align "Street Feeding" Efforts with Holistic Service Programs

Redirect "Street Feeding and Street Services" to be aligned with holistic service programs.  Street feeding and street services, although well-intentioned and good-hearted, actually "enables" homeless individuals rather than "engages" homeless individuals into 24/7 holistic program services.  Providing camping supplies and/or feeding in the parks, at street corners, at beaches and behind restaurants exacerbates and promotes homelessness, thus increasing the number of homeless individuals.  Organizations providing street services need to be encouraged to relocate their adult services to Sarasota Safe Harbor.

### Grade Incomplete (Pending Recommendation 4):

- Extensive due diligence and "till-work" have occurred with faith-based and civic organizations, however until Recommendation 4 (eg a Come-As-You-Are Center) is implemented very little more can be done on this recommendation.

## 9 - Harmonize and Standardize Ordinances Throughout the County

Ordinances should be harmonized and standardized throughout the County.  These ordinances should be drafted in such away as to promote engagement into holistic programs, and not "criminalize" the condition of homelessness.  It is very important to note that due to a series of court rulings (often referred to as "Pottinger"), Law Enforcement Agencies (LEAs) and Law Enforcement Officers (LEOs) will not be able to enforce most ordinances until Sarasota Safe Harbor is fully operational on a 24/7/168/365 basis.

## Grade Incomplete (Pending Recommendation 4):

- A County-wide task-force of law enforcement, government attorneys, subject-mater-experts, staff and a representative of the ACLU have drafted and vetted a comprehensive set of ordinances that are not-criminalizing and would be "Pottinger" compliant once Recommendation 4 implemented (eg opening of a Come-As-You-Are Center).

- Extensive due diligence and "till-work" have occurred, however, until Recommendation 4 (eg a Come-As-You-Are Center) is implemented the different municipalities may not want to vote on the vetted ordinance package.

- It is very important to note that the proposed ordinances as well as many existing ordinances cannot be enforced until a "Pottinger" compliant facility is built and opened.

## 10 - Create Homeless Street Outreach Teams and Train All LEOs within the County

Once Sarasota Safe Harbor and the Family Portals are almost ready to open, "homeless outreach teams" (HOTs) should then be activated 2-4 weeks before the opening of these new facilities. Street outreach teams will be critical to the success of the overall system.  The best HOTs pair a social service worker with a police officer.  Additionally, every LEO in the County should go through an appropriate level of homeless engagement and sensitivity training.

## Grade Incomplete (Pending Recommendation 4):

- Until Recommendation 4 (eg a Come-As-You-Are Center) is implemented it does not make sense to take action on this recommendation.

- The original report stated that "[i]t would likely be a waste of valuable resources to deploy teams any earlier than 2-4 weeks before the opening of these new facilities since there will be nowhere to successfully send individuals and families."  Because of volume and location

issues, dedicated HOT teams are not needed for families.  Once the adult HOT teams are established, they should be cross-trained in family issues.

## 11 - Increase "Longer Term" Housing Placements

Increase the number of "longer term" housing placements across the spectrum for men, women, families with children and unaccompanied minors.  To be successful, there needs to be an increase in inventory capacity as well as improvements in service programs to better prepare individuals and families for the challenges they will face.

## Grade C:

- Many different groups and individuals have been talking about this recommendation, but at the time of this report, there are only two efforts that are becoming a reality.

  The first is Harvest House's soon to open "Family Village" which will bring on-line 18 new units, housing up to 74 individuals.  The purchase and renovations of the Family Village have been made possible by the Lee Wetherington Foundation, the Community Foundation of Sarasota County, the County and one anonymous generous donor.  The Family Village is a square block bounded by MLK Jr. Street - Tuttle Avenue - 25th Street - Chester Avenue, and has been one of the worse, if not the worse, crime ridden blocks within Sarasota.

  The second is five units in South County being purchased and refurbished by Catholic Charities which is being funded by Sarasota County and Catholic Charities.  These five unites will provide housing for up to 21 individuals.  Bishop Frank Dewane and Catholic Charities representatives have stated this is just a start of what they plan to do more in the future.

  Taken together, Harvest House and Catholic Charities are in the process of adding 95 beds (23 family units).

- The Salvation Army is looking at a proposed project for family housing.  It is currently in the "program design" phase.

- It is important to note, that with just one exception, none of the general market housing projects being developed within the county would be defined as affordable housing.

- In many communities around the USA, local mental health authorities have been providing long-term supportive housing for individuals presenting with moderate to severe mental health diagnoses.  Unfortunately, the local Sarasota mental health authority stopped such programming and liquidated their housing inventory six months ago.

- A focused effort still needs to occur to develop a holistic housing and case management program and/or center for unaccompanied youth/minors.

Housing First:

- For more than 18 months, City of Sarasota staff and elected officials have been <u>talking</u> about Housing First options, but as of the time of this report, the City of Sarasota has yet to take one vote to fund a specific project, or select a specific site, or start due diligence on a specific site.  If the City of Sarasota truly considers Housing First as a viable option, the City should move forward as soon as possible with specific site(s) and development plan(s).

- A note about Housing First.  In essence, Housing First is life-long 100% subsidized supportive housing program for individuals experiencing homelessness.  Individuals receive free housing, free utilities and free supportive services.  Individuals who receive Housing First often "jump to the front of the line" and move ahead of wait-listed working poor to get housing vouchers/units.

  There are two basic ways to provide Housing First.  The first is a scattered-site voucher system that provides vouchers directly to individuals experiencing homelessness, and then provide supportive services and case management (this works very well for single mom/dad led families with children). The second is to build new units/complexes, and then provide supportive services and case management on site (this works very well for veterans).

  The budget impact of the City's proposed 4 year, 100 persons per year Housing First program would be significant.  The calculations below uses the following assumptions for the proposed 4-year "housing first" program for 100 new individuals a year . . . these are very optimistic assumptions (eg the real costs would likely be higher):
    - 100 new people a year for four years,
    - Case management loads of 1:20 (housing first requires case managers),
    - Case managers would be master level with base pay around $50,000 per year plus taxes and benefits,
    - $200 utility allowance per person, per unit, per month,
    - The monthly per person, per unit, per month rental would need to be $737.50 in order to fit within the $1,500,000 (a HIGHLY unlikely low assumption),
    - Zero inflation on annualized year-to-year rentals (a HIGHLY unlikely assumption),
    - A 20% drop-out in Year One and with minimal attrition over the next three years,
    - Life-long support of the proposed target group of chronic homeless individuals,
    - Based on a 20% drop out rate, 320 individuals would be in the program in Year 5,
    - No new people into the program after Year 4 of the program,
    - Zero allocation for program administrative and oversight costs.

  Year 1 = $1,500,000 total
       (Class 1 for Year 1 = $1.5 million)

Martbut Sarasota Report Card - 17

Year 2 = $2,740,000 total
    (Class 1 = $1.24 million plus Class 2 = $1.5 million)

Year 3 = $3,980,000 total
    (Classes 1 and 2 = $1.24 million each plus Class 3 = $1.5 million)

Year 4 = $5,220,000 total
    (Classes 1, 2 and 3 = $1.24 million each plus Class 4 = $1.5 million)

Years 5 and beyond = $4,960,000 total every year
    (Classes 1, 2, 3 and 4 = $1.24 million each)

This researcher believes the proposed 100 persons per year within a $1.5 million budget is unrealistic. This researcher believes the budget would need to be increased by at least 16-23% more per year to fully fund 100 persons in Year 1 (at least $240,000 more per year).

Virtually every agency administrator interviewed for this report said there is almost no availability of affordable units in which to use vouchers. The administrators at United Way 2-1-1 said there have been cases where individuals have had vouchers in hand, but could not find an apartment to use it within the 120-day time period to find housing. One person within the affordable housing community said there is a 3-month wait to get housing. One staff person within a community foundation stated that the vacancy rate for affordable housing in Sarasota is now "functionally zero."

It is therefore unrealistic that any voucher program could work as long as available affordable housing remained functionally at zero. A more practical scenario would be to fund and build housing stock dedicated for individuals experiencing homelessness, but this too is very expensive.

The creation of 320 housing first units vis-a-vis construction (rather than the use of vouchers) would cost at the very least $41,250,000 for construction plus the cost of land. For this report, 320 is used since the above assumptions assume a 20% drop out within the first year of each class.

If 400 units were to be constructed, it would cost at least an additional $10,312,500 for construction plus the cost for additional land (the total would be at least $51,562,500 plus the cost land).

Additionally, on an annual basis funds would be needed for the upkeep and maintenance costs of the facilities. Also, assuming the same assumptions above (eg master level case managers, 20:1 case management load, etc.), the master case managers would cost about $1,050,000 - $1,275,000 per year to serve a census of 320.

If these costs are attainable and sustainable by the City of Sarasota, the City of Sarasota is encouraged to move forward as fast as it can with their plan on the funding, siting and development of a significant amount of Housing First units, especially for families with children and veterans.

- Low Income Housing Tax Credits should also be looked at as soon as possible.


## 12 - Create a High Quality and Sustainable Governance System

Governance and leadership of the new and improved holistic homeless service system is critical. In order to reduce role ambiguity and to improve service delivery it is recommended that two governance systems be established - one for families with children which includes unaccompanied minors and a second one for adult men and women.


## Grade B:

- The County's Director of Homeless Services has successfully become a synerging strategic coordinator of activities throughout the County between funders, stakeholders and agencies. He is clearly seen by most agencies as the leader on homeless issues, policies and planning.

- The Family Haven Alliance led by the Gulf Coast Community Foundation has become a highly functional leadership and governance body for homelessness relating to families with children.

- The governance around adult homeless issues continues to be a challenge. This issue will likely resolve itself once Recommendation 4 is implemented (eg establishment of a Come-As-You-Are Center). Once there is movement on Recommendation 4, a similar and parallel structure to the Family Haven Alliance should be established for adult homelessness, ideally led by the Sheriff's Office.

- Some parts of the administrative governance infrastructure are being led by SPEH, while other parts are being led by the County. A some point in the near future, a possible merger of functional governance actives and structure may want to be investigated and pursued.

- The Patterson Foundation led a very successful leadership and capacity building effort called "Recoding Organizational DNA" which focused on helping 16 agencies move:
  - from Agency-Centric to System-Centric,
  - from Out-put Measurements to Out-come Measurements,
  - from Enabling to Engaging.

- Across the nation and many communities within Florida, local mental health authorities and substance abuse service providers have merged into one behavioral health agency (or were already one agency). These mergers have reduced administrative costs and streamlined service delivery. If this was to occur in Sarasota, this would provide an opportunity to co-locate and integrate comprehensive behavioral health services (eg mental health and substance abuse services) with homeless services onto one campus.

- It is very important to note that almost all of the agencies and community foundations have significantly increased funding for new and improved homeless services. The Gulf Coast Community Foundation has spent and/or committed more than $2.2 million for new one-time homeless service initiatives. The Community Foundation of Sarasota County's Season of Sharing program is now in its 15th year and has significantly increased its annual Season of Sharing funding to more than $2 million. The Patterson Foundation funded the very successful Recoding Organizational DNA initiative. However, with the very important exceptions of $256,000 annually in new funds and the possible future support of CAYA from the County, the level of "net-new" annual governmental spending is basically what it was 2 years ago.

  It is important to note that the County has spent $260,000 in one-time capital funding projects and has provided $700,000 in one-time CDBG pass-through dollars. The County has also realigned about $229,000 annually for homeless services and created the Director of Homeless Services position.

- As expectations rise for improving services (higher quality), and as expectations rise for expanding services (higher quantity), funding levels will also have to rise. Over the next year, the key stakeholders should start developing sustainability strategies to fund the improved and expanded services.


NOTE:    This is a "Report Card" of the original 12 recommendations presented by Marbut Consulting on November 25, 2013. It is not a "report card" of the County's reconstituted goals nor is it a report card on the City of Sarasota's most recent plan.

**Exhibit 1 -**
**Public Safety Triage and Stabilization Site Evaluation Criterion**

Based on my research and observations to date, a Public Safety Triage and Stabilization Unit is critically needed in order to successfully address street-level and chronic homelessness in Sarasota.

A Public Safety Triage and Stabilization Unit, sometimes called a "come-as-you-are-shelter" or a "low-demand-shelter" should include a holistic and comprehensive 24/7 programming.

It is very important to understand that homeless individuals do not "graduate" from street life back into general society if they are enabled to stay on the streets, in parks or in encampments. Likewise, homeless individuals do not graduate from street-life while being incarcerated.

The most successful and proven way to increase the rate of street graduations is for individuals to be in formal programs that provide holistic, transformational services 24 hours a day, seven days a week. Holistic and transformational means comprehensive services including master case management, behavioral health, substance abuse treatment, life skills training, job training, job placement, etc.

This researcher waited to start possible site evaluations until after the results from a comprehensive, countywide field study of unsheltered homeless adults was completed. Without this data in hand, it would have been impossible to evaluate specific locations.

Based on national best practices found in dozens of other communities, the following are the criterion that was used to evaluate sites:

- In order to reduce pedestrian and bicycle traffic passing through neighborhoods, and to increase efficiencies within the overall service system, this Triage and Stabilization Unit ideally should be located within a short walking distance of existing programs, preferably between service agency anchors.

- In order to maximize jail diversion for individuals whose legal involvement may be a result of untreated mental illness or substance abuse disorders, the Public Safety Triage and Stabilization Unit should be within a short drive of the County Jail.

- In order to improve neighborhood quality of life, it is critical to have existing ergonomic natural and/or industrial buffers around the facility and/or have the ability to create buffers.

- In order to save money and ramp-up quickly, the site needs to be readily available for use (eg there needs to be a willing seller and/or the property be owned by local government).

- In order to be a good steward of taxpayers' dollars, the cost of acquiring the land needs to be affordable.

- In order to be cost effective, the cost to build and/or renovate and/or install buildings needs to be affordable.

- In order to be cost effective, the establishment of support infrastructure and utilities needs to be affordable.

- In order not to waste taxpayers' dollars, the facility needs to be "right sized." We do not want to over-build a facility that has wasted space nor do we want to under-build a facility in such a way that hinders program and operational functionality.

- In order to start helping individuals, reduce fatalities and get community relief as soon as possible, the ramp-up time of a site should be short.

- Are there are any site-specific impediments that might stop or delay the "go-live" date of its operation?

It is important to note that this researcher never saw a map of any political districts within Sarasota County. Staffs of the County and the Cities within the County were asked not to provide any maps that contained political districts.

The main goal is to pick the site that is in the best overall interest of Sarasota and one that promotes the operational success of Sarasota Safe Harbor. The hope is the site selection will not get bogged down by NIMBY'ism nor political rivalries.

**Exhibit 2 -**
## A Note About Possible Public Safety Triage and Stabilization (CAYA) Sites

In order to break the log jam regarding the location of the Come-As-You-Are Center, Marbut Consulting proposes the following three possible alternatives:

A1-    Pursue the "3 to 1 Recommendation" which was developed by the agencies *CEO's Group* led by Kurt Stringfellow who is the the President and CEO of the Sarasota Family YMCA.  Their group's recommendation is to locate 24/7 homeless service operations at the existing Salvation Army on 10th Street.  Then in trade:
+ move Resurrection House the Salvation Army location,
+ stop the night-time Salvation Army program,
+ not build a separate Come-As-You-Are Center.

In other words, instead of 3 different homeless operations spread over the north-central area, only have one at the existing Salvation Army.  The Salvation Army site has an added benefit of being directly across the street from the Crisis Stabilization Unit run by Coastal Behavioral Healthcare.

This operation should be run by the Sheriff's Office and be "Pottinger" compliant thus allowing engagement of individuals that are "hanging-out" to come into the 24/7 center.

A2-    Same as A1 above, but instead of consolidating services at the Salvation Army site, consolidate the services at the current Harvest House Main Campus at 209 North Lime.  This site would garner all the same benefits of A1 but be located east of State Highway 301.  This location would also come on-line much faster that the A1 site if it was blessed by the City of Sarasota.  Additionally, this site would be significantly less expensive than A1 (eg lower purchase cost, easier renovations and not have to pay for relocation of existing social services).  Based on the criterion in Exhibit 1 on Page 21, this site was determined by Marbut Consulting to be the best overall site during the original study phase.

A3-    Have the County establish a Come-As-You-Are Center that is consistent with the established criteria (See Exhibit 1) in the unincorporated area of the County within 1/4 mile or so of the City of Sarasota.  This would get all the benefits of the original Recommendation 4 made in November 2013 and is likely less expensive than A1 above.  Several possible sites were identified in the original report that meet the outlined criterion in the original report (see the criterion in Exhibit 1 on Page 21 of this report and see sites in the original report).  The one and only real down side of A3 is it would extend the "crumb trial" longer than it would be if it was within the City of Sarasota closer to existing agencies such as the crisis units.

# Exhibit 3 -
## The Seven Guiding Principles of Homeless Transformation

### *The Measuring Stick*
### *Moving from Enablement to Engagement*

After visiting 237 homeless service providers in 12 states and the District of Columbia, the following *Seven Guiding Principles* were commonly found to be the best practices in the USA. These *Seven Guiding Principles of Homeless Transformation* are used as key measuring sticks when reviewing homeless service providers in Sarasota as well as the overall service network within Sarasota County.

1. ## Move to a Culture of Transformation (versus the Old Culture of Warehousing):

   Homeless individuals must be engaged and no longer enabled. Everybody within the services delivery system (eg general public, media, elected politicians, appointed officials, monitors, boards, staffs and volunteers of service agencies and most importantly the homeless themselves) must embrace a culture of transformation. A culture, that through the help of others, homeless individuals can transform and integrate themselves back into society. For moral and fiscal reasons, homelessness must become an unacceptable condition that is not tolerated in the USA.

2. ## Co-location and Virtual E-integration of as Many Services as Possible:

   In order to increase success, all services within a service area must be e-integrated. Virtual e-integration improves coordination of services, enhances performance, reduces "gaming" of the system, engages individuals on the margin of society and increases cost efficiencies within and between agencies. Furthermore, whenever financially possible, services should be co-located. Co-location goes beyond virtual e-integration by increasing the number of "service hits" into a shorter period of time through the reduction of wasted time in transit and minimization of mishandled referrals. Co-location also increases the supportive "human touch."

3. ## Must Have a Master Case Management System That is Customized:

   Because there are so many different service agencies helping homeless individuals (eg government at multi-levels, non-profits and faith-based), it is critical that ONE person coordinates the services an individual receives and to do so in a customized fashion. The types of service provided is critical, but what is more important is the sequencing and frequency of customized services.

4.  **Reward Positive Behavior:**

Positive behavior of individuals should be rewarded with increased responsibilities and additional privileges.  Privileges such as higher quality sleeping arrangements, more privacy and elective learning opportunities should be used as rewards.  It is important that these rewards be used as "tools" to approximate the "real world" in order to increase sustainable reintegration into society.

5.  **Consequences for Negative Behavior**:

Too often there are no consequences for negative behavior of individuals.  Unfortunately, this sends a message that bad behavior is acceptable.  Within the transformational process, it is critical to have swift and proportionate consequences.

6.  **External Activities Must be Redirected or Stopped:**

External activities such as "street feeding" must be redirected to support the transformation process. In most cases, these activities are well-intended efforts by good folks; however, these activities are very enabling and often do little to engage homeless individuals.

7.  **Panhandling Enables the Homeless and Must Be Stopped:**

Unearned cash is very enabling and does not engage homeless individuals in job and skills training which is needed to end homelessness.  Additionally, more often than not, cash is not used for food and housing but is instead used to buy drugs and alcohol which further perpetuates the homeless cycle.  Homeless individuals who are panhandling should be engaged into the transformational process.  Furthermore, most panhandlers are not truly homeless but are preying on the good nature of citizens to get tax-free dollars.

# Exhibit 4 -
## Robert G. Marbut Jr., Ph.D. Biography

First as a volunteer, then later as a San Antonio City Councilperson and a homeless service agency President/CEO, Dr. Robert Marbut has worked on homeless issues for more than three decades.

In 2007, frustrated by the lack of real improvement, and as part of the concept development for the Haven for Hope Campus, Dr. Marbut conducted a nationwide best practices study of homeless services.  After personally visiting 237 homeless service facilities, in 12 states and the District of Columbia, he developed *The Seven Guiding Principles of Homeless Transformation*.  Since then, Dr. Marbut has visited a total of 698 operations in 21 states plus Washington, DC and Mexico City, DF.

These Seven Guiding Principles of Transformation are used in all aspects of his work to create holistic, transformative environments in order to reduce homelessness.

Dr. Marbut was a White House Fellow to President George H.W. Bush and a former Chief of Staff to San Antonio Mayor Henry Cisneros.

He earned a Ph. D. from The University of Texas at Austin, Austin, Texas in International Relations (with an emphasis in international terrorism and Wahhabism), Political Behavior and American Political Institutions/Processes from the Department of Government.

He also has two Master of Arts degrees, one in Government from The University of Texas at Austin and one in Criminal Justice from the Claremont Graduate School.  His Bachelor of Arts is a Full Triple Major in Economics, Political Science and Psychology (Honors Graduate) from Claremont McKenna (Men's) College.

Dr. Marbut also has completed three post-graduate fellowships, one as a White House Fellow (USA's most prestigious program for leadership and public service), one as a CORO Fellow of Public and Urban Affairs and one as a TEACH Fellow in the Kingdom of Bahrain and the State of Qatar (1 of 13 USA educators selected).

**Contact Information:**

Robert G. Marbut Jr., Ph.D.
6726 Wagner Way
San Antonio, TX 78256

www.MarbutConsulting.com
MarbutR@aol.com
210-260-9696

June 22, 2015
C:\RGM Files Docs On 2nd Acer\Consulting\Sarasota County (check-up)\ReportPresentations\SarasotaCheckpPhaseReportFINAL.wpd

Martbut Sarasota Report Card - 26

**EXHIBIT 4**

# Housing Market Analysis

## MA-05 Overview

**Housing Market Analysis Overview:**

To be completed after the public comment period.

This will be a summary the market analysis.

# MA-10 Housing Market Analysis: Number of Housing Units - 91.410, 91.210(a)&(b)(2)

## Introduction

Sarasota predominately consists of single family detached owner occupied housing units. More than 60% of all residential units in Sarasota are single family detached units. There is a need for additional multi-family rental units both in the City of Sarasota and in Sarasota County.

## All residential properties by number of units

| Property Type | Number | % |
|---|---|---|
| 1-unit detached structure | 132,955 | 60% |
| 1-unit, attached structure | 16,183 | 7% |
| 2-4 units | 10,132 | 5% |
| 5-19 units | 19,315 | 9% |
| 20 or more units | 22,608 | 10% |
| Mobile Home, boat, RV, van, etc | 20,217 | 9% |
| *Total* | *221,410* | *100%* |

Table 1 – Residential Properties by Unit Number

Data Source:   2007-2011 ACS

## Unit Size by Tenure

| | Owners | | Renters | |
|---|---|---|---|---|
| | Number | % | Number | % |
| No bedroom | 124 | 0% | 1,411 | 4% |
| 1 bedroom | 3,571 | 3% | 8,090 | 20% |
| 2 bedrooms | 48,126 | 38% | 17,449 | 44% |
| 3 or more bedrooms | 74,767 | 59% | 13,146 | 33% |
| *Total* | *126,588* | *100%* | *40,096* | *101%* |

Table 2 – Unit Size by Tenure

Data Source:   2007-2011 ACS

## Describe the number and targeting (income level/type of family served) of units assisted with federal, state, and local programs.

Rental Housing:

The Sarasota Housing Authority (SHA) has more than 1300 Housing Choice Vouchers (HCV) serving Sarasota residents. Residents may lease units anywhere in Sarasota County. In addition, the SHA has received 116 HCV to assist veterans and 30 HCVs that are used to reunite families. Vouchers pay a private landlord an amount that enables the family to pay no more than 30% of their income for rent

OMB Control No: 2506-0117 (exp. 07/31/2015)

and utilities. The majority of the vouchers are tenant based, meaning the assistance is not tied to any specific apartment. There are 22 project based vouchers, meaning the voucher is assigned to a specific unit.

The SHA administers 394 units of public housing. These units are located in the City of Sarasota. The Venice Housing Authority (VHA) also owns 25 units of public housing. Public housing residents pay approximately 30% of their income for housing and utilities.

There are several federally financed developments that are designed for residents with special needs. The Section 202 program provides housing for residents over the age of 62. There are 556 units of Section 202 housing in Sarasota. Funding for this program is competitive and only nonprofit agencies are eligible to apply. Congress has not appropriated funding for the Section 202 program since 2012.

The Section 811 program finances housing for the disabled. There are 40 units of Section 811 housing in Sarasota. There are two ways projects can be funded. One is through a national competition open to nonprofit agencies. Congress has not appropriated funding for this program since 2013. The second program is an allocation of rental assistance to state housing finance agencies. The State of Florida did not apply for these funds in 2014.

The largest federal program enabling the construction of affordable housing is the Low Income Housing Tax Credit (LIHTC). The program is administered by the Florida Housing Finance Corporation and primarily provides housing that is affordable to families earning between 50 - 60% of AMI. Sarasota has 1,071 of LIHTC housing. This is a highly competitive program. In 2014 there were 82 applications submitted for funding in medium and small counties, which includes Sarasota County. Of those 82 applications, 11 applications were funded.

In 2009, Sarasota was one of only 56 applications selected nationally to receive Neighborhood Stabilization Program 2 (NSP2) funding. Sarasota used some of these funds to create 89 affordable rental housing units with 4 nonprofit housing providers. Of this total, 70 are in apartment complexes and 19 were single family homes scattered throughout the community.

Sarasota has also used State Housing Initiatives Partnership Program funds to create housing for the developmentally disabled, persons suffering from mental illness, persons recovering from substance abuse and HIV/AIDS. More than 200 housing units have been created. These are located on scattered sites throughout the county.

**Provide an assessment of units expected to be lost from the affordable housing inventory for any reason, such as expiration of Section 8 contracts.**

There are no known units expected to be lost from the affordable housing inventory.

**Does the availability of housing units meet the needs of the population?**

A community consensus emerged as part of the Comprehensive Plan discussions that there is a large deficit in the number of multi-family rental units that are affordable for low and very low income residents. Sarasota is largely a community of single family detached homes that does not always meet the needs of small families and single individuals. The lack of 1 and 2 bedroom multi-family units prevents residents from finding appropriately sized and affordable units.

## Describe the need for specific types of housing:

Sarasota only has 41,000 units of multi-family housing. This includes both rental housing and condominiums. There is a need for additional rental units in the community that are affordable.

This question was asked at the public meetings. The comments from the public included the following needs:

- Additional multi-family housing for all income ranges
- Additional multi-family housing in the City of North Port

### Discussion

Owner - occupied housing:

Sarasota has targeted its federal and state housing funds to maintain the existing housing stock owned by lower-income residents. In addition, Sarasota has used its funds to financially assist several nonprofits to create housing for first time homebuyers.

## MA-15 Housing Market Analysis: Cost of Housing - 91.410, 91.210(a)

### Introduction:

As demonstrated in the needs section of this document, the biggest problem in Sarasota is the cost of housing relative to the income of its residents. More than 40% of all Sarasota residents pay more than 30% of their income for housing, with more than 20% of all Sarasota residents paying more than 50% of their income for housing.

### Cost of Housing

|  | Base Year: 2000 | Most Recent Year: 2011 | % Change |
|---|---|---|---|
| Median Home Value | 0 | 0 | 0% |
| Median Contract Rent | 0 | 0 | 0% |

Table 3 – Cost of Housing

Data Source:      2000 Census (Base Year), 2007-2011 ACS (Most Recent Year)

| Rent Paid | Number | % |
|---|---|---|
| Less than $500 | 5,304 | 13.2% |
| $500-999 | 22,238 | 55.5% |
| $1,000-1,499 | 8,546 | 21.3% |
| $1,500-1,999 | 1,916 | 4.8% |
| $2,000 or more | 2,092 | 5.2% |
| **Total** | **40,096** | **100.0%** |

Table 4 - Rent Paid

Data Source:    2007-2011 ACS

### Housing Affordability

| % Units affordable to Households earning | Renter | Owner |
|---|---|---|
| 30% HAMFI | 1,415 | No Data |
| 50% HAMFI | 4,913 | 9,236 |
| 80% HAMFI | 22,206 | 24,615 |
| 100% HAMFI | No Data | 43,488 |
| **Total** | **28,534** | **77,339** |

Table 5 – Housing Affordability

Data Source:    2007-2011 CHAS

**Monthly Rent**

| Monthly Rent ($) | Efficiency (no bedroom) | 1 Bedroom | 2 Bedroom | 3 Bedroom | 4 Bedroom |
|---|---|---|---|---|---|
| Fair Market Rent | 722 | 803 | 1,027 | 1,376 | 1,616 |
| High HOME Rent | 695 | 746 | 897 | 1,029 | 1,128 |
| Low HOME Rent | 550 | 589 | 707 | 817 | 911 |

Table 6 – Monthly Rent

Data Source:    HUD FMR and HOME Rents

### Is there sufficient housing for households at all income levels?

There are 17,960 Sarasota residents who earn less than 30% of the Area Median Income. There are 1,415 housing units affordable to that income group. There are an additional 19,965 residents who earn between 30 and 50% of AMI. There are only 14,149 units affordable to this income group. As discussed in the needs section, this gap results in 20% of all Sarasota residents having to pay more than 50% of their income for housing. One stark example of the need is that in January 2015, the Sarasota Housing Authority opened their Housing Choice Voucher list for the first time in more than 5 years. More than 7,900 residents applied for housing in one week.

The 2015 Out of Reach Housing Study showed that Sarasota was the 9th least affordable county in Florida. A family has to earn $38,400 to be able to afford a 2-bedroom apartment at the Fair Market Rent of $960 a month.

### How is affordability of housing likely to change considering changes to home values and/or rents?

The data provided by HUD is for the period 2007 - 2011 and does not include the rapid appreciation in home prices in Sarasota that has occurred during the past few years. The median sales price in July 2011 was $151,000. The median sales price is now $219,000, an increase of 45%. This rapid appreciation, without a corresponding increase in wages, leads to less affordability.

### How do HOME rents / Fair Market Rent compare to Area Median Rent? How might this impact your strategy to produce or preserve affordable housing?

The 2014 Fair Market rent for a 2-bedroom unit was $1027. The area median rent in Sarasota County was $961. That should indicate that there are available rental units in Sarasota for Housing Choice Voucher holders to lease. However, the Sarasota Housing Authority reports that this is not the case and that residents are finding it increasingly difficult to find affordable rental units.

**Discussion:**

The cost of housing for lower income residents remains the largest housing problem in Sarasota County - especially for renters who do not receive a federal or state subsidy for housing.

## MA-20 Housing Market Analysis: Condition of Housing - 91.410, 91.210(a)

### Introduction

There are a large number of homes in Sarasota that need rehabilitation. The Sarasota population has a large number of persons over the age of 62 who are on a fixed income. Ten percent of all Sarasota homeowners who are severely cost burdened are elderly. These residents often lack the ability to make needed housing repairs. The housing stock is aging when additional repairs are needed.

### Describe the jurisdiction's definition for "substandard condition" and "substandard condition but suitable for rehabilitation:

The definition of "standard condition" is a residential property that meets the local housing code. The definition of a residential property in standard condition but suitable for rehabilitation is when the cost to bring the residential property to a standard condition costs less than $60,000.

### Condition of Units

| Condition of Units | Owner-Occupied | | Renter-Occupied | |
|---|---|---|---|---|
| | Number | % | Number | % |
| With one selected Condition | 44,578 | 35% | 20,588 | 51% |
| With two selected Conditions | 470 | 0% | 1,455 | 4% |
| With three selected Conditions | 36 | 0% | 120 | 0% |
| With four selected Conditions | 0 | 0% | 0 | 0% |
| No selected Conditions | 81,504 | 64% | 17,933 | 45% |
| *Total* | *126,588* | *99%* | *40,096* | *100%* |

Table 7 - Condition of Units

Data Source:    2007-2011 ACS

### Year Unit Built

| Year Unit Built | Owner-Occupied | | Renter-Occupied | |
|---|---|---|---|---|
| | Number | % | Number | % |
| 2000 or later | 25,600 | 20% | 7,954 | 20% |
| 1980-1999 | 50,159 | 40% | 13,111 | 33% |
| 1950-1979 | 48,146 | 38% | 17,166 | 43% |
| Before 1950 | 2,683 | 2% | 1,865 | 5% |
| *Total* | *126,588* | *100%* | *40,096* | *101%* |

Table 8 – Year Unit Built

Data Source:    2007-2011 CHAS

OMB Control No: 2506-0117 (exp. 07/31/2015)

## Risk of Lead-Based Paint Hazard

| Risk of Lead-Based Paint Hazard | Owner-Occupied | | Renter-Occupied | |
|---|---|---|---|---|
| | Number | % | Number | % |
| Total Number of Units Built Before 1980 | 50,829 | 40% | 19,031 | 47% |
| Housing Units build before 1980 with children present | 5,405 | 4% | 3,301 | 8% |

Table 9 – Risk of Lead-Based Paint

Data Source: 2007-2011 ACS (Total Units) 2007-2011 CHAS (Units with Children present)

## Vacant Units

| | Suitable for Rehabilitation | Not Suitable for Rehabilitation | Total |
|---|---|---|---|
| Vacant Units | 0 | 0 | 0 |
| Abandoned Vacant Units | 0 | 0 | 0 |
| REO Properties | 0 | 0 | 0 |
| Abandoned REO Properties | 0 | 0 | 0 |

Table 10 - Vacant Units

Data Source: 2005-2009 CHAS

## Describe the need for owner and rental rehabilitation based on the condition of the jurisdiction's housing.

As previously noted, the Sarasota housing stock is aging. As properties begin to age they need rehabilitation and have a higher cost to maintain. There are more than 69,000 housing units that were built prior to 1950. Many of these homes will need some level of rehabilitation.

There is an acute need to assist low-income homeowners make needed repairs to allow them to maintain their property and to allow older residents to remain in their home. Sarasota has spent a great deal of its federal and state housing funds helping its most vulnerable residents make needed repairs and yet there is always a waiting list for assistance. The FEMA rules limiting assistance to 50% of the value of the home impacts lower valued homes owned by low-income residents. This federal law limits the ability of poor people to make repairs to their homes and eventually results in lowered valued homes leaving the inventory as these homes are demolished from a lack of maintenance.

As the rental stock continues to age, Sarasota may need to begin to financially assist landlords to rehabilitate their properties.

This question was asked at the public meetings. The comments from the public included:

- There is a need for renovation of existing units, especially for elderly, veterans and those on fixed incomes.
- There is a need for renovation of housing owned by elderly owner occupants

Consolidated Plan SARASOTA 9

- There is a need for renovation of rental housing that is affordable and those owned by landlords that have tight profit margins.
- The need for rehab in North Port is not needed due to the age of the housing

## Estimate the number of housing units within the jurisdiction that are occupied by low or moderate income families that contain lead-based paint hazards. 91.205(e), 91.405

Target housing under the Residential Lead-Based Paint Hazard Reduction Act of 1992, means any housing constructed prior to 1978. The closest census data break out point is housing units built prior to 1980. Using base line data provided by HUD, that would indicate approximately 8,700 residential units with families that contain lead-based paint hazard. Fortunately, lead based paint was not as common in Florida as the rest of the nation. Testing shows that only 20% of the housing that potentially has lead, in fact has lead. That would indicate that there are approximately 1,640 units with low income residents with families that have lead.

### Discussion

The aging of the housing in Sarasota means that there will be a greater need for both rental and owner occupied rehabilitation. Federal law limiting assistance to 50% of the value of the home impacts lower income residents and results in a loss of affordable housing units.

# MA-25 Public And Assisted Housing - 91.410, 91.210(b)

## Introduction:

This section discusses the public housing and housing choice vouchers administered by the Sarasota Housing Authority and the Venice Housing Authority.

## Totals Number of Units

| | Certificate | Mod-Rehab | Public Housing | Program Type Total | Project-based | Tenant-based | Special Purpose Voucher Veterans Affairs Supportive Housing | Special Purpose Voucher Family Unification Program | Disabled * |
|---|---|---|---|---|---|---|---|---|---|
| # of units vouchers available | | | 448 | 1,387 | | | 333 | 205 | 0 |
| # of accessible units | | | | | | | | | |

*Includes Non-Elderly Disabled, Mainstream One-Year, Mainstream Five-year, and Nursing Home Transition

Table 11 – Total Number of Units by Program Type

Data Source: PIC (PIH Information Center)

## Describe the supply of public housing developments:

## Describe the number and physical condition of public housing units in the jurisdiction, including those that are participating in an approved Public Housing Agency Plan:

HUD's Real Estate Assessment Center (REAC) conducts physical property inspections of properties that are owned, insured or subsidized by HUD, including public housing and multi-family assisted housing. About 20,000 such inspections are conducted each year to ensure that assisted families have housing that is decent, safe, sanitary and in good repair. Developments begin with a score of 100 and points are deducted for identified deficiencies.

Consolidated Plan                                    SARASOTA                                    11

OMB Control No: 2506-0117 (exp. 07/31/2015)

A passing score for a REAC Physical Inspection is 60 or above.

The Venice Housing Authority Development, Venetian Walk Phase I was new in 2014 and has not yet received a REAC score from HUD.

Consolidated Plan

SARASOTA

12

**Public Housing Condition**

| Public Housing Development | Average Inspection Score |
|---|---|
| Bertha Mitchel | 92 |
| Mc Cown Tower | 99 |
| Janie's Garden Phase I | 97 |
| Janie's Garden Phase II | 96 |

Table 12 - Public Housing Condition

## Describe the restoration and revitalization needs of public housing units in the jurisdiction:

The Sarasota Housing Authority (SHA) has started construction on Janie's Garden Phase III. This will complete the Janie's Garden redevelopment program. The SHA intends to apply for the redevelopment of Orange Avenue in 2015.

The Venetian Walk I Senior Apartments opened in 2014. The VHA plans to construct 52 family units that will all be subject to Low Income Housing Tax Credit (LIHTC) restrictions and 25 of these units will be public housing units. The remaining units will be unsubsidized  The development will consist of three, 3 story / 12 unit and two 2 story / 8 unit concrete block buildings, together with a 1 story 1500 square foot clubhouse with computer lab, fitness room, meeting space and a tot lot.

## Describe the public housing agency's strategy for improving the living environment of low- and moderate-income families residing in public housing:

The Sarasota Housing Authority (SHA) and the Venice Housing Authority have used Low Income Housing Tax Credits to replace the worst public housing and replace it with new housing. Venetian Gardens was rebuilt in 2014 and the three phases of Janie's Garden will be completed in 2016.

In addition, the SHA has rehabilitated the Bertha Mitchell Apartments and has installed new roofs, doors, windows, kitchens, bathrooms and central air conditioning.

### Discussion:

The housing authorities located in Sarasota County have demonstrated dramatic improvement during the past several years. The Sarasota Housing Authority has moved from troubled status to high performing. The worst public housing units, Janie Poe, have been demolished and are being replaced with new public housing and low income housing tax credit units. Bertha Mitchell, one of the units slated to be demolished due to its poor condition has been renovated and now has an average inspection score of 92, which is considered excellent. Plans are in progress to replace the Orange Avenue development and rebuild on the former Cohen Way site.

The Venice Housing Authority has also made excellent progress. It has demolished its substandard public housing units and has completed phase I of its redevelopment project. A new 61 senior housing development is now open and they will be applying for an additional 52 family units in 2015.

During one of the public meetings, a citizen wanted to make sure that HUD and the public were aware of the tremendous progress that the public housing authorities have made during the past few years.

# MA-30 Homeless Facilities and Services - 91.410, 91.210(c)

## Introduction

The facilities and housing available to the homeless are described in this section.

## Facilities Targeted to Homeless Persons

| | Emergency Shelter Beds | | Transitional Housing Beds | Permanent Supportive Housing Beds | |
|---|---|---|---|---|---|
| | Year Round Beds (Current & New) | Voucher / Seasonal / Overflow Beds | Current & New | Current & New | Under Development |
| Households with Adult(s) and Child(ren) | 89 | 16 | 114 | 117 | 0 |
| Households with Only Adults | 209 | 98 | 125 | 158 | 0 |
| Chronically Homeless Households | 0 | 0 | 0 | 225 | 0 |
| Veterans | 0 | 0 | 24 | 144 | 0 |
| Unaccompanied Youth | 20 | 0 | 18 | 0 | 0 |

Table 13 - Facilities Targeted to Homeless Persons

Data Source Comments:   The data was provided by the Continuum of Care

**Describe mainstream services, such as health, mental health, and employment services to the extent those services are use to complement services targeted to homeless persons**

Health care is provided by the Sarasota County Health Department. Mental health providers serving the homeless include Coastal Behavioral Healthcare, Inc., First Step of Sarasota, Community Mental Health Centers and Cornerstone (formerly Manatee Glens). Employment services and second chance employment opportunities are provided by Goodwill Manasota. Career Source Suncoast provides job search and resume assistance using a mobile unit at the Salvation Army.

**List and describe services and facilities that meet the needs of homeless persons, particularly chronically homeless individuals and families, families with children, veterans and their families, and unaccompanied youth. If the services and facilities are listed on screen SP-40 Institutional Delivery Structure or screen MA-35 Special Needs Facilities and Services, describe how these facilities and services specifically address the needs of these populations.**

Continuum of Care services for the homeless in Sarasota are delivered through a consortium of nonprofit organizations, faith-based organizations and governmental agencies. These agencies provide homeless prevention, rapid re-housing, emergency shelter, transitional housing and permanent supportive housing. Other local agencies provide food, shelter and health care for the chronically homeless.

Many of the organizations providing services and facilities to the homeless are listed on screens SP-40 and MA-35. The specific services that these agencies provide are listed below:

- Catholic Charities - emergency shelter, transitional housing and case management for families with children, permanent supportive housing for HIV/AIDS clients who are homeless;
- The Salvation Army, Sarasota - emergency shelter for individuals and families, case management, substance abuse treatment, transitional housing, homeless prevention and rapid re-housing services;
- The Salvation Army, Venice - food assistance, meals and child care;
- Jewish Family and Children's Services - homeless prevention, case management and rapid re-housing for families and veterans;
- YMCA School House Link - educational support and coordination with service providers per McKinney-Vento legislation;
- Sarasota Family YMCA - emergency shelter for youths under 18 and transitional housing for persons aging out of foster care;
- Harvest House - emergency shelter for families, transitional housing and case management for families, permanent supportive housing for chronically homeless individuals and families;
- CASL / Renaissance Manor - permanent supportive housing for homeless and chronically homeless individuals, families and veterans;
- Resurrection House - day services for chronically homeless;

OMB Control No: 2506-0117 (exp. 07/31/2015)

- All Faiths Food Bank - food and meals for the working poor, families at risk of homelessness and homeless individuals and families;
- Public Housing Authority - VASH Vouchers for homeless veterans and their family members;
- Center of Hope South County - day services for homeless individuals and families and the chronically homeless;
- North Port Social Services - homeless prevention for families, referral services and coordination with providers;
- Community Area Ministries, Englewood - day services for the working poor and homeless individuals and families; and
- Laurel Civic Association - homeless prevention services for at risk families;
- Family Promise - transitional housing for homeless families.
- United Way 211 of Manasota - call center for referrals to other agencies

## MA-35 Special Needs Facilities and Services - 91.410, 91.210(d)

### Introduction

This section discusses the services needed to assist persons who are not homeless but require
supportive housing. This population includes the frail and non-frail elderly, persons with disabilities
(mental, physical and developmental), persons with alcohol or other drug addictions, persons with
HIV/AIDS and their families and public housing residents.

**Including the elderly, frail elderly, persons with disabilities (mental, physical, developmental),
persons with alcohol or other drug addictions, persons with HIV/AIDS and their families,
public housing residents and any other categories the jurisdiction may specify, and describe
their supportive housing needs**

Elderly and Non Frail Elderly - There are a substantial number of elderly residents (18.27%) paying more
than 50% of their income for housing. Nationally as seniors age, they tend to spend a larger portion of
their income for housing. Even if the home is totally paid for, property taxes and insurance increases
exceed the income growth of older citizens. To enable them to remain in their home, often the elderly
will need home modifications which can be costly for those on a fixed income.

Physically Disabled Residents - The census bureau determined that nationally 28% of all individuals with
a physical disability have an income below the federal poverty line. This is more than 4 times the rate
for persons who were not disabled. These lower incomes make finding affordable housing very
difficult. In addition, the number of barrier free housing units that will accommodate the
individual's disability is limited.

Developmental Disabilities - The Florida Developmental Disabilities Council determined that there are
not sufficient options for affordable housing for adults with developmental disabilities. "The State of
Florida has relied heavily on the family with 70.3 percent of the individuals living with the family
compared to the national average of 57.7 percent." There are also an increasing number of individuals
who are living with aging caregivers who will soon require alternative living arrangements. There also
appears to be a conflict between the desires of many families wanting planned residential communities
for the developmentally disabled and the goals and values of the Developmental Disabilities Act. There
is a need for additional employment opportunities, expanded public transportation and health care for
these residents.

Mental Illness - The National Alliance on Mental Illness states that the lack of affordable housing is the
largest barrier to recovery. Many of the individuals with mental illness only receive SSI, which has a
standard base rate of $733 a month. Given that the Section 8 payment standard is $825 a month, a
person living on SSI will find it very difficult, if not impossible, to find affordable housing in Sarasota.
Locally there is a need for permanent supportive housing. Ideally they would be SROs or one bedroom

OMB Control No: 2506-0117 (exp. 07/31/2015)

residences disbursed throughout the community. The lack of affordable housing leads to people cycling in and out of homelessness, jail, shelters and hospitals. Only 41% of those suffering from mental illness received treatment during the past year indicating a need for additional treatment opportunities. Locally there is a need for additional case management services.

Persons with alcohol or drug addictions - The U.S. Department of Health and Human Services states that the greatest need is for additional treatment funding and facilities. Nationally only .9% of all individuals who are classified as having a drug and/or alcohol abuse condition received treatment for this condition.

**Describe programs for ensuring that persons returning from mental and physical health institutions receive appropriate supportive housing**

Sarasota has one Florida Assertive Community Treatment team that works with these persons. However, they are understaffed and unable to meet all of the needs in the community.

**Specify the activities that the jurisdiction plans to undertake during the next year to address the housing and supportive services needs identified in accordance with 91.215(e) with respect to persons who are not homeless but have other special needs. Link to one-year goals. 91.315(e)**

To be completed after funding decisions are made and discussions with providers

**For entitlement/consortia grantees: Specify the activities that the jurisdiction plans to undertake during the next year to address the housing and supportive services needs identified in accordance with 91.215(e) with respect to persons who are not homeless but have other special needs. Link to one-year goals. (91.220(2))**

To be completed after funding decisions are made and discussions with providers

## MA-40 Barriers to Affordable Housing - 91.410, 91.210(e)

**Describe any negative effects of public policies on affordable housing and residential investment.**

In 2012, an 11-member committee examined public policies and their negative effects on affordable housing.  Two recommendations were made that parking reductions and cluster housing should be allowed by right rather than as exception to policy.

During the public meetings there was considerable discussion that the City of Sarasota and Sarasota County had policies that prevented affordable housing from being developed.  However, no specific regulations preventing the development of affordable housing were cited.  There were also a number of comments that the commissions had required affordable housing in several developments but then eliminated those requirements and that this practice should stop.

The City and County are establishing new Local Housing Incentive Committees in the fall of 2015 to examine this subject and this section will be updated when their report is completed.

Sec. 34-41 - Unlawful lodging out-of-doors prohibited.

(a) The following words and phrases, when used in this section, shall have the following meanings:

    (1) Lodging out-of-doors means using public or private property for living accommodation purposes by the erection, use or occupation of any tent, hut, lean-to, shack or temporary shelter for sleeping purposes or the laying down of bedding, such as a blanket or sleeping bag or similar material for the purpose of sleeping.

    (2) Living accommodation purposes means to remain living, to dwell or to reside at a place for a period of time for the purpose of using such place as a home.

(b) It shall be unlawful for any person to use any public or private property in the city for lodging out-of-doors except with the permission and consent of the property owner. Permission and consent to lodge out-of-doors on property owned by the city may be given for a specified period of time by the affirmative vote of the city commission.

(c) Being in a tent, hut, lean-to, shack or in a temporary shelter or being asleep atop or covered by materials in a public place or private place out-of-doors without the permission and consent of the property owner may be evidence of a violation but is not alone sufficient to constitute a violation of this section. One or more of the following must also exist before a law enforcement officer can find probable cause to issue a summons or to make an arrest:

    (1) Numerous items of personal belongings are present;

    (2) The person is engaged in cooking activities;

    (3) The person has built or is maintaining a fire;

    (4) The person has engaged in digging or earth breaking activities;

    (5) The person is asleep and when awakened states that he or she has no other place to live.

(d) Except as provided for in subsection (e), whenever a law enforcement officer has probable cause to believe that a violation of this section has occurred, he or she shall advise the person of the violation and afford the person an opportunity to be transported by a law enforcement officer to an available shelter. The law enforcement officer shall advise the person that all of his or her personal property which is not taken to the shelter, except that which is of no apparent utility or which is in an unsanitary condition, shall be inventoried and stored by the city police department for a maximum of sixty (60) days, until reclaimed. If the person elects to be transported to an available shelter the law enforcement officer shall make available such transportation as may be available for such purpose and the person making such election shall not be charged with a violation of this section. If the person refuses to be transported to an available shelter, then such person may be charged with a violation of this section.

(e) Subsection (d) shall not apply to any person who can not be properly identified, or is intoxicated by alcohol or drugs. For purposes of this subsection, proper identification shall include, but not be limited to, a driver's license, a government or employment identity card with photograph or other form of identification, which would satisfy a reasonable law enforcement officer as to the identity of the person.

(f) Any personal property that was inventoried and stored by the city police department for a person transported to a shelter under the provisions of this section which has not been reclaimed within sixty (60) days of the date the personal property was inventoried and stored shall be deemed abandoned and disposed of according to Chapter 705, Florida Statutes.

(Ord. No. 05-4600, § 2, 2-22-05; Ord. No. 05-4640, § 2, 8-15-05; Ord. No. 14-5093, § 2, 5-5-14)

EXHIBIT 6

# The Salvation Army, Sarasota - Overnight Shelter
## Program Daily Census
Reporting Period: 1/1/14 - 1/31/14

| 1/1/14 - 1/31/14 | |
|---|---|
| Client Count | 363 |

| Date | Client Count |
|---|---|
| 1/1/14 | 115 |
| 1/2/14 | 124 |
| 1/3/14 | 109 |
| 1/4/14 | 133 |
| 1/5/14 | 113 |
| 1/6/14 | 143 |
| 1/7/14 | 135 |
| 1/8/14 | 119 |
| 1/9/14 | 120 |
| 1/10/14 | 109 |
| 1/11/14 | 123 |
| 1/12/14 | 114 |
| 1/13/14 | 122 |
| 1/14/14 | 130 |
| 1/15/14 | 98 |
| 1/16/14 | 105 |
| 1/17/14 | 103 |
| 1/18/14 | 99 |
| 1/19/14 | 94 |
| 1/20/14 | 96 |
| 1/21/14 | 100 |
| 1/22/14 | 102 |
| 1/23/14 | 86 |
| 1/24/14 | 103 |
| 1/25/14 | 98 |
| 1/26/14 | 112 |
| 1/27/14 | 104 |
| 1/28/14 | 100 |
| 1/29/14 | 129 |
| 1/30/14 | 119 |
| 1/31/14 | 93 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 2/1/14 - 2/28/14

| 2/1/14 - 2/28/14 | |
|---|---|
| Client Count | 234 |

| Date | Client Count |
|---|---|
| 2/1/14 | 90 |
| 2/2/14 | 91 |
| 2/3/14 | 92 |
| 2/4/14 | 100 |
| 2/5/14 | 99 |
| 2/6/14 | 102 |
| 2/7/14 | 94 |
| 2/8/14 | 98 |
| 2/9/14 | 105 |
| 2/10/14 | 103 |
| 2/11/14 | 96 |
| 2/12/14 | 103 |
| 2/13/14 | 100 |
| 2/14/14 | 100 |
| 2/15/14 | 98 |
| 2/16/14 | 101 |
| 2/17/14 | 98 |
| 2/18/14 | 92 |
| 2/19/14 | 86 |
| 2/20/14 | 76 |
| 2/21/14 | 81 |
| 2/22/14 | 80 |
| 2/23/14 | 74 |
| 2/24/14 | 81 |
| 2/25/14 | 80 |
| 2/26/14 | 81 |
| 2/27/14 | 80 |
| 2/28/14 | 70 |
| - | 0 |
| - | 0 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 3/1/14 - 3/31/14

| 3/1/14 - 3/31/14 | |
|---|---|
| Client Count | 246 |

| Date | Client Count |
|---|---|
| 3/1/14 | 81 |
| 3/2/14 | 62 |
| 3/3/14 | 60 |
| 3/4/14 | 66 |
| 3/5/14 | 69 |
| 3/6/14 | 69 |
| 3/7/14 | 73 |
| 3/8/14 | 64 |
| 3/9/14 | 73 |
| 3/10/14 | 71 |
| 3/11/14 | 61 |
| 3/12/14 | 73 |
| 3/13/14 | 78 |
| 3/14/14 | 63 |
| 3/15/14 | 64 |
| 3/16/14 | 64 |
| 3/17/14 | 82 |
| 3/18/14 | 78 |
| 3/19/14 | 79 |
| 3/20/14 | 80 |
| 3/21/14 | 78 |
| 3/22/14 | 73 |
| 3/23/14 | 71 |
| 3/24/14 | 87 |
| 3/25/14 | 81 |
| 3/26/14 | 81 |
| 3/27/14 | 80 |
| 3/28/14 | 78 |
| 3/29/14 | 78 |
| 3/30/14 | 75 |
| 3/31/14 | 87 |

## The Salvation Army, Sarasota - Overnight Shelter
Program Daily Census
Reporting Period: 4/1/14 - 4/30/14

| 4/1/14 - 4/30/14 | |
|---|---|
| Client Count | 218 |

| Date | Client Count |
|---|---|
| 4/1/14 | 80 |
| 4/2/14 | 84 |
| 4/3/14 | 89 |
| 4/4/14 | 74 |
| 4/5/14 | 65 |
| 4/6/14 | 65 |
| 4/7/14 | 65 |
| 4/8/14 | 79 |
| 4/9/14 | 72 |
| 4/10/14 | 71 |
| 4/11/14 | 69 |
| 4/12/14 | 77 |
| 4/13/14 | 70 |
| 4/14/14 | 72 |
| 4/15/14 | 75 |
| 4/16/14 | 76 |
| 4/17/14 | 72 |
| 4/18/14 | 69 |
| 4/19/14 | 71 |
| 4/20/14 | 71 |
| 4/21/14 | 74 |
| 4/22/14 | 70 |
| 4/23/14 | 69 |
| 4/24/14 | 65 |
| 4/25/14 | 70 |
| 4/26/14 | 64 |
| 4/27/14 | 72 |
| 4/28/14 | 75 |
| 4/29/14 | 66 |
| 4/30/14 | 68 |
| - | 0 |

## The Salvation Army, Sarasota - Overnight Shelter
Program Daily Census
Reporting Period: 5/1/14 - 5/31/14

| 5/1/14 - 5/31/14 | |
|---|---|
| Client Count | 228 |

| Date | Client Count |
|---|---|
| 5/1/14 | 64 |
| 5/2/14 | 75 |
| 5/3/14 | 75 |
| 5/4/14 | 78 |
| 5/5/14 | 79 |
| 5/6/14 | 82 |
| 5/7/14 | 80 |
| 5/8/14 | 77 |
| 5/9/14 | 72 |
| 5/10/14 | 63 |
| 5/11/14 | 71 |
| 5/12/14 | 75 |
| 5/13/14 | 85 |
| 5/14/14 | 83 |
| 5/15/14 | 88 |
| 5/16/14 | 79 |
| 5/17/14 | 67 |
| 5/18/14 | 77 |
| 5/19/14 | 77 |
| 5/20/14 | 79 |
| 5/21/14 | 74 |
| 5/22/14 | 76 |
| 5/23/14 | 74 |
| 5/24/14 | 75 |
| 5/25/14 | 73 |
| 5/26/14 | 89 |
| 5/27/14 | 77 |
| 5/28/14 | 81 |
| 5/29/14 | 75 |
| 5/30/14 | 80 |
| 5/31/14 | 77 |

## The Salvation Army, Sarasota - Overnight Shelter
Program Daily Census
Reporting Period: 6/1/14 - 6/30/14

| 6/1/14 - 6/30/14 | |
|---|---|
| Client Count | 248 |

| Date | Client Count |
|---|---|
| 6/1/14 | 83 |
| 6/2/14 | 81 |
| 6/3/14 | 73 |
| 6/4/14 | 73 |
| 6/5/14 | 69 |
| 6/6/14 | 65 |
| 6/7/14 | 69 |
| 6/8/14 | 65 |
| 6/9/14 | 82 |
| 6/10/14 | 89 |
| 6/11/14 | 86 |
| 6/12/14 | 88 |
| 6/13/14 | 83 |
| 6/14/14 | 81 |
| 6/15/14 | 86 |
| 6/16/14 | 89 |
| 6/17/14 | 87 |
| 6/18/14 | 91 |
| 6/19/14 | 87 |
| 6/20/14 | 81 |
| 6/21/14 | 84 |
| 6/22/14 | 87 |
| 6/23/14 | 97 |
| 6/24/14 | 94 |
| 6/25/14 | 97 |
| 6/26/14 | 96 |
| 6/27/14 | 92 |
| 6/28/14 | 89 |
| 6/29/14 | 89 |
| 6/30/14 | 99 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 7/1/14 - 7/31/14

| 7/1/14 - 7/31/14 | |
|---|---|
| Client Count | 225 |

| Date | Client Count |
|---|---|
| 7/1/14 | 91 |
| 7/2/14 | 92 |
| 7/3/14 | 93 |
| 7/4/14 | 81 |
| 7/5/14 | 90 |
| 7/6/14 | 92 |
| 7/7/14 | 93 |
| 7/8/14 | 90 |
| 7/9/14 | 83 |
| 7/10/14 | 96 |
| 7/11/14 | 90 |
| 7/12/14 | 90 |
| 7/13/14 | 94 |
| 7/14/14 | 95 |
| 7/15/14 | 95 |
| 7/16/14 | 99 |
| 7/17/14 | 97 |
| 7/18/14 | 85 |
| 7/19/14 | 85 |
| 7/20/14 | 91 |
| 7/21/14 | 89 |
| 7/22/14 | 94 |
| 7/23/14 | 86 |
| 7/24/14 | 95 |
| 7/25/14 | 85 |
| 7/26/14 | 81 |
| 7/27/14 | 91 |
| 7/28/14 | 85 |
| 7/29/14 | 92 |
| 7/30/14 | 87 |
| 7/31/14 | 90 |

Data Provided by: Suncoastpartnership to End Homelessness, Inc. - HMIS - Using ServicePoint(c) by Bowman Systems

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 8/1/14 - 8/31/14

| 8/1/14 - 8/31/14 | |
|---|---|
| Client Count | 273 |

| Date | Client Count |
|---|---|
| 8/1/14 | 79 |
| 8/2/14 | 77 |
| 8/3/14 | 87 |
| 8/4/14 | 90 |
| 8/5/14 | 86 |
| 8/6/14 | 85 |
| 8/7/14 | 84 |
| 8/8/14 | 82 |
| 8/9/14 | 86 |
| 8/10/14 | 86 |
| 8/11/14 | 92 |
| 8/12/14 | 94 |
| 8/13/14 | 93 |
| 8/14/14 | 102 |
| 8/15/14 | 103 |
| 8/16/14 | 99 |
| 8/17/14 | 106 |
| 8/18/14 | 101 |
| 8/19/14 | 105 |
| 8/20/14 | 91 |
| 8/21/14 | 90 |
| 8/22/14 | 89 |
| 8/23/14 | 85 |
| 8/24/14 | 90 |
| 8/25/14 | 97 |
| 8/26/14 | 94 |
| 8/27/14 | 94 |
| 8/28/14 | 100 |
| 8/29/14 | 77 |
| 8/30/14 | 82 |
| 8/31/14 | 81 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 9/1/14 - 9/30/14

| 9/1/14 - 9/30/14 | |
|---|---|
| Client Count | 250 |

| Date | Client Count |
|---|---|
| 9/1/14 | 78 |
| 9/2/14 | 98 |
| 9/3/14 | 92 |
| 9/4/14 | 85 |
| 9/5/14 | 84 |
| 9/6/14 | 81 |
| 9/7/14 | 86 |
| 9/8/14 | 85 |
| 9/9/14 | 89 |
| 9/10/14 | 96 |
| 9/11/14 | 92 |
| 9/12/14 | 90 |
| 9/13/14 | 88 |
| 9/14/14 | 98 |
| 9/15/14 | 97 |
| 9/16/14 | 95 |
| 9/17/14 | 101 |
| 9/18/14 | 94 |
| 9/19/14 | 96 |
| 9/20/14 | 94 |
| 9/21/14 | 101 |
| 9/22/14 | 103 |
| 9/23/14 | 97 |
| 9/24/14 | 97 |
| 9/25/14 | 97 |
| 9/26/14 | 97 |
| 9/27/14 | 88 |
| 9/28/14 | 91 |
| 9/29/14 | 92 |
| 9/30/14 | 100 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 10/1/14 - 10/31/14

| 10/1/14 - 10/31/14 | |
|---|---|
| Client Count | 261 |

| Date | Client Count |
|---|---|
| 10/1/14 | 93 |
| 10/2/14 | 91 |
| 10/3/14 | 92 |
| 10/4/14 | 87 |
| 10/5/14 | 98 |
| 10/6/14 | 92 |
| 10/7/14 | 94 |
| 10/8/14 | 94 |
| 10/9/14 | 91 |
| 10/10/14 | 84 |
| 10/11/14 | 97 |
| 10/12/14 | 93 |
| 10/13/14 | 105 |
| 10/14/14 | 109 |
| 10/15/14 | 105 |
| 10/16/14 | 100 |
| 10/17/14 | 89 |
| 10/18/14 | 103 |
| 10/19/14 | 110 |
| 10/20/14 | 105 |
| 10/21/14 | 99 |
| 10/22/14 | 99 |
| 10/23/14 | 97 |
| 10/24/14 | 94 |
| 10/25/14 | 93 |
| 10/26/14 | 98 |
| 10/27/14 | 90 |
| 10/28/14 | 92 |
| 10/29/14 | 94 |
| 10/30/14 | 94 |
| 10/31/14 | 89 |

Data Provided by: Suncoastpartnership to End Homelessness, Inc. - HMIS - Using ServicePoint(c) by Bowman Systems

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 11/1/14 - 11/30/14

| 11/1/14 - 11/30/14 | |
|---|---|
| Client Count | 270 |

| Date | Client Count |
|---|---|
| 11/1/14 | 92 |
| 11/2/14 | 90 |
| 11/3/14 | 87 |
| 11/4/14 | 83 |
| 11/5/14 | 86 |
| 11/6/14 | 82 |
| 11/7/14 | 85 |
| 11/8/14 | 95 |
| 11/9/14 | 85 |
| 11/10/14 | 91 |
| 11/11/14 | 93 |
| 11/12/14 | 99 |
| 11/13/14 | 88 |
| 11/14/14 | 94 |
| 11/15/14 | 91 |
| 11/16/14 | 87 |
| 11/17/14 | 109 |
| 11/18/14 | 62 |
| 11/19/14 | 112 |
| 11/20/14 | 112 |
| 11/21/14 | 102 |
| 11/22/14 | 96 |
| 11/23/14 | 107 |
| 11/24/14 | 109 |
| 11/25/14 | 124 |
| 11/26/14 | 106 |
| 11/27/14 | 104 |
| 11/28/14 | 114 |
| 11/29/14 | 111 |
| 11/30/14 | 109 |
| - | 0 |

Data Provided by: Suncoastpartnership to End Homelessness, Inc. - HMIS - Using ServicePoint(c) by Bowman Systems

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 12/1/14 - 12/31/14

| 12/1/14 - 12/31/14 | |
|---|---|
| Client Count | 252 |

| Date | Client Count |
|---|---|
| 12/1/14 | 100 |
| 12/2/14 | 96 |
| 12/3/14 | 96 |
| 12/4/14 | 96 |
| 12/5/14 | 84 |
| 12/6/14 | 84 |
| 12/7/14 | 86 |
| 12/8/14 | 92 |
| 12/9/14 | 97 |
| 12/10/14 | 90 |
| 12/11/14 | 97 |
| 12/12/14 | 98 |
| 12/13/14 | 87 |
| 12/14/14 | 90 |
| 12/15/14 | 97 |
| 12/16/14 | 90 |
| 12/17/14 | 89 |
| 12/18/14 | 88 |
| 12/19/14 | 86 |
| 12/20/14 | 82 |
| 12/21/14 | 92 |
| 12/22/14 | 89 |
| 12/23/14 | 82 |
| 12/24/14 | 80 |
| 12/25/14 | 81 |
| 12/26/14 | 82 |
| 12/27/14 | 81 |
| 12/28/14 | 80 |
| 12/29/14 | 91 |
| 12/30/14 | 96 |
| 12/31/14 | 80 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 1/1/15 - 1/31/15

| 1/1/15 - 1/31/15 | |
|---|---|
| Client Count | 267 |

| Date | Client Count |
|---|---|
| 1/1/15 | 85 |
| 1/2/15 | 85 |
| 1/3/15 | 82 |
| 1/4/15 | 91 |
| 1/5/15 | 92 |
| 1/6/15 | 91 |
| 1/7/15 | 106 |
| 1/8/15 | 110 |
| 1/9/15 | 95 |
| 1/10/15 | 92 |
| 1/11/15 | 90 |
| 1/12/15 | 97 |
| 1/13/15 | 99 |
| 1/14/15 | 99 |
| 1/15/15 | 110 |
| 1/16/15 | 104 |
| 1/17/15 | 95 |
| 1/18/15 | 99 |
| 1/19/15 | 97 |
| 1/20/15 | 95 |
| 1/21/15 | 92 |
| 1/22/15 | 97 |
| 1/23/15 | 105 |
| 1/24/15 | 100 |
| 1/25/15 | 101 |
| 1/26/15 | 111 |
| 1/27/15 | 111 |
| 1/28/15 | 115 |
| 1/29/15 | 109 |
| 1/30/15 | 98 |
| 1/31/15 | 94 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 2/1/15 - 2/28/15

| 2/1/15 - 2/28/15 | |
|---|---|
| Client Count | 298 |

| Date | Client Count |
|---|---|
| 2/1/15 | 87 |
| 2/2/15 | 99 |
| 2/3/15 | 101 |
| 2/4/15 | 90 |
| 2/5/15 | 98 |
| 2/6/15 | 92 |
| 2/7/15 | 92 |
| 2/8/15 | 90 |
| 2/9/15 | 105 |
| 2/10/15 | 111 |
| 2/11/15 | 112 |
| 2/12/15 | 111 |
| 2/13/15 | 126 |
| 2/14/15 | 113 |
| 2/15/15 | 116 |
| 2/16/15 | 112 |
| 2/17/15 | 117 |
| 2/18/15 | 134 |
| 2/19/15 | 146 |
| 2/20/15 | 129 |
| 2/21/15 | 112 |
| 2/22/15 | 118 |
| 2/23/15 | 113 |
| 2/24/15 | 103 |
| 2/25/15 | 116 |
| 2/26/15 | 120 |
| 2/27/15 | 112 |
| 2/28/15 | 105 |
| - | 0 |
| - | 0 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 3/1/15 - 3/31/15

| 3/1/15 - 3/31/15 | |
|---|---|
| Client Count | 285 |

| Date | Client Count |
|---|---|
| 3/1/15 | 106 |
| 3/2/15 | 112 |
| 3/3/15 | 109 |
| 3/4/15 | 109 |
| 3/5/15 | 115 |
| 3/6/15 | 106 |
| 3/7/15 | 103 |
| 3/8/15 | 114 |
| 3/9/15 | 116 |
| 3/10/15 | 112 |
| 3/11/15 | 112 |
| 3/12/15 | 109 |
| 3/13/15 | 109 |
| 3/14/15 | 111 |
| 3/15/15 | 111 |
| 3/16/15 | 113 |
| 3/17/15 | 117 |
| 3/18/15 | 119 |
| 3/19/15 | 119 |
| 3/20/15 | 115 |
| 3/21/15 | 121 |
| 3/22/15 | 120 |
| 3/23/15 | 117 |
| 3/24/15 | 118 |
| 3/25/15 | 115 |
| 3/26/15 | 114 |
| 3/27/15 | 111 |
| 3/28/15 | 113 |
| 3/29/15 | 116 |
| 3/30/15 | 116 |
| 3/31/15 | 108 |

Data Provided by: Suncoastpartnership to End Homelessness, Inc. - HMIS - Using ServicePoint(c) by Bowman Systems

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 4/1/15 - 4/30/15

| 4/1/15 - 4/30/15 | |
|---|---|
| Client Count | 284 |

| Date | Client Count |
|---|---|
| 4/1/15 | 110 |
| 4/2/15 | 112 |
| 4/3/15 | 98 |
| 4/4/15 | 95 |
| 4/5/15 | 104 |
| 4/6/15 | 109 |
| 4/7/15 | 107 |
| 4/8/15 | 105 |
| 4/9/15 | 104 |
| 4/10/15 | 90 |
| 4/11/15 | 64 |
| 4/12/15 | 113 |
| 4/13/15 | 100 |
| 4/14/15 | 109 |
| 4/15/15 | 112 |
| 4/16/15 | 123 |
| 4/17/15 | 110 |
| 4/18/15 | 103 |
| 4/19/15 | 117 |
| 4/20/15 | 123 |
| 4/21/15 | 112 |
| 4/22/15 | 106 |
| 4/23/15 | 121 |
| 4/24/15 | 117 |
| 4/25/15 | 108 |
| 4/26/15 | 121 |
| 4/27/15 | 111 |
| 4/28/15 | 120 |
| 4/29/15 | 121 |
| 4/30/15 | 110 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 5/1/15 - 5/31/15

| 5/1/15 - 5/31/15 | |
|---|---|
| Client Count | 284 |

| Date | Client Count |
|---|---|
| 5/1/15 | 97 |
| 5/2/15 | 95 |
| 5/3/15 | 100 |
| 5/4/15 | 106 |
| 5/5/15 | 107 |
| 5/6/15 | 106 |
| 5/7/15 | 111 |
| 5/8/15 | 107 |
| 5/9/15 | 121 |
| 5/10/15 | 121 |
| 5/11/15 | 114 |
| 5/12/15 | 127 |
| 5/13/15 | 116 |
| 5/14/15 | 130 |
| 5/15/15 | 122 |
| 5/16/15 | 125 |
| 5/17/15 | 127 |
| 5/18/15 | 131 |
| 5/19/15 | 128 |
| 5/20/15 | 131 |
| 5/21/15 | 129 |
| 5/22/15 | 129 |
| 5/23/15 | 124 |
| 5/24/15 | 119 |
| 5/25/15 | 129 |
| 5/26/15 | 127 |
| 5/27/15 | 123 |
| 5/28/15 | 127 |
| 5/29/15 | 122 |
| 5/30/15 | 132 |
| 5/31/15 | 124 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 6/1/15 - 6/30/15

| 6/1/15 - 6/30/15 | |
|---|---|
| Client Count | 294 |

| Date | Client Count |
|---|---|
| 6/1/15 | 118 |
| 6/2/15 | 120 |
| 6/3/15 | 114 |
| 6/4/15 | 109 |
| 6/5/15 | 108 |
| 6/6/15 | 116 |
| 6/7/15 | 115 |
| 6/8/15 | 123 |
| 6/9/15 | 118 |
| 6/10/15 | 133 |
| 6/11/15 | 127 |
| 6/12/15 | 127 |
| 6/13/15 | 121 |
| 6/14/15 | 121 |
| 6/15/15 | 121 |
| 6/16/15 | 122 |
| 6/17/15 | 122 |
| 6/18/15 | 121 |
| 6/19/15 | 115 |
| 6/20/15 | 117 |
| 6/21/15 | 123 |
| 6/22/15 | 110 |
| 6/23/15 | 77 |
| 6/24/15 | 119 |
| 6/25/15 | 126 |
| 6/26/15 | 118 |
| 6/27/15 | 116 |
| 6/28/15 | 72 |
| 6/29/15 | 121 |
| 6/30/15 | 114 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 7/1/15 - 7/31/15

| 7/1/15 - 7/31/15 | |
|---|---|
| Client Count | 302 |

| Date | Client Count |
|---|---|
| 7/1/15 | 116 |
| 7/2/15 | 112 |
| 7/3/15 | 111 |
| 7/4/15 | 96 |
| 7/5/15 | 60 |
| 7/6/15 | 112 |
| 7/7/15 | 121 |
| 7/8/15 | 121 |
| 7/9/15 | 133 |
| 7/10/15 | 127 |
| 7/11/15 | 117 |
| 7/12/15 | 121 |
| 7/13/15 | 125 |
| 7/14/15 | 120 |
| 7/15/15 | 126 |
| 7/16/15 | 127 |
| 7/17/15 | 124 |
| 7/18/15 | 123 |
| 7/19/15 | 128 |
| 7/20/15 | 133 |
| 7/21/15 | 131 |
| 7/22/15 | 139 |
| 7/23/15 | 140 |
| 7/24/15 | 138 |
| 7/25/15 | 85 |
| 7/26/15 | 129 |
| 7/27/15 | 133 |
| 7/28/15 | 131 |
| 7/29/15 | 138 |
| 7/30/15 | 130 |
| 7/31/15 | 125 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 8/1/15 - 8/26/15

| 8/1/15 - 8/26/15 | |
| --- | --- |
| Client Count | 293 |

| Date | Client Count |
| --- | --- |
| 8/1/15 | 129 |
| 8/2/15 | 121 |
| 8/3/15 | 124 |
| 8/4/15 | 130 |
| 8/5/15 | 138 |
| 8/6/15 | 140 |
| 8/7/15 | 133 |
| 8/8/15 | 123 |
| 8/9/15 | 131 |
| 8/10/15 | 139 |
| 8/11/15 | 138 |
| 8/12/15 | 137 |
| 8/13/15 | 134 |
| 8/14/15 | 127 |
| 8/15/15 | 122 |
| 8/16/15 | 124 |
| 8/17/15 | 134 |
| 8/18/15 | 133 |
| 8/19/15 | 135 |
| 8/20/15 | 87 |
| 8/21/15 | 138 |
| 8/22/15 | 127 |
| 8/23/15 | 136 |
| 8/24/15 | 151 |
| 8/25/15 | 149 |
| 8/26/15 | 156 |
| - | 0 |
| - | 0 |
| - | 0 |
| - | 0 |
| - | 0 |

**The Salvation Army, Sarasota - Overnight Shelter**
Program Daily Census
Reporting Period: 8/27/15 - 9/23/15

| 8/27/15 - 9/23/15 | |
|---|---|
| Client Count | 322 |

| Date | Client Count |
|---|---|
| 8/27/15 | 152 |
| 8/28/15 | 144 |
| 8/29/15 | 143 |
| 8/30/15 | 146 |
| 8/31/15 | 156 |
| 9/1/15 | 139 |
| 9/2/15 | 128 |
| 9/3/15 | 125 |
| 9/4/15 | 129 |
| 9/5/15 | 137 |
| 9/6/15 | 139 |
| 9/7/15 | 139 |
| 9/8/15 | 132 |
| 9/9/15 | 145 |
| 9/10/15 | 143 |
| 9/11/15 | 121 |
| 9/12/15 | 126 |
| 9/13/15 | 132 |
| 9/14/15 | 123 |
| 9/15/15 | 138 |
| 9/16/15 | 138 |
| 9/17/15 | 136 |
| 9/18/15 | 123 |
| 9/19/15 | 120 |
| 9/20/15 | 89 |
| 9/21/15 | 142 |
| 9/22/15 | 132 |
| 9/23/15 | 137 |
| - | 0 |
| - | 0 |
| - | 0 |

EXHIBIT 7

ARTICLE III. - PANHANDLING

Sec. 23-6. - Panhandling defined.

(a)  As used in this article, panhandling shall mean any solicitation made in person upon any street, public place, park or beach in the city, in which a person requests an immediate donation or money or other gratuity from another person, and includes but is not limited to seeking donations:

(1)  By vocal appeal or for music, singing, or other street performance; and,

(2)  Where the person solicited receives an item of little or no monetary value in exchange for a donation, under circumstances where a reasonable person would understand that the transaction is in substance a donation.

(b)  Panhandling, however, shall not include the act of passively standing or sitting nor performing music, singing or other street performance with a sign or other indication that a donation is being sought, without any vocal request other than in response to an inquiry by another person.

(Ord. No. 02-4371, § 1, 5-6-02)

Sec. 23-7. - Places of panhandling.

(a)  It shall be unlawful to engage in an act of panhandling when either the panhandler or the person being solicited is located at any of the following locations: at a bus stop; in any public transportation vehicle or public transportation facility; in a sidewalk cafe; on private property, unless the panhandler has permission from the owner or occupant; in a parking lot or garage owned or operated by the city, including entryways or exits and pay stations connected therewith; in a public park, beach, fairground, or sporting facility, including entryways or exits thereto; or within twenty (20) feet in any direction from an automatic teller machine, parking meter, parking pay station or entrance to a bank.

(b)  It shall be unlawful to engage in the act of panhandling on any day after sunset, or before sunrise.

(Ord. No. 02-4371, § 1, 5-6-02; Ord. No. 11-4977, § 1, 7-5-11; Ord. No. 13-5060, § 2, 4-23-13)

Sec. 23-8. - Manner of panhandling.

(a)  It shall be unlawful to engage in an act of panhandling in an aggressive manner, including any of the following actions:

(1)  Touching the solicited person without the solicited person's consent;

(2)  Panhandling a person while such person is standing in line and waiting to be admitted to a commercial establishment;

(3)  Blocking the path of a person being solicited, or the entrance to any building or vehicle;

(4)  Following behind, ahead or alongside a person who walks away from the panhandler after being solicited;

(5)  Using profane or abusive language, either during the solicitation or following a refusal to make a donation, or making any statement, gesture, or other communication which would cause a reasonable person to be fearful or feel compelled; or

(6)  Panhandling in a group of two (2) or more persons.

(Ord. No. 02-4371, § 1, 5-6-02)