IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID CROSS, SHAWN DAVIS,           )
DONALD GOULD, PAUL LONARDO,         )
JOSEPH VASTA, GEORGE ZELLNER,       )
MICHAEL BASILE, and DOROTHY MEEHAN, )
individually and on behalf of all others )
similarly situated,                 )
                                    )
            Plaintiffs,             )
v.                                  )          CASE NO.: 15-cv-02364-EAK-JSS
                                    )
CITY OF SARASOTA; and BERNADETTE    )
DIPINO, in her official capacity as Chief of Police, )
                                    )
            Defendants              )
_____)

**SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, DAVID CROSS, SHAWN DAVIS, DONALD GOULD, PAUL LONARDO,

JOSEPH VASTA, GEORGE ZELLNER, MICHAEL BASILE, and DOROTHY MEEHAN

(hereinafter "Plaintiffs"), sue the City of Sarasota, and Bernadette DiPino, (hereinafter

"Defendants"), and allege as follows:

**INTRODUCTION**

1.      This case seeks declaratory and injunctive as a result of the City's persistent

efforts to criminalize the status of those who are homeless despite the lack of an available shelter

and a deepening housing crisis. The Plaintiffs contend that the City's use of ordinances that

criminalize sleeping violates the Eighth Amendment prohibition on cruel and unusual

punishment. Separately, the City's ordinance criminalizing panhandling is facially

unconstitutional because it contains geographical restrictions that are content-based in violation

of the First Amendment. Plaintiffs seek relief on behalf of themselves and all others similarly situated.

**PARTIES**

2.      DAVID CROSS is a homeless man in Sarasota who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2013, Mr. Cross was criminally prosecuted by the City for lodging out of doors, but a judge dismissed the case. In 2015, Mr. Cross was given a trespass warning based on the predicate of lodging out of doors. After Mr. Cross appealed the trespass warning, the City vacated the warning. Mr. Cross is in need of shelter and lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

3.      SHAWN DAVIS is a homeless man in Sarasota who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2013, Mr. Davis was criminally prosecuted by the City for lodging out of doors. In 2015, Mr. Davis was given a trespass warning based on the predicate of lodging out of doors. After Mr. Davis appealed the trespass warning, the City vacated the warning. Mr. Davis is in need of shelter and lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

4.      DONALD GOULD is a homeless man in Sarasota with a disabling condition who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. Absent an available shelter, Mr. Gould reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

5.    PAUL LONARDO, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Lonardo meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Lonardo will be in need of shelter. Absent an available shelter, Mr. Lonardo reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

6.    JOSEPH VASTA, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Vasta meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Vasta will be in need of shelter. Absent an available shelter, Mr. Vasta reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

7.    GEORGE ZELLNER is a homeless man in Sarasota with a disabling condition who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. In 2015, Mr. Zellner was given a trespass warning based on the predicate of lodging out of doors. After Mr. Zellner appealed the trespass warning, the City vacated the warning. Mr. Zellner is in need of shelter and lives in fear that each night he will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

8.    MICHAEL BASILE, a resident of Sarasota, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Basile meets the definition of being homeless under 24 C.F.R. § 91.5. Upon leaving the transitional housing facility Mr. Basile will be in need of shelter. Absent an available shelter, Mr. Basile reasonably fears that he will be subject to arrest by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

9.    DOROTHY MEEHAN is a homeless woman in Sarasota with a disabling condition who lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. Since 2013, Ms. Meehan has been arrested sixteen times for lodging out of doors in violation of City Code 34-41. Ms. Meehan is in need of shelter and lives in fear that each night she will be arrested by the City and criminally prosecuted for lodging out of doors or other criminal offenses for the life-sustaining activity of sleeping.

10.    Defendant, City of Sarasota, Florida, (City) is a municipal corporation, organized under the laws of the State of Florida, with the capacity to sue and be sued. The City is the legal and political governmental entity responsible for the actions of the Sarasota Police Department, its officials, agents, and employees. The City is sued in its own right and on the basis of the acts or omissions of its officials, agents, and employees who were following the City's Ordinances and policies.

11.    Defendant, Bernadette DiPino, is the Chief of Police of the Sarasota Police Department (Chief DiPino) and has the responsibility for enforcement of municipal ordinances. She is sued in her official capacity in Count II, which seeks injunctive relief only.

4

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over claims brought under 42 U.S.C. §§ 1983 and 1988 pursuant to 28 U.S.C. § 1343(a)(3) as well as 28 U.S.C. § 1331.

13.      Venue is appropriate in the Middle District of Florida. The Plaintiffs and Defendants are located in the Middle District and the acts and omissions complained of occurred in Sarasota County, Florida.

## GENERAL ALLEGATIONS

**The HUD framework**

14.      Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act), on May 29, 2009. The HEARTH Act consolidated homeless assistance programs administered by the U.S. Department of Housing and Urban Development (HUD) into a single program and codified into law the Continuum of Care (*CoC*) planning process. The HEARTH Act directed HUD to promulgate regulations for these new programs and processes.

15.      HUD subsequently promulgated rules which imposed regulatory requirements towards its ongoing efforts to bring technological advancements to homeless service providers' approach to record-keeping. A unified system of data collection ensured a collaborative effort among communities and offered a better understanding of these efforts to HUD. These improvements were aimed at exploring issues faced by communities and their homeless. Additionally, more precise data about this vulnerable population served to streamline missions as well as aid HUD and other agencies in targeted funding.

16.      HUD had previously introduced a program that would transition agencies that serve the homeless from paper to electronic data-collecting program called Homeless

Management Information Systems (*HMIS*). Congress directed HUD to work with communities, bringing services agencies together for the purpose of evaluating the dispersion of state and federal grants.

17.     HUD and other planners and policymakers use aggregate *HMIS* data to better inform homeless policy and decision making at the federal, state, and local levels. *HMIS* enables HUD to collect national-level data on the extent and nature of homelessness over time. Specifically, *HMIS* can be used to produce an unduplicated count of homeless persons, understand patterns of service use, and measure the effectiveness of programs. Data on homeless persons is collected and maintained at the local level.

18.     Through *HMIS*, the government hoped to implement technology that provided more exact strategies to their funding. Using the information from communities' homeless populations' needs, HUD believed it could make more educated decisions about how to allocate governmental funding. Such funding is contingent on the use of *HMIS* by supportive agencies. Those agencies are required to determine how they combine their efforts to meet the requirements of the *CoC* for those agencies seeking governmental funding.

19.     The Suncoast Partnership to End Homelessness (*Suncoast Partnership*) is the lead agency in Sarasota County designated by HUD to further the *CoC* agenda and administer the *HMIS*. On an annual basis, and pursuant to HUD requirements, the *Suncoast Partnership*, in collaboration with 28 local agencies, conducts a comprehensive survey for homeless adults referred to as the *Point-In-Time Count Report*. ("the *PIT Survey*"). The *PIT Survey* counts individuals in Sarasota County who are living on the streets, in encampments, the jail, temporary shelters and transitional shelters.

20.    HUD has also established regulations that require state and local grantee governments to support their applications for funding under the Community Planning and Development (*CPD*) formula grant programs under a variety of federal housing programs. These regulations, codified at 24 CFR Part 91, require grantee governmental units to submit what is known as a consolidated plan that serves as the comprehensive housing affordability strategy to receive funding under the *CPD* grant programs. A consolidated plan must describe a jurisdictions' homeless strategy and conduct a homeless needs' assessment. The jurisdiction must set out a three to five-year strategy that establishes priorities, identifies resources available to meet goals and objectives, and establishes a one-year action plan. HUD requires submission of a consolidated plan every five years.

21.    Federal law defines a "homeless individual" to include one who lacks a fixed, regular and adequate night-time residence, or one who resides in a shelter, transitional housing or a place not ordinarily used for sleeping accommodations, such as streets, automobiles, abandoned buildings, parks or other public spaces. Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2000). A homeless individual is also an "individual[] who lack[s] a fixed, regular, and adequate nighttime residence." 24 C.F.R. § 576.2.

22.    Federal regulations define "chronically homeless" as:

(1) An individual who:

    (i) Is homeless and lives in a place not meant for human habitation, a safe haven, or in an emergency shelter; and

    (ii) Has been homeless and living or residing in a place not meant for human habitation, a safe haven, or in an emergency shelter continuously for at least one year or on at least four separate occasions in the last 3 years, where each homeless occasion was at least 15 days; and

    (iii) Can be diagnosed with one or more of the following conditions: substance use disorder, serious mental illness, developmental disability (as defined in

section 102 of the Developmental Disabilities Assistance Bill of Rights Act of 2000 (42 U.S.C. 15002)), posttraumatic stress disorder, cognitive impairments resulting from brain injury, or chronic physical illness or disability;

(2) An individual who has been residing in an institutional care facility, including a jail, substance abuse or mental health treatment facility, hospital, or other similar facility, for fewer than 90 days and met all of the criteria in paragraph (1) of this definition, before entering that facility; or

(3) A family with an adult head of household (or if there is no adult in the family, a minor head of household) who meets all of the criteria in paragraph (1) of this definition, including a family whose composition has fluctuated while the head of household has been homeless.

24 C.F.R. § 578.3.

**Sarasota's Consolidated Plan**

23.     In 2011, the City and Sarasota County submitted a joint consolidated plan to HUD covering the five-year period of 2011-2016 (*Consolidated Plan*). See Exhibit 1.[1] The City is the lead agency in Sarasota County responsible for administering jointly funded programs covered by the Consolidated Plan.

24.     The *Consolidated Plan* noted that a homeless census conducted in 2009 identified 803 homeless in Sarasota County on any given day. Ex. 1 at 58.

25.     The *Consolidated Plan* stated that in 2010 the *CoC* identified an emergency homeless shelter as a high priority. Ex. 1 at 60.

26.     The *Consolidated Plan* identified a goal of developing a "viable alternative to arrest and incarceration" within the city of Sarasota and Sarasota County "to encourage chronic homeless to choose treatment over incarceration."  Ex. 1 at 64.

27.     The *Consolidated Plan* documented a gap of 884 units of emergency shelter needed within Sarasota County. Ex. 1 at 110.  The *Consolidated Plan* further noted a need for

---

[1] Many of the findings, goals and strategies documented in the Consolidated Plan were a repeat of the prior joint consolidated plan submitted to HUD for the period covering 2005-2010.

services for 75 chronically homeless individuals, 31 of whom are severely mentally ill. Ex. 1 at 111. A strategy for addressing these unmet needs was to build and complete a homeless facility shelter in North County by 2015. Ex. 1 at 112.

28.     The *Consolidated Plan* highlighted that there were large pockets of "extreme poverty" in Sarasota County due to 17.2% of the population having between 0-50% of the Area Median Income (AMI). The City in particular, "has a disproportionately high percentage of very-low and low-income households. Within [the City], these populations are proportionately near double the other municipalities and unincorporated areas." Ex. 1 at 33.

29.     In December 2011, the S*uncoast Partnership* also presented a detailed plan called "StepUp Sarasota: A Ten Year Plan to End Homelessness."[2] The StepUp Sarasota Plan called for 5 objectives:

- Streamline countywide systems to develop, fund, implement and monitor programs that address homelessness, poverty, and economic stability

- Meet immediate needs of the homeless

- Develop communitywide intervention programs to identify and stabilize housing for people and families at risk of homelessness

- Use cost-effective ways to provide levels and steps of housing to support people toward permanent housing

- Cultivate economic stability by creating steps toward self-sufficiency, permanent housing and financial stability

**The Marbut Report**

30.     After a series of incidents in 2013 about which the City received national media attention over its treatment of the homeless, the City and Sarasota County hired Dr. Robert G.

---

[2] The report is available at http://suncoastpartnership.org/wp-content/uploads/2013/08/STEP-UP-Volume-One-12-21-11.pdf (last accessed September 30, 2015).

Marbut, a nationally-recognized expert on homelessness, to assess the situation, provide recommendations and submit a written Strategic Action Plan ("the *Marbut Report*").

31.     In November 2013, the *Marbut Report* was delivered to a joint city-county meeting. See Exhibit 2. The *Marbut Report* made the following key findings:

a.   There are at least 1,460 single homeless adults in Sarasota County;

b.   There is a shortage of at least 1,187 beds/mats for adults, not including families;

c.   21% of the jail population is homeless.

Ex. 2 at 8.

32.     The *Marbut Report* noted that Sarasota County does not have a true emergency shelter for adult men and women. Ex. 2 at 9. The *Marbut Report* made twelve recommendations, including the establishment of a 24/7 *Public Safety Triage and Stabilization Unit* emergency shelter to serve as the main intake portal for adult homeless men and women. Ex. 2 at 3.

33.     Significantly, the *Marbut Report* noted that area law enforcement agencies would not be able to enforce several ordinances until such time as an emergency shelter was operational. The *Marbut Report* discouraged criminalizing homelessness through ordinance enforcement. Ex. 2 at 22-23.

34.     On November 25, 2013, both the City and Sarasota County, acting through their respective legislative commissions, unanimously approved the *Marbut Report*.

35.     In a series of meetings in 2014, the legislative body for the City rejected several site selections for a homeless shelter.

36.     In a written report dated June 19, 2015, attached as Exhibit 3, a report card was given assessing each of the twelve recommendations contained in the *Marbut Report*. The report card assessed an "F" for addressing the critical recommendation numbered 4 in the *Marbut*

*Report*, and noted that all empirical and anecdotal evidence indicated that street homelessness within the City was increasing. See Ex. 3 at 10-11.

**Housing crisis**

37.    A housing crisis exists in Sarasota County, particularly for low-income individuals.

38.    As part of the planning process for the 2016 submission to HUD of the *Consolidated Plan*, the City performed a Housing Market Analysis (*HMA*) in Sarasota County in 2015. See Exhibit 4. The *HMA* revealed that there are nearly 18,000 residents who earn less than 30% of the AMI, but only 1,415 housing units affordable to that income group. The *HMA* identified an additional 20,000 residents who earn between 30 and 50% of the AMI, but only 14,149 housing units affordable to that income group. This gap resulted in 20% of all Sarasota residents having to pay more than 50% of their income for housing. The *HMA* stated:

> One stark example of the need is that in January 2015, the Sarasota Housing Authority opened their Housing Choice Voucher list for the first time in more than 5 years. More than 7,900 residents applied for housing in one week.

*HMA* at 6.

39.    The *HMA* further noted that many individuals within the community that are disabled due to mental illness receive supplemental security income (SSI) in the amount of $733 a month and that a person living on SSI will find it very difficult, if not impossible, to find affordable housing in Sarasota …. [and] that the lack of affordable housing leads to people cycling in and out of homelessness, jails, shelters and hospitals." *HMA* at 18-19.

40.    Another recent study from the Florida Housing Coalition documented a housing crisis in Sarasota County and reported that 25% of households pay more than 30% of their

income for housing. 50% of those households pay more than 50% of their income towards housing.

**The *PIT Survey* numbers**

41.    According to the 2015 *PIT Survey*, there are at least 1,365 unsheltered homeless persons in Sarasota County, Florida. The *PIT Survey* documented that 1,106 (more than 75 percent) of these homeless individuals are located within the City of Sarasota, Florida. *PIT Survey* at 17.

42.    903 of these individuals are single adults. *Id* at 18. Nearly 12 percent are veterans and 53 percent suffer from one or more disabilities. *Id*. at 19-20. More than 50 percent of the homeless population in Sarasota County reported that they became homeless as a result of loss of employment or financial reasons while nearly 30 percent were forced into homelessness as a result of housing issues. 372 of the 1,365 unsheltered homeless persons had stayed in an emergency shelter or used motel vouchers the night before the survey while 325 reported they were in a place not meant for habitation. Another 223 stayed in transitional housing for the homeless. *Id*. at 22.

43.    359 homeless individuals last had a regular place to stay for at least 3 months to 1 year and 364 reported that they last had a regular place to stay for more than 1 year. *Id*. at 23.

44.    Of the shelters located in Sarasota County, there are a total of 436 beds available for unsheltered homeless individuals, leaving a gap of 929. *Id*. at 27.

45.    The 2015 *PIT Survey* established that there is a shortage of at least 1,187 beds for adults, not including homeless families.

46.     According to the 2015 *PIT Survey* the overall homeless rate in Sarasota County went up 17.4% and unsheltered adult street-level homelessness rose from 320 in 2014 to 324 in 2015.

47.     Sarasota County Fire Department's monthly "Response to Homeless Population" report shows that calls for service to individuals experiencing homelessness in the City went up 28.3% between June 2014 and April 2015 compared to the period from July 2013 to May 2014.

**LODGING ORDINANCE**

48.     The City criminalizes lodging out of doors via Section 34-41 of the City Code (Lodging Ordinance). See Exhibit 5, attached hereto. In relevant part, the Lodging Ordinance makes it unlawful to use any public or private property for lodging out of doors without the permission and consent of the property owner. Subsection (c) provides that the following conduct may constitute lodging out of doors:

> Being in a tent, hut, lean-to, shack or in a temporary shelter or being asleep atop or covered by materials in a public place or private place out-of-doors without the permission and consent of the property owner may be evidence of a violation but is not alone sufficient to constitute a violation of this section. One or more of the following must also exist before a law enforcement officer can find probable cause to issue a summons or to make an arrest:
>
> (1) Numerous items of personal belongings are present;
> (2) The person is engaged in cooking activities;
> (3) The person has built or is maintaining a fire;
> (4) The person has engaged in digging or earth breaking activities;
> (5) The person is asleep and when awakened states that he or she has no other place to live.

49.     Subsection (d) states that when an officer has probable cause to believe a violation has occurred, the individual must be afforded an opportunity to be transported to an available shelter, that any personal property which is not taken to a shelter will be inventoried

and stored for 60 days, and that if a person elects to be transported to an available shelter they will not be charged with a violation.

**The Salvation Army**

50.    As noted in the *Marbut Report*, there is no 24/7 publicly available shelter within Sarasota County for the chronically homeless.

51.    The one facility that purports to have an emergency shelter program is at the Salvation Army, located near downtown Sarasota.

52.    Under the terms of a Conditional Use Permit issued by the City, the Salvation Army is not permitted by zoning to have more than 262 beds.

53.    Under current zoning regulations governing mass shelters, the Salvation Army is required to have a minimum of 35 square feet of space for each of the 262 beds at the facility.

54.    The Salvation Army is not legally required to accept any individuals transported to its facility and numerous individuals have been trespassed from the facility.

55.    The Salvation Army has a policy that charges an individual in need of shelter a daily fee.

56.    Since approximately 2007, the Salvation Army has designated 98 mats to be placed on the floor in the facility's kitchen and in hallways each evening for the purpose of taking individuals off the street and, for a fee, providing them with a temporary shelter ("the overflow mats").

57.    The Salvation Army receives grants from HUD under the Emergency Solutions Grant program set forth in 24 C.F.R. § 576. The minimum standards for emergency shelters operating under the ESG program require that "the shelter must provide each program participant

14

in the shelter with an acceptable place to sleep and adequate space and security for themselves and their belongings." 24 C.F.R. § 576.403(b)(3).

58.    The Salvation Army does not provide those individuals on the overflow mats with an acceptable place to sleep and adequate space and security for themselves and their belongings.

59.    The overcrowded conditions of the kitchen floor area where the overflow mats are located do not provide individuals with an acceptable place to sleep and adequate space and security for themselves and their belongings.

60.    The number of individuals placed on overflow mats exceeds the Conditional Use Permit imposed by the City.

61.    The kitchen floor and hallway areas where the overflow mats are located do not provide for adequate emergency ingress and egress.

62.    Individuals placed on the overflow mats do not have the minimum 35 square feet of space required by the City's current zoning regulations for mass shelters.

63.    Individuals placed on the overflow mats are not provided space to store their belongings.

64.    Individuals placed on the overflow mats are not provided with any sheets for bedding.

65.    Individuals placed on the overflow mats are required to exit the facility no later than 4:30 a.m. each day and may not return until 5:00 p.m.

66.    The Salvation Army does not have sufficient beds to meet the needs of the 1,365 homeless individuals documented in the *PIT Survey*.

67.     Those individuals who are unable to obtain a bed or floor mat in the shelter have no choice but to sleep in the public places of Sarasota.

68.     The capacity of the overflow mats at the Salvation Army is routinely exceeded on any given night. Attached hereto as Exhibit 6 is the daily census data for the period beginning January 1, 2014, through September 23, 2015, of homeless individuals who seek shelter at the Salvation Army.

69.     For the period between January 1, 2015, and September 23, 2015, the Salvation Army was at or above capacity 235 out of 266 nights (88%) for the overflow mats.

70.     For the period between January 1, 2015, and September 23, 2015, the Salvation Army operated on average at 116.7% above the capacity for the overflow mats.

71.     For the period between July 1, 2015, and September 23, 2015, the Salvation Army operated on average at 128% above the capacity for the overflow mats.

72.     Without accounting for those individuals who are excluded from accessing the Salvation Army based on policies, such as limitations on the length of stay, fees charged for emergency shelter, religious participation requirements, and those trespassed from the facility, the Salvation Army is not an available shelter.

73.     Under the totality of conditions, the Salvation Army is not an available shelter within the meaning of City Code 34-41.

**Criminal Prosecutions**

74.     The City has arrested and criminally prosecuted 882 individuals for sleeping via the use of the lodging ordinance or being in a park after hours.

75.     In 2013, the City criminally prosecuted 354 individuals for lodging out of doors and 127 individuals for being in a park after hours.

76.     In 2014, the City criminally prosecuted 192 individuals for lodging out of doors and 107 individuals for being in a park after hours. 139 of those criminal prosecutions were for conduct that occurred when the Salvation Army was at or above the 98 designated overflow mats.

77.     As of September 23, 2015, the City had criminally prosecuted 62 individuals for lodging out of doors and 40 for being in a park after hours. 59 of those criminal prosecutions were for conduct that occurred when the Salvation Army was at or above the 98 designated overflow mats.

78.     The individuals prosecuted for lodging out of doors are homeless with no shelter available to them.

79.     The overwhelming majority of individuals prosecuted for being in a park after hours are homeless with no shelter available to them.

80.     On November 7, 2014, Christopher Nelson, a homeless man who had been arrested and criminally prosecuted by the City six times for lodging out of doors or sleeping in a public park, was found incapacitated by emergency first responders as a result of thousands of yellow jacket wasps covering every inch of his skin. Mr. Nelson had fallen into a yellow jacket colony while seeking shelter. Mr. Nelson died from anaphylactic shock as a result of multiple stings.

**Other Police Conduct**

81.     The City, through its exercise of police power, routinely engages in conduct that harasses homeless individuals and prevents them from sleeping.

82.     Despite knowing that there is no available shelter within Sarasota County, the City regularly gives homeless individuals sleeping in public spaces a warning that if they are

17

discovered or seen sleeping in public places again that they will be cited for trespass, lodging out of doors, being in a public park after hours, or other criminal offenses.

83.    The City routinely awakens homeless individuals sleeping and demands identification from them for the purpose of running warrant checks.

84.    The City conducts what it describes as "field interviews" of homeless individuals at all times of the day, but mostly during the late evening or early morning hours, which includes the detention of the individual and their identification for the purpose of running a check for active warrants.

85.    Even when an individual is found not to have any active warrants, the City instructs homeless individuals that they cannot sleep in public spaces, telling them that they must roll their bedding up and move on to another location out of sight.

86.    The City criminally prosecutes homeless individuals even though the Salvation Army is closed and the officer is unable to offer or transport an individual to an available shelter.

87.    Despite knowing that there is not available shelter, the City routinely issues trespass warnings to homeless individuals on the basis that they are lodging out of doors or sleeping in a public park after hours.

88.    Because of the lack of shelter space and the inability to obtain permanent housing, a large number of individuals who are homeless in Sarasota will remain so for the foreseeable future.

**DAVID CROSS**

89.    Mr. Cross is homeless and his passion is reading.  He lacks a fixed, regular, and adequate nighttime residence and his primary nighttime residence is a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

18

90.     Mr. Cross can be found inside the Selby Library in downtown Sarasota for much of the time it is open.

91.     At approximately 4 a.m. on August 18, 2015, Mr. Cross was sleeping in the bushes outside of the Selby Library. Mr. Cross had previously been instructed by officers that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

92.     The Selby Library is designated by the County as a "safe place" with signs indicating such. Mr. Cross chose this location to rest because it is well-lit and has multiple video cameras on the premises.

93.     After being awakened, Mr. Cross was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass warning operated as an injunction against Mr. Cross from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

94.     Mr. Cross appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Cross was unable to visit the Selby Library in the interim for fear that he would be arrested.

95.     Mr. Cross does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

96.     Mr. Cross cannot afford to pay the fee that the Salvation Army charges for shelter each night.

**SHAWN DAVIS**

97.     Mr. Davis is homeless. He lacks a fixed, regular, and adequate nighttime residence and his primary nighttime residence is a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

98.     At approximately 4 a.m. on August 18, 2015, Mr. Davis was sleeping in the bushes outside of the Selby Library. Mr. Davis had previously been instructed that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

99.     After being awakened, Mr. Davis was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass warning operated as an injunction against Mr. Davis from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

100.     Mr. Davis appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Davis was unable to visit the Selby Library in the interim for fear that he would be arrested.

101.     Mr. Davis does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

102.     Mr. Davis cannot afford to pay the fee that the Salvation Army charges for shelter each night.

**DONALD GOULD**

103.    Mr. Gould has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

104.    At the time of those criminal prosecutions Mr. Gould had no access to an available shelter.

105.    Mr. Gould lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence.

106.    Mr. Gould reasonably fears that he will be prosecuted and arrested by the City for violation of the Lodging Ordinance.

**PAUL LONARDO**

107.    Mr. Lonardo has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

108.    At the time of those criminal prosecutions Mr. Lonardo had no access to an available shelter.

109.    Mr. Lonardo has made substantial progress and does not currently reside on the streets. Mr. Lonardo, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Lonardo still meets the definition of being homeless under 24 C.F.R. § 91.5.

110.    Mr. Lonardo reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance.

**JOSEPH VASTA**

111.    Mr. Vasta has been arrested and criminally prosecuted for violation of the Lodging Ordinance, including at times when the Salvation Army has been at or above its maximum capacity.

112.    At the time of those criminal prosecutions Mr. Vasta had no access to an available shelter.

113.    Mr. Vasta has made substantial progress and does not currently reside on the streets. Mr. Vasta, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Vasta still meets the definition of being homeless under 24 C.F.R. § 91.5.

114.    Mr. Vasta reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance.

**GEORGE ZELLNER**

115.    At approximately 4 a.m. on August 18, 2015, Mr. Zellner was sleeping in the bushes outside of the Selby Library. Mr. Zellner had previously been instructed that this was a safe place to sleep as long as he was out of the area at least one hour before the library opened at 10 a.m.

116.    After being awakened, Mr. Zellner was advised by the police officer that the Salvation Army was full. He was then written a trespass warning with the predicate offense of violation of the Lodging Ordinance. He was not cited criminally for either violation of the Lodging Ordinance or trespass. Instead, he was given a written trespass warning. The trespass

warning operated as an injunction against Mr. Zellner from being on the grounds of or inside the Selby Library and, if violated, would result in an arrest and incarceration.

117.    Mr. Zellner appealed the trespass warning. Although the City subsequently vacated the warning, Mr. Davis was unable to visit the Selby Library in the interim for fear that he would be arrested.

118.    Mr. Zellner does not have a residence and has been homeless for several years. Each night, he has to find a place to sleep, but lives in fear that he will be arrested and criminally prosecuted under the Lodging Ordinance.

119.    Mr. Zellner cannot afford to pay the fee that the Salvation Army charges for shelter each night.

**MICHAEL BASILE**

120.    Mr. Basile has been arrested and criminally prosecuted for violation of the Lodging Ordinance.

121.    At the time of those criminal prosecutions Mr. Basile had no access to an available shelter.

122.    Mr. Basile has made substantial progress and does not currently reside on the streets. Mr. Basile, however, lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence. He currently has a primary nighttime residence in transitional housing that is a privately operated shelter designed to provide temporary living accommodations. As such, Mr. Basile still meets the definition of being homeless under 24 C.F.R. § 91.5.

123.    Mr. Basile reasonably fears that if he returns to the streets, he will be prosecuted and arrested by the City for violation of the Lodging Ordinance.

**DOROTHY MEEHAN**

124.    Ms. Meehan has been arrested and criminally prosecuted for violation of the Lodging Ordinance, including at times when the Salvation Army has been at or above its maximum capacity.

125.    At the time of those criminal prosecutions Ms. Meehan had no access to an available shelter.

126.    Ms. Meehan lacks a fixed, regular, and adequate nighttime residence and does not have a permanent residence.

127.    Ms. Meehan reasonably fears that she will be prosecuted and arrested by the City for violation of the Lodging Ordinance.

**COUNT I**

**Violation of Prohibition Against Cruel and Unusual
Punishment (Eighth Amendment; Declaratory Judgment)**

128.    Plaintiffs DAVID CROSS, SHAWN DAVIS, GEORGE ZELLNER, DONALD GOULD, MICHAEL BASILE and DOROTHY MEEHAN hereby incorporate paragraphs 1-4, 7-106, and 115-127 as if fully set forth herein.

129.    This Count is filed pursuant to 42 U.S.C. § 1983 against the City seeking declaratory relief and damages.

130.    Poverty, unemployment, untreated mental and physical illness, drug and alcohol dependence, and the absence of an available shelter often forces Plaintiffs and other homeless individuals to sleep in public places in Sarasota.

131.    Criminalizing the sleeping in a public space when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

132.     Plaintiffs are homeless and have no way to comply with the Lodging Ordinance because they must sleep outdoors and do not have access to an available shelter.

133.     The City has cited, arrested, or threatened Plaintiffs for sitting, lying, or sleeping in public places in Sarasota.

134.     The City is punishing Plaintiffs and other homeless individuals based on their status as homeless persons.

135.     The City's actions penalize Plaintiffs for sleeping, a basic and necessary life-sustaining function.

131.     The City has a policy and custom of enforcing the Lodging Ordinance broadly; the prohibition on lodging out of doors amounts to a ban on sleeping, lying down, or sitting— basic necessities in life. The Lodging Ordinance particularly targets persons who are homeless because they have to carry and possess their personal belongings at all times in violation of the Lodging Ordinance and do not have the ability to store them due to their homeless status.

132.     The Sarasota Police Department does not monitor whether the shelters actually report their status or encourage them to do so. Police officers do not monitor the Salvation Army to confirm whether or not the shelters are actually full on a given night. There have been times that the shelter has been full but that information was not provided to or obtained by the Sarasota Police Department.

133.     The Sarasota Police Department does not determine whether a particular person with specific disabilities can be accommodated at the Salvation Army or whether any particular person is permitted to stay at any shelter because of a prior trespass warning.

134.     On information and belief, the City, through the Sarasota Police Department, Chief of Police, and police officers, aggressively enforces the Lodging Ordinance against

homeless individuals in Sarasota in order to force these individuals to make the untenable choice between criminal convictions and leaving the City.

136.    On information and belief, the enforcement of these ordinances is part of a policy promoted by the City and the Sarasota Police Department to "solve" the homelessness problem in Sarasota through the criminalization of being homeless.

137.    The City's actions in criminalizing Plaintiffs for sleeping in public when there is no available shelter constitutes cruel and unusual punishment in violation of Plaintiffs' rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

138.    Because the challenged ordinance violates the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution when there is no available shelter, Plaintiffs are entitled to a declaratory judgment that the Lodging Ordinance is unconstitutional as applied.

139.    Plaintiffs have suffered damages as a result of the City's actions in enforcing the lodging out of doors ordinance as a predicate for the issuance of trespass warnings, including, but not limited to, restricting their freedom, right of association, right to travel, and right to access public facilities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief as follows:

A.  A declaration that enforcement of the Lodging Ordinance violates the Eighth Amendment when there is no available shelter;

B.  Compensatory damages;

C.  Attorneys' fees and costs;

26

D. Such other relief the Court deems appropriate.

## COUNT II

### (Injunctive Relief)

135.    Plaintiffs, DAVID CROSS, SHAWN DAVIS, DONALD GOULD, PAUL LONARDO, JOSEPH VASTA, GEORGE ZELLNER, and DOROTHY MEEHAN restate paragraphs 1 through 127 as if fully set forth herein.

136.    This Count is brought pursuant to 42 U.S.C. § 1983 against the City and Chief DiPino in her official capacity.

137.    Plaintiffs reasonably fear and are at substantial risk of being criminally prosecuted by the Defendants for violation of the Lodging Ordinance despite the absence of an available shelter.

138.    Enforcement of the Lodging Ordinance when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

139.    Criminalizing the sleeping in a public space when there is no publicly available shelter violates the Eighth Amendment prohibition against cruel and unusual punishment.

140.    The Salvation Army is not an "available shelter" within the meaning of the ordinance. Homeless individuals not involved in programmatic activity at the Salvation Army are given a mat to sleep on the floor of the kitchen and, most of the time, must pay a fee of approximately $10 to do so. Such individuals are required to leave the facility at 4:30 a.m.

141.    Defendants have a policy and custom of enforcing the Lodging Ordinance broadly; the prohibition on lodging out of doors amounts to a ban on sleeping, lying down, or sitting—basic necessities in life. The Lodging Ordinance particularly targets persons who are homeless because they have to carry and possess their personal belongings at all times in

27

violation of the Lodging Ordinance and do not have the ability to store them due to their homeless status.

142.    The Sarasota Police Department does not monitor whether the shelters actually report their status or encourage them to do so. Police officers do not monitor the Salvation Army to confirm whether or not the shelters are actually full on a given night. There have been times that the shelter has been full but that information was not provided to or obtained by the Sarasota Police Department.

143.    The Sarasota Police Department does not determine whether a particular person with specific disabilities can be accommodated at the Salvation Army or whether any particular person is permitted to stay at any shelter because of a prior trespass warning.

144.    On information and belief, the City, through the Sarasota Police Department, Chief of Police, and police officers, aggressively enforces the Lodging Ordinance against homeless individuals in Sarasota in order to force these individuals to make the untenable choice between criminal convictions and leaving the City.

145.    On information and belief, the enforcement of these ordinances is part of a policy promoted by the City and the Sarasota Police Department to "solve" the homelessness problem in Sarasota through the criminalization of being homeless.

146.    Repeat citations or convictions under the Lodging Ordinance or sleeping in public can have a detrimental effect on an individual's health and his or her ability to find and continue employment, procure and maintain housing, and receive government assistance or benefits.

147.    Defendants' actions pose a health risk to the homeless population of Sarasota because the constant need to keep moving to avoid citations under these ordinances prevents

these individuals from sleeping. Sleep is a physical and mental necessity for people to properly function. Lack of sleep causes disruptions in cognitive function and exacerbates a myriad of physical and mental health problems.

148.    Homeless individuals like Plaintiffs typically cannot afford to pay the fines associated with violations of the Lodging Ordinance. These individuals often do not have a permanent address or telephone, which makes it difficult for them to receive communications from the court. They also often lack reliable transportation. If they fail to appear in court, the court will issue a warrant for their arrest, which will result in additional time in jail and fines for failing to appear. If these fines are not paid, the homeless individual may be subject to a civil contempt order, which only worsens the situation. Incarceration is also disruptive and expensive. Periods of incarceration interrupt employment and social security disability benefits.  Moreover, a homeless individual can be charged the costs for his or her incarceration.

149.    Homeless individuals must disclose criminal convictions, even for minor infractions, on applications for public and private housing. These convictions become a matter of public record. As a result, the convictions may cause them to lose the opportunity to obtain permanent public and private housing. Additionally, an individual may lose a housing placement if he or she is incarcerated. Conviction and incarceration for lodging out of doors or similar offenses interfere with the ability to obtain and maintain Social Security disability benefits. Recipients may not receive benefits for any period in which they are incarcerated. In addition, those applying for benefits may miss crucial hearings or deadlines while incarcerated, delaying their receipt of much needed income and the ability to access medical care with Medicaid eligibility.

150.    Likewise, individuals must disclose criminal convictions when they apply for employment, and even minor infractions may make a potential employer less likely to hire an applicant. Missing work due to required court appearances or because of periods of incarceration may lead to the loss of employment and income.

151.    Defendants' policy, custom and practice of issuing citations to, arresting, and harassing homeless individuals like Plaintiffs under the Lodging Ordinance and other ordinances, under the circumstances alleged herein, and when there is no publicly available shelter, has the effect of "criminalizing" homelessness. These measures do not accomplish any significant or legitimate public policy goal. Instead, they perpetuate the cycle of homelessness by decreasing opportunities for homeless individuals to find housing and gainful employment and take care of their health needs.

152.    "[T]he criminalization of homelessness does nothing to address the underlying causes of homelessness and often serves to exacerbate them. . . . It serves only to move people away from services and causes them to acquire a criminal record, thus making it even more difficult for them to obtain employment and housing." *Ombudsman's Special Report* at 5 (summarizing problems described in The National Coalition for the Homeless and The National Law Center on Homelessness & Poverty, *A Dream Denied: The Criminalization of Homelessness in U.S. Cities* (2006) (available at https://policeoversight.cityofboise.org/media/10768/Interactions_Between_BPD_and_Homeless.pdf).

153.    The U.S. Interagency Council on Homelessness states, "[c]riminalization undermines real solutions." Moreover, "[i]n addition to violating domestic law, criminalization measures may also violate international human rights law, specifically the Convention Against

Torture and International Covenant on Civil and Political Rights." U.S. Interagency Council on Homelessness, *Searching Out Solutions: Constructive Alternatives to the Criminalization of Homelessness* 7, 8 (2012).

154.    At all relevant times, Defendants and their agents acted under color of state law and within the scope of their employment.

155.    The City, through its Police Department, and the Chief of Police maintain a policy, custom and practice of unlawfully enforcing § Sec. 34-41, against homeless individuals despite their knowledge that there is no publicly available shelter.

156.    Even after the filing of this lawsuit, the City has continued to enforce the Lodging Ordinance through criminal prosecutions.

157.    Plaintiffs have each received citations and/or convictions, or threats of citations, for violations of the Lodging Ordinance or for sleeping or lying down in public.

158.    On information and belief, with knowledge that Plaintiffs were homeless and had no lawful place to sleep or rest within the City of Sarasota because of a chronic shortage of shelter beds, Sarasota police officers have issued citations, arrested, and/or threatened Plaintiffs with arrest in an effort to drive them and other homeless individuals out of the City of Sarasota. As a result, Plaintiffs often had to move constantly all night long, or sleep outside of the city limits to avoid further harassment from police officers.

159.    In addition, the City, its Police Department, and Chief DiPino, failed to exercise the proper supervision over Sarasota police officers' interactions with homeless individuals and failed to train these officers in how to appropriately and lawfully enforce the Lodging Ordinance. This policy of inadequate training and supervision constitutes deliberate indifference on the part

31

of Defendants towards the rights of homeless individuals with whom the police come into contact.

160.    Defendants' policies and practices of enforcing the Lodging Ordinance in the absence of an available shelter have caused and will continue to cause Plaintiffs to suffer irreparable injury. Unless enjoined Plaintiffs will continue to suffer sleep deprivation, humiliation and psychological and physical harm from the threat of criminal prosecution for engaging in the life-sustaining activity of sleeping.

161.    Plaintiffs seek a temporary restraining order and/or preliminary and permanent injunction, enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing the Lodging Ordinance with respect to persons sleeping or lying down in public when there is no publicly available shelter.

162.    Plaintiffs have demonstrated a substantial likelihood of success because the data shows that the City has enforced and continues to enforce the Lodging Ordinance despite the absence of an available shelter in violation of the express language of the Lodging Ordinance.

163.    The granting of the requested injunction serves a public interest because it is contrary to the public's interest to impose cruel and unusual punishment upon homeless persons who engage in the life-sustaining activity of sleeping when there is no available shelter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief as follows:

A. A permanent injunction enjoining Defendants from continued enforcement of the Lodging Ordinance when there is no available shelter;

B. Attorneys' fees and costs;

C. Such other relief the Court deems appropriate.

## COUNT III

### (Facial challenge to Panhandling Ordinance)

158.    Plaintiff, DAVID CROSS, repeats paragraphs 10, 12 and 13 as if fully set forth herein.

159.    This count seeks declaratory relief and compensatory damages under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendment of the United States Constitution.

160.    Section 23-6 of the City Code defines "panhandling" as "any solicitation made in person upon any street, public place, park or beach in the city, in which a person requests an immediate donation or money or other gratuity from another person, and includes but is not limited to seeking donations: (1) [b]y vocal appeal or for music, singing, or other street performance; and, (2) [w]here the person solicited receives an item of little or no monetary value in exchange for a donation, under circumstances where a reasonable person would understand that the transaction is in substance a donation." See § 23-6(a), City Code (Panhandling Ordinance), attached hereto as Exhibit 7.

161.    Section 23-7 of the Panhandling Ordinance makes it unlawful to engage in the act of panhandling at specified locations within the City. Specifically, subsection (a) makes it unlawful:

> to engage in an act of panhandling when either the panhandler or the person being solicited is located at any of the following locations: at a bus stop; in any public transportation vehicle or public transportation facility; in a sidewalk cafe; on private property, unless the panhandler has permission from the owner or occupant; in a parking lot or garage owned or operated by the city, including entryways or exits and pay stations connected therewith; in a public park, beach, fairground, or sporting facility, including entryways or exits thereto; or within twenty (20) feet in any direction from an automatic teller machine, parking meter, parking pay station or entrance to a bank.

§ 23-7(a), Panhandling Ordinance.

33

162.   The solicitation of charitable contributions in a public forum constitutes speech protected under the First Amendment.

163.   The Panhandling Ordinance broadly covers solicitation by any means, including holding a sign or standing with hands outstretched. At the same time, it is tailored to limit soliciting an *immediate* donation or transaction, and therefore does not cover soliciting a future payment or a signature on a petition.

164.   The restrictions contained within § 23-7(a) of the Panhandling Ordinance are not content neutral because they restrict speech that solicits an immediate donation or transaction, but not one that solicits a future donation or transaction.

165.   The restrictions contained within § 23-7(a) of the Panhandling Ordinance are also not content neutral because they restrict a category of speech by geographical limitations, but do not restrict other speech, including commercial speech entitled to less constitutional protection, within those same geographical limitations.

166.   Even if the restrictions contained within § 23-7(a) of the Panhandling Ordinance are content neutral, they are content-based regulations because they draw distinctions based on the message a particular speaker conveys within the geographical limitations set forth therein.

167.   Even if the restrictions contained within § 23-7(a) of the Panhandling Ordinance are content neutral, they are content-based regulations because they restrict speech based on the City's disagreement with the message panhandling conveys within the geographical limitations set forth therein.

168.   Since 2013, the City has regularly prosecuted and arrested individuals for violation of § 23-7.

169.   Prior to the filing of this action, the City prosecuted an individual for violation of § 23-7 and extradited them from another jurisdiction when they failed to appear for a court date. The failure to appear and contempt was dismissed, but the defendant was sentenced to ten (10) days in jail.

170.   Mr. Cross desires to exercise his right to engage in speech within the City, including in certain geographical areas such as (1) at a bus stop; (2) in any public transportation vehicle or public transportation facility; (3) in a sidewalk cafe; (3) on private property; (4) in a parking lot or garage owned or operated by the City, including entryways or exits and pay stations connected therewith; (5) in a public park, beach, fairground, or sporting facility, including entryways or exits thereto; and (6) within twenty (20) feet in any direction from an automatic teller machine, parking meter, parking pay station or entrance to a bank.

171.   But for the reasonable fear by Mr. Cross that he would be criminally prosecuted for violation of § 23-7, he would have exercised his First Amendment right to engage in soliciting charitable contributions within the geographical areas prohibited under the Panhandling Ordinance.

172.   Other individuals are regularly allowed to engage in free speech within the geographical areas prohibited under the Panhandling Ordinance, including individuals seeking future contributions, entities and individuals soliciting commercial business, individuals soliciting political support, voter registration, and petition-signature gathering.

173.   The restrictions contained in § 23-7 of the Panhandling Ordinance are facially unconstitutional and are not narrowly tailored to serve any compelling governmental interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request relief as follows:

A.   A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is not content neutral;

B.   A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is a content-based regulation that draws distinctions based on the message a particular speaker conveys within the geographical limitations set forth therein;

C.  A declaration that the Panhandling Ordinance violates the First Amendment on its face because it is a content-based regulation that restricts speech based on the City's disagreement with the message panhandling conveys within the geographical limitations set forth therein;

D.  A declaration that the Panhandling Ordinance violates the First Amendment as applied to Mr. Cross because it restricts speech based on Mr. Cross' status as a homeless person.

E.   Compensatory damages;

F.   Attorneys' fees and costs; and

G.  Such other relief the Court deems appropriate.

Respectfully submitted,

*/s/ Andrea Flynn Mogensen*
ANDREA FLYNN MOGENSEN
Florida Bar No. 0549681
Cooperating Attorney for the American Civil
  Liberties Union Foundation of Florida, Inc.
  Sarasota Chapter
The Law Office of Andrea Flynn Mogensen, P.A.
200 South Washington Boulevard, Suite 7
Sarasota FL 34236
Tel: 941.955.1066

Fax: 941.866.7323
amogensen@sunshinelitigation.com


/s/ Tracy Pratt
Tracy Pratt, Florida Bar No. 113074
Cooperating Attorney for the American Civil
  Liberties Union Foundation of Florida, Inc.
  Sarasota Chapter
5726 Cortez Rd. W. #221
Bradenton, FL 34210-2701
(941) 920-8815
tracy@tracyprattlaw.com


/s/ Nancy Abudu
Nancy Abudu, Florida Bar No. 111881
Legal Director
ACLU Foundation of Florida, Inc.
4500 Biscayne Boulevard – Suite 340
Miami, FL 33137-3227
Telephone:  786-363-2700
Facsimile:  786-363-1108
nabudu@aclufl.org


/s/ Adam Tebrugge
Adam Tebrugge, Florida Bar No. 473650
Staff Attorney
ACLU Foundation of Florida, Inc.
P.O. Box 21142
Tampa, FL 33622-1142
(813) 288-8390
atebrugge@aclufl.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 5, 2016, I electronically filed the above with the Clerk

of Court via CM/ECF, which shall cause a copy to be sent by e-mail to all counsel of record.


/s/ Andrea Flynn Mogensen
ANDREA FLYNN MOGENSEN

37